DANIELLE M. HOLT
(Nevada Bar No. 13152)
DE CASTROVERDE LAW GROUP
1149 S Maryland Pkwy
Las Vegas, NV 89104
Ph (702) 222-9999
Fax (702) 383-8741
danielle@decastroverdelaw.com

JESSICA L. BLOME
(Cal. Bar No. 314898, pro hac vice application forthcoming)
GREENFIRE LAW, PC
P.O. Box 8055
Berkeley, CA 94707
(510) 900-9502
jblome@greenfirelaw.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA**

| | |
|---|---|
| WILD HORSE EDUCATION, a non-profit corporation, and LAURA LEIGH, individually, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management, <br><br> Defendants. | CASE NO. _____ <br><br> **PLAINTIFFS' COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

1. Plaintiffs respectfully bring this case to challenge the United States Department of Interior, Bureau of Land Management (BLM)'s removal of wild, free-roaming horses and burros from the Antelope Complex of Herd Management Areas (Antelope Complex) in violation of the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. § 1331, et seq., which mandates that "excess wild free-roaming horses and burros . . . be **humanely** captured and removed" and then placed for "humane treatment and care" with private individuals or entities. 16 U.S.C. § 1333(b)(2)(B) (emphasis added); 43 CFR 4700.0-05(e). Despite this clear directive, between July 9 and 24, 2023, the BLM gathered and removed more than 1,000 wild horses by helicopter in the Antelope Complex, located in Nevada. Observers watched in horror, as the BLM's helicopters chased stallions, mares, and foals, causing such panic that many animals were injured or broke their legs and had to be euthanized. At least one stallion was forced to stumble around on a broken leg, in obvious pain and agony, until a BLM official finally intervened after more than thirty minutes. In total, as of July 26, 2023, twenty-one wild horses have suffered and died cruel and inhumane deaths because of the BLM's removal action.

2. Plaintiff WILD HORSE EDUCATION and its members and supporters, including Founder and Director LAURA LEIGH, have suffered extensive emotional trauma because of the BLM's violation of the humane handling requirements set forth in the Wild and Free-Roaming Horses and Burros Act, in violation of their well-established First Amendment Right to observe these horses being treated humanely.

3. Plaintiffs bring this suit not only to enforce the Wild and Free-Roaming Horses and Burros Act's humane handling requirement, including the minimum standards of care outlined in the BLM's Comprehensive Animal Welfare Policy (CAWP), but also to force the BLM to promulgate the CAWP as an enforceable rule in compliance with the Administrative Procedures Act. 5 U.S.C. § 553. In addition, Plaintiffs challenge the BLM's decision to rely on a six-year-old Environmental Assessment (EA) to support its decision to gather horses from the Antelope Complex without making a Determination of NEPA Adequacy, as required by the National Environmental Policy Act (NEPA) and the Secretary's NEPA regulations. A Determination of

NEPA Adequacy requires that the Secretary justify its decision to rely on an existing EA by substantiating its decision with some analysis of adequacy and documentation that the circumstances or the present action are like those of the prior action. Plaintiffs further challenge the BLM's decision to rely on the six-year-old EA in violation of the Wild Horse Act's immediacy requirement. *Friends of Animals v. Culver*, No. 19-3506 (D.D.C. Jun. 28, 2022).

## JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of this action pursuant to 5 U.S.C. § 706, 28 U.S.C § 1331, and 28 U.S.C. § 1361.

5. Venue is proper in this district court pursuant to 28. U.S.C. § 1391. The BLM has sufficient contacts to subject it to personal jurisdiction in this district.

## THE PARTIES

6. Plaintiff WILD HORSE EDUCATION is a national non-profit corporation dedicated to research, journalism, and public education concerning the activities and operations of federal and state management of the free-roaming wild horse and burro populations. Wild Horse Education's principal place of business is 216 Lemmon Drive, # 316, Reno, N.V., 89506. Wild Horse Education has more than 150,000 members and educates and informs the public about wild horses and burros through articles, photographs, videos, and sharing data and other information. Wild Horse Education also frequently submits comments on Herd Management Area Plans, Environmental Assessments, and other wild horse management documents and hearings made available for public comment. Advocating for the wild horses and burros in the Antelope Complex is an important issue for Wild Horse Education and will be always in the future.

