DANIELLE M. HOLT
(Nevada Bar No. 13152)
DE CASTROVERDE LAW GROUP
1149 S Maryland Pkwy
Las Vegas, NV 89104
Ph (702) 222-9999
Fax (702) 383-8741
danielle@decastroverdelaw.com

JESSICA L. BLOME
(Cal. Bar No. 314898, pro hac vice)
GREENFIRE LAW, PC
2478 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| WILD HORSE EDUCATION, a non-profit corporation, and LAURA LEIGH, individually,<br><br>        Plaintiffs,<br><br>        v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management,<br><br>        Defendants. | CASE NO. 3:23-cv-372-LRH-CLB<br>**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

1.     Plaintiffs respectfully bring this case to challenge the United States Department of Interior, Bureau of Land Management (BLM)'s removal of wild, free-roaming horses and burros from the Antelope and Triple B Complexes in violation of the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. § 1331, et seq., which mandates that "excess wild free-roaming horses and burros . . . be **humanely** captured and removed" and then placed for "humane treatment and care" with private individuals or entities. 16 U.S.C. § 1333(b)(2)(B) (emphasis added); 43 CFR 4700.0-05(e). Despite this clear directive, during the years 2019-2023, over 10,000 wild horses have been removed by helicopter in the Antelope and Triple B Complexes. Wild horses, including foals, suffered and died cruel and inhumane deaths because of the BLM's removal actions, including deaths resulting from fractured skulls, broken necks, leg fractures, lacerations, and more.

2.     During gather activities in the Antelope Complex, Plaintiffs unsuccessfully attempted to convince the BLM to suspend gather operations during excessive Heat Index warnings, when catastrophic injury rates rise.  They watched in horror, as the BLM's helicopters chased stallions, mares, and foals, causing such panic that many animals were injured or broke their legs and had to be euthanized. At least one stallion was forced to stumble around on a broken leg, in obvious pain and agony, until a BLM official finally intervened after more than thirty minutes.

3.     Plaintiff WILD HORSE EDUCATION and its members and supporters, including Founder and Director LAURA LEIGH, have suffered extensive emotional trauma because of the BLM's violation of the humane handling requirements set forth in the Wild and Free-Roaming Horses and Burros Act (Wild Horses Act), in violation of their well-established First Amendment Right to observe these horses being treated humanely.

4.     Plaintiffs bring this suit not only to enforce the Wild Horses Act's humane handling requirement, including the Standards for Wild Horse and Burro Gathers and Standards for Off-Range Corral Facilities, Transportation, and Adoption/Sale Events outlined in the BLM's Comprehensive Animal Welfare Program (CAWP), but also to force the BLM to promulgate these CAWP standards as enforceable rules in compliance with the Administrative Procedures Act. 5

U.S.C. § 553. In addition, Plaintiffs challenge the BLM's decision to rely on a six-year-old Environmental Assessment (EA)—Antelope and Triple B Complexes Gather Plan Environmental Assessment, DOI-BLM-NV-E030-2017-0010-EA (2017)—to support its decision to gather horses from the Antelope Complex without making a Determination of NEPA Adequacy, as required by the National Environmental Policy Act (NEPA) and the Secretary's NEPA regulations. A Determination of NEPA Adequacy requires that the Secretary justify its decision to rely on an existing EA by substantiating its decision with some analysis of adequacy and documentation that the circumstances or the present action are like those of the prior action. Plaintiffs further challenge the BLM's decision to rely on the six-year-old EA in violation of the Wild Horse Act's immediacy requirement. *Friends of Animals v. Culver*, 610 F. Supp. 3d 157 (D.D.C. 2022).

### JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this action pursuant to 5 U.S.C. § 706, 28 U.S.C § 1331, and 28 U.S.C. § 1361.

6.     Venue is proper in this district court pursuant to 28. U.S.C. § 1391. The BLM has sufficient contacts to subject it to personal jurisdiction in this district.

### THE PARTIES

7.     Plaintiff WILD HORSE EDUCATION is a national non-profit corporation dedicated to research, journalism, and public education concerning the activities and operations of federal and state management of the free-roaming wild horse and burro populations. Wild Horse Education's principal place of business is 216 Lemmon Drive, # 316, Reno, N.V., 89506. Wild Horse Education has more than 150,000 members and educates and informs the public about wild horses and burros through articles, photographs, videos, and sharing data and other information. Wild Horse Education also frequently submits comments on Herd Management Area Plans, Environmental Assessments, and other wild horse management documents and hearings made available for public comment. Advocating for the wild horses and burros in the Antelope and Triple B Complexes is an important issue for Wild Horse Education and will be always in the future.

