TODD KIM, Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

JOSEPH W. CRUSHAM, Trial Attorney (CA Bar No. 324764)
Wildlife & Marine Resources Section
PETER BROCKER, Trial Attorney (NYS Bar No. 5385448)
Natural Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Phone: (202) 307-1145 (Crusham)
Email: joseph.crusham@usdoj.gov
Phone: (202) 305-8636 (Brocker)
Email: peter.brocker@usdoj.gov

*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| WILD HORSE EDUCATION, and LAURA LEIGH, individually,<br><br>*Plaintiffs,*<br><br>v.<br><br>U.S. DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JOHN RABY, in his official capacity as Nevada State Director of the Bureau of Land Management,<br><br>*Federal Defendants.* | Case No. 3:23-cv-00372-LRH-CLB<br><br>**FEDERAL DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT AND MEMORANDUM IN SUPPORT** |

i

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................ 1

LEGAL BACKGROUND ................................................................................... 2

   I.   The Wild Free-Roaming Horses and Burros Act ..................................... 2

   II.   First Amendment and Gathers Under the Act ......................................... 3

   III.   The National Environmental Policy Act ................................................ 3

BACKGROUND .................................................................................................. 4

   I.   Factual Background and Plaintiffs' Allegations ...................................... 4

   II.   Procedural History ................................................................................. 7

LEGAL STANDARD ......................................................................................... 7

   I.   Federal Rule of Civil Procedure 12(b)(1) .............................................. 7

   II.   Federal Rule of Civil Procedure 12(b)(6) .............................................. 8

ARGUMENT ...................................................................................................... 8

   I.   Plaintiffs' Claim to Compel BLM to Issue the CAWP Standards as Rules Fails ............... 8

      A.   Any Challenge to BLM's Issuance of the CAWP Standards is Time-Barred. ................. 8

      B.   Per Plaintiffs' Allegations, the CAWP Standards Are Not Substantive Rules. ............. 10

      C.   Plaintiffs Do Not Seek to Compel Legally Required, Discrete Agency Action. ........... 12

   II.   Plaintiffs Do Not State a Claim under NEPA. ........................................ 14

   III.   Plaintiffs' "Immediacy" Claim is Duplicative of their NEPA Claim and Fails for the Same Reasons. ................................................................................................... 16

IV.    Plaintiffs Fail to State a Claim Under the First Amendment. ........................................ 17

  A.  Plaintiffs Cannot Sue Federal Defendants Under Section 1983. ................................. 17

  B.  Plaintiffs' First Amendment Claim Based on Prior Restrictions on Viewing Antelope Gather Operations is Moot. ............................................................................. 18

  C.  Plaintiffs Fail to Allege Sufficient Facts to State a Claim Regarding On-Going Restrictions. ....................................................................................................... 21

  D.  Plaintiffs Do Not Have a First Amendment Right to View Humane Gathers. .............. 22

  E.  Any Implied Humane Gather Claim Under the Act is Nonjusticiable. .......................... 23

CONCLUSION ................................................................................................................. 24

# TABLE OF AUTHORITIES

**CASES**                                                                **PAGE**

*Alaska Ctr. For Env't v. U.S. Forest Serv.*,
   189 F.3d 851 (9th Cir. 1999) .......................................................... 18

*Alvarez v. Hill*,
   667 F.3d 1061 (9th Cir. 2012) ........................................................ 21

*Am. C.L. Union of Nev. v. U.S. Gen. Servs. Admin*,
   3:13-CV-00189-RCJ-VPC,
   2014 WL 135219 (D. Nev. Jan. 10, 2014) ...................................... 17

*Am. Horse Prot. Ass'n, Inc. v. Frizzell*,
   403 F. Supp. 1206 (D. Nev. 1975) .................................................. 11

*Am. Horse Prot. Ass'n, Inc. v. Watt*,
   694 F.2d 1310 (D.C. Cir. 1982) ........................................................ 2

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .......................................................................... 8

*Bassiri v. Xerox Corp.*,
   292 F. Supp. 2d 1212 (C.D. Cal. 2003) ............................................ 8

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*,
   403 U.S. 388 (1971) ........................................................................ 17

*Cedars–Sinai Med. Ctr. v. Shalala*,
   177 F.3d 1126 (9th Cir. 1999) .......................................................... 9

*Colo. Wild Horse & Burro Coal. v. Jewell*,
   130 F. Supp. 3d 205 (D.D.C. 2015) ................................................ 10

*Conservation Force v. Salazar*,
   646 F.3d 1240 (9th Cir. 2011) .......................................................... 8

*Daniels-Hall v. Nat'l Educ. Ass'n*,
   629 F.3d 992 (9th Cir. 2010) ............................................................ 4

*Egbert v. Boule*,
   142 S. Ct. 1793 (2022) .................................................................... 17

*Erringer v. Thompson*,
   371 F.3d 625 (9th Cir. 2004) .......................................................... 10

*Friends of Animals v. BLM*,
    548 F. Supp. 3d 39 (D.D.C. 2021) ................................................................ 15, 16

*Friends of Animals v. BLM*,
    2:16-CV-1670-SI,
    2018 WL 1612836 (D. Or. Apr. 2, 2018) ...................................................... 10, 14

*Friends of Animals v. Culver*,
    610 F. Supp. 3d 157 (D.D.C. 2022) ...................................................................... 16

*Friends of Animals v. Pendley*,
    523 F. Supp. 3d 39 (D.D.C. 2021) ................................................................ 10, 11

*Friends of Animals v. Silvey*,
    353 F. Supp. 3d 991 (D. Nev. 2018) ............................................................ passim

*Fund for Animals, Inc. v. BLM*,
    460 F.3d 13 (D.C. Cir. 2006) ............................................................... 2, 21, 24

*Gator.com Corp. v. L.L. Bean, Inc.*,
    398 F.3d 1125 (9th Cir. 2005) ...................................................................... 18, 21

*Hells Canyon Pres. Council v. U.S. Forest Serv.*,
    593 F.3d 923 (9th Cir. 2010) ............................................................................ 8, 13

*Hemp Indus. Ass'n v. Drug Enforcement Admin.*,
    333 F.3d 1082 (9th Cir. 2003) ...................................................................... 10, 12

*Hodges v. CGI Fed. Def. & Intel.*,
    727 F. App'x 236 (9th Cir. 2018) ........................................................................ 17

*Jacob v. Biden*,
    542 F. Supp. 3d 938 (N.D. Cal. 2021) .................................................................. 21

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) .............................................................................................. 7

*Leigh v. Jewell*,
    No. 3:11-CV-00608-HDM-WGC, 2014 WL 31675 (D. Nev. Jan. 3, 2014) .................... passim

*Leigh v. Salazar*,
    677 F.3d 892 (9th Cir. 2012) ............................................................... 3, 19, 22

*Leigh v. Salazar*,
    954 F. Supp. 2d 1090 (D. Nev. 2013) ................................................... 3, 20, 22, 23

*Leigh v. Salazar*,
   3:11-cv-608-HDM-WGC,
   2013 WL 1249824 (D. Nev. Mar. 26, 2013) ............................................. 22

*Leigh v. Salazar*,
   Case No. 3:10-cv-00597-LRH-VPC, Dkt. 9-1 (Sept. 24, 2010) ......................... 19, 20

*Leigh v. Salazar*,
   No. 3:11-CV-00608-HDM-WGC, 2012 WL 2367823 (D. Nev. June 21, 2012) .................... 19

*Leigh v. Salazar*,
   No. 3:13-cv-00006-MMD-VPC, 2014 WL 4700016 (D. Nev. Sept. 22, 2014) ..... 13, 22, 23, 24

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989) ................................................................ 3

*Mayo v. Reynolds*,
   875 F.3d 11 (D.C. Cir. 2017) .................................................... 4, 15

*Morse v. N. Coast Opportunities, Inc.*,
   118 F.3d 1338 (9th Cir. 1997) .................................................... 17

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
   668 F.3d 1067 (9th Cir. 2011) ..................................................... 4

*Native Vill. of Nuiqsut v. BLM*,
   9 F.4th 1201 (9th Cir. 2021) ..................................................... 18

*Navarro v. Block*,
   250 F.3d 729 (9th Cir. 2001) ...................................................... 8

*Norton v. S. Utah Wilderness,
   All.*, 542 U.S. 55 (2004) ..................................................... 12, 13

