DANIELLE M. HOLT
(Nevada Bar No. 13152)
DE CASTROVERDE LAW GROUP
1149 S Maryland Pkwy
Las Vegas, NV 89104
Ph (702) 222-9999
Fax (702) 383-8741
danielle@decastroverdelaw.com

JESSICA L. BLOME
(Cal. Bar No. 314898, admitted pro hac vice)
GREENFIRE LAW, PC
P.O. Box 8055
Berkeley, CA 94707
(510) 900-9502
jblome@greenfirelaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

|  |  |
|---|---|
| WILD HORSE EDUCATION, a non-profit corporation and LAURA LEIGH, individually,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management,<br><br>Defendants. | CASE NO. 3:23-cv-00372-LRH-CLB<br><br>**PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT and ALTERNATIVE MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT** |

**TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................................. 3

II.     FACTUAL ALLEGATIONS ................................................................................. 3

III.    LEGAL STANDARD ........................................................................................... 4

IV.     ARGUMENT ........................................................................................................ 5

        A.      Plaintiffs' First Cause of Action Survives Defendants' Motion to Dismiss ........... 5

                1.      Plaintiffs' Claims are Based on 5 U.S.C. § 706 .......................................... 5

                2.      Plaintiffs' First Cause of Action is Not Time-Barred ................................. 5

                3.      The CAWP Standards Are Substantive Rules ............................................ 8

                4.      Defendants Violated 5 U.S.C. § 706(2)(D) ................................................ 12

                5.      Defendants Violated 5 U.S.C. § 706(1) ..................................................... 12

        B.      Plaintiffs' Second Cause of Action Survives Defendants' Motion to Dismiss .... 13

        C.      Plaintiffs' Third Cause of Action Survives Defendants' Motion to Dismiss ....... 14

                1.      Defendants Failed to Consider New Circumstances, New Information, and Changes ............................................................................................................. 15

                2.      Defendants Failed to Take a Hard Look at Potentially Significant Environmental Impacts .................................................................................. 16

        D.      Plaintiffs' Fourth Cause of Action Survives Defendants' Motion to Dismiss ...... 16

        E.      Alternatively, the Court should grant leave to amend Plaintiffs' Complaint. ...... 18

V.      CONCLUSION .................................................................................................... 22

## I.      INTRODUCTION

When Congress enacted the Wild Horses and Burro Act (Wild Horse Act or "the Act"), it acknowledged the importance of wild free-roaming horses on public lands. In implementing the Act, the Bureau of Land Management (BLM) attests that it is concerned with the well-being of wild horses, but it regularly enacts gather plans that are in violation of the Wild Horse Act and the National Environmental Policy Act (NEPA), resulting in physical harm to individual horses and herds. For example, in 2022 alone, more than 200 horse deaths were associated with BLM gather operations. Specific to the Antelope Complex, wild horses, including foals, have suffered and died cruel and inhumane deaths because of the BLM's removal actions, including deaths resulting from fractured skulls, broken necks, leg fractures, lacerations, and more. For this reason, Plaintiffs are challenging BLM's actions, demanding that they be held accountable to the law and in providing wild horses with humane treatment.

Plaintiff's First Amended Complaint, or "FAC," contains four causes of action, which Defendants seek to dismiss based upon Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

In addressing Defendants' motion, Plaintiffs acknowledge that certain amendments to its First Amended Complaint may be necessary to clarify these causes of action. Accordingly, Plaintiffs alternatively seek leave to file their proposed Second Amended Complaint, which is attached to the Declaration of Jessica L. Blome as Exhibit 1 and filed herewith. With such amendment, Plaintiffs can clearly establish that the Court has subject matter jurisdiction over this case and its claims, and Plaintiffs' can aver claims upon which relief can be granted.

## II.     FACTUAL ALLEGATIONS

Plaintiffs' First Cause of Action seeks to compel BLM to adopt animal welfare standards through rulemaking pursuant to 5 U.S.C. §§ 553 and 702. *See* Dkt 38 (FAC) at ¶¶76-84. Plaintiffs' Second Cause of Action seeks to set aside the 2017 EA/FONSI for the Antelope Complex as it has been promulgated and relied upon in violation of the Wild Horse Act's immediacy requirement as contained in 16 U.S.C. § 1333(b)(2). *See id.* at ¶¶85-90. Plaintiffs' Third Cause of Action challenges the 2017 EA/FONSI under NEPA as BLM failed to analyze

the significant environmental impacts of removing wild horses from the Antelope Complex. *See id.* at ¶¶91-98. Plaintiffs' Fourth Cause of Action seeks monetary and injunctive relief based on violations of their First Amendment rights. *See id.* at ¶¶99-110.

## III.    LEGAL STANDARD

A motion to dismiss filed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure "allow[s] a party to challenge the subject matter jurisdiction of the district court to hear a case." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). The burden of proving that jurisdiction does exist falls to the party asserting jurisdiction. *See id.* The motion to dismiss should only be granted "if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Id.*

To withstand a challenge under Rule 12(b)(6), "a complaint must set forth 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A court reviewing a motion to dismiss under Rule 12(b)(6) must "accept[ ] as true all of the factual allegations contained in the complaint and draw[ ] all inferences in favor of the nonmoving party." *Autor v. Pritzker*, 740 F.3d 176, 179 (D.C. Cir. 2014) (quotation marks omitted). Moreover, a "complaint survives a motion to dismiss even '[i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by [the] plaintiff, both of which are plausible.'" *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)). Even if the defendants believes that its version will "prove to be the true one . . . that does not relieve defendants of their obligation to respond to a complaint that states a plausible claim for relief, and to participate in discovery." *Id*. Factual disputes are not appropriately addressed through a Motion to Dismiss. *See Farmer v. Las Vegas Metro. Police Dep't,* 2018 U.S. Dist. LEXIS 186660, at *7 (D. Nev. Oct. 31, 2018); *Ronpak, Inc. v. Elecs. for Imaging, Inc.*, U.S. Dist. LEXIS 4546, at *14 (N.D. Cal. Jan. 14, 2015).