7. Plaintiff WILD HORSE EDUCATION and its members, supporters, and staff have a long-standing interest in wild, free-roaming horses and burros and routinely advocate for wild horses and burros in Nevada. If they had been given the opportunity, Nonprofit Plaintiffs would have submitted comments to BLM regarding the need for an updated EA for the Antelope Complex.

8. Plaintiff WILD HORSE EDUCATION and its members, supporters, and staff would have participated rigorously in the public participation process required for notice-and-comment rulemaking under the Administrative Procedures Act if the BLM had complied with the law and promulgated the CAWP as a rule.

9. Plaintiff WILD HORSE EDUCATION'S members, supporters, and staff visit the Antelope Complex for photography, observing wildlife, and other recreational and professional pursuits. Plaintiff's members, supporters, and staff gain aesthetic enjoyment from observing, attempting to observe, hearing, seeing evidence of, and studying wild horses and burros. The opportunity to possibly view wild horses and burros, or signs of them, in these areas is of significant interest and value to Plaintiff's members, supporters, and staff, and increases their use and enjoyment of Nevada's public lands. Plaintiff's members, supporters, and staff have engaged in these activities in the past and have specific plans to do so again in the future.

10. Plaintiff WILD HORSE EDUCATION'S members and supporters are adversely impacted by the gathering and removal of wild horses and burros from the Antelope Complex. Plaintiff's members also have an interest in the health and humane treatment of animals, and work to rehabilitate sick and injured wildlife, including horses and burros. Plaintiff's members, staff, volunteers, and supporters have engaged in these activities in the past and intend to do so again soon.

11. Plaintiff WILD HORSE EDUCATION, as well as its members, supporters, and staff, is dedicated to ensuring the long-term survival of the wild, free-roaming horses and burros throughout the contiguous United States, and specifically in Nevada, and to ensuring that Defendants comply with all applicable state and federal laws related to the survival and humane treatment of wild horses and burros in Nevada. In furtherance of these interests, Plaintiff's members, supporters, and staff have worked, and continue to work, to protect and advocate for wild horses and burros in Nevada and throughout the contiguous United States.

12. The interests of Plaintiff WILD HORSE EDUCATION's members, supporters, and staff have been, and will continue to be, injured by Defendants' improper and inhumane gather

and removal of wild horses and burros in the Antelope Complex. The interests of Plaintiff's members, supporters, and staff have been, and will continue to be, injured by Defendants' failure to comply with their obligations under the Wild Horse Act, NEPA, APA, and First Amendment in gathering, removing, and processing wild, free-roaming horses and burros in gruesome, inhumane, and completely hidden ways in the Antelope Complex pursuant to an outdated six-year-old EA.

13. The injunctive relief requested provides the only remedy that can redress the injuries of Plaintiff WILD HORSE EDUCATION, including of its members, supporters, volunteers, and staff. The relief requested by Plaintiffs, if granted, would require Defendants to comply with the requirements of the Wild Horse Act, NEPA, APA, and the First Amendment before further gathering and removing wild, free-roaming horses and burros from the Antelope Complex. The relief requested by Plaintiffs, if granted, would reduce the number of wild, free-roaming horses and burros needlessly injured, killed, or removed by Defendants.