8.     Plaintiff WILD HORSE EDUCATION and its members, supporters, and staff have a long-standing interest in wild, free-roaming horses and burros and routinely advocate for wild horses and burros in Nevada. If they had been given the opportunity, Nonprofit Plaintiffs would have submitted comments to BLM regarding the need for an updated EA for the Antelope and Triple B Complexes.

9.     Plaintiff WILD HORSE EDUCATION and its members, supporters, and staff would have participated rigorously in the public participation process required for notice-and-comment rulemaking under the Administrative Procedures Act if the BLM had complied with the law and promulgated the CAWP standards as a rule.

10.    Plaintiff WILD HORSE EDUCATION'S members, supporters, and staff visit the Antelope and Triple B Complexes for photography, observing wildlife, and other recreational and professional pursuits. Plaintiff's members, supporters, and staff gain aesthetic enjoyment from observing, attempting to observe, hearing, seeing evidence of, and studying wild horses and burros. The opportunity to possibly view wild horses and burros, or signs of them, in these areas is of significant interest and value to Plaintiff's members, supporters, and staff, and increases their use and enjoyment of Nevada's public lands. Plaintiff's members, supporters, and staff have engaged in these activities in the past and have specific plans to do so again in the future.

11.    Plaintiff WILD HORSE EDUCATION'S members and supporters are adversely impacted by the gathering and removal of wild horses and burros from the Antelope and Triple B Complexes. Plaintiff's members also have an interest in the health and humane treatment of animals, and work to rehabilitate sick and injured wildlife, including horses and burros. Plaintiff's members, staff, volunteers, and supporters have engaged in these activities in the past and intend to do so again soon.

12.    Plaintiff WILD HORSE EDUCATION, as well as its members, supporters, and staff, is dedicated to ensuring the long-term survival of the wild, free-roaming horses and burros throughout the contiguous United States, and specifically in Nevada, and to ensuring that Defendants comply with all applicable state and federal laws related to the survival and humane

treatment of wild horses and burros in Nevada. In furtherance of these interests, Plaintiff's members, supporters, and staff have worked, and continue to work, to protect and advocate for wild horses and burros in Nevada and throughout the contiguous United States.

13.     The interests of Plaintiff WILD HORSE EDUCATION's members, supporters, and staff have been, and will continue to be, injured by Defendants' improper and inhumane gather and removal of wild horses and burros in the Antelope and Triple B Complexes. The interests of Plaintiffs' members, supporters, and staff have been, and will continue to be, injured by Defendants' failure to comply with their obligations under the Wild Horse Act, NEPA, APA, and First Amendment in gathering, removing, and processing wild, free-roaming horses and burros in gruesome, inhumane, and completely hidden ways in the Antelope and Triple B Complexes pursuant to an outdated six-year-old EA.

14.     The injunctive relief requested provides the only remedy that can redress the injuries of Plaintiff WILD HORSE EDUCATION, including of its members, supporters, volunteers, and staff. The relief requested by Plaintiffs, if granted, would require Defendants to comply with the requirements of the Wild Horse Act, NEPA, APA, and the First Amendment before further gathering and removing wild, free-roaming horses and burros from the Antelope Complex. The relief requested by Plaintiffs, if granted, would reduce the number of wild, free-roaming horses and burros needlessly injured, killed, or removed by Defendants.

15.     Plaintiff LAURA LEIGH is the Founder and President of Plaintiff WILD HORSE EDUCATION. In addition, Ms. Leigh works with multiple non-profit organizations engaged in public land issues and provides in-field documentation and commentary on public land issues such as wild horse and burro gathers and removals. Ms. Leigh is also a free-lance photojournalist, whose work has appeared internationally in media broadcast outlets, such as CNN, BBC/ITV, ABC, Common Dreams, and CounterPunch. Ms. Leigh has visited, observed, and photographed the wild horses and burros at the Antelope Complex at least once a year since 2009. Ms. Leigh experiences great enjoyment from watching and monitoring individual horses and burros in the Antelope and Triple B Complexes. Of particular interest, Ms. Leigh commonly seeks out and photographs

unique stallions in the Antelope and Triple B Complexes; she has developed a personal knowledge of these stallions and their bands. Ms. Leigh has also attended, for nearly fifteen years, several wild horse and burro roundups throughout the United States, and frequently reviews photographs and videos from any roundups she is not able to attend in person on a daily basis. When Ms. Leigh recognizes individual horses and burros that she has previously observed as wild, free-roaming horses and burros, she experiences great sadness, but feels it is her responsibility to the animals to observe their treatment and capture and share it with others to educate them on the plight of wild horses and burros. The further gathering and removal of wild horses and burros in the Antelope and Triple B Complexes in cruel and inhumane ways will adversely affect the substantial recreational, aesthetic, and conservational interests of Ms. Leigh.