*PETA v. Gittens*,
   396 F.3d 416 (D.C. Cir. 2005) .................................................... 21

*Press-Enterprise Co. v. Superior Court of California.*,
   478 U.S. 1 (1986) ............................................................... 3, 4

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ............................................................... 3

*S. Cal. All. of Publicly Owned Treatment Works v. EPA*,
   297 F. Supp. 3d 1060 (E.D. Cal. 2018) ............................................. 9

*S. Utah Wilderness All. v. Norton*,
   457 F. Supp. 2d 1253 (D. Utah 2006) ............................................. 14

*S. Utah Wilderness All. v. Kempthorne*,
  525 F.3d 966 (10th Cir. 2008) ............................................................ 14

*Sacora v. Thomas*,
  628 F.3d 1059 (9th Cir. 2010) ............................................................ 10

*Stock W., Inc. v. Confederated Tribes of the Colville*,
  *Rsrv.*, 873 F.2d 1221 (9th Cir. 1989) .................................................... 7

*United States v. Ritchie*,
  342 F.3d 903 (9th Cir. 2003) ................................................................ 6

*W. Coast Seafood Processors Ass'n v. NRDC*,
  643 F.3d 701 (9th Cir. 2011) ............................................................... 21

*W. Radio Servs. Co. v. Espy*,
  79 F.3d 896 (9th Cir. 1996) ........................................................... 10, 19

*W. Radio Servs. Co. v. U.S. Forest Serv.*,
  578 F.3d 1116 (9th Cir. 2009) ............................................................. 17

*Wind River Mining Corp. v. United States*,
  946 F.2d 710 (9th Cir. 1991) ................................................................ 9

**STATUTES**

5 U.S.C. § 553 .......................................................................................... 5
5 U.S.C. § 553(b)(A) .............................................................................. 10
5 U.S.C. § 706(2)(D) .............................................................................. 12
16 U.S.C. § 1331 ...................................................................................... 2
16 U.S.C. § 1332(c) ................................................................................. 2
16 U.S.C. § 1333(a) ................................................................................. 2
16 U.S.C. § 1333(b)(1) ............................................................................ 2
16 U.S.C. § 1333(b)(2) ............................................................................ 2
16 U.S.C. § 1333(b)(2)(B) .................................................................... 2, 6
28 U.S.C. § 2401(a) ................................................................................. 8
42 U.S.C. § 1983 ................................................................................. 1, 17
42 U.S.C. § 4321–4370h ......................................................................... 3

**RULES**

Federal Rule of Civil Procedure 12(b)(1) ........................................... 1, 7
Federal Rule of Civil Procedure 12(b)(6) ........................................... 1, 8

**REGULATIONS**

40 C.F.R. § 1502.9(d)(1)(ii) ............................................................... 4, 15
43 C.F.R. § 46.120 ................................................................................. 14

43 C.F.R. § 46.120(a)...................................................................................................... 14
43 C.F.R. § 46.120(c)................................................................................................. 6, 14
43 C.F.R. § 4700.0-5(e).............................................................................................. 2, 12
43 C.F.R. § 4700.0-05(e).................................................................................................. 6
43 C.F.R. § 4710.3-1........................................................................................................ 2

**Other Authorities**

73 Fed. Reg. 61,292, 61,295 .......................................................................................... 14

**INTRODUCTION**

Plaintiffs brought this suit to challenge the U.S. Bureau of Land Management's ("BLM's") gathers of wild horses in the Antelope Complex this past summer under the Wild Free-Roaming Horses and Burros Act ("the Act"). After the Court denied their motion for emergency, preliminary relief and BLM completed the gathers, Plaintiffs filed an Amended Complaint. Plaintiffs do not dispute that BLM was required by the Act to gather horses this summer from the Antelope Complex due to an extreme overpopulation of horses, or that future gathers may be necessary because that overpopulation remains despite BLM's efforts. Rather, Plaintiffs take issue with the way BLM conducted the gathers and with its reliance on 2017 National Environmental Policy Act ("NEPA") analysis. Federal Defendants now move to dismiss the Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

First, Plaintiffs' claim to compel BLM to re-issue its animal welfare standards through rulemaking fails for three independent reasons: (1) any challenge to the procedures used to issue the standards in 2015 and 2016 is time-barred; (2) even if there was no time bar, Plaintiffs fail to state a claim upon which relief can be granted, as notice and comment is required only for substantive rules and Plaintiffs admit that the standards are non-binding policies; and (3) Plaintiffs cannot compel any formal rulemaking on the standards because Plaintiffs do not seek to compel legally required, discrete agency action. Second, Plaintiffs' NEPA claim fails because Plaintiffs improperly read in requirements to NEPA that do not exist and fail to identify any change in circumstances plausibly undermining the 2017 Antelope and Triple B Complexes Gather Plan Environmental Assessment ("2017 EA"), which analyzed the effects of gathering wild horses for a ten-year period. Third, because Plaintiffs' claim under the "immediacy" provision of the Act also challenges BLM's reliance on the 2017 EA, it is duplicative of their NEPA claim and fails for the same reasons. Finally, Plaintiffs' First Amendment claim fails because it cannot proceed under 42 U.S.C. § 1983, it is based only on one alleged access past restriction that is moot, and it seeks in part to vindicate a non-existent right to view humane gathers.

Accordingly, the Court should dismiss Plaintiffs' Amended Complaint.

# LEGAL BACKGROUND

## I.   The Wild Free-Roaming Horses and Burros Act

In 1971, Congress passed the Act, 16 U.S.C. § 1331 *et seq.*, which directs the Secretary of the Interior to provide for the protection and management of wild horses "in the area where presently found, as an integral part of the natural system of the public lands." *Id.* But after only a few years, the wild horse population had grown dramatically, "and action [was] needed to prevent a successful program from exceeding its goals and causing animal habitat destruction." *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982) (citation omitted). Accordingly, in 1978, Congress passed amendments to the Act, which gave the Secretary greater authority and discretion to manage and remove excess horses. *Id.* at 1316–18.

Section 3 of the Act directs the Secretary to manage wild horses and burros "to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). "The Bureau (as the Secretary's delegate) carries out this function in localized 'herd management areas' ('HMAs')[.]" *Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 15 (D.C. Cir. 2006); *see* 16 U.S.C. § 1332(c); 43 C.F.R. § 4710.3-1. In each HMA, BLM typically establishes an Appropriate Management Level ("AML") range. *See Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1008 (D. Nev. 2018), *aff'd*, 820 F. App'x 513 (9th Cir. 2020) ("BLM is given great deference [] in establishing AMLs…"). If BLM determines there is an overpopulation of wild horses and burros and that action is necessary to remove them, BLM must immediately act to remove the excess animals to achieve AML. 16 U.S.C. § 1333(b)(2).

The Act specifies that excess wild horses shall be "humanely captured and removed." *Id.* § 1333(b)(2)(B). BLM regulations define "humane treatment" as "handling compatible with animal husbandry practices accepted in the veterinary community, without causing unnecessary stress or suffering to a wild horse or burro." 43 C.F.R. § 4700.0-5(e). BLM has broad discretion in managing and removing wild horses from public lands. *See* 16 U.S.C. § 1333(b)(1); *Leigh v. Jewell*, No. 3:11-CV-00608-HDM-WGC, 2014 WL 31675, at *5 (D. Nev. Jan. 3, 2014) (finding the Act's definition of "humane" "affords BLM discretion in conducting [] wild horse roundups").

## II.   First Amendment and Gathers Under the Act

The First Amendment contains a "qualified right of access for the press and public to observe government activities." *Leigh v. Salazar*, 677 F.3d 892, 898 (9th Cir. 2012). The Ninth Circuit has held that whether this right of access applies to wild horse and burro gathers is governed by the two-step test articulated in *Press-Enterprise Co. v. Superior Court of California.*, 478 U.S. 1, 8-9 (1986). *Leigh*, 677 F.3d at 898–900. Under that standard, a district court must determine: (1) "whether the place and process have historically been open to the press and general public"; and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." *Id.* at 898 (quoting *Press-Enter.*, 478 U.S. at 8–9).