If a court concludes that a motion to dismiss should be granted, but that the complaint can

be amended to cure a deficiency, leave to amend shall be freely given. *See Swafford v. IBM*, 383

F. Supp. 3d 916, 926 (N.D. Cal. 2019); Fed. R. Civ. Proc. 15(a)(2). Such leave can be granted

"even if no request to amend the pleading was made, unless [the court] determines that the

pleading could not possibly be cured by the allegation of other facts." *Id.*

## IV.    ARGUMENT

### A.    Plaintiffs' First Cause of Action Survives Defendants' Motion to Dismiss

#### 1.    Plaintiffs' Claims are Based on 5 U.S.C. § 706

As a preliminary matter, in Plaintiffs' First Amended Complaint, Plaintiffs' ask this

Court to compel the APA to promulgate CAWP standards as a rulemaking under 5 U.S.C. § 702.

*See* Dkt 38 (FAC) at ¶84. Plaintiffs seek leave to amend the First Amended Complaint, averring

that through this cause of action Plaintiffs actually seek relief based on 5 U.S.C. § 706.

Specifically, Plaintiffs aver that BLM has unlawfully withheld promulgation of humane

treatment standards pursuant to the requirements of 5 U.S.C. § 553 in violation of 5 U.S.C. §

706(1). As such, Plaintiffs seek an order compelling BLM to adhere to 5 U.S.C. § 553 in

codifying regulations that address the Comprehensive Animal Welfare Program's substantive

rules. Plaintiffs also aver that BLM's promulgation of the CAWP Standards without following

the requirements of 5 U.S.C. § 553 violates 5 U.S.C. § 706(2)(D) in that it was done without

observance of procedure required by law. As a result, the current CAWP Standards should be

vacated and set aside.

#### 2.    Plaintiffs' First Cause of Action is Not Time-Barred

Judicial review under the APA normally requires challenges to be filed within six years

of final agency action. *See* 28 U.S.C. § 704; 28 U.S.C. § 2401(a); *Hells Canyon Pres. Council v.*

*United States Forest Serv.*, 593 F.3d 923, 930 (9th Cir. 2010). Defendants argue that Plaintiffs'

First Cause of Action is time-barred because it was not filed within six years of the date the

CAWP Standards were prepared. This is incorrect. As addressed *supra*, the six-year statute of

limitations does not apply to Plaintiffs' claim based on Section 706(1) of the APA. Further, to

the extent that Section 706(2) applies, the statute of limitations did not begin to run until 2020.

"[T]he language of § 706(1) applies to present and ongoing violations. . . . As both a practical and legal matter, the court could not compel action that the agency unlawfully withheld or unreasonably delayed in the past but then subsequently performed." *Wyo-Ben Inc. v. Haaland*, 63 F.4th 857, 873 (10th Cir. 2023). Consequently, many courts have refused to apply Section 2401(a)'s six-year statute of limitations to Section 706(1) challenges. *See Hells Canyon Pres. Council*, 593 F.3d at 933 (stating in dicta that Plaintiffs might be able to pursue a 706(1) claim despite their 706(2) claim being time-barred by Section 2401(a)); *Wyo-Ben Inc.*, 63 F.4th at 873-74 (applying the repeated violations doctrine to Section 706(1) to find Section 2401(a)'s statute of limitations inapplicable to Section 706(1) claims); *Wilderness Soc'y v. Norton,* 434 F.3d 584, 588 (D.C. Cir. 2006) (noting that the Court has "repeatedly refused" to apply Section 2401(a)'s six-year statute of limitations to Section 706(1) claims); *Pit River Tribe v. BLM*, 512 F. Supp. 3d 1055, 1064-65 (E.D. Cal. 2021) (refusing to apply Section 2401(a)'s six-year statute of limitations where BLM continued to act with unreasonable delay in fulfilling its obligation; "[e]ach day that BLM fails to [act] constitutes a single, discrete violation"); *Pub. Citizen, Inc. v. Mukasey*, 2008 U.S. Dist. LEXIS 81246, at *23 (N.D. Cal. Oct. 9, 2008) ("there is no limitations period specifically applicable to unreasonable or unlawful delay claims under the APA"); *Am. Canoe Ass'n v. United States EPA*, 30 F. Supp. 2d 908, 925 (E.D. Va. 1998) "application of a statute of limitations to a claim of unreasonable delay is grossly inappropriate, in that it would mean [an agency] could immunize its allegedly unreasonable delay from judicial review simply by extending that delay for six years); *Nat. Res. Def. Council v. Fox*, 909 F. Supp. 153, 160 (S.D.N.Y. 1995) (finding statute of limitations does not bar claims to rectify agency inaction).

For similar reasons, the "final agency action" requirement in Section 704 does not apply to APA challenges based upon action unlawfully withheld or unreasonably delayed. As stated by the Ninth Circuit, "[j]udicial review of an agency's actions under § 706(1) for alleged delay has been deemed an exception to the 'final agency decision' requirement. Under this exception, the court is examining an agency's actions prior to a final agency decision for purposes of measuring agency delay." *Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 511 (9th Cir. 1997) (internal citations

omitted); *see also Alaska v. Haaland*, 2022 U.S. Dist. LEXIS 44142, at *15 n.45 (D. Alaska Mar. 14, 2022) (recognizing that review under § 706(1) is an "exception to the final agency action requirement"); *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1272 n.4 (D. Utah 2017) ("there is no final agency action" in a Section 706(1) claim); *Padres Hacia Una Vida Mejor v. Jackson*, 2012 U.S. Dist. LEXIS 49047, at *29 (E.D. Cal. Apr. 5, 2012) (finding that a § 706(1) challenge can be made in the face of complete inaction); *Gilmore v. Salazar*, 748 F. Supp. 2d 1299, 1311 (N.D. Okla. 2010) (recognizing that there is no final agency action to review under a § 706(1) claim).