14. Plaintiff LAURA LEIGH is the Founder and President of Plaintiff WILD HORSE EDUCATION. In addition, Ms. Leigh works with multiple non-profit organizations engaged in public land issues and provides in-field documentation and commentary on public land issues such as wild horse and burro gathers and removals. Ms. Leigh is also a free-lance photojournalist, whose work has appeared internationally in media broadcast outlets, such as CNN, BBC/ITV, ABC, Common Dreams, and CounterPunch. Ms. Leigh has visited, observed, and photographed the wild horses and burros at the Antelope Complex at least once a year since 2009. Ms. Leigh experiences great enjoyment from watching and monitoring individual horses and burros in the Antelope Complex. Of particular interest, Ms. Leigh commonly seeks out and photographs unique stallions in the Antelope Complex, as this is one of the only areas where stallions with certain color patterns are located. Ms. Leigh has also attended several wild horse and burro roundups throughout the United States, and frequently reviews photographs and videos from any roundups she is not able to attend in person. When Ms. Leigh recognizes individual horses and burros that she has previously observed as wild, free-roaming horses and burros, she experiences great sadness, but feels it is her responsibility to the animals to observe their treatment and capture and share it with

others to educate them on the plight of wild horses and burros. The further gathering and removal of wild horses and burros in the Antelope Complex in cruel and inhumane ways will adversely affect the substantial recreational, aesthetic, and conservational interests of Ms. Leigh.

15. Defendant JON RABY is Nevada State Director of the BLM, and is charged by federal statute with managing, administering, and protecting the wild horses and burros in the State of Nevada, including the Antelope Complex, pursuant to the Wild Horse Act.

16. Defendant DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGE-MENT is charged by federal statute to manage administer and protect the wild horses and burros in the State of Nevada, including the Antelope Complex, pursuant to the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331–1340.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

17. Plaintiffs WILD HORSE EDUCATION and LAURA LEIGH submitted comments on the relevant Gather Environmental Assessment, identified as DOI-BLM-NV-E030-2017-0010-EA in 2017.

18. Among other matters, WILD HORSE EDUCATION commented on issues involving handling wild horses during capture. WILD HORSE EDUCATION noted an actual foaling season had not been identified by the agency. The lack of clear identification of foaling/breeding season in wild horses creates a real danger to the health and safety of mares and foals, because the BLM will roundup horses in this area as actual foaling season begins in February and continues through July. WILD HORSE EDUCATION requested that the BLM extend its prohibition on capture by helicopter drive trapping for the Antelope Complex from February 1 to August 15 and not the arbitrary March 1 to July 1 the agency uses now for all HMAs, regardless of the true foaling season for each HMA.

19. In its public comment, WILD HORSE EDUCATION also noted that the BLM had not identified a data-based folding season in any underlying Herd Management Area Plan (HMAP) and had not identified it in its 2007 Environmental Assessment either.

20. Plaintiff LEIGH brought litigation involving abusive actions into the court (and

1  other matters) and the court warned BLM in numerous instances (Triple B-2011, Jackson
2  Mountain-2012, Owyhee Complex-2013) concerning inappropriate conduct during capture.
3    21. In 2015 the BLM formally adopted the Comprehensive Animal Welfare Policy
4  (CAWP) and informed Plaintiff LEIGH that the BLM would conduct annual reviews of the
5  CAWP and the BLM's implementation of the CAWP. The BLM published an assessment tool on
6  its website, so the public understood how the BLM would implement the CAWP.
7    22. Since 2016 and each year thereafter, Plaintiff LEIGH has requested a copy of
8  annual CAWP reviews through the Freedom of Information Act (FOIA). Each year, the BLM
9  has responded that it could not identify any responsive documents to her FOIA request.
10  Therefore, on information and belief, the BLM never conducted annual reviews of CAWP.
11    23. In 2021, on information and belief, the BLM hired a supervisor to manage and
12  implement the CAWP program. The supervisor informed Plaintiff LEIGH that the BLM would
13  not be conducting annual CAWP reviews.
14    24. Plaintiffs WILD HORSE EDUCATION and LAURA LEIGH have requested, on
15  multiple occasions, to be alerted if the BLM decides to review or revise the CAWP. On August
16  25, 2023, Plaintiff LEIGH specifically requested that the BLM permit Plaintiffs opportunity to
17  contribute to the After-Action Review process for roundup activities in Nevada to assist with
18  CAWP compliance issues. The BLM never responded to any of Plaintiffs' requests for public
19  participation.
20    25. In 2022, Plaintiff WILD HORSE EDUCATION, conducted its own review of
21  CAWP compliance and published a three-part review of the BLM CAWP program for its
22  members and supporters, as well as the public, as part of its public education mission.
23    26. Prior to the start of the removal action for the Antelope Complex, the BLM issued
24  two press releases indicating the BLM had made a Determination of NEPA Adequacy as
25  required by 43 CFR § 46.120. The press releases linked to the Determination of NEPA
26  Adequacy, but the links were broken, and no documents were attached.
  27. On July 7, 2023, Plaintiff LEIGH informed the Nevada BLM's public affairs