16.    Defendant JON RABY is Nevada State Director of the BLM, and is charged by federal statute with managing, administering, and protecting the wild horses and burros in the State of Nevada, including the Antelope and Triple B Complexes, pursuant to the Wild Horse Act.

17.    Defendant DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGE-MENT is charged by federal statute to manage administer and protect the wild horses and burros in the State of Nevada, including the Antelope Complex, pursuant to the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331–1340.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

18.    Plaintiffs WILD HORSE EDUCATION and LAURA LEIGH submitted comments on the relevant Antelope and Triple B Complexes Gather Environmental Assessment, identified as DOI-BLM-NV-E030-2017-0010-EA in 2017.

19.    Among other matters, WILD HORSE EDUCATION commented on issues involving handling wild horses during capture. WILD HORSE EDUCATION noted an actual foaling season for the Antelope Complex herds had not been identified by the agency. The lack of clear identification of foaling/breeding season in wild horses creates a real danger to the health and safety of mares and foals, because the BLM will roundup horses in this area during actual peak foaling season, which begins in February and continues through the end of July. WILD HORSE

EDUCATION requested that the BLM extend its prohibition on capture by helicopter drive trapping for the Antelope Complex from February 1 to August 15, and not follow the arbitrary March 1 to July 1 prohibition the agency uses now for all HMAs, regardless of the true foaling season for each HMA.

20.     In its public comment, WILD HORSE EDUCATION also noted that the BLM had not identified a data-based foaling season in any underlying Herd Management Area Plan (HMAP) and had not identified it in its 2017 Environmental Assessment either.

21.     Plaintiff LEIGH brought litigation involving abusive actions into the court (and other matters) and the court warned BLM in numerous instances (Triple B-2011, Jackson Mountain-2012, Owyhee Complex-2013) concerning inappropriate conduct during capture.

22.     In 2015 the BLM formally adopted the Comprehensive Animal Welfare Program (CAWP) and informed Plaintiff LEIGH that the BLM would conduct annual reviews of the CAWP and the BLM's implementation of the CAWP. The BLM published an assessment tool on its website, so the public understood how the BLM would implement the CAWP.

23.     From 2016-2021, Plaintiff LEIGH has requested a copy of annual CAWP reviews through the Freedom of Information Act (FOIA). Each year, the BLM has responded that it could not identify any responsive documents to her FOIA request. Therefore, on information and belief, the BLM never conducted annual reviews of CAWP.

24.     During the 2021 Antelope Complex operation, Plaintiff LEIGH met with Holle Waddel (Bureau Chief) and the newly hired Jerrie Bertola (CAWP Lead) to discuss issues relating to welfare and was told that follow-up would occur, but this never took place.

25.     Jerrie Bertola confirmed that no review of CAWP was done from 2017-2021, that none would be done for those years, that no annual CAWP reviews would be conducted, and that no programmatic review of CAWP was planned.

26.     Plaintiffs WILD HORSE EDUCATION and LAURA LEIGH have requested, on multiple occasions, to be alerted if the BLM decides to review or revise the CAWP and its standards. On August 25, 2021, Plaintiff LEIGH specifically requested that the BLM permit

Plaintiffs the opportunity to contribute to the After-Action Review process for roundup activities in Nevada to assist with CAWP compliance issues. The BLM never responded to any of Plaintiffs' requests for public participation.

27.     In 2022, Plaintiff WILD HORSE EDUCATION, conducted its own review of CAWP compliance and published a three-part review of the BLM CAWP program for its members and supporters, as well as the public, as part of its public education mission.

28.     Prior to the start of the removal action for the Antelope Complex, the BLM issued two press releases indicating the BLM had made a Determination of NEPA Adequacy as required by 43 CFR § 46.120. The press releases linked to the Determination of NEPA Adequacy, but the links were broken, and no documents were attached.

29.     On July 7, 2023, Plaintiff LEIGH informed the Nevada BLM's public affairs office that the provided link to the Determination of NEPA Adequacy was broken. The public affairs office advised Plaintiff LEIGH that the BLM had not prepared a Determination of NEPA Adequacy. Instead, the BLM intended to rely on its six-year-old EA to support the 2023 removal action in the Antelope Complex.

30.     On July 14, 2023, Plaintiffs' counsel sent the BLM a letter advising them of significant, excessive heat and requested that the BLM cease its removal action in the Antelope Complex until temperatures fell below 95 degrees Fahrenheit, as required by CAWP Standards. On this same day, Plaintiffs' counsel called the BLM to request the termination of removal activities until the weather returned to normal conditions. Nobody responded to Plaintiffs' counsel by email, letter, or phone call.