If the answer to both questions is affirmative, a qualified right of access attaches to the government proceeding. This Court has so held with respect to the public's right to view gather operations. *Leigh v. Salazar,* 954 F. Supp. 2d 1090, 1100-01 (D. Nev. 2013). The government may overcome that right by demonstrating "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Leigh*, 677 F.3d 898 (quoting *Press-Enter.*, 478 U.S. at 9). This Court has recognized that "the effective and efficient gather of the horses" and "the safety of all individuals including those involved in gather activities, members of the viewing public, and the horses themselves" all constitute "important overriding interests." *Leigh*, 954 F. Supp. 2d at 1101-03.

## III.   The National Environmental Policy Act

NEPA, 42 U.S.C. §§ 4321–4370h, serves the dual purpose of informing agency decision-makers of the environmental effects of proposed federal actions and ensuring that relevant information is made available to the public so it "may also play a role in both the decisionmaking process and the implementation of that decision." *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA requires the agency to take a "hard look" at the potential environmental consequences of its decision-making. *Id.* at 350. However, NEPA does not mandate particular results or impose substantive environmental obligations. *Id.* at 350-51. Instead, "NEPA ensures that [an] agency will not act on incomplete information[.]" *Marsh v. Or.*

*Nat. Res. Council*, 490 U.S. 360, 371 (1989).

Furthermore, "NEPA does not prevent an agency from satisfying future NEPA obligations by performing a NEPA analysis at the outset of a long-term project." *Mayo v. Reynolds*, 875 F.3d 11, 22 (D.C. Cir. 2017). NEPA analyses do not have a set expiration date, but they must be supplemented or re-evaluated when the information and data upon which they rely has materially changed or become stale. *See* 40 C.F.R. § 1502.9(d)(1)(ii) (agencies must prepare supplements to their NEPA analyses if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts"); *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1086 (9th Cir. 2011) ("Reliance on data that is too stale to carry the weight assigned to it may be arbitrary and capricious.").

## BACKGROUND

### I.    Factual Background and Plaintiffs' Allegations

The wild horse gathers at issue in this case are part of a larger, ten-year gather plan for several BLM-managed HMAs in Nevada. In 2017, BLM estimated that the population of wild horses within the Antelope, Antelope Valley, Goshute, Maverick-Medicine, Spruce-Pequop, and Triple B HMAs (collectively, "the Antelope and Triple B Complexes") was "almost 11 times above the low [AML] of 899 wild horses." Decision Record, Dkt. 21-5 at 4.[1] Because gather logistics and efficiencies and available holding space would make it impossible for BLM to gather this dramatic excess of horses in a single gather, BLM structured its gather plan for the Antelope and Triple B Complexes to allow for a series of gathers and population control measures over ten years. *See, e.g.*, *id.* at 5 (BLM deciding "to gather and remove excess wild horses over a ten-year period from the initial gather within and outside the Antelope and Triple B Complexes, and to reduce the wild horse population growth rates to achieve and maintain established AML ranges").

---

[1]    *See BLM National NEPA Register*, DOI-BLM-NV-E030-2017-0010-EA, https://eplanning.blm.gov/eplanning-ui/project/84367/570. The Court may take judicial notice of the Decision Record and other items on BLM's website because they are "publicly available" on an official government website, and their accuracy and authenticity are not subject to reasonable dispute. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

BLM completed the 2017 EA to assess the possible environmental effects of the ten-year gather plan authorized by the Decision Record.  This Court upheld the Decision Record and 2017 EA against prior challenges under the Act and NEPA.  *See Friends of Animals*, 353 F. Supp. 3d 991.

On July 5, 2023, BLM posted online notices that it intended to begin gathers in the north and south portions of the Antelope Complex that month.[2] The Antelope Complex includes the Antelope and Antelope Valley (east of U.S. Highway 93) HMAs (collectively, "the Antelope Complex-South"), as well as the Antelope Valley (northwest of U.S. Highway 93), Goshute, and Spruce-Pequop HMAs (collectively, "the Antelope Complex-North").[3]  Both gathers commenced on July 9—the Antelope Complex-South gather was completed on July 26.  *See supra*, note 3.

Also on July 26, Plaintiffs sued to challenge BLM's gathers in the Antelope Complex. Dkt. 1 ¶ 1. Plaintiffs do not dispute that the Antelope Complex was well-above AML prior to this summer's gathers or that it remains so today. *See* Dkt. 21 at 7–8 (explaining that as of March, the Antelope Complex was at "more than 10 times the high end of the AML" excluding 2023 foals). Rather, Plaintiffs take issue with the way BLM conducted the gathers, and with its reliance on the 2017 EA. In their Amended Complaint, Dkt. 38, Plaintiffs assert four claims: violation of Administrative Procedure Act ("APA"), 5 U.S.C. § 553; violation of the Act's "immediacy" provision; violation of NEPA; and violation of the First Amendment. *Id.* ¶¶ 76–110.

Plaintiffs' APA claim is concerned with BLM's Comprehensive Animal Welfare Program ("CAWP"). *Id.* ¶¶ 22, 42, 79. The CAWP is a "proactive program for protecting the welfare of wild horses and burros under [BLM's] management and protection." *Id.* ¶ 42. Plaintiffs are focused on the CAWP Standards for Wild Horse and Burro Gathers ("CAWP Gather Standards"),

---

[2] *Bureau of Land Management to begin the FY23 Antelope Complex-North Wild Horse Gather*, BLM, https://www.blm.gov/press-release/bureau-land-management-begin-fy23-antelope-complex-north-wild-horse-gather; *Bureau of Land Management to begin the FY2023 Antelope Complex-South Wild Horse Gather*, BLM, https://www.blm.gov/press-release/bureau-land-management-begin-fy2023-antelope-complex-south-wild-horse-gather.

[3] *2023 Antelope Complex-South Wild Horse Gather*, BLM, https://www.blm.gov/programs/wild-horse-and-burro/herd-management/gathers-and-removals/nevada-ely-do/2023-antelope; *2023 Antelope Complex-North Wild Horse Gather*, BLM, https://www.blm.gov/programs/wild-horse-and-burro/herd-management/gathers-and-removals/nevada/2023-antelope-complex.

which BLM issued on June 30, 2015, and the CAWP Standards for Off-Range Corral Facilities, Transportation, and Adoption/Sale Events ("CAWP Off-Range Standards," and, together, "CAWP Standards"), which BLM issued on January 29, 2016.[4] *Id.* ¶ 79. Plaintiffs allege that BLM did not comply with CAWP Gather Standards in conducting the Antelope Complex gathers this past summer. *Id.* ¶¶ 68–75. They assert that both CAWP Standards "must be promulgated as rules" because they "implement the [Act's] humane handling requirements," citing to 16 U.S.C. § 1333(b)(2)(B) and 43 C.F.R. 4700.0-05(e). *Id.* ¶ 79. Plaintiffs admit that the CAWP Standards are "unenforceable 'agency polic[ies]'" and claim that by issuing them as so, BLM has "restrict[ed] [Plaintiffs'] ability to enforce the BLM's mandate to humanely capture and remove wild horses," and deprived them of the opportunity to participate in a rulemaking. *Id.* ¶¶ 81–83.

Plaintiffs' second claim alleges that BLM violated the "immediacy requirement" of the Act by relying on the 2017 EA to conduct this summer's gathers. *Id.* ¶ 87; *see also id.* ¶ 67 (reliance on "NEPA review that is [] six years old violates the [] Act's immediacy requirement.").

Plaintiffs' NEPA claim relies on 43 C.F.R. § 46.120(c) and argues that BLM needed to issue a Determination of NEPA Adequacy ("DNA") in order to rely on the 2017 EA to conduct the gathers last summer and to do future gathers in the Antelope and Triple B Complexes. *Id.* ¶¶ 92–93. Plaintiffs allege that if BLM had issued a DNA, they "would have expected evaluation" of "new circumstances" and "new information." *Id.* ¶ 93.

Plaintiffs' First Amendment claim appears to primarily proceed on two theories: (1) that BLM deprived them of access to view gather operations at one trap site during the Antelope Complex gathers this summer, *id.* ¶ 75; and (2) that Plaintiffs have a First Amendment "right to

---

[4] In addition to being judicially noticeable because they are on BLM's website, the CAWP Standards are incorporated by reference into the Amended Complaint because Plaintiffs refer "extensively" to them and they "form the basis of" Plaintiffs' first claim. *See United States v. Ritchie,* 342 F.3d 903, 908 (9th Cir. 2003); *Permanent Instruction Memorandum No. 2021-002,* Wild Horse and Burro Comprehensive Animal Welfare Program, BLM, https://www.blm.gov/policy/pim-2021-002 (attaching both CAWP Standards).   For ease of reference, Federal Defendants have attached the CAWP Gather Standards as Exhibit 1 and the CAWP Off-Range Standards as Exhibit 2.

view the animals being treated humanely" via the Act, and that BLM violated this right by allegedly inhumanely gathering horses during this summer's gathers, *id.* ¶¶ 104, 109. Plaintiffs also state that they have a right to view various types of on- and off-range locations where gathered horses are held, but they do not identify any specific locations, allege that they have tried to access such locations, or allege that BLM has denied them access. *See id.* ¶ 101.