 As regards Plaintiffs' Section 706(2) claim, the initial promulgation of the CAWP Standards were not final agency action. The Supreme Court has set out two requirements for agency action to be considered final. "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-178 (internal citations omitted).

If this Court deems it necessary to explore whether the CAWP Standards are "final agency action," Plaintiffs seek leave to amend the First Amended Complaint as addressed *supra*. The additional allegations clarify that the CAWP Standards' publication in 2015 and 2016 was not the consummation of the agency's decision-making process, but rather, the Standards were in a preliminary "beta" form at that time. It was not until 2020, when the BLM issued PIM 2021-002, that the agency "codif[ied]" the Standards and ordered mandatory training on the Standards for BLM staff, contractors, and other partners. At that time, all helicopter gather contracts and off-range corral contracts were required to incorporate the CAWP standards. The following year, BLM began to issue public CAWP team assessment reports for individual gathers. Thus, it was not until December of 2020 that the CAWP standards and program were consummated. It was not until December of 2020 that the Standards determined rights and obligations from which legal consequences flow.

### 3.     The CAWP Standards Are Substantive Rules

Section 553's rulemaking procedures function to ensure that agencies act in essentially the same manner as legislatures when performing legislative functions and encourage public participation in agency rulemaking. *See Batterton v. Marshall*, 648 F.2d 694, 703 (D.C. Cir. 1980) (noting the "essential purpose" of this procedure "is to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies").

In issuing substantive rules (sometimes referred to as legislative rules), Section 553's procedures require that agencies first publish a public notice of proposed rulemaking in the Federal Register. *See* 5 U.S.C. § 553(b). Following publication, the agency must allow for submission of public comment. *See id*. at § 553(c). After consideration of these comments, the agency may issue a final rule that incorporates "a concise general statement of [the rule's] basis and purpose." *Id*. The rule is then republished in the Federal Register, and after 30 days, the rule can become effective. *See id*. at § 553(d).

There are limited exceptions in which agencies need not follow the APA's notice and comment procedure for rulemaking, and these exceptions are narrowly construed. *See Am. Hosp. Asso. v. Bowen*, 834 F.2d 1037, 1044-45 (D.C. Cir. 1987). The exceptions are for interpretive rules, policy statements, procedural rules, or for good cause. *See* 5 U.S.C. § 553(b). The good cause exception is permitted when notice and comment would be "impracticable, unnecessary, or contrary to the public intent." *Id*. The APA does not define substantive/legislative rules, interpretive rules, policy statements, or procedural rules, leaving their meaning to be established through case law. *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987). Perhaps not surprisingly, this has resulted in case law that does not always provide a clear distinction. *See id*. Yet, the "common theme" of the exceptions is that they "accommodate situations where the policies promoted by public participation in rulemaking are outweighed by the countervailing considerations of effectiveness, efficiency, expedition and reduction in expense." *Am. Hosp.*

*Asso.*, 834 F.2d at 1045, quoting *Guardian Fed. Sav. & Loan Asso. v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 662 (D.C. Cir. 1978).

A rule is substantive, or legislative, where it supplements or effects a change in statute or regulation, creates rights, imposes obligations, or constrains an agency's discretion. *See Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014); *Hemp Indus. Ass'n v. Drug Enforcement Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003); *McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988).

In examining whether discretion has been constrained, the Ninth Circuit has noted that if an agency issues a directive that "establishes a 'binding norm' that 'so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criterion,' it effectively replaces agency discretion with a new 'binding rule of substantive law.'" *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1014 (9th Cir. 1987) (citations omitted).

Another indicator of a legislative rule is that its provisions contain numerical terms that cannot be gleaned from a particular record. *See Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 495 (2010); *Hoctor v. United States Dep't of Agric.*, 82 F.3d 165, 170-71 (7th Cir. 1996). This is because such a rule turns on a number that, even if reasonable, is likely arbitrary, and when an agency bases rules on arbitrary choices, they are legislating. *See id*. By way of example, in *Hoctor v. United States Dep't of Agric.*, the court found that a rule requiring perimeter fences for dangerous animals to be at least eight-foot high was legislative when the underlying regulation merely required structurally sound containment of dangerous animals:

> The rule is arbitrary in the sense that it could well be different without significant impairment of any regulatory purpose. But this does not make the rule a matter of indifference to the people subject to it. . . . The concerns of these [people] are legitimate and since, as we are stressing, the rule could well be otherwise, the agency was obliged to listen to them before settling on a final rule and to provide some justification for that rule . . . Notice and comment is the procedure by which the persons affected by legislative rules are enabled to communicate their concerns in a comprehensive and systematic fashion to the legislating agency.

*Hoctor*, 82 F.3d at 170-71.

By contrast, a policy statement does not impose any rights or obligations, create a binding norm, or otherwise constrain an agency's decision. *See McLouth Steel Products Corp.*, 838 F.2d at 1320. The Ninth Circuit has addressed the distinction as follows:

> The critical factor to determine whether a directive announcing a new policy constitutes a rule or a general statement of policy is "the extent to which the challenged [directive] leaves the agency, or its implementing official free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case . . . .

> To the extent that the directive merely provides guidance to agency officials in exercising their discretionary power while preserving their flexibility and their opportunity to make "individualized determination[s]," it constitutes a general statement of policy . . . .  In contrast, to the extent that the directive "narrowly limits administrative discretion" or establishes a "binding norm" that "so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criterion," it effectively replaces agency discretion with a new "binding rule of substantial law."