office that the provided link to the Determination of NEPA Adequacy was broken. The public affairs office advised Plaintiff LEIGH that the BLM had not prepared a Determination of NEPA Adequacy. Instead, the BLM intended to rely on its six-year-old EA to support the 2023 removal action in the Antelope Complex.

28. On July 14, 2023, Plaintiffs' counsel sent the BLM a letter advising them of significant, excessive heat and requested that the BLM cease its removal action in the Antelope Complex until temperatures fell below 95 degrees Fahrenheit, as required by CAWP Standards. On this same day Plaintiffs' counsel called the BLM to request the termination of removal activities until the weather returned to normal conditions. Nobody responded to Plaintiffs' counsel by email, letter, or phone call.

29. Plaintiffs have exhausted administrative remedies.

**GENERAL ALLEGATIONS OF FACTS**

**A. Wild Free-Roaming Horses and Burros Act**

30. Finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West," and that "they contribute to the diversity of life forms within the Nation and enrich the lives of the American people," Congress enacted the Wild Horses and Burros Act, or "Wild Horse Act" to ensure that "wild-free roaming horses and burros shall be protected from capture, branding, harassment, [and] death," and will "be considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331.

31. "Wild free-roaming horses and burros" are defined under the Wild Horse Act as "all unbranded and unclaimed horses and burros on public lands of the United States," which include lands "administered by the Secretary of the Interior through the Bureau of Land Management or by the Secretary of Agriculture through the Forest Service." *Id*. §§ 1332(b), (e); *see also* 36 C.F.R. § 222.60(b)(13).

32. The Wild Horse Act directs the Secretary of the Interior to "manage wild free-roaming horses and burros as components of the public lands ... in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1331.

To further ensure this objective, the statute provides that "[a]ll management activities shall be at the minimal feasible level." 16 U.S.C. § 1333(a).

33. The Wild Horse Act also gives the Secretary the ability to remove "excess" wild free-roaming horses and burros from the public range. "[E]xcess animals" are defined in the statute as wild free-roaming horses and burros "which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16 U.S.C. § 1332(f).

34. The BLM's regulations require that the Secretary establish Herd Management Areas (HMAs) for the maintenance of wild horse and burro herds. 43 C.F.R. § 4710.3-1. In delineating each herd management area, the BLM must consider the appropriate management level for the herd, the habitat requirements of the animals, the relationships with other uses of the public and adjacent private lands, and the constraints contained in § 4710.4, which limits management of wild horses and burros to "the minimum level necessary to attain the objective identified in approved land use plans and herd management area plans." 43 C.F.R. § 4710.4.

35. Before removing excess horses or burros from an HMA, the Secretary must first determine that 1) an overpopulation of animals exists and 2) that action is necessary to remove excess animals, before *immediately* removing the excess animals. 16 U.S.C. § 1333(b)(2) (emphasis added). The Secretary must determine both of those requirements based on the current inventory of lands, information contained in any land use planning documents, information contained in court ordered environmental impact statements, and any additional information currently available to him/her. *Id.*

36. A Gather Plan violates the immediacy mandate of the Wild Horse Act if it permits the removal of excess animals for a ten-year period from its adoption. *See* 16 U.S.C. § 1333(b)(2); *Friends of Animals v. Culver*, No. 19-3506 (D.D.C. Jun. 28, 2022) (invalidating an EA authorizing the phased removal of horses over a ten-year-period).