31.     Plaintiffs have exhausted all administrative remedies.

## GENERAL ALLEGATIONS OF FACTS

**A.  Wild Free-Roaming Horses and Burros Act**

32.     Finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West," and that "they contribute to the diversity of life forms within the Nation and enrich the lives of the American people," Congress enacted the Wild Horses and Burros

Act, or "Wild Horse Act" to ensure that "wild-free roaming horses and burros shall be protected from capture, branding, harassment, [and] death," and will "be considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331.

33.     "Wild free-roaming horses and burros" are defined under the Wild Horse Act as "all unbranded and unclaimed horses and burros on public lands of the United States," which include lands "administered by the Secretary of the Interior through the Bureau of Land Management or by the Secretary of Agriculture through the Forest Service." *Id*. §§ 1332(b), (e); *see also* 36 C.F.R. § 222.60(b)(13).

34.     The Wild Horse Act directs the Secretary of the Interior to "manage wild free-roaming horses and burros as components of the public lands ... in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1331. To further ensure this objective, the statute provides that "[a]ll management activities shall be at the minimal feasible level." 16 U.S.C. § 1333(a).

35.     The Wild Horse Act also gives the Secretary the ability to remove "excess" wild free-roaming horses and burros from the public range. "[E]xcess animals" are defined in the statute as wild free-roaming horses and burros "which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16 U.S.C. § 1332(f).

36.     The BLM's regulations require that the Secretary establish Herd Management Areas (HMAs) for the maintenance of wild horse and burro herds. 43 C.F.R. § 4710.3-1. In delineating each herd management area, the BLM must consider the appropriate management level for the herd, the habitat requirements of the animals, the relationships with other uses of the public and adjacent private lands, and the constraints contained in § 4710.4, which limits management of wild horses and burros to "the minimum level necessary to attain the objective identified in approved land use plans and herd management area plans." 43 C.F.R. § 4710.4.

37.     Before removing excess horses or burros from an HMA, the Secretary must first determine that 1) an overpopulation of animals exists and 2) that action is necessary to remove

excess animals, before *immediately* removing the excess animals. 16 U.S.C. § 1333(b)(2) (emphasis added). The Secretary must determine both of those requirements based on the current inventory of lands, information contained in any land use planning documents, information contained in court ordered environmental impact statements, and any additional information currently available to him/her. *Id.*

38.     A Gather Plan violates the immediacy mandate of the Wild Horse Act if it permits the removal of excess animals for a ten-year period from its adoption. *See* 16 U.S.C. § 1333(b)(2); *Friends of Animals v. Culver*, 610 F. Supp. 3d 157 (D.D.C. 2022) (invalidating an EA authorizing the phased removal of horses over a ten-year-period).

39.     Excess horses must be "humanely captured and removed" per the Wild Horse Act's mandates. 16 U.S.C § 1333(b)(2)(B).

40.     "[H]umane treatment" is defined as "handling compatible with animal husbandry practices accepted in the veterinary community, without causing unnecessary stress or suffering to a wild horse or burro." 43 C.F.R. § 4700.0-5(e). "Inhumane treatment" is defined as "any intentional or negligent action or failure to act that causes stress, injury, or undue suffering to a wild horse or burro and is not compatible with animal husbandry practices accepted in the veterinary community." 43 C.F.R. § 4700.0-5(f).

41.     The Secretary delegated responsibility to administer the Wild Horse Act to the BLM. 43 C.F.R. § 4700.0-3.

42.     On June 30, 2015, the BLM adopted its Comprehensive Animal Welfare Program (CAWP) as "a proactive program for protecting the welfare of wild horses and burros under the agency's management and protection." According to the BLM, the CAWP "formalizes standard operating procedures surrounding animal care and handling; establishes formal training programs in animal welfare for BLM personnel, partners and contractors; and implements internal and external assessments for all activities undertaken in the Wild Horse and Burro Program." *See* BLM Perm. Inst. Memo. 2021-002 (Dec. 18, 2020), *available at* https://www.blm.gov/policy/pim-2021-002. In this regard, BLM has promulgated CAWP Standards for Wild Horse and Burro Gathers

and CAWP Standards for Off-Range Corral Facilities, Transportation, and Adoption/Sale Events.

43.     The CAWP standards address the BLM's plan for humane handling, including requirements for trap and temporary holding facility design, capture and handling, transportation, and care after capture. The standards are also incorporated into helicopter gather contracts as specifications for performance.

**B.  National Environmental Policy Act**

44.     A second statute, NEPA, 42 U.S.C. § 4321 et seq., governs decisions by the BLM to gather horses and burros. NEPA requires federal agencies to take a "hard look" at the environmental consequences before carrying out federal actions. *Marsh v. Or. Nat. Res. Council,* 490 U.S. 360, 373–74 (1989).