## II.   Procedural History

On August 1, 2023, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction seeking to "stop [BLM's] gather of wild horses and burros at the Antelope Complex[.]" Dkt. 10 at 2. Plaintiffs claimed that BLM was violating the Act, that it was not complying with the CAWP Gather Standards, and that it was not providing proper viewing access under the First Amendment. *See id.* Federal Defendants opposed Plaintiffs' motion and submitted detailed declarations from BLM personnel explaining that—while some deaths are unfortunately part of any wild horse gather—BLM's Antelope Complex gathers followed the CAWP Gather Standards and deaths were well-within expected levels. *See, e.g.*, Dkt. 21-1 ¶¶ 14–19, 26.

On August 9, 2023, the Court held an all-day evidentiary hearing. Dkt. 29. The Court ruled from the bench and denied Plaintiffs' motion. *Id.*; *see* Hearing PM Transcript at 126:21–142:19. On August 20, BLM completed the Antelope Complex-North gather, which brought an end to the Antelope Complex gathers challenged by Plaintiffs. *See supra*, note 3. A few weeks later, Plaintiffs filed an Amended Complaint. Dkt. 38.

## LEGAL STANDARD

## I.   Federal Rule of Civil Procedure 12(b)(1)

"Federal courts are courts of limited jurisdiction," and they "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears." *Stock W., Inc. v. Confederated Tribes of the Colville Rsrv.*, 873 F.2d 1221, 1225 (9th Cir. 1989) (citation omitted). "[W]hen a defendant brings a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), the plaintiff

1  bears the burden of establishing jurisdiction." *Bassiri v. Xerox Corp.*, 292 F. Supp. 2d 1212, 1219

2  (C.D. Cal. 2003), *rev'd and remanded on other grounds*, 463 F.3d 927 (9th Cir. 2006).

3  **II.    Federal Rule of Civil Procedure 12(b)(6)**

4       A motion to dismiss under Fed. R. Civ. P. 12(b)(6) "tests the legal sufficiency of a

5  claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "To survive a motion to

6  dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

7  relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation

8  omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows

9  the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

10  *Id.* (citation omitted). A pleading "that offers 'labels and conclusions' or 'a formulaic recitation

11  of the elements of a cause of action'" is insufficient to state a claim. *Id.* (citation omitted). If there

12  is "a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable

13  legal theory," the Court must dismiss the complaint under Rule 12(b)(6). *Conservation Force v.

14  Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (citation omitted).

**ARGUMENT**

15

16  **I.    Plaintiffs' Claim to Compel BLM to Issue the CAWP Standards as Rules Fails.**

17       Plaintiffs' first claim admits that the CAWP Standards are non-binding policies and

18  attempts to force BLM to issue them as binding rules. For multiple reasons, this claim fails.

19       **A.  Any Challenge to BLM's Issuance of the CAWP Standards is Time-Barred.**

20       As an initial matter, Plaintiffs' claim fails because the CAWP Gather and Off-Range

21  Standards were issued in 2015 and 2016, respectively, and any challenge to the procedures by

22  which BLM issued them is barred by the APA's six-year statute of limitations.

23       Under 28 U.S.C. § 2401(a), "APA claims are subject to a six-year statute of limitations."

24  *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 930 (9th Cir. 2010); *see* 28 U.S.C.

25  § 2401(a) (all civil actions against the United States must be filed within six years after the right

26  of action first accrues). Thus, "[i]f a person wishes to challenge a mere procedural violation in the

27  adoption of a regulation or other agency action, the challenge must be brought within six years of

28

the decision." *Wind River Mining Corp. v. United States*, 946 F.2d 710, 715 (9th Cir. 1991).

Plaintiffs allege that BLM adopted the CAWP Standards on June 30, 2015. Dkt. 38 ¶ 42. Plaintiffs conflate the CAWP Gather Standards, which were issued on June 30, 2015, and the CAWP Off-Range Standards, which were issued on January 29, 2016. *See* Exhibit 1, CAWP Gather Standards, at 1-1; Exhibit 2, CAWP Off-Range Standards, at 1.[5] The statute of limitations on Plaintiffs' claim that it was procedurally improper for BLM to not issue the CAWP Gather Standards through rulemaking expired on June 30, 2021, and their claim as to the CAWP Off-Range Standards expired on January 29, 2022. *See Cedars–Sinai Med. Ctr. v. Shalala*, 177 F.3d 1126, 1129 (9th Cir. 1999) ("Under well-settled circuit authority, a cause of action challenging procedural errors in the promulgation of regulations accrues on the issuance of the rule."); *S. Cal. All. of Publicly Owned Treatment Works v. EPA*, 297 F. Supp. 3d 1060, 1068 (E.D. Cal. 2018) (holding that plaintiffs' claim that EPA failed to issue 2010 policy via notice and comment was time-barred) (hereafter, "*SCAP*"). Plaintiffs filed on July 26, 2023, and therefore their claims as to both CAWP Standards are time-barred.

Plaintiffs may argue that the statute of limitations should be equitably tolled. *See SCAP*, 297 F. Supp. 3d at 1069 (explaining that for tolling to be appropriate, plaintiffs must show that "(1) that [they were] pursuing [their] rights diligently, and (2) that some extraordinary circumstance stood in [their] way") (citation omitted). But no equitable tolling is appropriate here because Plaintiffs' own allegations make plain that they have been aware of the CAWP Standards since their issuance. For example, Plaintiff Leigh claims that BLM informed her that "BLM would conduct annual reviews of the CAWP" in 2015. *Id.* ¶ 22. She also claims to have requested copies of such "annual reviews" through the Freedom of Information Act "from 2016-2021." *Id.* ¶ 23.

Accordingly, Plaintiffs' claim is time-barred and should be dismissed.

---

[5] This conflation is emblematic of Plaintiffs' allegations generally regarding the CAWP Standards. Despite identifying the CAWP Off-Range Standards a few times in their Amended Complaint, they do not appear to make any specific allegations concerning BLM's compliance with these standards. Their allegations are focused on the CAWP Gather Standards.

**B.  Per Plaintiffs' Allegations, the CAWP Standards Are Not Substantive Rules.**

Even if the claim was not time-barred, Plaintiffs' challenge to the procedures used to promulgate the CAWP Standards fails to state a claim upon which relief can be granted. An agency is required to go through formal rulemaking subject to notice and comment only if it issues a "substantive rule." *See* 5 U.S.C. § 553(b)(A) (exempting "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice" from notice and comment requirements); *Sacora v. Thomas*, 628 F.3d 1059, 1069 (9th Cir. 2010) ("Under the APA, a federal administrative agency is required to follow prescribed notice-and-comment procedures before promulgating substantive rules.").[6] Substantive rules "create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress." *Hemp Indus. Ass'n v. Drug Enforcement Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003).

An agency's internal manuals, handbooks, and guidelines explaining how the agency will exercise its discretion under a relevant statute are "not substantive in nature" and do not have the "force and effect of law." *See W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 901 (9th Cir. 1996) (collecting cases); *see also Friends of Animals v. BLM,* No. 2:16-CV-1670-SI, 2018 WL 1612836, at *18 (D. Or. Apr. 2, 2018) ("Administrative manuals and handbooks 'merely establish [] guidelines' for agency action."). Thus, this Court has held that "pronouncements and guidance for wild horse excess determinations and removal gathers" in a BLM handbook were "not substantive in nature and [did] not create legal duties upon BLM." *Friends of Animals*, 353 F. Supp. 3d at 1004. That ruling is consistent with numerous other courts that have found BLM's policies and handbooks to be non-substantive. *See, e.g.*, *Colo. Wild Horse & Burro Coal. v. Jewell*, 130 F. Supp. 3d 205, 214 (D.D.C. 2015) (provision of the handbook requiring population inventories every two years did not create "a legal duty" for BLM); *Friends of Animals*, 2018 WL 1612836, at *18 (BLM was not required to strictly comply with handbook because it did not carry the "independent force and effect of law"); *Friends of Animals v. Pendley*, 523 F. Supp. 3d 39,

---

[6] "Legislative rule" and "substantive rule" are used by courts "interchangeably." *Erringer v. Thompson*, 371 F.3d 625, 629 n.8 (9th Cir. 2004).