*Colwell v. HHS*, 558 F.3d 1112, 1124 (9th Cir. 2009), quoting *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013-14 (9th Cir. 1987) (emphasis in the original).

Here, the Wild Horse Act mandates that excess horses be humanely captured and removed. *See* 16 U.S.C § 1333(b)(2)(B)&(C). Congress provided some direction to the Secretary of the Interior by noting that humane treatment includes "proper transportation, feeding, and handling." *Id.* No further instruction was provided regarding how the agency should fulfill the Act's mandate for humane treatment. Instead, Congress delegated the issue's resolution, authorizing the agency to issue regulations as necessary. *See* 16 U.S.C. § 1336.

In 2015 and 2016, BLM first created the CAWP Standards for the purpose of "protecting the welfare of wild horses and burros under the agency's management and protection." The Standards address the BLM's plan for humane handling; they include detailed provisions related to transportation, feeding, handling, and more. All helicopter gather contracts and off-range corral contracts are required to incorporate the CAWP standards as specifications for performance. And, the CAWP standards create numerous mandatory obligations that BLM staff, contractors, and associated partners must follow when removing horses from public lands. *See* CAWP Standards for Wild Horse and Burro Gathers; CAWP Standards for Off-Range Corral Facilities, Transportation, and Adoption/Sale Events; BLM PIM 2021-002 (Dec. 18, 2020).

For example, the CAWP Standards for Wild Horse and Burro Gathers address trap site and temporary holding facilities by mandating that "[f]ence panels in pens and alleys must be not less than 6 feet high for horses, 5 feet high for burros, and the bottom rail must not be more than 12 inches from ground level[,]" and "[w]ater must be provided at a minimum rate of ten gallons per 1000 pound animal per day, adjusted accordingly for larger or smaller horses, burros and foals, and environmental conditions, with each trough placed in a separate location of the pen (i.e. troughs at opposite ends of the pen). Water must be refilled at least every morning and evening." As regards capture techniques, "[wild horses and burros] that are roped and tied down in recumbency must be untied within 30 minutes[,]" and "[h]alters and ropes tied to a [wild horse or burro] may be used to roll, turn, position or load a recumbent animal, but a [wild horse or burro] must not be dragged across the ground by a halter or rope attached to its body while in a recumbent position." *See* CAWP Standards for Wild Horse and Burro Gathers. The CAWP Standards for Off-Range Corral Facilities, Transportation, and Adoption/Sale Events contain similar mandatory provisions such as "[t]he side panels of the loading chute must be a minimum of 6 feet high and covered with materials such as plywood or metal without holes that may cause injury[,]" "[s]alt and/or mineral blocks should be provided in holding pens at all times[,]" and "[s]traight deck trailers or stock trailers must be used for transporting [wild horse and burros] to another off-range corral facility, off-range pasture, eco-sanctuary or adoption event. …Two-tiered or double deck trailers are prohibited. … Transport vehicles for [wild horse and burros] must have a covered roof containing them such that [wild horse and burros] cannot escape." *See* CAWP Standards for Off-Range Corral Facilities, Transportation, and Adoption/Sale Events.

Defendants allege the CAWP Standards are "interpretative policy statements," but this is not so. The CAWP Standards clearly establish a "binding norm" that "so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criterion," and as such, it is a substantive rule. *Mada-Luna*, 813 F.2d at 1014; *see also Colwell v. HHS*, 558 F.3d at 1124.  Not only is BLM's discretion limited by the Standards, but contractors and associated partners also are bound by its provisions. The level of detail is not

"interpretative," but instead the provisions are akin to those addressed in *Hoctor*. The terms of the Standards are "arbitrary in the sense that [they] could well be different without significant impairment of any regulatory purpose." *Hoctor*, 82 F.3d at 170-71. When an agency creates rules in such a manner, they are legislating and must abide by Section 553's procedural requirements. *See id.* BLM is obliged to listen to the public before settling on such substantive rules and provide justification for them. *See id.*

As necessary and as addressed *supra*, Plaintiffs request leave to file their proposed Second Amended Complaint to include additional allegations regarding the CAWP Standards. *See* Blome Decl., Exh. 1. Specifically, Plaintiffs' proposed second amended allegations provide further information regarding 16 U.S.C. § 1333, include reference to 16 U.S.C. § 1336, and provide further detail regarding the scope of and mandatory provisions within the CAWP Standards.

### 4. Defendants Violated 5 U.S.C. § 706(2)(D)

The law is clear that "[a] rule which is subject to the APA's [Section 553] procedural requirements, but was adopted without them, is invalid." *United States v. Picciotto*, 875 F.2d 345, 346 (1989). Because the CAWP Standards are subject to Section 553, the Court has the authority to set them aside for being made "without observance of procedure." 5 U.S.C. § 706(2)(D); *see also California v. Azar,* 911 F.3d 558, 575 (9th Cir. 2018).

### 5. Defendants Violated 5 U.S.C. § 706(1)

Unlawful, as the term is used in Section 706(1), includes but is not limited to the meaning given in Section 706(2), including actions taken without observance of procedure required by law. *See N. Am. Van Lines, Inc. v. United States*, 412 F. Supp. 782, 794 (N.D. Ind. 1976). Plaintiffs agree that Section 706(1) claims "can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Defendants argue that BLM is not legally required to issue substantive rules for the purposes of humanely capturing and removing excess horses; it is up to the agency's discretion. This is incorrect.