37. Excess horses must be "humanely captured and removed" per the Wild Horse Act's mandates. 16 U.S.C § 1333(b)(2)(B).

38. "[H]umane treatment" is defined as "handling compatible with animal husbandry practices accepted in the veterinary community, without causing unnecessary stress or suffering to a wild horse or burro." 43 C.F.R. § 4700.0-5(e). "Inhumane treatment" is defined as "any intentional or negligent action or failure to act that causes stress, injury, or undue suffering to a wild horse or burro and is not compatible with animal husbandry practices accepted in the veterinary community." 43 C.F.R. § 4700.0-5(f).

39. The Secretary delegated responsibility to administer the Wild Horse Act to the BLM. 43 C.F.R. § 4700.0-3.

40. On June 30, 2015, the BLM adopted its Comprehensive Animal Welfare Program (CAWP) as "a proactive program for protecting the welfare of wild horses and burros under the agency's management and protection." According to the BLM, the CAWP "formalizes standard operating procedures surrounding animal care and handling; establishes formal training programs in animal welfare for BLM personnel, partners and contractors; and implements internal and external assessments for all activities undertaken in the Wild Horse and Burro Program." *See* BLM Perm. Inst. Memo. 2021-002 (Dec. 18, 2020), *available at* https://www.blm.gov/policy/pim-2021-002.

41. The CAWP addresses the BLM's plan for humane handling, including requirements for trap and temporary holding facility design, capture and handling, transportation, and care after capture. The standards are also incorporated into helicopter gather contracts as specifications for performance.

**B. National Environmental Policy Act**

42. A second statute, NEPA, 42 U.S.C. § 4321 et seq., governs decisions by the BLM to gather horses and burros. NEPA requires federal agencies to take a "hard look" at the environmental consequences before carrying out federal actions. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373–74 (1989).

43. NEPA serves the dual purpose of, first, informing agency decisionmakers of the significant environmental effects of proposed major federal actions and, second, ensuring that

relevant information is made available to the public so that it "may also play a role in both the decision-making process and the implementation of that decision." *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

44. To meet these goals, NEPA requires a comprehensive Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3.

45. To determine whether a proposed action will have significant effects, an agency may prepare an Environmental Assessment ("EA"). 40 C.F.R. § 1501.54. An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (quoting 40 C.F.R. § 1508.9(a)).

46. If in its EA the agency finds that the proposed action will not significantly affect the human environment, it may issue a finding of no significant impact ("FONSI") in lieu of an EIS. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) (citing 40 C.F.R. § 1508.9(a)(1)); *see also* 40 C.F.R. § 1501.6(e).

47. A FONSI "briefly present[s] the reasons why an action … will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared." 40 C.F.R. § 1508.1(1).

48. An agency may only rely on an EA to support its decision to conduct gathers for a limited period, due to the immediacy requirement of the Wild Horse Act. 16 U.S.C. § 1333(b)(2); *Friends of Animals v. Culver*, No. 19-3506 (D.D.C. Jun. 28, 2022).

49. An agency my rely on an existing EA only if it determines, "with appropriate supporting documentation, that it adequately assessed the environmental effects of the proposed action and reasonable alternatives" in the existing EA." *See* 40 CFR § 46.120(c). The "supporting record must include an evaluation of whether new circumstances, new information, or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects." *Id.* The Secretary and BLM refer to this document generally as a Determination of NEPA

Adequacy.

## C. First Amendment to the U.S. Constitution

50. The First Amendment prohibits any law "abridging the freedom of speech, or of the press." U.S. Const. Amend. I.

51. Finding that "many governmental processes operate best under public scrutiny," the Supreme Court has held that there is a qualified right of access for the press and public to observe government activities. *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8–9 (1986).

52. This Court has found that BLM's removal of wild horses and burros and other gather activities on public land meet the first part of the right of access claim—i.e., that a qualified right of access applies to gather activities. *Leigh v. Salazar*, 954 F. Supp. 2d 1090, 1101 (D. Nev. 2013).

53. The Wild Horse Act further qualifies the right of access by declaring that the BLM must conduct its removal, or gather, activities humanely.

54. The BLM's failure to humanely remove wild horses from the Antelope Complex violates the Wild Horse Act, as well as Plaintiffs' right to view the animals being treated humanely under the First Amendment of the United States Constitution.