45.     NEPA serves the dual purpose of, first, informing agency decisionmakers of the significant environmental effects of proposed major federal actions and, second, ensuring that relevant information is made available to the public so that it "may also play a role in both the decision-making process and the implementation of that decision." *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

46.     To meet these goals, NEPA requires a comprehensive Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3.

47.     To determine whether a proposed action will have significant effects, an agency may prepare an Environmental Assessment ("EA"). 40 C.F.R. § 1501.54. An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (quoting 40 C.F.R. § 1508.9(a)).

48.     If in its EA the agency finds that the proposed action will not significantly affect the human environment, it may issue a finding of no significant impact ("FONSI") in lieu of an EIS. *Native Ecosystems Council v. U.S. Forest Serv*., 428 F.3d 1233, 1239 (9th Cir. 2005) (citing 40 C.F.R. § 1508.9(a)(1)); *see also* 40 C.F.R. § 1501.6(e).

49.     A FONSI "briefly present[s] the reasons why an action … will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared." 40 C.F.R. § 1508.1(1).

50.     An agency may only rely on an EA to support its decision to conduct gathers for a limited period, due to the immediacy requirement of the Wild Horse Act. 16 U.S.C. § 1333(b)(2); *Friends of Animals v. Culver*, 610 F. Supp. 3d 157 (D.D.C. 2022).

51.     An agency may rely on an existing EA only if it determines, "with appropriate supporting documentation, that it adequately assessed the environmental effects of the proposed action and reasonable alternatives" in the existing EA." *See* 40 CFR § 46.120(c). The "supporting record must include an evaluation of whether new circumstances, new information, or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects." *Id.* The Secretary and BLM refer to this document generally as a Determination of NEPA Adequacy.

**C.  First Amendment to the U.S. Constitution**

52.     The First Amendment prohibits any law "abridging the freedom of speech, or of the press." U.S. Const. Amend. I.

53.     Finding that "many governmental processes operate best under public scrutiny," the Supreme Court has held that there is a qualified right of access for the press and public to observe government activities. *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8–9 (1986).

54.     This Court has found that BLM's removal of wild horses and burros and other gather activities on public land meet the first part of the right of access claim—i.e., that a qualified right of access applies to gather activities. *Leigh v. Salazar*, 954 F. Supp. 2d 1090, 1101 (D. Nev. 2013).

55.     The Wild Horse Act further qualifies the right of access by declaring that the BLM must conduct its removal, or gather, activities humanely.

**D.  The Antelope and Triople B Complexes of Herd Management Areas**

56.     The Antelope and Triple B Complexes are in northeastern Nevada. The Antelope

Complex encompasses several herd management areas where wild horses live. The Antelope Complex contains the Antelope Valley HMA, Antelope HMA, Spruce-Pequop HMA, and Goshute HMA. The Triple B Complex contains the Triple B HMA, Maverick-Medicine HMA, Antelope Valley HMA (West of U.S. Highway 93), and Cherry Spring Wild Horse Territory (WHT).

57.     Discrepancies exist in BLM documents regarding the exact number of acres associated with the HMA in the Antelope and Triple B Complexes. The 2017 Antelope and Triple B Complexes Gather Plan Environmental Assessment states that the total area for the Antelope Complex consists of 1,183,340 acres of a mix of private and public lands, and the Triple B Complex consists of 1,632,324 acres of a mix of private and public lands.

58.     The topography is varied and contrasting with valley floors, alluvial fans, canyons, mountains, steep ridges, and basins. Elevations within the Antelope Complex range from 5,000 feet to over 10,200 feet. The climate is typical of middle latitude, semi-arid lands. Precipitation normally ranges from approximately five to seven inches on the valley bottoms to 16 to 18 inches on the mountain peaks. Most of this precipitation comes during the winter months in the form of snow occurring primarily in the winter and spring with the summers being quite dry. Temperatures range from greater than 90 degrees Fahrenheit in the summer months to minus 15 degrees or colder in the mountains in the winter.

59.     There are hundreds of different species of wildlife in the Complexes including mule deer, sage grouse, blue grouse, eagles, and hawks. The Complexes are also grazed by domestic livestock.

60.     During the 1900s to the 1940s, the Army Remount Service was active in a portion of the Antelope/Antelope Valley Complex. Periodically, the Army would release animals in the wild to upgrade their stock. The released stallions were mainly thoroughbreds or Morgans. A few draft blood lines were introduced to develop a hardier strain of horse to pull wagons and heavy artillery. As a result, the wild horses found in the complex are hardy and sound. They possess a variety of colors with variations from white to black, but most are sorrels and bays.

61.     The BLM has set an Appropriate Management Level, or AML, of 427-789 wild

horses in the Antelope Complex of HMAs and of 472-889 wild horses in the Triple B Complex. An AML is like a quota for wild horses allowed by the BLM to exist in the only area designated for them in the United States.