55 (D.D.C. 2021) (instruction memorandum did not require notice and comment because "BLM's interpretive guidance on the statutes it administers does not have binding legal effect").

The Court should reach the same conclusion here. The CAWP Standards are not substantive rules because they create no binding duties on BLM (or anyone else). Instead, they are interpretative policy statements that effectuate BLM's broad duty to humanely gather horses under the Act. BLM has "a great deal of discretion" under the Act. *Am. Horse Prot. Ass'n, Inc. v. Frizzell,* 403 F. Supp. 1206, 1217 (D. Nev. 1975). BLM must "humanely" gather excess wild horses, but this is a "broad rather than discrete mandate," and BLM is afforded "discretion in conducting [] wild horse roundups." *Leigh*, 2014 WL 31675, at *5. The CAWP Gather Standards are policies that BLM follows in humanely gathering horses and burros, and the CAWP Off-Range Standards are policies that BLM follows in humanely caring for such animals after gathers. Because the CAWP Standards merely explain how BLM "will exercise its broad" authority under the Act, notice and comment was not required. *Friends of Animals* 523 F. Supp. 3d at 53.

Plaintiffs do not allege that the CAWP Standards are substantive rules that create binding duties for BLM. To the contrary, their claim is premised on their displeasure that the CAWP Standards are "unenforceable" against BLM. Dkt. 38 ¶¶ 81–82. Because BLM was required to go through rulemaking *only if* the CAWP Standards are substantive—i.e., if they "create legal duties" binding on BLM, *see Friends of Animals*, 353 F. Supp. 3d at 1005—Plaintiffs' admission that the CAWP Standards do not impose binding duties on BLM dooms this claim.

Accordingly, Plaintiffs have not plausibly alleged that the CAWP Standards are substantive rules, and thus there was no requirement for BLM to issue them through rulemaking.[7]

---

[7] Plaintiffs also request that the Court "compel Defendants to comply with . . . the temperature and foaling prohibitions of the BLM's CAWP [Gather] standards" in their First Amendment claim. Dkt. 38 ¶ 109. If Plaintiffs seek review of BLM's compliance with CAWP Standards, this also fails. Courts "will not review allegations of noncompliance with an agency statement that is not binding on the agency.'" *Friends of Animals*, 353 F. Supp. 3d at 1004 (citation omitted). Whether a statement is binding depends on if it is substantive and if it conformed to "procedural requirements," including notice and comment. *Id.* As shown above, the CAWP Standards are not substantive rules, and they were not subject to notice and comment.

**C.  Plaintiffs Do Not Seek to Compel Legally Required, Discrete Agency Action.**

Even if the Court determined that the CAWP Standards are substantive rules—i.e., that they were issued "without observance of procedure required by law"—the remedy would be to "hold unlawful and set aside" the CAWP Standards. *See* 5 U.S.C. 706(2)(D); *Hemp. Indus.*, 333 F.3d at 1091 (invaliding action that did not go through notice and comment rulemaking because it was a "procedurally invalid legislative rule"). This is not what Plaintiffs seek—they argue that the Act requires BLM to promulgate the CAWP Standards as a rule and that the Court has the "authority to compel the BLM" to do so. Dkt. 38 ¶¶ 79, 84. Plaintiffs are incorrect.

APA Section 706(1) allows courts to "compel agency action unlawfully withheld or unreasonable delayed." But a plaintiff can compel agency action "only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (hereafter, "*SUWA*"). "The limitation to required agency action rules out judicial direction of even discrete agency action that is not demanded by law." *Id.* at 65. The discreteness and mandatory requirements prevent "undue judicial interference with [agencies'] lawful discretion" and "avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Id.* at 66. In *SUWA*, the Court held that courts should not "compel[] compliance with broad statutory mandates," because that would require those courts to manage "compliance with the broad statutory mandate," thereby "injecting the judge into day-to-day agency management." *Id.* at 66–67. One example the Court gave of such a "broad statutory mandate" with which it would be improper to compel compliance was the Act's mandate that BLM manage wild horses and burros "in a manner that is designed to achieve and maintain a thriving natural ecological balance[.]" *Id.* at 67.

Citing to Section 1333(b)(2)(B) of the Act and 43 C.F.R. § 4700.0-5(e), Plaintiffs claim that because the CAWP Standards "implement the [Act's] humane handling requirements," they must be promulgated as rules. Dkt. 38 ¶ 79. Section 1333(b)(2)(B) states that BLM "shall cause . . . additional excess wild free-roaming horses and burros to be humanely captured and removed[,]" and 43 C.F.R. § 4700.0-5(e) defines "humane treatment" to mean "handling

compatible with animal husbandry practices accepted in the veterinary community, without causing unnecessary stress or suffering to a wild horse or burro." Neither contain language even suggesting promulgation of a rule by BLM—much less do they contain the "specific, unequivocal command" required to show that the Court can compel BLM to issue a rule because BLM is "legally required" to do so. *See SUWA*, 542 U.S. at 63 (citation omitted); *see also Hells Canyon*, 593 F.3d at 932 (noting that courts' ability to compel agency action is "carefully circumscribed to situations where an agency has ignored a specific legislative command").

To the contrary, the Act's humane handling provisions "impose[] a broad rather than discrete mandate" on BLM, affording it "discretion in conducting" gathers, and the provisions could not be enforced by a court "without interference in defendant's day-to-day operations." *Leigh*, 2014 WL 31675, at *4–5. Indeed, courts in this District have rejected Ms. Leigh's prior attempts to compel compliance with the Act's humane handling provision because she sought "essentially the same general agency compliance" with the Act's broad mandates that the Supreme Court held improper in *SUWA*. *Leigh v. Salazar*, No. 3:13-cv-00006-MMD-VPC, 2014 WL 4700016, at *3–5 (D. Nev. Sept. 22, 2014) (finding Ms. Leigh's claim that BLM had failed to "ensur[e] the humane capture and removal of excess wild horses in compliance with the [Act]" did "not amount to a discrete agency action for which judicial review is available[]"); *Leigh*, 2014 WL 31675, at *4–5 (same). Plaintiffs' claim that BLM was required to issue the CAWP Standards through rulemaking is a thinly veiled repackaging of these prior attempts to compel compliance with the Act's broad humane handling mandate, which courts in this District have found non-justiciable for failure to challenge discrete, final agency action. Thus, in addition to the Act not legally requiring BLM to issue a rule, because Plaintiffs seek to compel BLM to issue rules as an indirect means of compelling compliance with the Act's broad mandate that BLM humanely gather horses, this claim also fails for seeking to compel non-discrete agency action.

*** 

Accordingly, for each of the foregoing independently sufficient reasons, the Court should dismiss Plaintiffs' first claim for relief.

**II.      Plaintiffs Do Not State a Claim under NEPA.**

Plaintiffs' NEPA claim is based on their assertion that 43 C.F.R. § 46.120(c) requires BLM to issue a DNA to continue relying on the 2017 EA. Dkt. 38 ¶ 93. Plaintiffs misread Section 46.120(c), which does not support a NEPA claim here.

As an initial matter, Plaintiffs claim that BLM violated NEPA by failing to complete a DNA is facially invalid. "DNAs are an administrative convenience created by the BLM, and are not defined in NEPA or its implementing regulations issued by the Council on Environmental Quality [CEQ]." *S. Utah Wilderness All. v. Norton*, 457 F. Supp. 2d 1253, 1255 (D. Utah 2006), *aff'd in part, appeal dismissed in part sub nom. S. Utah Wilderness All. v. Kempthorne*, 525 F.3d 966 (10th Cir. 2008); *see also Friends of Animals*, 2018 WL 1612836, at *9.

Further, Section 46.120 does not create any new obligations for agencies seeking to comply with NEPA. *See* Implementation of the National Environmental Policy Act (NEPA) of 1969, 73 Fed. Reg 61,292, 61,295 ("This final rule adds no additional obligations not currently required under NEPA and the CEQ regulations."). For this reason alone, Plaintiffs' reliance is misplaced and their NEPA claim cannot rest on a requirement set forth only in Section 46.120.