Congress delegated responsibility to the Secretary of the Interior to implement the Wild Horse Act, with such delegation including responsibility to issue regulations as deemed necessary. *See* 16 U.S.C. §§ 1331, 1333, 1336. Where any provision of a statute is silent or ambiguous, leaving it to the administrating agency to fill any gaps left, the agency must act "to elucidate [that] specific provision of the statute **by regulation**." *See Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 844 (1984) (emphasis added).

Here, the Wild Horse Act is silent and ambiguous as regards the meaning of humane treatment, whether for proper transportation, feeding, and handling or otherwise. It is impossible to interpret the statute as regards this issue without promulgating substantive rules. Congress could have provided standards to address BLM's implementation of human procedures, but it did not. Where Congress has specifically declined to create a standard, an agency cannot implement the statute through interpretative rules. Rather, in such circumstances, the implementing rules are necessarily substantive rules that require adherence to Section 533's procedures. *See Mendoza v. Perez*, 754 F.3d 1002, 1022-23 (D.C. Cir. 2014).

There is no permissible construction of the Wild Horse Act that can avoid formal rulemaking. Instead, the silence and ambiguity in the statute requires BLM to adhere to Section 553 of the APA and adopt binding regulations.

**B.**     **Plaintiffs' Second Cause of Action Survives Defendants' Motion to Dismiss**

Defendants argue that Plaintiffs' Second Cause of Action is duplicative of Plaintiffs' Third Cause of Action. This is incorrect. While both seek to set aside the 2017 EA/FONSI, Plaintiffs' Second Cause of Action is based on the agency's violation of the immediacy requirement of the Wild Horse Act; Plaintiffs' Third Cause of Action is based on the agency's violation of NEPA. *See* Dkt 38 (FAC) at ¶¶85-89, 91-98. Defendants correctly note that Plaintiffs' original complaint merged these two causes of action. However, because one is based on violation of the Wild Horse Act and the other on NEPA, Plaintiffs' First Amended Complaint separated these causes of action.

Where BLM determines that "an overpopulation exists on a given area of the public lands

and that action is necessary to remove excess animals, [BLM] shall immediately remove excess animals from the range so as to achieve appropriate management levels." 16 U.S.C. § 1333(b)(2) (emphasis added). Plaintiffs' First Amended Complaint cites to *Friends of Animals v. Culver* in support of this cause of action. In that case, Plaintiffs challenged a ten-year gather plan for violating the Wild Horse Act's immediacy requirement and for violating NEPA by not taking a hard look at environmental consequences. *See Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 167-72 (D.D.C. 2022). The Court ruled that the gather plan did violate the immediacy requirement, but that it did not violate NEPA. *See id.*

In reaching this ruling, the Court addressed the case of *Friends of Animals v. Silvey*, which Defendants cite to in their Motion to Dismiss, noting that it did not "address[] the argument that a 'phased' gather plan exceeds the WHBA's requirement that BLM 'immediately' remove excess horses." *See id.* at 170 (referencing *Friends of Animals v. Silvey*, 353 F. Supp. 991, 1007 (D. Nev. 2018)). It is axiomatic that cases have no precedential value when they have not addressed the issues now before the court. *See Webster v. Fall*, 266 U.S. 507, 511 (1925) ("[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents"); *Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Eds., Inc.*, 937 F.2d 1572, 1581 (Fed. Cir. 1991) ("[w]hen an issue is not argued or is ignored in a decision, such decision is not precedent to be followed in a subsequent case in which the issue arises"). The Court also commented on, with disapproval, the case of *Friends of Animals v. BLM*, another case cited by Defendants in their Motion to Dismiss. *See Friends of Animals v. Culver*, 610 F. Supp. 3d at 170 (referencing *Friends of Animals v. BLM*, 548 F. Supp. 3d 39, 59 (D.D.C. 2021).

Accordingly, Plaintiffs' Second Cause of Action has been properly pled.

**C.    Plaintiffs' Third Cause of Action Survives Defendants' Motion to Dismiss**

Plaintiffs' Third Cause of Action is based on violation of NEPA. *See* Dkt 38 (FAC) at ¶¶91-98.  Specifically, it alleges that the 2017 EA/FONSI must be set aside because it (1) violated 43 CFR 46.120(c) and (2) failed to take a hard look at the potentially significant

environmental impacts of removing wild horses from the Antelope Complex.

   **1.**  **Defendants Failed to Consider New Circumstances, New Information, and Changes.**

   Rule 46.120(c) allows reliance on existing environmental analysis when a newly proposed action adequately assesses "new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects." Defendants argue the Rule is irrelevant because it only applies to newly proposed actions. Plaintiffs, however, contend that the 2022/2023 gather was a new action, as were the 2018, 2019, 2020, and 2021 gathers (as well as any future gathers that rely upon the 2017 EA/FONSI). Thus, Rule 46.120(c) applies. In the alternative, if these gathers are not considered to be new actions, Plaintiffs request permission to file their proposed Second Amended Complaint to allege that BLM supplement the 2017 EA/FONSI, as required under NEPA. *See* Blome Decl., Exh. 1.

   NEPA requires that federal agencies perform environmental analysis before taking any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). Where there is new proposed action and the agency wishes to rely on an existing environmental analysis, Rule 45.120(c) applies; where there is ongoing action, NEPA requires supplementation in the light of changes that might cause significant environmental impact. *See* 43 CFR 46.120(c); *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1152 (9th Cir. 1998); *Tri-Valley Cares v. United States DOE*, 2008 U.S. Dist. LEXIS 60509, at *10 (N.D. Cal. July 25, 2008).

   The 2017 EA/FONSI is packaged as covering one ten-year action, but this packaging is arbitrary and capricious, and not in accordance with law. Further, it ignores that a factual dispute exists as to whether or not BLM initially considered the 2022/2023 gather a new project. *See* Dkt 38 (FAC) at ¶¶28-29. Where a factual dispute exists, a Motion to Dismiss is not appropriate. *See also Farmer,* 2018 U.S. Dist. LEXIS at *7; *Ronpak, Inc.*, U.S. Dist. LEXIS at *14.