## D. The Antelope Complex of Herd Management Areas

55. The Antelope Complex is in northeastern Nevada. The nearest town is Ely, Nevada, approximately 50 miles southwest. The Antelope Valley Complex encompasses several herd management areas where wild horses live. The area consists of 327,385 acres of BLM land and 72,376 acres of a mix of private and other public lands for a total of 399,761 acres.

56. The topography is varied and contrasting with valley floors, alluvial fans, canyons, mountains, steep ridges, and basins. Elevations range from 5,700 feet up to 10,000 feet. The climate is semi-arid with approximately 16 inches of precipitation per year at higher elevations, and approximately 8 inches at lower elevations. Due to the variance of topography, wild horses can be seen at different elevations throughout the year, but normally follow a pattern based on climatic and seasonal conditions.

57. There are about 362 different species of wildlife in the Complex including mule deer, sage grouse, blue grouse, eagles, and hawks. The Complex is also grazed by domestic livestock.

58. During the 1900s to the 1940s, the Army Remount Service was active in a portion of the Antelope/Antelope Valley Complex. Periodically, the Army would release animals in the wild to upgrade their stock. The released stallions were mainly thoroughbreds or Morgans. A few draft blood lines were introduced to develop a hardier strain of horse to pull wagons and heavy artillery. As a result, the wild horses found in the complex are hardy and sound. They possess a variety of colors with variations from white to black, but most are sorrels and bays.

59. The BLM has set an Appropriate Management Level, or AML, of 150-324 wild horses in the Antelope Complex of HMAs. An AML is like a quota for wild horses allowed by the BLM to exist in the only area designated for them in the United States.

60. In 2017, the BLM conducted an emergency operation in the Antelope Complex with the goal of reducing the wild horse population from an estimated 1,320 wild horses to the then-AML of 155-259. To support its emergency removal action, the BLM adopted an Environmental Assessment/Finding of No Significant Impact on December 21, 2017 (the "2017 EA/FONSI").

61. Under the 2017 EA/FONSI, the BLM analyzed the environmental impacts of removing thousands of wild horses and burros from the Antelope, Antelope Valley, Goshute, Maverick-Medicine, Spruce Pequop, and Triple B Herd Management Areas over a period of ten years. *See* DOI-BLM-NV-E030-2017-0010-EA.

62. The Gather EA did not identify or analyze the herd-specific foaling season, nor the habitat-specific ground conditions during different seasons.

63. Six years after its adoption of the EA/FONSI, the BLM purported to rely on the EA/FONSI to support its planned removal action that is the subject of this litigation, which began on July 9, 2023.

64. The BLM failed to issue a Determination of NEPA Adequacy prior to relying on

the six-year-old EA/FONSI as required by 43 CFR § 46.120.

65. The BLM's decision to rely on six-year-old NEPA review violates the Wild Horse Act's immediacy requirement. 16 U.S.C. 1333(b)(2); *see also Friends of Animals v. Culver*, No. 19-3506 (D.D.C. Jun. 28, 2022) (holding "BLM's ten-year deadline [in a wild horse gather EA] exceeds its discretion, per statutory command").

**E. The 2023 Removal of Horses from the Antelope Complex.**

66. The BLM proceeded with its removal of horses from the Antelope Complex, beginning on July 9, 2023, despite extreme heat, at temperatures exceeding 95 degrees Fahrenheit and often exceeding 100 degrees Fahrenheit, in violation of CAWP Standards.

67. The BLM uses helicopters to roundup horses only if foals are not present, yet it proceeded with its roundup of horses within the Antelope Complex aided by helicopters even though it observed foals and was informed of the presence of foals.