62.     In 2017, the BLM conducted an emergency operation in part of the Antelope Complex with the goal of reducing the wild horse population from an estimated 1,320 wild horses to the then-AML of 155-259. To support its emergency removal action, the BLM adopted an Environmental Assessment/Finding of No Significant Impact on December 21, 2017 (the "2017 EA/FONSI").

63.     Under the 2017 EA/FONSI, the BLM analyzed the environmental impacts of removing thousands of wild horses and burros from the Antelope and Triple B Complexes over a period of ten years. *See* DOI-BLM-NV-E030-2017-0010-EA.

64.     The Gather EA did not identify or analyze the herd-specific foaling season, nor the habitat-specific ground conditions during different seasons.

65.     The BLM has purported to rely on the 2017 EA/FONSI to supports gathers in the Antelope and Triple B Complexes that occurred in 2018, 2019, 2020, 2021, and 2022.

66.     For each of these gathers, the BLM failed to issue a Determination of NEPA Adequacy prior to relying on the EA/FONSI, as required by 43 CFR § 46.120.

67.     The BLM's decision to rely on a NEPA review that is now six years old violates the Wild Horse Act's immediacy requirement. 16 U.S.C. 1333(b)(2); *see also Friends of Animals v. Culver*, 610 F. Supp. 3d 157  (D.D.C. 2022) (holding "BLM's ten-year deadline [in a wild horse gather EA] exceeds its discretion, per statutory command").

**E.  Removal of Horses from the Antelope and Triple B Complexes**

68.     Between January 31, 2017-February 23, 2018, the BLM gathered and removed more than 1,300 horses by helicopter in the Triple B Complex. Between July 9-17, 2019, the BLM gathered and removed more than 800 wild horses, including 134 foals, by helicopter in the Triple B Complex. Between July 28-August 22, 2020, the BLM gathered and removed more than 350 wild horses, including 100 foals, by helicopter in the Triple B Complex. Between July 15-August

25, 2022, the BLM gathered and removed more than 1,500 wild horses, including 329 foals, by helicopter in the Triple B Complex. At various times during these gathers, temperatures exceeded 95 degrees Fahrenheit.

69. Between September 19-October 2, 2018, the BLM gathered and removed more than 900 wild horses, including 165 foals, by helicopter in the Antelope Complex. Between August 10-October 18, 2019, the BLM gathered and removed more than 900 wild horses, including 165 foals, by helicopter in the Antelope Complex. Between July 27-July 28, 2020, the BLM gathered and removed more than 50 wild horses, including 10 foals, by helicopter in the Antelope Complex. Between August 2-30, 2021, BLM engaged in an "emergency" gather that resulted in the gather of 2,203 wild horses, including 369 foals, by helicopter. Between July 9-August 20, 2023, the BLM gathered and removed more than 3,000 wild horses, including more than 500 foals, by helicopter in the Antelope Complex. At various times during these gathers, temperatures exceeded 95 degrees Fahrenheit. During the 2023 gathers, temperatures often exceeded 100 degrees Fahrenheit.

70. The BLM proceeded with its removal of horses from the Antelope and Triple B Complexes despite extreme heat and in direct contradiction of CAWP standards.

71. The BLM uses helicopters to roundup horses only if foals are not present, yet it proceeded with its roundup of horses within the Antelope and Triple B Complexes aided by helicopters even though it observed foals and was informed of the presence of foals.

72. Due to the extreme heat, inhumane and prohibited use of helicopters, and general disregard for CAWP standards, the BLM admits that its removal actions in the Antelope and Triple B Complexes have injured and killed at least 149 horses, including approximately 30 foals, as of August 20, 2023. These include deaths resulting from fractured skulls, broken necks, leg fractures, lacerations, and more.

73. The BLM has violated the CAWP standards and, if not enjoined by this Court, will continue to do so in violation of the Wild Horse Act's mandate that wild horses must be "humanely captured and removed." 16 U.S.C § 1333(b)(2)(B).

74. The CAWP standards set the floor for humane handling standards, and noncompliance with provisions labeled "minor" are ignored. BLM continually violates documenting procedures associated with recording deaths outlined in CAWP standards. The BLM has also violated the statutory requirement that wild horses be handled humanely, e.g. using helicopters to roundup horses after July 1, despite the actual, observed presence of foals. *See* 16 U.S.C. 1333(b)(2)(B); 43 CFR 4700.0-5(e).

75. In addition to inhumanely treating wild horses during gathers, Defendants have failed to provide Plaintiffs consistent, meaningful viewing access of gather operations. During the 2023 removal action in the Antelope Complex, Plaintiffs were denied access because BLM purposely placed trap areas on lands only accessible through private roads, even though the BLM knew it did not have permission for the public to utilize those roads to observe the roundup.