The plain text of 43 C.F.R. § 46.120 also does not support Plaintiffs' NEPA claim. Section 46.120 was promulgated to streamline the lengthy analyses required by NEPA and to provide agencies with guidance on how to utilize pre-existing NEPA analyses for assessing the impacts of a newly proposed action. 43 C.F.R. § 46.120(a). Plaintiffs read the subsection 46.120(c) in isolation, and therefore ignore the critical importance of subsection (a), which limits the application of 43 C.F.R. § 46.120 to only newly proposed actions, rather than ongoing actions.

The 2023 gather at issue is not a newly proposed action; rather, the 2017 EA authorizes BLM to conduct gathers on the Antelope and Triple B Complexes over a ten-year period as necessary to achieve and maintain AML. Indeed, this Court has already upheld the 2017 EA and Decision Record and observed that they "allow[] for the gathering of wild horse over a ten-year period[.]" *Friends of Animals*, 353 F. Supp. 3d at 1004. Because the 2017 EA authorizes BLM to conduct gathers through 2027, there is no new "proposed action" for which new NEPA analysis

is required, or to which an existing NEPA analysis needs to be applied. Rather, this past summer's gathers, and any future gathers conducted in the Antelope and Triple B Complexes through 2027, are merely steps that implement the Decision Record, the environmental effects of which were thoroughly analyzed by the 2017 EA. *See* Dkt. 38 ¶ 63 (Plaintiffs alleging that 2017 EA "analyzed the environmental impacts of removing thousands of wild horses and burros . . . over a period of ten years"). Courts have rejected Plaintiffs' categorical argument that each gather conducted under a long-term gather plan must be separately analyzed under NEPA. *See Friends of Animals v. BLM*, 548 F. Supp. 3d 39, 64 (D.D.C. 2021) (upholding ten-year gather plan EA and rejecting argument that "NEPA requires consideration of every possible implementation action or the particulars of each gather to satisfy the 'hard look' requirement"); *see also Friends of Animals*, 353 F. Supp. 3d at 1004 (this Court upholding the 2017 EA and rejecting argument that BLM violated APA by "not [] drafting separate EAs for each roundup approved under the plan").

Moreover, NEPA analyses, such as the 2017 EA, do not have any set expiration date. *See Mayo*, 875 F.3d at 22 ("NEPA does not prevent an agency from satisfying future NEPA obligations by performing a NEPA analysis at the outset of a long-term project."). Instead, NEPA analyses must be supplemented or re-evaluated only when the action has materially changed or when the information and data upon which the NEPA analysis relied has materially changed or become stale. *See* 40 C.F.R. § 1502.9(d)(1)(ii) (agencies must prepare supplements to their NEPA analyses if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts"). Here, Plaintiffs do not allege that there have been any changes to the agency action as set forth in the 2017 EA; nor do Plaintiffs allege "significant new circumstances or information" that BLM needs to analyze. Instead, they allege that if BLM had completed a DNA that there are vague "new circumstances" that they "would have expected" BLM to analyze, including "the current foaling season, heavy snowfall during the 2022-2023 winter, current range conditions, efficacy of growth suppression methods, and more." Dkt. 38 ¶ 93. Plaintiffs do not argue that any of these alleged new conditions show that AML has been reached, that the AML has changed, nor even that they undermine the 2017

EA's analysis. Rather, Plaintiffs simply claim that these conditions would have been addressed in a DNA. This is insufficient to state a claim that a supplemental NEPA analysis was required.

As a result, Plaintiffs have failed to state a NEPA claim.

### III. Plaintiffs' "Immediacy" Claim is Duplicative of their NEPA Claim and Fails for the Same Reasons.

Plaintiffs' second claim is solely focused on BLM's 2017 EA. Plaintiffs argue that "BLM may rely on an EA to support its decision to conduct gathers for a limited period, due to the immediacy requirement of the Wild Horse Act." Dkt. 38 ¶ 86. They also allege that BLM "abused its discretion and violated the Wild Horses Act by relying on a phased Environmental Assessment—the 2017 EA/FONSI—for multiple gathers[.]" *Id.* ¶ 87. Moreover, they claim that BLM's "decision to rely on the 2017 EA[]" was arbitrary and capricious. *Id.* ¶ 89. Accordingly, Plaintiffs' second claim, purportedly brought under the Act's "immediacy" provision, is in effect identical to their NEPA claim because it also challenges BLM's reliance on the 2017 EA and claims that BLM needs to conduct a new NEPA analysis.[8] Thus, for the same reasons described above with respect to Plaintiff's NEPA claim, this claim also fails.

Plaintiffs rely on *Friends of Animals v. Culver*, 610 F. Supp. 3d 157 (D.D.C. 2022). Dkt. 38 ¶¶ 86–87. There, the court held that "the ten-year 'phased' approach of the" decision record at issue violated the Act's immediacy requirement. *Culver*, 610 F. Supp 3d at 168–71.[9] That holding had nothing to do with BLM's NEPA analysis—in fact, the court upheld BLM's EA in that case. *Id.* at 171–72 (rejecting argument that BLM violated NEPA by failing to take a "hard look" at "risks" posed by "ten years" of gathers). Thus, *Culver* provides no support for Plaintiffs' second claim, which challenges BLM's reliance on the 2017 EA.

Accordingly, Plaintiffs' second claim fails to state a claim upon which relief can be granted for the same reasons described above with respect to their NEPA claim.

---

[8] Plaintiffs initially pled their NEPA and "immediacy" claims together. *See* Dkt. 1 ¶ 79–86.

[9] Other courts have reached different conclusions on this issue. *See Friends of Animals*, 548 F. Supp. 3d at 59 (finding that plaintiff "failed to demonstrate that it is likely to prevail on the merits of its contention that long-term gather plans are precluded by the statutory command that the Secretary act 'immediately'"). And the Decision Record here is distinguishable, in any event.

1

**IV.     Plaintiffs Fail to State a Claim Under the First Amendment.**

2

3       Plaintiffs' First Amendment claim seeks relief that is unavailable against the federal

4   government and—aside from moot conduct not likely to recur—is based on conclusory, vague

5   allegations that fail to state a claim. It also seeks to vindicate a non-existent First Amendment

    right to view "humane" gathers. The Court should dismiss this claim as well.

6

**A.  Plaintiffs Cannot Sue Federal Defendants Under Section 1983.**

7

8       First, Plaintiffs try to bring this claim under 42 U.S.C. § 1983 to get "compensatory

9   damages" for past alleged violations of their First Amendment rights. Dkt. 38 ¶¶ 100, 106. This

    fails because "by its very terms, § 1983 precludes liability in federal government actors." *Morse*

10  *v. N. Coast Opportunities, Inc.*, 118 F.3d 1338, 1343 (9th Cir. 1997); *Hodges v. CGI Fed. Def. &*

11  *Intel.*, 727 F. App'x 236, 239 (9th Cir. 2018) (§ 1983 "does not apply to the federal government").

12      Even construing the claim under *Bivens v. Six Unknown Named Agents of the Federal*

13  *Bureau of Narcotics*, 403 U.S. 388 (1971), it still fails. For one, BLM cannot be sued under *Bivens*

14  because "no *Bivens* remedy is available against a federal agency." *W. Radio Servs. Co. v. U.S.*

15  *Forest Serv.*, 578 F.3d 1116, 1119 (9th Cir. 2009) (affirming dismissal of *Bivens* claims against

16  Forest Service). Moreover, the Ninth Circuit has determined that "[t]he APA leaves no room for

17  *Bivens* claims based on agency action or inaction." *Id.* at 1123. Thus, no *Bivens* claim can be pled

18  against any of the individual Federal Defendants because Plaintiffs' First Amendment claims are

19  based on agency action or inaction—specifically, their belief that they were improperly denied

20  viewing access by BLM personnel during the Antelope Complex gathers. *Id.* at 1125 (affirming

21  dismissal of *Bivens* claims, including under First Amendment, against Forest Service officials);

22  *see Am. C.L. Union of Nev. v. U.S. Gen. Servs. Admin.*, No. 3:13-CV-00189-RCJ-VPC, 2014 WL

23  135219, at *2 (D. Nev. Jan. 10, 2014) (dismissing potential *Bivens* claim based on *Western*

24  *Radio*'s holding that "the APA provides an adequate remedy" for First Amendment claims against

25  federal government); *Egbert v. Boule,* 142 S. Ct. 1793, 1807 (2022) (noting that the Court has

26  "never held that *Bivens* extends to First Amendment claims," and holding that "there is no *Bivens*

27  cause of action [for a] First Amendment retaliation claim").