   Since 2017, thousands of horses have been gathered and removed from the Triple B

Complex. *See* Dkt 38 (FAC) at ¶68. "Had BLM assessed the environmental effects of the proposed gather and reasonable alternatives, Plaintiffs would have expected evaluation of new circumstances, new information, or changes such as those associated with the current foaling season, heavy snowfall during the 2022-2023 winter, current range conditions, efficacy of growth suppression methods, and more." *See id.* at ¶93. Plaintiffs are not required at this time to present evidence establishing this contention. It is enough that such new circumstances, new information, or changes have been alleged.

### 2.    Defendants Failed to Take a Hard Look at Potentially Significant Environmental Impacts

Plaintiffs allege that BLM violated NEPA when it failed to analyze the significant environmental impacts of removing wild horses from the Antelope Complex. This claim is fact-based, focusing on issues raised by the public during the review of the 2017 EA. It requires, at a minimum, an analysis of the administrative record, which has not yet been designated in this case. Because factual disputes exist, however, a Motion to Dismiss is not appropriate. *See Farmer*, 2018 U.S. Dist. LEXIS at *7; *Ronpak, Inc.*, U.S. Dist. LEXIS at *14.

Defendants allege the 2017 EA was upheld in the case of *Friends of Animals v. Silvey*, but that case can only stand as precedent for issues specifically before the Court. *See Webster*, 266 U.S. at 511; *Nat'l Cable Television Ass'n, Inc.*, 937 F.2d at 1581. Thus, for example, issues regarding BLM's failure to address foals, herd-specific foaling seasons, and habitat-specific ground conditions may still be challenged. *See* Dkt 38 (FAC) at ¶¶64, 94.

### D.    Plaintiffs' Fourth Cause of Action Survives Defendants' Motion to Dismiss

Plaintiffs' Fourth Cause of Action is based on BLM's violation of Plaintiffs' First Amendment rights. *See* Dkt 38 (FAC) at ¶¶99-110. Plaintiffs acknowledge that damages under 42 U.S.C. § 1983 are not available in this case, and the proposed Second Amended Complaint removes reference to such damages. *See* Blome Decl., Exh. 1. However, Plaintiffs have properly alleged First Amendment violations.

Plaintiffs' First Amended Complaint generally avers that Defendants interfered with their

First Amendment rights "by preventing them from observing and documenting the BLM's gather of wild horses in the Antelope Complex." *See id.* at ¶103. As an example, "[d]uring the 2023 removal action in the Antelope Complex, Plaintiffs were denied access because BLM purposely placed trap areas on lands only accessible through private roads, even though the BLM knew it did not have permission for the public to utilize those roads to observe the roundup." *See id.* at ¶75. Plaintiffs' proposed Second Amended Complaint also notes that BLM used trailers on repeated occasions to block Plaintiffs from viewing the gathers. *See* Blome Decl., Exh. 1.

Defendants argue that these allegations are insufficient and untrue. But Defendants have filed a Motion to Dismiss – not a Motion for Summary Judgment --, so Plaintiffs need not put forth all evidence at this time.  *See Farmer*, 2018 U.S. Dist. LEXIS at *7; *Ronpak, Inc.*, U.S. Dist. LEXIS at *14.

Defendants also argue that the issue is moot. This is not true. Instead, this is the hallmark of the type of case capable of repetition for which relief is warranted.

The Supreme Court has explained that "a case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013). A case is moot when "the challenged conduct ceases such that there is no reasonable expectation that the wrong will be repeated" in circumstances where "it becomes impossible for the court to grant any effectual relief whatever to the prevailing party." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000).  "The party asserting mootness has a heavy burden to establish that there is no effective relief remaining for a court to provide." *In re Palmdale Hills Prop., LLC*, 654 F.3d 868, 874 (9th Cir. 2011); *see also Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006). "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Hernandez v. County of Monterey*, 110 F. Supp. 3d 929, 955.

Here, BLM intends to rely upon the 2017 EA for multiple gathers up through the year 2027. There is no evidence that these gathers will be conducted differently than past gathers. Plaintiffs also propose adding the following language to the First Amended Complaint that

illustrates such First Amendment violations are routine and regular:

> BLM routinely and regularly interferes with the public's First Amendment rights during gather operations. BLM Incident Commanders, such as Garrett Swisher, routinely approve hidden traps on private property. Meaningful access is denied, with members of the public kept as far away as a mile or more from gathers. When killing horses for "pre-existing" injuries, BLM frequently fails to photograph the injuries, thereby preventing the public from being able to observe BLM's conduct.

Defendants' Motion to Dismiss must therefore fail.

### E.       Alternatively, the Court should grant leave to amend Plaintiffs' Complaint.

If the Court is inclined to grant Defendants' Motion to Dismiss and for clarification, Plaintiffs seek leave to file their proposed Second Amended Complaint as follows:

- Insert a paragraph after Paragraph 33 of the First Amended Complaint that states:

Congress has explicitly authorized the Secretary to "issue such regulations as he deems necessary for the furtherance of the purposes of [the Wild Horse Act]." 16 U.S.C. § 1336.

- Revise Paragraph 39 of the First Amended Complaint to state:

Excess horses must be "humanely captured and removed" per the Wild Horse Act's mandates. 16 U.S.C § 1333(b)(2)(B) & (C).  "The Secretary shall cause such number of additional excess wild free-roaming horses and burros to be humanely captured and removed for private maintenance and care for which he determines an adoption demand exists by qualified individuals, and for which he determines he can assure humane treatment and care (including proper transportation, feeding, and handling) . . . The Secretary shall cause additional excess wild free-roaming horses and burros for which an adoption demand by qualified individuals does not exist to be destroyed in the most humane and cost efficient manner possible." *Id.*

- Insert one paragraph after Paragraph 39 of the First Amended Complaint that states:

The Wild Horse Act also provides that helicopter use must be conducted in a humane manner. *See* 16 U.S.C. § 1338a.