68. Due to the extreme heat, inhumane and prohibited use of helicopters, and general disregard for CAWP standards, the BLM admits that its removal action has injured or killed at least 21 wild horses as of July 26, 2023:

> 2 mares have suffered broken necks, 1 mare was killed because she was blind in one eye, A stallion suffered a catastrophic compound fracture of his rear leg, 4 foals have died (2 from dehydration, 1 from colic that can be caused by heat and dehydration and one due to lameness), Sorrel foal died : umbilical hernia (an umbilical hernia doesn't kill you, it can interfere with things like breathing when overly stressed). A stallion broke his neck during loading into a semi-truck to ship to short-term holding. Bay, 15-year old Mare (Female); Death (Chronic-Pre-existing); mare blind in one eye. 20 year old Sorrel mare; Death (Acute/Unexpected); lameness, left rear leg. Sorrel foal (male); Bay, 9-year old Stud (Male); Death (Chronic-Pre-existing); blind in right eye. Death (Chronic/Pre-existing); club footed, both front feet. Bay, 4-year old Stud (Male); Death (Acute/Unexpected); fractured, right rear leg. Bay, foal Colt (Male); Death (Chronic/Pre-existing; fractured, right rear leg (because it happened before capture). Bay, 3-year old Stud (Male); hernia; Sorrel, 1-year old Stud (Male); Death "humpback" (often a sign of extreme pain) 2 on the same day: 20+ year old Bay, blind in one eye.

*See* BLM removal report, dated July 26, 2023.

69. The BLM has violated the CAWP and will continue violating the CAWP in

violation of the Wild Horse Act if not enjoined by this Court.

70. The CAWP sets the floor for humane handling standards. The BLM has also violated the statutory requirement that wild horses be handled humanely, e.g. using helicopters to roundup horses after July 1, despite the actual, observed presence of foals. *See* 16 U.S.C. 1333(b)(2)(B); 43 CFR 4700.0-5(e).

71. In addition to inhumanely treating wild horses during the 2023 removal action in the Antelope Complex, Defendants have failed to provide Plaintiffs consistent, meaningful viewing access of gather operations.

### FIRST CAUSE OF ACTION
### Administrative Procedures Act, 5 U.S.C. § 553

72. Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

73. According to the Administrative Procedures Act, "rule" means "the hole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4).

74. The APA sets forth a number of requirements for the promulgation of rules, including notice-and-comment, to ensure the right of public participation in agency decision making. *See* 5 U.S.C. § 553.

75. The BLM's CAWP is a rule, as that term is defined by the Administrative Procedures Act.

76. Defendants violated 16 U.S.C. § 553 by adopting the CAWP as an agency policy, as opposed to a rulemaking.

77. Defendants' violation of the APA has injured Plaintiffs, who would have passionately and robustly participated in the development of the CAWP had it been properly promulgated as a rulemaking.

78. The APA gives this Court authority to compel the BLM to promulgate CAWP as a rulemaking under. 5 U.S.C. § 702.

**SECOND CAUSE OF ACTION**
**National Environmental Policy Act and Administrative Procedure Act, 5 U.S.C. § 706(2)**

79. Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

80. The BLM may rely on an existing EA only if it determines, "with appropriate supporting documentation, that it adequately assessed the environmental effects of the proposed action and reasonable alternatives" in the existing EA." *See* 40 CFR § 46.120(c). The "supporting record must include an evaluation of whether new circumstances, new information, or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects." *Id.* The Secretary and BLM refer to this document generally as a Determination of NEPA Adequacy.

81. The BLM may rely on an EA to support its decision to conduct gathers for a limited period, due to the immediacy requirement of the Wild Horse Act. 16 U.S.C. § 1333(b)(2); *Friends of Animals v. Culver*, No. 19-3506 (D.D.C. Jun. 28, 2022).

82. The BLM violated NEPA when it failed to analyze the significant environmental impacts of removing wild horses from the Antelope Complex as alleged herein, including by proceeding with the removal action, even though the BLM observed foals in the wild horse population.

83. In addition, the BLM violated NEPA by abusing its discretion by relying on a phased ten-year Environmental Assessment for multiple gathers in violation of the Wild Horse and Burro Act's immediacy requirement. *See Friends of Animals v. Culver*, No. 19-3506 (D.D.C. Jun. 28, 2022) (holding "BLM's ten-year deadline [in a wild horse gather EA] exceeds its discretion, per statutory command").