### FIRST CAUSE OF ACTION
### Administrative Procedures Act, 5 U.S.C. §§ 553, 702

76. Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

77. According to the Administrative Procedures Act, "rule" means "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4).

78. The APA sets forth a number of requirements for the promulgation of rules, including notice-and-comment, to ensure the right of public participation in agency decision making. *See* 5 U.S.C. § 553.

79. The BLM's CAWP Standards for Wild Horse and CAWP Burro Gathers and Standards for Off-Range Corral Facilities, Transportation, and Adoption/Sale Events implement the Wild Horse Act's humane handling requirements and must be promulgated as rules. *See* 16 U.S.C. § 1333(b)(2)(B) (emphasis added); 43 CFR 4700.0-05(e).

80. The BLM's CAWP Standards for Wild Horse and CAWP Burro Gathers and Standards for Off-Range Corral Facilities, Transportation, and Adoption/Sale Events, in whole or

a part, qualify as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy" under the Administrative Procedures Act, 5 U.S.C. § 551(4).

81.     Defendants violated 5 U.S.C. § 553 by adopting the CAWP standards as an unenforceable "agency policy," as opposed to a rulemaking.

82.     Defendants' violation of the APA has injured Plaintiffs by restricting their ability to enforce the BLM's mandate to humanely capture and remove wild horses.

83.     Defendants' violation of the APA has injured Plaintiffs, who would have passionately and robustly participated in the development of the CAWP standards had it been properly promulgated as a rulemaking.

84.     The APA gives this Court authority to compel the BLM to promulgate CAWP standards as a rulemaking under 5 U.S.C. § 702.

**SECOND CAUSE OF ACTION**
**Administrative Procedures Act, 5 U.S.C. § 706**

85.     Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

86.     The BLM may rely on an EA to support its decision to conduct gathers for a limited period, due to the immediacy requirement of the Wild Horse Act. 16 U.S.C. § 1333(b)(2); *Friends of Animals v. Culver*, 610 F. Supp. 3d 157 (D.D.C. 2022).

87.     The BLM abused its discretion and violated the Wild Horses Act by relying on a phased Environmental Assessment—the 2017 EA/FONSI—for multiple gathers in violation of the Wild Horse Act's immediacy requirement. *See Friends of Animals v. Culver*, 610 F. Supp. 3d 157 (D.D.C. 2022.

88.     Defendants' actions have injured Plaintiffs in the manner described in this Complaint.

89.     The BLM's decision to rely on the 2017 EA/FONSI was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law or was in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right. 5 U.S.C. § 706(2)(A) & (C).

90.     The APA gives this Court authority to compel the BLM to promulgate CAWP standards as a rulemaking under 5 U.S.C. §§ 553 and 702.

### THIRD CAUSE OF ACTION
**National Environmental Policy Act and Administrative Procedure Act, 5 U.S.C. § 706**

91.     Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

92.     The BLM may rely on an existing EA only if it determines, "with appropriate supporting documentation, that it adequately assessed the environmental effects of the proposed action and reasonable alternatives" in the existing EA." *See* 40 CFR 46.120(c). The "supporting record must include an evaluation of whether new circumstances, new information, or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects." *Id.* The Secretary and BLM refer to this document generally as a Determination of NEPA Adequacy.

93.     The BLM violated NEPA when it failed to evaluate the 2017 EA/FONSI pursuant to 40 CFR 46.120. Had BLM assessed the environmental effects of the proposed gather and reasonable alternatives, Plaintiffs would have expected evaluation of new circumstances, new information, or changes such as those associated with the current foaling season, heavy snowfall during the 2022-2023 winter, current range conditions, efficacy of growth suppression methods, and more.

94.     The BLM violated NEPA when it failed to analyze the significant environmental impacts of removing wild horses from the Antelope Complex as alleged herein, including by proceeding with the removal action, even though the BLM observed foals in the wild horse population.

95.     Defendants' decision to proceed with the gather and removal of over 7,000 wild horses from the Antelope and Triple B Complexes without analyzing significant environmental impacts was arbitrary and capricious, an abuse of discretion, and contrary to the law.

96. Defendants' actions have injured Plaintiffs in the manner described in this Complaint.

97. The BLM unlawfully withheld its evaluation of the 2017 EA/FONSI required by 40 CFR §46.120 in violation of the APA, 5 U.S.C. § 706(1).

98. The BLM's decision to rely on the 2017 EA/FONSI was arbitrary and capricious, and not in accordance with law in violation of the APA, 5 U.S.C. § 706(2)(A).

**FOURTH CAUSE OF ACTION**
**First Amendment Violation, U.S. Constitution, 42 U.S.C. § 1983, 28 U.S.C. § 2201**

99. Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

100. Under 42 U.S.C. § 1983, a party may seek monetary and injunctive relief against a party who, under color of law of any state, subjects any person within the jurisdiction of the United States to a deprivation of any rights, privileges, or immunities secured by the Constitution and other laws.