28

Accordingly, the Court should dismiss Plaintiffs' First Amendment claim with prejudice to the extent it is brought under § 1983 (or *Bivens*) and seeks money damages.

### B.  Plaintiffs' First Amendment Claim Based on Prior Restrictions on Viewing Antelope Gather Operations is Moot.

Plaintiffs' only factual allegation concerning access restrictions to view gathers on the Antelope Complex is that during the BLM's gather operations this summer, "Plaintiffs were denied access because BLM purposely placed trap areas on lands only accessible through private roads, even though the BLM knew it did not have permission for the public to utilize those roads to observe the roundup." Dkt. 38 ¶ 75. There is no truth to the claim that BLM purposely placed a trap site on checkerboarded land to deprive Plaintiffs of viewing access. BLM chose that site to ensure the effective and efficient gather of horses and the safety of the public, BLM employees, BLM contractors, and the horses themselves.

Regardless, any claim Plaintiffs may have had regarding the past placement of a trap site on checkerboard land is moot. "[A]n action is mooted when the issues presented are no longer live and therefore the parties lack a legally cognizable interest for which the courts can grant a remedy." *Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 854 (9th Cir. 1999). No relief can be granted that would allow Plaintiffs to view the now-complete Antelope Complex gather operations at the trap site on checkerboard land.[10] Plaintiffs are not currently being denied access to view a gather at the checkboard land site. Thus, any claim Plaintiffs may have had regarding the placement of that specific trap on checkerboard land during this summer's Antelope Complex gathers is moot. To show their claim is live, Plaintiffs must demonstrate that the "capable of repetition, yet evading review" exception applies, and they "have the burden of showing that there is a reasonable expectation that they will once again be subjected to the challenged activity." *Native Vill. of Nuiqsut v. BLM.*, 9 F.4th 1201, 1209 (9th Cir. 2021) (citation omitted).

---

[10] As discussed above, Plaintiffs' claim for "compensatory damages"—which was likely added to avoid dismissal for mootness—from this alleged past First Amendment violation fails. Nor can Plaintiffs' declaratory judgment request keep live an otherwise moot dispute. *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1129 (9th Cir. 2005) ("The limitations that Article III imposes upon federal court jurisdiction are not relaxed in the declaratory judgment context.").

Plaintiffs may rely on the Ninth Circuit's decision in *Leigh*, which reversed this Court's holding that Ms. Leigh's First Amendment claims were moot for purposes of a preliminary injunction after a specific gather was complete. *See* 677 F.3d at 897. There, the Court found that Ms. Leigh's First Amendment claim was not moot because she sought "unrestricted access" to future gathers and the decision record authorized gathers through the following year. *See id.* That case is distinguishable and does not control here. For one, the Ninth Circuit's decision was limited to determining that Ms. Leigh's claims were not moot at the preliminary injunction stage because she requested forms of relief other than stopping the completed gather that could be granted. *Id.* at 896–97.[11] This Court already determined that, as to Plaintiffs' Motion for Temporary Order and Preliminary Injunction, any claims Plaintiffs had about the checkerboard land issue were moot. *See* Hearing PM Transcript at 128:21–129:4. Now, the Court is presented with a different question—whether Plaintiffs' only factual allegation in the Amended Complaint regarding access is moot—and it should come to the same conclusion.

Moreover, the Ninth Circuit did not expressly consider whether any specific access restrictions were likely to recur in the future. This may have been because at least some of the restrictions at issue there were relatively broad and arguably applicable to future gathers. *See, e.g.*, *Leigh v. Salazar*, Case No. 3:10-cv-00597-LRH-VPC, Dkt. 9-1 (Sept. 24, 2010) (screenshot of BLM website providing two viewing days for two-week long gather). Indeed, courts interpreting the decision have noted that when a roundup has been completed, a plaintiff still must show that "objectionable conduct is capable of repetition" in order to avoid mootness, even if BLM is "authorized to return for further roundups[.]" *See Leigh v. Salazar*, No. 3:11-CV-00608-HDM-WGC, 2012 WL 2367823, at *2 (D. Nev. June 21, 2012). Thus, with respect to access to view gather operations, the Ninth Circuit's decision is best read as finding that, based on the

---

[11] The Ninth Circuit's decision partially rested on Ms. Leigh's request for "access to horses after they are gathered," and that she identified one "holding facility to which she was denied access." 677 F.3d at 897. While Plaintiffs purport to seek similar relief here, Dkt. 38, Prayer for Relief ¶ D, as explained below, they do not identify any specific locations where they would like access, that they have requested access, or that BLM has denied access.

record in that case, at least some of the challenged restrictions were likely to recur—a case-specific determination that does not necessarily apply here.  Moreover, the restrictions at issue in that case and the Ninth Circuit's decision on mootness occurred prior to this Court finding and defining a qualified First Amendment right to view gathers and explaining how the government's viewing restrictions may be justified. On remand, the Court engaged in an exhaustive, fact-intensive analysis and found that BLM's restrictions did not violate the First Amendment because they were reasonable and narrowly tailored.  *Leigh*, 954 F. Supp. 2d at 1103.  This new legal framework necessarily affects the determination of whether a specific restriction and the  government's justification for that restriction are likely to recur.

Here, while the 2017 EA and Decision Record continue to authorize BLM to conduct gathers in the Antelope and Triple B Complexes, there are no gathers currently scheduled there. Either way, Plaintiffs do not challenge any viewing restrictions expressed in the 2017 EA or Decision Record that could arguably be expected to recur. Their only allegation pertains to the checkerboard land issue which arose based on fact-specific circumstances on one day during the Antelope Complex gathers this past summer. Plaintiffs do not allege that BLM is likely to place a trap site at the same checkerboard land site again during any future gathers in the Antelope or Triple B Complexes, nor do they ask for an order providing them access to such a hypothetical trap site. Dkt. 38, Prayer for Relief ¶ D (vaguely requesting "meaningful viewing access").[12]

Even if Plaintiffs were to amend again to allege that the checkerboard land issue from this summer's gather is likely to recur, this would be insufficient and amount to mere speculation. As the Court observed at the hearing in this case and on remand in *Leigh*, the circumstances that lead BLM to choose a particular trap site, and any incumbent restrictions necessary for the safety of

---

[12] Indeed, the moot dispute raised by Plaintiffs—an isolated viewing restriction that arose based on specific facts and circumstances during this summers' gathers—reflects the changed legal landscape after the Court's decision finding a qualified First Amendment right to view gathers. Specifically, in contrast to the limited access indicated via public notice prior to the gathers in *Leigh v. Salazar*, Case No. 3:10-cv-00597-LRH-VPC, Dkt. 9-1, BLM published Gather Observation Protocols for the Antelope Complex gathers "striv[ing] to offer safe and meaningful opportunities for the public to observe helicopter-assisted wild horse gather operations," Dkt. 21-7 at 10–12. Plaintiffs do not challenge any of the limitations contained in these Protocols.

BLM, its contractors, the horses, and the public, are highly fact-specific. *See Fund for Animals*, 460 F.3d at 22 ("Particular decisions to remove wild horses and burros are highly fact-specific."). Thus, Plaintiffs cannot plausibly allege that the checkerboard land issue that arose on one day during the 2023 Antelope Complex gathers will recur because it "highly depend[ed] upon a series of facts unlikely to be duplicated in the future." *PETA v. Gittens*, 396 F.3d 416, 424 (D.C. Cir. 2005) (noting that a "legal controversy so sharply focused on a unique factual context" will "rarely present a reasonable expectation that the same complaining party would be subjected to the same actions again") (cleaned up, citations omitted). Plaintiffs would have to speculate to allege that the facts and circumstances surrounding the checkerboard land issue are likely to recur in a future gather on the Antelope (or Triple B) Complex, and "speculative possibility does not constitute 'a reasonable expectation.'" *See W. Coast Seafood Processors Ass'n v. NRDC*, 643 F.3d 701, 704-05 (9th Cir. 2011); *Jacob v. Biden*, 542 F. Supp. 3d 938, 955 (N.D. Cal. 2021) (dismissing claims where plaintiffs had "not shown, beyond mere speculation, that there is a reasonable expectation of being subjected to the same legal action once more").   In sum, this is not one of the "extraordinary cases" in which the "capable of repetition, yet evading review" exception applies. *See Alvarez v. Hill*, 667 F.3d 1061, 1064 (9th Cir. 2012) (citation omitted).