- Revise Paragraph 42 of the First Amended Complaint to state:

The BLM developed its Comprehensive Animal Welfare Program (CAWP) as "a proactive program for protecting the welfare of wild horses and burros under the agency's management and protection." The CAWP Standards for Wild Horse and Burro Gathers were prepared on June 30, 2015, and the CAWP Standards for Off-Range Corral Facilities, Transportation, and Adoption/Sale Events were prepared on January 29, 2016. When first promulgated, these standards were viewed as a 'beta' version, allowing BLM to test them and determine how to implement them.

- Revise Paragraph 43 of the First Amended Complaint to state:

The CAWP standards address the BLM's plan for humane handling, including requirements for trap and temporary holding facility design, capture and handling, transportation, and care after capture.

- Insert eight paragraphs after Paragraph 43 of the First Amended Complaint that state:

In December of 2020, the BLM issued a Permanent Instruction Memorandum (PIM) to "codif[y]" the use of these standards for all horse gathers and mandate training of the BLM staff, contractors, and partners associated with gather operations. See BLM PIM 2021-002 (Dec. 18, 2020), available at https://www.blm.gov/policy/pim-2021-002. The BLM stated that the PIM "establishes a framework to ensure there are standards in place regarding the humane care and handling of animals, as well as a process to verify compliance with those standards. It also provides transparency on BLM's standard operating procedures for humane care and proper handling." Id.

In the PIM, the BLM acknowledged "the public has a compelling interest in knowing that animals are well cared for."

In approximately 2020, as addressed in the PIM, all helicopter gather contracts and off-range corral contracts became required to incorporate the CAWP standards as specifications for performance.

The CAWP Standards for Wild Horse and Burro Gathers contain over 90 different standards related to transportation, feeding, handling, and more. See CAWP Standards for Wild Horse and Burro Gathers. CAWP Standards for Off-Range Corral Facilities, Transportation, and Adoption/Sale Events contain over 100 different standards related to transportation, feeding, handling, and more. See CAWP Standards for Off-Range Corral Facilities, Transportation, and Adoption/Sale Events.

The CAWP standards create numerous mandatory obligations that BLM staff, contractors, and associated partners must follow when removing horses from public lands. See CAWP Standards for Wild Horse and Burro Gathers; CAWP Standards for Off-Range Corral Facilities, Transportation, and Adoption/Sale Events; BLM PIM 2021-002 (Dec. 18, 2020).

For example, the CAWP Standards for Wild Horse and Burro Gathers address trap site and temporary holding facilities by mandating that "[f]ence panels in pens and alleys must be not less than 6 feet high for horses, 5 feet high for burros, and the bottom rail must not be more than 12 inches from ground level[,]" and "[w]ater must be provided at a minimum rate of ten gallons per 1000 pound animal per day, adjusted accordingly for larger or smaller horses, burros and foals, and environmental conditions, with each trough placed in a separate location of the pen (i.e. troughs at opposite ends of the pen). Water must be refilled at least every morning and evening." As regards capture techniques, "[wild horses and burros] that are roped and tied down in recumbency must be untied within 30 minutes[,]" and "[h]alters and ropes tied to a [wild horse or burro] may be used

to roll, turn, position or load a recumbent animal, but a [wild horse or burro] must not be dragged across the ground by a halter or rope attached to its body while in a recumbent position." See CAWP Standards for Wild Horse and Burro Gathers.

The CAWP Standards for Off-Range Corral Facilities, Transportation, and Adoption/Sale Events contain similar mandatory provisions such as "[t]he side panels of the loading chute must be a minimum of 6 feet high and covered with materials such as plywood or metal without holes that may cause injury[,]" "[s]alt and/or mineral blocks should be provided in holding pens at all times[,]" and "[s]traight deck trailers or stock trailers must be used for transporting [wild horse and burros] to another off-range corral facility, off-range pasture, eco-sanctuary or adoption event. …Two-tiered or double deck trailers are prohibited. … Transport vehicles for [wild horse and burros] must have a covered roof containing them such that [wild horse and burros] cannot escape." See CAWP Standards for Off-Range Corral Facilities, Transportation, and Adoption/Sale Events.

Since approximately 2021, the BLM has issued CAWP team assessment reports for individual gather operations, reporting on compliance with the CAWP standards.

- Revise Paragraph 75 of the First Amended Complaint to state:

In addition to inhumanely treating wild horses during gathers, Defendants have failed to provide Plaintiffs consistent, meaningful viewing access of gather operations. During the 2023 removal action in the Antelope Complex, Plaintiffs were denied access because BLM purposely placed trap areas on lands only accessible through private roads, even though the BLM knew it did not have permission for the public to utilize those roads to observe the roundup. BLM also used trailers on repeated occasions to block Plaintiffs from viewing the gathers.

- Insert one paragraph after Paragraph 75 of the First Amended Complaint that states:

BLM routinely and regularly interferes with the public's First Amendment rights during gather operations. BLM Incident Commanders, such as Garrett Swisher, routinely approve hidden traps on private property. Meaningful access is denied, with members of the public kept as far away as a mile or more from gathers. When killing horses for "pre-existing" injuries, BLM frequently fails to photograph the injuries, thereby preventing the public from being able to observe BLM's conduct.