84. Defendants' decision to proceed with the gather and removal of over 1,000 wild horses and burros from the Antelope Complex without analyzing significant environmental impacts was arbitrary and capricious, an abuse of discretion, and contrary to the law.

85. Defendants' actions have injured Plaintiffs in the manner described in this

Complaint.

86. The BLM's decision to rely on the 2017 EA/FONSI was arbitrary and capricious, and not in accordance with law in violation of the APA, 5 U.S.C. § 706(2).

### THIRD CAUSE OF ACTION
### U.S. Constitution, First Amendment

87. Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

88. Plaintiffs have a right, under the First Amendment to the United States Constitution, to observe and document the BLM's gather of the wild horses in the Antelope Complex, including during gather operations, in capture pens, sorting pens, temporary holding corrals, and off-range holding corrals where horses and burros are held for veterinary treatment and prepared for potential adoption or sale or to live at long-term holding facilities.

89. Defendants have interfered with Plaintiffs' protected right under the First Amendment by inhumanely treating horses during the Antelope Complex, in violation of the Wild Horse Act, 16 U.S.C. § 1333(b)(2)(B); 43 CFR 4700.0-5(e).

90. Defendants' actions have injured Plaintiffs in the manner described in this Complaint.

91. This Court is authorized to enjoin Defendants from further violations of Plaintiffs' First Amendment rights, including by compelling Defendants to provide Plaintiffs meaningful access to all locations where horses are being gathered removed during the gather are currently housed to accurately document the BLM's activities.

92. This Court is further authorized to compel Defendants to comply with the Wild Horse Act's humane handling requirements, including the temperature and foaling prohibitions of the BLM's CAWP, to protect Plaintiffs' First Amendment right to view wild horses being treated humanely.

# PRAYER FOR RELIEF

THEREFORE, Plaintiffs respectfully requests that this Court:

A. Issue an order and injunction compelling Defendants to cease implementation of the 2017 EA/FONSI for the Antelope Complex until Defendants have fully complied with the Wild Free-Roaming Horses and Burros Act, National Environmental Policy Act, Administrative Procedure Act, and First Amendment;

B. Vacate and set aside the 2017 EA/FONSI;

C. Issue an order compelling Defendants to provide Plaintiffs with meaningful viewing access of the gather operation, off-range holding corrals where gathered horses and burros from the 2023 Antelope Complex operations are currently held, and to each phase of future gather and removal efforts of horses and burros living in the Antelope Complex, including trap sites, temporary holding corrals, and off-range holding corrals;

D. Issue an order compelling Defendants to treat wild horses humanely during all phases of removal activities, including by enforcing the CAWP prohibition on using helicopters for gathers during foaling season and conducting gathers on days of excessive heat, as required by the Wild Horse Act, 16 U.S.C. § 1333(b)(2)(B); 43 CFR 4700.0-5(e), and First Amendment.

E. Maintain jurisdiction over this action until Defendants are in compliance with the Wild Free-Roaming Horses and Burros Act, National Environmental Policy Act, Administrative Procedure Act, First Amendment, and every order of this Court;

F. Award Plaintiffs attorney fees and costs pursuant to and 28 U.S.C. § 2412; and

G. Grant such additional and further relief to which Plaintiffs may be entitled.

| | | |
|---|---|---|
| 1 | DATED: July 26, 2023, | Respectfully Submitted, |

*/s/ Danielle M. Holt*
Danielle M. Holt
(Nevada Bar No. 13152)
DE CASTROVERDE LAW GROUP
1149 S Maryland Pkwy
Las Vegas, NV 89104
    Ph (702) 222-9999
    Fax (702) 383-8741
danielle@decastroverdelaw.com

*/s/ Jessica L. Blome*
Jessica L. Blome
(Cal. Bar No. 314898, pro hac vice application forthcoming)
GREENFIRE LAW, PC
P.O. Box 8055
Berkeley, CA 94707
(510) 900-9502
jblome@greenfirelaw.com

*Attorneys for Plaintiffs*