101. Plaintiffs have a right, under the First Amendment to the United States Constitution, to observe and document the BLM's gather of the wild horses in the Antelope Complex, including during gather operations, in capture pens, sorting pens, temporary holding corrals, and off-range holding corrals where horses and burros are held for veterinary treatment and prepared for potential adoption or sale or to live at long-term holding facilities.

102. These rights under the First Amendment to the United States Constitution have been made enforceable against the states through the Fourteenth Amendment.

103. Defendants have interfered with Plaintiffs' protected right under the First Amendment by preventing them from observing and documenting the BLM's gather of wild horses in the Antelope Complex.

104. Defendants failure to humanely remove wild horses from the Antelope and Triple B Complexes violates the Wild Horse Act, as well as Plaintiffs' right to view the animals being treated humanely under the First Amendment of the United States Constitution.

105.    Defendants' actions have injured Plaintiffs in the manner described in this Complaint.

106.    Plaintiffs are entitled to compensatory damages to address their injury.

107.    Plaintiffs are entitled to injunctive relief to prevent Defendants from continuing to interfere with their rights under the First Amendment.

108.    This Court is authorized to enjoin Defendants from further violations of Plaintiffs' First Amendment rights, including by compelling Defendants to provide Plaintiffs meaningful access to all locations where horses are being gathered and to locations where removed horses are currently housed to accurately document the BLM's activities and handling of these horses.

109.    This Court is further authorized to compel Defendants to comply with the Wild Horse Act's humane handling requirements, including the temperature and foaling prohibitions of the BLM's CAWP standards, to protect Plaintiffs' First Amendment right to view wild horses being treated humanely.

110.    Plaintiffs are also entitled to a declaration under 28 U.S.C. § 2201(a) that Defendants' above-described actions violated Plaintiffs' First Amendment rights.

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs respectfully requests that this Court:

    A. Issue an order and injunction compelling Defendants to cease implementation of the 2017 EA/FONSI for the Antelope Complex until Defendants have fully complied with the Wild Free-Roaming Horses and Burros Act, National Environmental Policy Act, Administrative Procedure Act, and First Amendment;

    B. Vacate and set aside the 2017 EA/FONSI because it allows successive gathers in violation of the immediacy requirement of the Wild Free-Roaming Horses and Burros Act;

    C. Issue an order providing declaratory relief that Defendants have violated Plaintiffs' First Amendment rights by not allowing Plaintiffs with meaningful

viewing access of gather operations and by not allowing Plaintiffs their First Amendment right to view wild horses being treated humanely;

D. Issue an order compelling Defendants to provide Plaintiffs with meaningful viewing access of the gather operation, off-range holding corrals where gathered horses and burros from the 2023 Antelope Complex operations are currently held, and to each phase of future gather and removal efforts of horses and burros living in the Antelope Complex, including trap sites, temporary holding corrals, and off-range holding corrals;

E. Issue an order compelling Defendants to treat wild horses humanely during all phases of removal activities, including by enforcing the CAWP standards' prohibition on using helicopters for gathers during peak foaling season and conducting gathers on days of excessive heat, as required by the Wild Horse Act, 16 U.S.C. § 1333(b)(2)(B); 43 CFR 4700.0-5(e), and First Amendment.

F. Maintain jurisdiction over this action until Defendants are in compliance with the Wild Free-Roaming Horses and Burros Act, National Environmental Policy Act, Administrative Procedure Act, First Amendment, and every order of this Court;

G. Award Plaintiffs compensatory damages for past mental or emotional injury pursuant to 28 U.S.C. § 1983;

H. Award Plaintiffs attorney fees and costs pursuant to and 28 U.S.C. § 2412; and

I. Grant such additional and further relief to which Plaintiffs may be entitled.

1

DATED: September 14, 2023                    Respectfully Submitted,

2

3                                            */s/ Danielle M. Holt*
                                             Danielle M. Holt
                                             (Nevada Bar No. 13152)
4                                            DE CASTROVERDE LAW GROUP
                                             1149 S Maryland Pkwy
5                                            Las Vegas, NV 89104
                                                     Ph (702) 222-9999
6                                                    Fax (702) 383-8741
                                             danielle@decastroverdelaw.com
7

8                                            */s/ Jessica L. Blome*
                                             Jessica L. Blome
9                                            (Cal. Bar No. 314898, pro hac vice)
                                             GREENFIRE LAW, PC
10                                           P.O. Box 8055
                                             Berkeley, CA 94707
11                                           (510) 900-9502
                                             jblome@greenfirelaw.com
12

13                                           *Attorneys for Plaintiffs*

14

15

16

17

18

19

20

21

22

23

24

25

26