Indeed, because BLM's choice of trap site and its supporting justifications are so fact dependent, an order from this Court declaring that Plaintiffs' First Amendment rights were violated based on this past incident would be too narrow to meaningfully address any restrictions Plaintiffs may face during any future gathers on the Antelope or Triple B Complexes. This further shows that the Court can provide Plaintiffs no "meaningful relief" on their First Amendment claims based on the checkerboard land issue. *See Gator.com*, 398 F.3d at 1129 (citations omitted).

Accordingly, the Court should find that the only viewing restriction Plaintiffs allege occurred during the Antelope Complex gathers this year—the checkerboard land issue—is moot.

### C. Plaintiffs Fail to Allege Sufficient Facts to State a Claim Regarding On-Going Restrictions.

Plaintiffs' First Amendment claim is otherwise based on conclusory, general allegations

insufficient to state a claim. For example, Plaintiffs vaguely state that BLM has "failed to provide" them with "consistent, meaningful viewing access of gather operations." Dkt. 38 ¶ 75. They also assert that they have a First Amendment right to view horses in "capture pens, sorting pens, temporary holding corrals, and off-range holding corrals[,]" but they do not identify any specific locations or allege that they have sought or been denied access to such locations. *Id.* ¶ 101. Nor do they allege any facts suggesting that these areas "have historically been open to the press and general public" or "whether public access plays a significant positive role in the functioning of the particular process." *See Leigh*, 677 F.3d at 898-900. Notably, this Court has previously held that "short-term holding facilities . . . have not been [historically] open to the press and general public" and thus no "qualified right of access arises." *Leigh*, 954 F. Supp. 2d at 1103–04.

Plaintiffs' vague and general allegations are insufficient to state a claim. *See Leigh v. Salazar*, 3:11-cv-608-HDM-WGC, 2013 WL 1249824, at *1 n.1 (D. Nev. Mar. 26, 2013) (dismissing Ms. Leigh's First Amendment claim which set forth "only legal conclusions or vague and general factual allegations that do not sufficiently apprise defendants of the nature of the claim"); *Leigh*, 2014 WL 4700016, at *5 (dismissing Ms. Leigh's First Amendment claim where she did not allege that operations to which she was allegedly denied access were historically open to the public or that public access played a significant role in the operations, and allegations did "not permit the Court to infer more than the mere possibility of misconduct").

**D.  Plaintiffs Do Not Have a First Amendment Right to View Humane Gathers.**

Plaintiffs also allege that they have a "First Amendment right to view wild horses being treated humanely," Dkt. 38 ¶ 109, and that by failing to "humanely remove wild horses from the Antelope and Triple B complexes," BLM violated this right, *id.* ¶ 104.

Plaintiffs' attempt to shoehorn the Act's humane handling provision into the First Amendment fails. The qualified First Amendment right to view government activities is about just that: viewing government activities. The relevant questions are whether the activity has "historically been open to the press and general public," and whether "public access" furthers the activity in a positive manner. *See Leigh*, 677 F.3d at 898–900. Any First Amendment right

concerns only the right to "observe government activities." *Leigh*, 954 F. Supp. 2d at 1090. To the extent Plaintiffs view BLM activities with which they disagree, the First Amendment gives Plaintiffs the right to report on and discuss what they observe. *See Leigh,* 2014 WL 4700016, at *5 (explaining that First Amendment rights provide "qualified access to, and to report on, government activities"). But the First Amendment does not confer Plaintiffs with a right to view and compel particular government conduct—i.e., conduct that Plaintiffs consider to be "humane" under the Act. Plaintiffs' attempt to create out of whole cloth a "right to view humane gathers" is just another bid to avoid the decisions holding that Ms. Leigh cannot compel compliance with the Act's humane handling provisions, which are discussed in further detail above and below.

Accordingly, Plaintiffs do not have a First Amendment right to view humane gathers, and their fourth claim should be dismissed to the extent it proceeds on this theory.

### E.  Any Implied Humane Gather Claim Under the Act is Nonjusticiable.

Finally, to the extent the Court construes Plaintiffs' fourth cause of action as a claim under the Act because it seeks to force BLM to "comply with the Wild Horse Act's humane handling requirements," it still fails. Dkt. 38 ¶ 109.  As explained above, Ms. Leigh has previously sued BLM for allegedly inhumanely gathering horses, and courts in this District have held that the claim is nonjusticiable under the APA. This Court should hold the same.

For example, in *Leigh v. Jewell*, Ms. Leigh argued that BLM had violated the Act and its own internal policies by "conducting roundups of excess wild horses in an inhumane manner." 2014 WL 31675, at *1. The court noted that challenges under the Act are governed by the APA, which requires Plaintiffs to challenge "final agency action" for the Court to have subject matter jurisdiction. *Id.* at *1–2 (citations omitted). "Given the lack of clarity" in Ms. Leigh's pleading, the court analyzed whether BLM's conduct was reviewable as either agency action or a failure to act. *Id.* at *3. The court found that "the conduct of the wild horse gathers is not final agency action," meaning the court did not have "subject matter jurisdiction to consider plaintiff's claim" as affirmative agency action. *Id.* at *3–4. The court determined that the "consummation of the decisionmaking process was the decision to conduct a roundup," which was "embodied in the

[EA]." *Id.* at *4. The conduct of the gather, on the other hand, "merely implement[ed] the EA," and did not qualify as independently reviewable final agency action. The Court should reach the same conclusion here, as BLM's actions during the gathers in the Antelope Complex merely implemented the 2017 EA and Decision Record and cannot qualify as final agency action.

Moreover, as explained above, two different courts in this District have held that the "humane handling" provision of the Act imposes broad, non-discrete duties upon BLM and that, under *SUWA*, Ms. Leigh cannot compel compliance with the provision under APA Section 706(1). *See supra* page 13.  Thus, to the extent there is an implied "humane handling" claim embedded in Plaintiffs' First Amendment claim, it similarly fails to challenge discrete agency action. Plaintiffs ask the Court to compel BLM to comply with the Act's broad mandate to humanely gather horses, and there is no way for the Court to do this without improperly "injecting" itself "into day-to-day" management of BLM's wild horse and burro program. *Leigh*, 2014 WL 31675, at *4–5. As just one example, one of Plaintiffs' alleged concerns is ensuring that gathers do not occur in extreme temperatures. Dkt. 38 ¶ 109. Though the CAWP Gather Standards have temperature guidelines, at the evidentiary hearing, it became clear that Plaintiffs sought to have the Court review the adequacy of the particular device BLM uses to measure temperatures during gathers. Put simply, the Court could not do this without injecting itself into the day-to-day operations of BLM. In sum, the best practices and methods for humanely gathering horses are BLM's area of expertise, and this is why Congress structured the Act to "afford[] BLM discretion in conducting the wild horse roundups." *Leigh*, 2014 WL 31675, at *5.

Accordingly, to the extent the Court construes Plaintiffs' First Amendment claim to include a humane treatment claim under the Act, the Court should dismiss it.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Amended Complaint.

//

//

//

Dated: October 23, 2023

Respectfully submitted,

TODD KIM, Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

*/s/ Joseph W. Crusham*
JOSEPH W. CRUSHAM, Trial Attorney
(CA Bar No. 324764)
Wildlife & Marine Resources Section
Phone: (202) 307-1145
Email: joseph.crusham@usdoj.gov

PETER BROCKER, Trial Attorney
(NYS Bar No. 5385448)
Natural Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Phone: (202) 305-8636
Email: peter.brocker@usdoj.gov

*Attorneys for Federal Defendants*

25

**CERTIFICATE OF SERVICE**

I hereby certify that on October 23, 2023, I electronically filed and served the foregoing with the Clerk of the Court for the United States District Court for the District of Nevada using the CM/ECF system, which will send notification of this filing to the attorneys of record.

*/s/ Joseph W. Crusham*
Joseph W. Crusham
Attorney for Federal Defendants