- Revise the title for the First Cause of Action in the First Amended Complaint to state:

### FIRST CAUSE OF ACTION

### Administrative Procedures Act, 5 U.S.C. §§ 553, 706

- Revise Paragraph 78 of the First Amended Complaint to state:

The APA sets forth a number of requirements for the promulgation of substantive rules (sometimes referred to as legislative rules), including notice-and-comment, to ensure the right of public participation in agency decision making. *See* 5 U.S.C. § 553.

- Insert two paragraphs after Paragraph 78 of the First Amended Complaint that state:

When creating regulations to enforce the Wild Horse Act, as enabled through Section 1336 of the Wild Horse Act, the BLM must follow the requirements of the APA's Section 553. *See* 5 U.S.C. § 553; 16 U.S.C. § 1336.

The BLM's CAWP Standards for Wild Horse and CAWP Burro Gathers and Standards for Off-Range Corral Facilities, Transportation, and Adoption/Sale Events are substantive rules created to implement the Wild Horse Act's humane handling requirements and must be promulgated pursuant to the rulemaking requirements of the APA's Section 553. *See* 5 U.S.C. § 553; 16 U.S.C. § 1333(b)(2)(B); 16 U.S.C. § 1336; 43 CFR 4700.0-05(e).

- Revise Paragraph 80 of the First Amended Complaint to state:

The BLM's CAWP Standards for Wild Horse and CAWP Burro Gathers and Standards for Off-Range Corral Facilities, Transportation, and Adoption/Sale Events, in whole or in part, are substantive rules because they supplement or effect a change in BLM's regulations, create rights, impose obligations, and/or constrain BLM's discretion. *See Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014); *Hemp Indus. Ass'n v. Drug Enforcement Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003); *McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988).

- Insert two paragraphs after Paragraph 83 of the First Amended Complaint that states:

The BLM has unlawfully withheld or unreasonably delayed promulgating CAWP standards pursuant to the requirements of 5 U.S.C. § 553 in violation of 5 U.S.C. § 706(1).

The BLM's promulgation of the CAWP Standards without following the requirements of 5 U.S.C. § 553 was in violation of 5 U.S.C. § 706(2)(D) in that it was done without observance of procedure required by law.

- Revise Paragraph 84 of the First Amended Complaint to state:

The APA gives this Court authority to compel the BLM to promulgate CAWP standards as a rulemaking under 5 U.S.C. § 706(1).

- Insert one paragraph after Paragraph 84 of the First Amended Complaint that states:

The APA gives this Court authority to set aside the CAWP standards under 5 U.S.C. § 706(2).

- Delete Paragraph 90 of the First Amended Complaint.

- Revise Paragraph 92 of the First Amended Complaint to change reference of 40 CFR 46.120(c) to 43 CFR 46.120(c).

- Insert one paragraph after Paragraph 92 of the First Amended Complaint that states:

The BLM has a duty to supplement EAs when new circumstances, new information, or changes arise that might have significant environmental impacts. *See Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1152 (9th Cir. 1998)*; Tri-Valley Cares v. United States DOE,* 2008 U.S. Dist. LEXIS 60509, at *10 (N.D. Cal. July 25, 2008).

- Revise Paragraph 93 of the First Amended Complaint to state:

The BLM violated NEPA when it failed to evaluate the 2017 EA/FONSI pursuant to 43 CFR 46.120 and 40 CFR 1502.9. Had BLM assessed the environmental effects of the proposed gather and reasonable alternatives, Plaintiffs would have expected evaluation of new circumstances, new information, or changes such as those associated with the current foaling season, heavy snowfall during the 2022-2023 winter, current range conditions, efficacy of growth suppression methods, and more.

- Insert one paragraph after Paragraph 93 of the First Amended Complaint that states:

The BLM violated NEPA when it failed to supplement the 2017 EA/FONSI to address new circumstances, new information, or changes that might have significant environmental impacts.

- Revise Paragraph 97 of the First Amended Complaint to state:

The BLM unlawfully withheld its evaluation of the 2017 EA/FONSI required by 43 CFR §46.120 and unlawfully withheld supplementation of the 2017 EA/FONSI as required by NEPA in violation of the APA, 5 U.S.C. § 706(1).

- Delete Paragraphs 100 and 106 of the First Amended Complaint.

- Revise Paragraph E of the First Amended Complaint's Prayer for Relief to state:

Vacate and set aside BLM's CAWP Standards for Wild Horse and CAWP Burro Gathers and Standards for Off-Range Corral Facilities, Transportation, and Adoption/Sale Events because they are in violation of the Administrative Procedures Act and issue an order compelling BLM to engage in rulemaking pursuant to 5 U.S.C. § 553 for regulations that address the substantive rules to be followed by BLM's Comprehensive Animal Welfare Program.

- Delete Paragraph G of the First Amended Complaint's Prayer for Relief.

## V.      CONCLUSION

For the foregoing reasons, Defendants Motion to Dismiss must be denied and Plaintiffs allowed to amend their First Amended Complaint. Plaintiffs seek to hold BLM accountable to the Wild Horse Act, NEPA, and APA when gathering and removing horses from the Antelope

Complex. The Court has subject matter jurisdiction over each of Plaintiffs' causes of action, and Plaintiffs have properly pled these causes of action. Alternatively, Plaintiffs seek leave of court to file their proposed Second Amended Complaint, attached to the Declaration of Jessica L. Blome as Exhibit 1.

Respectfully submitted,

DATED: November 27, 2023,                    */s Danielle M. Holt*

Danielle M. Holt
(Nevada Bar No. 13152)
DE CASTROVERDE LAW GROUP
danielle@decastroverdelaw.com

*/s Jessica L. Blome*

Jessica L. Blome
(CA Bar No. 314898)
GREENFIRE LAW, PC
jblome@greenfirelaw.com
*Attorneys for Plaintiffs*