UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| WILD HORSE EDUCATION, a non-profit corporation; and LAURA LEIGH, individually, | Case No. 3:23-cv-00372-LRH-CLB |
| | ORDER |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management, | |
| Defendants. | |

Before the Court is Defendants United States Department of Interior, Bureau of Land Management, and Nevada State Director of the Bureau of Land Management Jon Raby's (collectively, "BLM") motion to dismiss. ECF No. 40. Plaintiffs Wild Horse Education and Laura Leigh (collectively, "Wild Horse") filed a response in opposition to the motion (ECF No. 43) and BLM replied (ECF No. 44). For the reasons articulated herein, the Court grants the motion in accordance with this Order.

## I.    BACKGROUND

This matter arises out of BLM's continued efforts to maintain sustainable wild horse and burro populations in the state of Nevada. By way of party background, Wild Horse Education is a national non-profit dedicated to research, journalism, and public education concerning the activities and operations of federal and state agency management of free-roaming wild horse and burro populations; Laura Leigh is the founder and President of Wild Horse Education and a free-lance photojournalist who works with non-profit organizations engaged in public land issues; and Jon Raby is the Nevada State Director of the Bureau of Land Management. ECF No. 38 at 3–6. Familiarity with applicable law here is instructive:

**A.      The Wild Free-Roaming Horses and Burros Act**

In 1971, Congress passed the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. § 1331, *et seq.* (the "Wild Horses and Burros Act") which states "wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death" as they are "an integral part of the natural system of the public lands." 16 U.S.C. § 1331. The Wild Horses and Burros Act charges the Secretary of the Interior ("Secretary") with the protection and management of all wild free-roaming horses and burros. 16 U.S.C. §§ 1332(a), 1333(a). However, after only a few years of the Wild Horses and Burros Act's implementation, wild horse and burro populations had grown dramatically and "action [was] needed to prevent a successful program from exceeding its goals and causing animal habitat destruction." *Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982) (citation and quotation omitted). Accordingly, in 1978, Congress amended the Wild Horses and Burros Act to give the Secretary greater authority and discretion to manage and remove "excess" wild horses and burros from public lands. *Id*. at 1316–18.

Specifically, the amended Wild Horses and Burros Act directs the Secretary to remove excess wild horses or burros "to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. §§ 1332(f), 1333(a). As the Secretary's delegate, BLM "carries out this function in localized 'herd management areas' ("HMAs") … established in accordance with broader land use plans." *Fund for Animals, Inc. v. BLM* ("*Fund for Animals*"), 460 F.3d 13, 15 (D.C. Cir. 2006); *see* 16 U.S.C. § 1332(c); 43 C.F.R. § 4710.3-1. BLM manages wild horse populations in designated HMAs by establishing an Appropriate Management Level ("AML") which is a sustainable wild horse population range with both an upper and lower limit. *Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1001 (D. Nev. Dec. 17, 2018), aff'd, 820 F. App'x 513 (9th Cir. 2020) (citing *Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174, 1178 (10th Cir. 2016)). "In each HMA, BLM officials are afforded significant discretion to compute [AMLs] for the wild horse populations they manage." *Fund for Animals*, 460 F.3d at 16. The purpose of an AML is "to move towards a thriving natural ecological balance," and an AML is used as "a trigger by which BLM is alerted to address population imbalance." *In Def. of Animals v. U.S. Dept. of Interior*, 751 F.3d 1054, 1063-64 (9th Cir. 2014).

Where BLM determines "that an overpopulation exists on a [HMA] and that action is necessary to remove excess animals, he shall immediately remove excess animals from the range so as to achieve [AML]." 16 U.S.C. § 1333(b)(2). The capture and removal of excess animals must be done "humanely" per the Wild Horses and Burros Act. 16 U.S.C. § 1333(b)(2)(B). While the Wild Horses and Burros Act imparts some conditions on BLM as to making overpopulation, removal, and AML determinations, *see* 16 U.S.C. § 1333(b)(1), district courts in the Ninth Circuit have concluded that the definition and use of the word "humane" in the statute and regulations "imposes a broad rather than discrete mandate" on BLM which "affords BLM discretion" in making those determinations and conducting removals, *see Leigh v. Jewell* ("*Jewell*"), Case No. 3:11-CV-00608-HDM-WGC, 2014 WL 31675, at *5 (D. Nev. Jan. 3, 2014).

### B.  The National Environmental Policy Act

The National Environmental Policy Act, 42 U.S.C. §§ 4321–4370h ("NEPA"), serves the dual purposes of ensuring that "the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts" of proposed federal actions and also that relevant information is made available to the public so that it may "play a role in both the decisionmaking process and the implementation of that decision." *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). The policy goals of NEPA are "realized through a set of action-forcing procedures that require that agencies take a hard look at environmental consequences of a proposed course of action. *Id*. at 350 (citation and quotations omitted). However, NEPA does not mandate results or impose substantive environmental obligations on an agency. *Id*. at 350-51. Instead, NEPA ensures that an agency will not act on incomplete information. *Marsh v. Or Nat. Res. Council*, 490 U.S. 360, 371 (1989).

Under NEPA, a federal agency must prepare an Environmental Impact Statement ("EIS") when it proposes "major Federal actions significantly affecting the quality of the human environment." *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 575 (9th Cir. 1998) (citing 42 U.S.C. § 4332(2)(C)). In an EIS, the agency must evaluate the environmental impact of its proposed action as well as alternatives to the proposed action. 42 U.S.C. § 4332(2)(C). "If an agency is unsure whether its proposed action will have significant environmental impacts," the

agency may first prepare an Environmental Assessment ("EA"). *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 872 (9th Cir. 2022), cert. denied sub nom. *Am. Petroleum Inst. v. Env't Def. Ctr.*, 143 S. Ct. 2582 (2023). An EA is a concise public document that provides evidence and analysis for the agency to determine whether it needs to prepare an EIS. *Id.* (citing and quoting 40 C.F.R. § 1508.9(a)(1)). An EA is intended "to help an agency decide if an EIS is warranted" and does not "replace or substitute" an EIS. *Id.* (citing *Anderson v. Evans*, 314 F.3d 1006, 1023 (9th Cir. 2002)). Where "substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor," an EIS is required. *LaFlamme v. FERC*, 852 F.2d 389, 397 (9th Cir.1988) (internal quotations omitted). However, if an agency determines that a proposed action will have no significant impact on the environment, the agency is not required to issue an EIS and instead may issue a Finding of No Significant Impact ("FONSI"). *See Morongo*, 161 F.3d at 575.

C.     **The Wild Horses and Burros Act and the First Amendment**

In the First Amendment, there is a "qualified right of access for the press and public to observe government activities." *Leigh v. Salazar* ("*Leigh I*"), 677 F.3d 892, 898 (9th Cir. 2012). The Ninth Circuit has held that whether this right of access applies to wild horse and burro gathers is governed by the two-step test articulated in *Press-Enterprise Co. v. Superior Court of California* ("*Press-Enterprise II*"), 478 U.S. 1 (1986). *Id.* at 898–01. Under the *Press-Enterprise II* analysis, a reviewing court must determine (1) whether the place and process have historically been open to the press and general public, and (2) whether public access plays a significant positive role in the functioning of the particular process in question. *Id.* at 898 (citation and quotation omitted). If the answer to both questions is affirmative, a qualified right of access attaches to the government action. *Id.* This Court has held that the public has a qualified right of access to view horse gather operations. *Leigh v. Salazar* ("*Leigh II*"), 954 F. Supp. 2d 1090, 1100-01 (D. Nev. Jul. 19, 2013). However, the Ninth Circuit has stated that the government may overcome that right "only by demonstrating an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Leigh I*, 677 F.3d at 898 (citation and quotation omitted). This Court has recognized that "the effective and efficient gather of the horses"

and "the safety of all individuals including those involved in gather activities, members of the viewing public, and the horses themselves" constitute "important overriding interests." *Leigh II*, 954 F. Supp. 2d at 1101–103.

### D.     Background Facts and Wild Horse's Allegations

The parties agree that in December of 2017, BLM prepared an EA (the "2017 EA") in which it analyzed the environmental impacts associated with a proposed gather of excess horses from the Antelope, Antelope Valley, Goshute, Maverick-Medicine, Spruce-Pequop, and Triple B HMAs (collectively, "the Antelope and Triple B Complexes"). *See* ECF No. 21-5 at 3–12. The Antelope and Triple B Complexes are scattered throughout the eastern portion of Elko County and the northern portion of White Pine County in Nevada. *Id*. at 4. In the 2017 EA, BLM estimated the population of wild horses within the Antelope and Triple B Complexes to be 9,525 which—at that time—was nearly eleven times above the low range AML of 899 horses. *Id*. Because of immense overpopulation, the 2017 EA adopted "Alternative A" as the "Proposed Action" which established a "10-year gather plan and population control measures resulting in the removal of excess wild horses to achieve and maintain" AML populations in the Antelope and Triple B Complexes. *Id*.

In this matter, Wild Horse (1) generally challenges the gathers that have occurred on the Antelope and Triple B Complexes as part of Alternative A's ten-year phased gather plan, and (2) specifically challenges two gathers that ran concurrently from July 9, 2023, through August 20, 2023, on the Antelope Complex (the "2023 Antelope Complex Gather"). *See generally* ECF No. 38. The 2023 Antelope Complex Gather occurred at two locations in the north and south portions of the Antelope Complex: the Antelope and Antelope Valley (east of U.S. Highway 93) HMAs (collectively, "the Antelope Complex-South"), and the Antelope Valley (northwest of U.S. Highway 93), Goshute, and Spruce-Pequop HMAs (collectively, "the Antelope Complex-North"). *Id*. at 13; ECF No. 40 at 13. On July 26, 2023, Wild Horse filed a complaint against BLM challenging the aforementioned gathers by seeking a preliminary injunction and declaratory relief. *See generally* ECF No. 1. Shortly after filing the complaint, Wild Horse filed a request for temporary restraining order and preliminary injunction ("TRO Request") in which it asked the Court to immediately stop the 2023 Antelope Complex Gather because BLM was violating

provisions of the Wild Horses and Burros Act, not complying with its internal Comprehensive Animal Welfare Program ("CAWP) Gather Standards, and not providing proper viewing access to some 2023 Antelope Complex Gather-sites. ECF No. 10. The Court held an evidentiary hearing on August 9, 2023, denied the TRO Request, and articulated its findings and conclusions from the bench. ECF No. 29. The 2023 Antelope Complex Gather ended shortly thereafter.

On September 14, 2023, Wild Horse filed its First Amended Complaint (the "FAC") in which it alleges four causes of action. ECF No. 38. Wild Horse's first cause of action alleges that BLM violated 5 U.S.C. § 553 of the Administrative Procedure Act ("APA") by not issuing its CAWP Standards as substantive rules. *Id*. at 16. This cause of action requests that the Court compel BLM to promulgate its CAWP Standards as rules under 5 U.S.C. § 702. *Id*. at 17. Wild Horse's second cause of action alleges that BLM violated the "immediacy" provision of the Wild Horses and Burros Act by relying on the 2017 EA to conduct multiple gathers on the Antelope and Triple B Complexes including the 2023 Antelope Complex Gather. *Id*. This cause of action also alleges that BLM's reliance on the 2017 EA was arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. §§ 706(2)(A) and 706(2)(C). *Id*. at 18. Wild Horse's third cause of action alleges that BLM violated NEPA by failing to issue a Determination of NEPA Adequacy ("DNA") ahead of the 2023 Antelope Complex Gather as required under 43 C.F.R. § 46.120(c).[1] *Id*. This cause of action also alleges that BLM's decision to rely on the 2017 EA and proceed with the 2023 Antelope Complex Gather without analyzing its significant environmental impacts was arbitrary, capricious, an abuse of discretion, and contrary to law under 5 U.S.C. § 706(2)(A) and that BLM unlawfully withheld its evaluation of the 2017 EA required under 43 C.F.R. § 46.120(c) in violation of 5 U.S.C. § 706(1). *Id*. at 19. Wild Horse's fourth cause of action alleges that BLM violated Wild Horse's protected First Amendment right to observe and document BLM's gather

---

[1] Wild Horse inconsistently alleges this cause of action in the FAC, sometimes citing 40 C.F.R. 46.120(c) and other times citing 43 C.F.R. 46.120(c). ECF No. 38 at 12, 14, 18. However, the parties argue dismissal of this cause of action pursuant to 43 C.F.R. § 46.120(c). *See* ECF No. 40 at 22; ECF No. 43 at 14, 15; ECF No. 44 at 11. Accordingly, the Court's analysis of this cause of action proceeds with the understanding that Wild Horse brings this cause of action pursuant to BLM's alleged duty to issue a DNA under 43 C.F.R. § 46.120(c).

of wild horses in the Antelope Complex. *Id*. at 19, 20. The FAC requests injunctive and declaratory relief as well as compensatory damages under this cause of action. *Id*. On October 23, 2023, BLM filed a motion to dismiss the FAC. ECF No. 40. The motion is addressed below.

## II.   LEGAL STANDARD

### A.   Federal Rule of Civil Procedure 12(b)(1)

A party may seek the dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). "Rule 12(b)(1) jurisdictional attacks can either be facial or factual." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) (citation omitted). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). When faced with a facial jurisdictional attack, district courts in the Ninth Circuit "consider the allegations of the complaint to be true and construe them in the light most favorable to the plaintiff." *Bob Moore, LLC v. United States*, Case No. 2-15-CV-660-GMN-PAL, 2016 WL 1171001, at *2 (D. Nev. Mar. 23, 2016) (citation omitted). The burden of establishing subject-matter jurisdiction rests with the party asserting jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also United States v. Orr Water Ditch Co.*, 600 F.3d 1152, 1157 (9th Cir. 2010). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

### B.   Federal Rule of Civil Procedure 12(b)(6)

A party may seek the dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss for failure to state a claim, a complaint must satisfy the notice pleading standard of Fed. R. Civ. P. 8(a). *See Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008). Under Rule 8(a), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8(a) does not require "detailed factual allegations;" however, a "pleading that offers only 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" is insufficient and

1  fails to meet the broad pleading standard under Rule 8(a). *Ashcroft v. Iqbal*, 556 U.S. 662, 678
2  (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

3         To sufficiently allege a claim under Rule 8(a)(2), viewed within the context of a
4  Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as
5  true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at
6  570). A claim has facial plausibility when the pleaded factual content allows the court to draw the
7  reasonable inference, based on the court's judicial experience and common sense, that the
8  defendant is liable for the alleged misconduct. *See id.* at 678–79 (stating that "[t]he plausibility
9  standard is not akin to a probability requirement, but it asks for more than a sheer possibility that
10 a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with
11 a defendant's liability, it stops short of the line between possibility and plausibility of entitlement
12 to relief" (internal quotation marks and citations omitted)). Further, in reviewing a motion to
13 dismiss, the court accepts the factual allegations in the complaint as true. *Id.* However, "bare
14 assertions" in a complaint amounting "to nothing more than a 'formulaic recitation of the
15 elements'" of a claim are not entitled to an assumption of truth. *Id.* at 680–81 (quoting *Twombly*,
16 550 U.S. at 555). The court discounts these allegations because "they do nothing more than state
17 a legal conclusion—even if that conclusion is cast in the form of a factual allegation." *Moss v. U.S.*
18 *Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009). "In sum, for a complaint to survive a motion to
19 dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must
20 be plausibly suggestive of a claim entitling the plaintiff to relief." *Id*.

21 **III.   DISCUSSION**

22        Two preliminary issues require attention. First, BLM brings its motion to dismiss under
23 Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF No. 40 at 9. In terms of a Rule
24 12(b)(1) challenge, a court may consider evidence outside of the complaint. *Safe Air*, 373 F.3d at
25 1039. In terms of a Rule 12(b)(6) challenge, a court's review is generally limited to the complaint.
26 *Daniels—Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). However, a court may
27 consider evidence on which the complaint necessarily relies if: "(1) the complaint refers to the
28 document; (2) the document is central to the plaintiffs' claim; and (3) no party questions the

authenticity of the copy attached to the 12(b)(6) motion." *Id.* (internal quotations and citations omitted). In that case, a court may "treat such a document as 'part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).'" *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (quoting *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)). The Court reviews BLM's motion accordingly.

Second, Wild Horse attempts to amend the FAC through its opposition response. District courts in the Ninth Circuit do not allow amendment of a complaint by briefing filed in opposition to a motion to dismiss. *See, e.g., Apple Inc. v. Allan & Assoc. Ltd.*, 445 F. Supp. 3d 42, 59 (N.D. Cal. Mar. 27, 2020) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss") (internal quotation marks and citation omitted). In fact, the Ninth Circuit has explained that "new allegations" in an opposition to a Rule 12(b)(6) motion are "irrelevant" in determining a Rule 12(b)(6) dismissal, and specifically stated that "a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss" when determining the propriety of a Rule 12(b)(6) dismissal. *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (citation omitted).

Normally, the Court would be bound by the allegations contained in the FAC as to determining the merits of BLM's motion to dismiss. However, a highly unusual circumstance is present here: BLM replied to and thoroughly addressed Wild Horse's proposed amendments. *Compare* ECF No. 43 at 5, 12, 13 (Wild Horse proposing to amend its first cause of action to seek relief based on 5 U.S.C. §§ 706(1) and 706(2)(D), not § 702) *with* ECF No. 44 at 5–9 (BLM arguing that the first cause of action fails as a matter of law even if alleged under §§ 706(1) or 706(2)(D)). Each party has presented substantive arguments as to the merits of the proposed amendments as if Wild Horse was granted leave to amend the FAC. Because the parties have effectively briefed the proposed amendments, the Court analyzes BLM's motion accordingly.

**A.    The Court Dismisses Wild Horse's First Cause of Action with Prejudice.**

In the FAC, Wild Horse alleges that BLM violated 5 U.S.C. § 553 by not adopting its CAWP Standards as substantive rule and requests that the Court compel BLM to promulgate them as such under 5 U.S.C. § 702. ECF No. 38 at 16. BLM argues that this cause of action should be

dismissed for a mix of failure to state a claim and lack of subject-matter jurisdiction reasons including (1) the cause of action is time-barred by the APA's six-year statute of limitations; (2) the CAWP Standards are not substantive rules nor subject to formal rulemaking; and (3) the remedy Wild Horse seeks is non-discrete agency action and, therefore, not permissible. ECF No. 40 at 16–21. In response, Wild Horse seeks leave to amend declaring that it seeks relief based on 5 U.S.C. § 706(1), not § 702. ECF No. 43 at 5 ("Specifically, [Wild Horse avers] that BLM has unlawfully withheld promulgation of humane treatment standards pursuant to the requirements of 5 U.S.C. § 553 in violation of 5 § U.S.C. 706(1)"). Wild Horse also seeks leave to amend this cause of action to allege that BLM violated 5 U.S.C. § 706(2)(D). *Id.* ("[Wild Horse] also aver[s] that BLM's promulgation of the CAWP Standards without following the requirements of 5 U.S.C. § 553 violates 5 U.S.C. § 706(2)(D) in that it was done without observance of procedure required by law"). In reply, BLM argues that even the amended cause of action fails as a matter of law for various reasons (ECF No. 44 at 5), many of which the Court addresses below.

The Court finds that Wild Horse's first cause of action fails for a mixture of failure to state a claim and lack of subject-matter jurisdiction reasons. An agency is required to undergo formal rulemaking subject to notice and comment only when it issues a substantive rule. *See* 5 U.S.C. § 553; *see also Sacora v. Thomas*, 628 F.3d 1059, 1069 (9th Cir. 2010) (stating that the APA requires a federal agency "to follow prescribed notice-and-comment procedures before promulgating substantive rules"). Substantive rules are those which "create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress." *Hemp Indus. Ass'n v. Drug Enforcement Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003). Under § 553(b)(A), formal rulemaking notice and comment procedures do not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice[.]" 5 U.S.C. § 553(b)(A); *see also Sacora*, 628 F.3d at 1069.

The FAC lacks any allegation that the CAWP Standards are substantive rules. Not once does Wild Horse allege that those standards create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress. Instead, Wild Horse vaguely alleges that BLM disregarded the CAWP Standards and, on a single instance, offers the conclusory

statement that they "must be promulgated as rules." ECF No. 38 at 15, 16. Its opposition to the motion is the first time Wild Horse alleges that the CAWP Standards are substantive rules subject to formal rulemaking. ECF No. 43 at 8. In that opposition, Wild Horse cites to several current CAWP Standards and argues that those cited standards clearly establish a "binding norm" that "fills out the statutory scheme." *Id*. at 11. Wild Horse requests leave to amend its FAC to include these allegations regarding the CAWP Standards as substantive rules. *Id*. at 12.

In reply, BLM argues that the CAWP Standards are not substantive rules, that Wild Horse failed to address its argument that they are akin to agency policy and handbooks, and that the cause of action alleged in the FAC does not square with Wild Horse's opposition argument that the CAWP Standards are substantive rules. ECF No. 44 at 9, 10. The Court agrees. This cause of action, as alleged in the FAC and as appearing in Wild Horse's proposed second amended complaint, states that BLM "violated 5 U.S.C. § 553 by adopting the CAWP standards as an unenforceable 'agency policy,' as opposed to rulemaking." ECF No. 38 at 17. However, in its opposition and proposed second amended complaint, Wild Horse argues that the very standards BLM adopted as "unenforceable agency policies" are substantive rules that impart "mandatory obligations that BLM staff, contractors, and associated partners must follow when removing horses from public lands." ECF No. 43 at 10. Simply put, Wild Horse's allegation that BLM has issued its CAWP Standards as unenforceable agency policy does not square with its opposition argument and proposed amendment that those same standards are substantive rules. Either the CAWP Standards as issued are substantive rules and BLM has failed to comply with them or they are BLM policy not subject to formal rulemaking; they cannot be both at the same time.

Even if Wild Horse successfully alleged that the CAWP Standards were substantive rules, Wild Horse still fails to state a claim under 5 U.S.C. § 706(1) and the Court lacks subject-matter jurisdiction over the 5 U.S.C. § 706(2)(D) claim. Under § 706(1), a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1). The United States Supreme Court has explained that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All*. ("*SUWA*"), 542 U.S. 55, 64 (2004) (*emphasis* original). In *SUWA*, the

11

Supreme Court defined "discrete" agency action as rules, orders, licenses, sanctions, and relief before distinguishing such action that the agency is "required to take" as action the agency is legally obligated to take. *Id*. at 62–63. In the Ninth Circuit, a reviewing court's ability to compel agency action under § 706(1) "is carefully circumscribed to situations where an agency has ignored a specific legislative command." *Hells Canyon Pres. Council v. U.S. Forest Serv.* ("*Hells Canyon*"), 593 F.3d 923, 932 (9th Cir. 2010). A court "can compel agency action under [§ 706(1)] only if there is 'a specific, unequivocal command' placed on the agency to take a 'discrete agency action,' and the agency has failed to take that action." *Vietnam Veterans of Am. v. Cent. Intel. Agency*, 811 F.3d 1068, 1075 (9th Cir. 2016) (citing and quoting *SUWA*, 542 U.S. at 63, 64).

Again, nowhere in the FAC does Wild Horse allege that BLM ignored a specific legislative command to issue its CAWP Standards as substantive rules. Such allegation does not appear until its opposition in which Wild Horse proposes to amend its first cause of action to allege that BLM unlawfully withheld promulgation of "humane handling standards" as substantive rules pursuant to 5 U.S.C. § 553 in violation of 5 U.S.C. § 706(1). ECF No. 43 at 5. In reply, BLM argues that Wild Horse's § 706(1) claim fails as a matter of law because Wild Horse does not identify any specific legislative command that requires BLM to undergo formal rulemaking as to these standards. ECF No. 44 at 5. After careful review of the FAC and Wild Horse's proposed amendments, the Court finds that Wild Horse has failed to point to any legal obligation, demand of law, or legislative command that requires BLM to promulgate humane handling standards as substantive rules. At first glance, this deficiency may potentially be cured through amendment but upon closer inspection of Wild Horse's opposition and proposed amendments, leave to amend would be futile.

Wild Horse argues that the Wild Horses and Burros Act's silence and ambiguity as to the meaning of humane treatment equates to legislative command and requires BLM to undergo formal rulemaking. ECF No. 43 at 13. Wild Horse's concession that the Wild Horses and Burros Act is silent as to a legislative command that BLM promulgate humane treatment standards as substantive rules renders any potential § 706(1) claim implausible. Although the Wild Horses and Burros Act requires that BLM treat wild horses humanely, *see* 16 U.S.C. §1333(b)(2)(B), (C), it

does not require BLM to promulgate humane treatment standards as substantive rules. Absent a specific legislative command, BLM's alleged unreasonable delay or unlawful withholding of the CAWP Standards as substantive rules claim is not reviewable under § 706(1). *See SUWA*, 542 U.S. at 63 (explaining that §706(1) is limited to enforcement of an unequivocal command).

In fact, permitting Wild Horse's proposed § 706(1) claim to proceed would invite the Court to compel agency action where Wild Horse believes the agency should act, not where the agency failed to carry out a specific legislative directive. *See Hells Canyon*, 593 F.3d at 932 (stating that § 706(1) "does not give us license to 'compel agency action' whenever the agency is withholding or delaying an action we think it should take"). Accordingly, Wild Horse's failure to identify an agency action that BLM is required to take, paired with its admission that the Wild Horses and Burros Act is silent as to such command, results in a failure to state a claim and lack of subject-matter jurisdiction, and neither deficiency is capable of cure by amendment. *See id.* at 933 (stating that plaintiffs failed to state a claim under § 706(1) where they did not identify a discrete agency action that the defendant was required to take); *see also San Luis Unit Food Producers v. United States* ("*San Luis Unit*"), 709 F.3d 798, 804 (9th Cir. 2013) (explaining that where a §706(1) claim lacks assertions that the agency failed to take a *discrete* agency that it is *required* to take, the claim may be dismissed for lack of jurisdiction) (citation omitted) (*emphasis* original). For these reasons, Wild Horse's first cause of action as alleged in the FAC and with any proposed amendment is dismissed with prejudice as brought under 5 U.S.C. §706(1). *See Gros Ventre Tribe v. United States*, 469 F.3d 801, 814 (9th Cir.2006) (upholding a district court's dismissal of an APA claim for lack of jurisdiction because the government was not required to take discrete action).

Wild Horse also proposes to amend this cause of action to request that the Court set the CAWP Standards aside pursuant to 5 U.S.C. § 706(2)(D). ECF No. 43 at 5. In reply, BLM argues that the proposed § 706(2)(D) claim should be dismissed because it is time-barred by the APA's six-year statute of limitations, it does not challenge final agency action, and the CAWP Standards are not the type of agency guidance required to be promulgated through formal rulemaking. ECF No. 44 at 7–11. Under § 706(2)(D), a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … without observance of procedure required by

1   law[.]" 5 U.S.C. § 706(2)(D). "To bring a claim under 5 U.S.C. § 706(2), plaintiffs must identify

2   a final agency action upon which the claim is based." *Hells Canyon*, 593 F.3d at 930 (citing 5

3   U.S.C. § 704). An agency action is final where it marks the consummation of the agency's

4   decisionmaking process and where rights or obligations have been determined or from which legal

5   consequences flow. *See id*.; *see also Jewell*, 2014 WL 31675, at *2 (citation omitted).

6        In opposition, Wild Horse states that the CAWP Gather Standards formally adopted by

7   BLM in 2015 are not final agency action because they are not the consummation of the agency's

8   decision-making process. ECF No. 43 at 7. Thus, Wild Horse abandons any claim it may have

9   previously made in the FAC that the adoption of those standards in 2015 constitutes final agency

10  action challengeable pursuant to § 706(2). In that same opposition, Wild Horse alleges BLM's

11  issuance of the Permanent Instruction Memorandum 2021-002 (the "PIM") to be final agency

12  action. *Id*. As noted, "For an agency action to be final, the action must (1) mark the consummation

13  of the agency's decisionmaking process and (2) be one by which rights or obligations have been

14  determined, or from which legal consequences will flow." *Or. Natural Desert Ass'n v. U.S. Forest

15  Serv.*, 465 F.3d 977, 982 (9th Cir.2006) (citation and quotation omitted). "The core question is

16  whether the agency has completed its decisionmaking process, and whether the result of that

17  process is one that will directly affect the parties." *Id*. (citation omitted). Where no final agency

18  action is challenged, a court lacks subject-matter jurisdiction to consider a § 706(2)(D) claim. *See

19  San Luis Unit*, 709 F.3d at 801.

20       After careful review, the Court finds that the PIM is not final agency action and, as such,

21  Wild Horse has failed to challenge final agency action as to its proposed § 706(2)(D) claim. The

22  PIM does not mark the consummation of BLM's decision-making process. Instead, the PIM

23  clarifies and reiterates decisions, processes, and standards that are the consummation of decision-

24  making processes from 2015 and 2016. This is evidenced by the PIM's language which states that

25  the PIM's purpose is to "re-affirm" BLM's longstanding commitment to the humane treatment of

26  wild horses and burros; that the PIM "reiterates" BLM's practices and provides "additional

27  clarification" to BLM employees; and that all state, district, and field offices are instructed to

28  "continue" to comply with its CAWP policies. ECF No. 44-2 at 3. Because the PIM does not mark

the consummation of BLM's decision-making process, the Court need not analyze whether rights or obligations have been determined by the PIM or whether legal consequences flow from it. Wild Horse's failure to identify a final agency action challengeable under § 706(2)(D) results in this claims dismissal for lack of subject-matter jurisdiction. *See Jewell*, 2014 WL 31675, at *4 (dismissing a plaintiff's § 706(2) claim for lack of subject-matter jurisdiction where plaintiff failed to challenge final agency action).

In summary, Wild Horse's first cause of action fails to allege that the CAWP Standards are substantive rules; fails to allege a specific legislative command by which BLM is obligated to promulgate its CAWP Standards as substantive rules as is required of a 5 U.S.C. § 706(1) claim; admits that no such legislative command exists which could save its § 706(1) claim; and fails to challenge final agency action as is required of a 5 U.S.C. § 706(2)(D) claim. Wild Horse's first cause of action as alleged in the FAC, and with any proposed amendments, is dismissed with prejudice for failure to state a claim and lack of subject-matter jurisdiction. No leave to amend is granted as amendment would be futile. *See Carrico v. City and Cty. of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011) (stating where amendment is futile, leave to amend is properly denied).

**B.    The Court Dismisses Wild Horse's Third Cause of Action Without Prejudice.**[2]

In the FAC, Wild Horse alleges BLM violated NEPA when it relied on the 2017 EA without issuing a DNA to assess the environmental effects of and reasonable alternatives to the 2023 Antelope Complex Gather pursuant to 43 § C.F.R. 46.120(c). ECF No. 38 at 18. This cause of action additionally alleges that BLM's decision to proceed with the 2023 Antelope Complex Gather without issuing a DNA was arbitrary, capricious, an abuse of discretion, and contrary to the law; that BLM's failure to perform a more recent DNA violated 5 U.S.C. § 706(1); and that BLM's decision to rely on the 2017 EA was arbitrary and capricious and not in accordance with law in violation of 5 U.S.C. § 706(2)(A). *Id.* at 18, 19.

///

---

[2]    BLM argues for dismissal of Wild Horse's second cause of action for reasons more thoroughly explained as to the third cause of action. Because BLM's arguments for dismissing the second cause of action build upon the arguments for dismissing the third cause of action, the Court analyzes Wild Horse's third cause of action before the second.

In its motion, BLM argues that Wild Horse fails to state a NEPA violation claim for various reasons. First, BLM claims that Wild Horse cannot base a NEPA violation on § 46.120(c) because that Section does not impose NEPA obligations on an agency and does not obligate BLM to issue a DNA. ECF No. 40 at 22. Second, BLM claims that Wild Horse ignores § 46.120(a) which limits the application of § 46.120(c) to newly proposed actions. *Id*. at 22, 23. Third, BLM claims that the 2017 EA has no expiration date and must be re-evaluated or supplemented only when that action has materially changed. *Id*. at 23. In opposition, Wild Horse argues that the 2023 Antelope Complex Gather was newly proposed action before alternatively requesting leave to amend this cause of action as a failure to supplement claim as required by NEPA. ECF No. 43 at 15. In reply, BLM argues that (1) Wild Horse concedes that DNAs are not required by NEPA; (2) the environmental effects of gathers in the Antelope and Triple B Complexes through 2027 were thoroughly analyzed in the 2017 EA; and (3) courts have consistently found gathers performed as part of a multi-year proposed action gather to not be newly proposed actions. ECF No. 44 at 11, 12. While BLM also claims that Wild Horse has failed to allege facts and proposed amendments that state a claim to supplement the 2017 EA, it admits that it is theoretically possible for Wild Horse to do so. *Id*. at 12, 13.

As alleged, the Court finds that Wild Horse has failed to state a claim as to its third cause of action. 43 C.F.R. § 46.120(c) states:

> [a]n existing environmental analysis prepared pursuant to NEPA and the Council on Environmental Quality regulations may be used in its entirety if the Responsible Official determines, with appropriate supporting documentation, that it adequately assesses the environmental effects of the proposed action and reasonable alternatives. The supporting record must include an evaluation of whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects.

43 C.F.R. § 46.120(c). A DNA is "an administrative convenience created by the [agency], and [is] not defined in NEPA or its implementing regulations issued by the Council of Environmental Quality." *Tribes v. United States*, Case No. 1:22-CV-00680-CL, 2023 WL 7182281, at *24 (D. Or. Sept. 11, 2023), report and recommendation adopted sub nom. *Klamath Tribes v. United States Bureau of Reclamation*, Case No. 1:22-CV-00680-CL, 2024 WL 472047 (D. Or. Feb. 7, 2024). Put alternatively, DNAs are not official NEPA documents. *N. Alaska Envtl. Ctr. v. U.S. Dept. of*

*Interior*, 983 F.3d 1077, 1082 n.3 (9th Cir. 2020) (citation omitted). Moreover, DNAs cannot be tiered to NEPA documents and, while they may be used to determine the sufficiency of previously issued NEPA documents, *S. Utah Wilderness All. v. Norton*, 457 F. Supp. 2d 1253, 1255 (D. Utah Aug. 1, 2006), the Ninth Circuit has stated that non-NEPA documents have a "limited role" in determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS. *Idaho Sporting Cong. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000).

There are various issues with Wild Horse's third cause of action as alleged in the FAC and with its proposed amendments. First, failure to issue a DNA cannot plausibly provide the basis for a NEPA violation because DNAs are not required by NEPA nor considered official NEPA documents. *See* 40 C.F.R. § 1508.10 (defining the term "environmental document" to include Environmental Assessments, Environmental Impact Statements, Findings of No Significant Impact, and Notices of Intent). Second, § 46.100, which outlines federal action subject to NEPA's procedural requirements, states that the Section does not impose additional obligations on an agency not currently required under NEPA. *See* Implementation of the National Environmental Policy Act (NEPA) of 1969, 73 FR 61292-01 ("This final rule adds no additional obligations not currently required under NEPA and the CEQ regulations"). More specifically, the Department of the Interior clarified that § 46.120 "explains how to incorporate existing environmental analysis previously prepared pursuant to NEPA and the CEQ regulations into the analysis being prepared." *Id.* Thus § 46.120 does not require BLM to issue a DNA but instructs BLM on how to incorporate the 2017 EA into a subsequent analysis. Accordingly, an alleged failure to issue a DNA pursuant to 43 C.F.R. § 46.120(c) cannot be the basis of Wild Horse's third cause of action.

Moreover, § 46.120(c) is contextually limited by § 46.120(a) to the use of an existing NEPA analysis for assessing the impacts of a newly "proposed action." 43 C.F.R. § 46.120(a). Alternative A—the ten-year phased gather plan in the Antelope and Triple B Complexes—is specifically defined as the "Proposed Action" in the 2017 EA. ECF No. 25-1 at 4. Therefore, the ten-year phased gather plan is the only plausible "proposed action" at play here, not each subsequent gather as Wild Horse posits.

///

17

Even if BLM's failure to issue a DNA pursuant to 43 C.F.R. § 46.120(c) ahead of the 2023 Antelope Complex Gather could plausibly violate NEPA, the FAC and opposition amendments still fail to state a claim on which relief can be granted. Under NEPA, BLM may utilize the 2017 EA as a basis to conduct the 2023 Antelope Complex Gather where it adequately addresses the impacts of the gathers over a ten-year period and where there are no new circumstances, new information, or changes in the gather action or its impacts that were not analyzed in the 2017 and that would result "in *significantly different* environmental effects." *Desert Prot. Soc'y v. Haaland*, Case No. 2-19-CV-00198-DJC-CKD, 2023 WL 6386901, at *9 (E.D. Cal. Sep. 29, 2023) (citation and quotation omitted) (*emphasis* original). Here, Wild Horse generally alleges that it would have expected a DNA to evaluate "new circumstances, new information, or changes" before providing a vague non-exclusive list of what those new circumstances might include. ECF No. 38 at 18. However, Wild Horse fails to allege that those new circumstances were (1) not examined in the 2017 EA, and (2) would result in significantly different environmental effects.

For example, Wild Horse alleges "the current foaling season" to be a new circumstance. *Id*. Not only did the 2017 EA consider foaling season in its decision to adopt Alternative A, *see* ECF No. 21-5 at 8, 9, but neither the FAC nor Wild Horse's proposed amendments include any factual detail as to what the current foaling season is, how it is different from the foaling season examined in the 2017 EA, and how the current foaling season would result in significantly different environmental effects. Put alternatively, Wild Horse fails to provide factual support plausibly suggesting that new circumstances, facts, or changes existed ahead of the 2023 Antelope Complex Gather that would have resulted in significantly different environmental effects of the gather than those assessed and analyzed in the 2017 EA.

For these reasons, the Court finds that Wild Horse has failed to state a claim as to its third cause of action. Accordingly, BLM's motion to dismiss is granted as to that claim. However, the Court dismisses this cause of action without prejudice and grants Wild Horse's request for leave to amend to allege that BLM must supplement the 2017 EA as required by NEPA. Amending this cause of action to state a supplement claim that is not based on BLM's alleged failure to issue a DNA under 43 C.F.R. § 46.120(c) is proper as amendment could cure the stated deficiencies. *See*

*Carrico*, 656 F.3d at 1008. Nevertheless, the Court cautions that Wild Horse's proposed second amended complaint as currently alleged fails to state a supplement claim under 40 C.F.R. § 1502.9(d)(1)(ii).

      **C.**     **The Court Dismisses Wild Horse's Second Cause of Action without Prejudice.**

      In the FAC, Wild Horse alleges that BLM's reliance on the 2017 EA to conduct multiple gathers violates the immediacy requirement of the Wild Horses and Burros Act and that BLM's decision to rely on the 2017 EA was arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, in excess of jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. §§ 706(2)(A) and (C). ECF No. 38 at 17, 18. In its motion, BLM argues that Wild Horse's immediacy-related cause of action is duplicative of its NEPA cause of action and should be dismissed for the same reasons. ECF No. 40 at 24. In opposition, Wild Horse argues that the two causes of action are independent, and that court treat them as such. ECF No. 43 at 13, 14. Wild Horse cites *Friends of Animals v. Culver*, 610 F. Supp. 3d 157 (D.D.C. Jun. 28, 2022) to highlight the fact that an immediacy claim under the Wild Horses and Burros Act claim and a NEPA-claim are distinct. *Id*. at 14. In reply, BLM claims that *Culver* is inapplicable because that court was faced with a challenge to a non-NEPA decision record whereas Wild Horse challenges the 2017 EA here which is a NEPA document. ECF No. 44 at 13.

      BLM's argument that this cause of action should be dismissed because it is duplicative of Wild Horse's NEPA cause of action is unpersuasive. While the claims are similar, something Wild Horse admits, the causes of action allege violations of different but related law: the second cause of action is based on an alleged temporal violation of the immediacy provision of the Wild Horse and Burros Act while the NEPA-based cause of action is a more specific challenge based on BLM's failure to issue a DNA ahead of the 2023 Antelope Complex Gather pursuant to 43 C.F.R. § 46.120(c). Wild Horse does not allege that BLM's failure to complete a DNA pursuant to 43 C.F.R. § 46.120(c) violated the immediacy requirement of the Wild Horses and Burros Act.

      However, the Court cannot overlook the various issues presented in this cause of action. The FAC does not make clear whether Wild Horse is bringing this cause of action as to all the subsequent gathers conducted on the Antelope and Triple B Complexes pursuant to the 2017 EA

or just the 2023 Antelope Complex Gather. The FAC alleges that BLM abused its discretion and violated the Wild Horses and Burros Act by relying on the 2017 EA for "multiple gathers" and, further, that BLM relied on the 2017 EA to conduct gathers in 2018, 2019, 2020, 2021, and 2022. ECF No. 38 at 14, 17. However, the only factual support Wild Horse provides for this cause of action is that the 2017 EA is now six years old. *Id*. at 14. The only gather conducted by BLM for which the 2017 EA would be six years old is the 2023 Antelope Complex Gather. The FAC contains no factual support for Wild Horse's claim that BLM violated the immediacy requirement of the Wild Horses and Burros Act by relying on the 2017 EA for the gathers conducted in 2018, 2019, 2020, 2021, and 2022. To the extent that Wild Horse brings this cause of action to challenge BLM's reliance on the 2017 EA for "multiple gathers," it fails to state a claim by offering nothing more than a formulaic recitation of the immediacy provision and factual support applicable only to the most recent gathers.

Even if the Court were to construe this cause of action to challenge only the 2023 Antelope Complex Gather, Wild Horse still fails to state a claim on which relief may be granted. While Wild Horse correctly points out that the Wild Horses and Burros Act requires BLM to "immediately" remove excess animals once it determines that removal of excess animals is necessary, it offers only that the 2017 EA is six years old to support that allegation. A single supporting fact falls well short of the facial plausibility pleading standard of Fed. R. Civ. P. 8(a). This bare assertion that BLM violated the immediacy provision by relying on a six-year-old EA, without more, does not permit the Court to draw the reasonable inference that BLM is liable for the misconduct alleged. *See Ashcroft*, 556 U.S. at 678–81 (citation and quotation omitted). Much like its third cause of action, Wild Horse fails to allege sufficient factual support to state a claim. Because additional facts could cure the stated deficiency, the Court grants Wild Horse leave to amend its second cause of action. *See Carrico*, 656 F.3d at 1008. Accordingly, the Court grants BLM's motion to dismiss as to Wild Horse's second cause to action. The claim is dismissed without prejudice and Wild Horse is granted leave to amend.

///

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     **D.**       **The Court Dismisses Wild Horse's Fourth Cause of Action without Prejudice.**

     Background as to this cause of action is pertinent. At the TRO Request evidentiary hearing, it was revealed that Wild Horse's First Amendment allegations specifically reflected two gather-sites on the Antelope Complex-North: (1) the "Spruce South Trap" located in Goshute Valley, and (2) the "Checkerboard Pattern Trap" located in Wells. ECF No. 36 at 70–75. At the hearing, BLM revealed that the Spruce South Trap's geography and topography made public viewing access physically unsafe for the viewing public and gather personnel. *Id*. at 75–77. BLM further revealed that the Checkerboard Pattern Trap was located on "checkerboard land," meaning it was physically located on public land accessible only via private property roads. *Id*. at 70–72. BLM stated that the private property owner granted BLM permission to use his roads but did not grant the public permission. *Id*. at 72–74.

     Upon conclusion of the hearing, the Court found that the public has a right of access to view gather activities under the *Press Enterprise II*-analysis but that there are exceptions to that right of access where the government has an overriding interest that is narrowly tailored as established in *Leigh II*, 954 F. Supp. 2d at 1100-101. ECF No. 36 at 127. The Court noted that BLM had established a strong overriding interest in safety and efficiency due to the geography of the South Spruce Trap that exceeded the public's right to view and access the gather site. *Id*. at 128. While the Court viewed BLM's restriction of viewing access at the Checkerboard Pattern Trap as a Constitutional violation, it also found the issue was moot as it was an isolated occurrence and there was no further intention to conduct a gather at that site. [3] *Id*. at 128, 129.

     The FAC alleges that BLM has "interfered with Wild Horse's protected right under the First Amendment by preventing them from observing and documenting BLM's gather of wild horses in the Antelope Complex." ECF No. 38 at 19. As factual support, Wild Horse seemingly refers to the Checkerboard Pattern Trap in the Antelope Complex-North during the 2023 Antelope Complex Gather: "During the 2023 removal action in the Antelope Complex, Plaintiffs were

---

[3]    In its ruling, the Court cautioned BLM that "if a gathering site needs to be on private property or needs to be only accessed through private property, the BLM clearly has a duty to try and obtain consent and permission for access through the private property and for the use of the private property for the site, and if it doesn't have that permission, then it's going to have to show some very overriding interests in why the public's right of access should be denied." ECF No. 36 at 129.

denied access because BLM purposely placed trap areas on lands only accessible through private road**s**, even though BLM knew it did not have permission for the public to utilize those roads to observe the roundup." *Id*. at 17. The FAC also alleges that Wild Horse is entitled to compensatory damages under 42 U.S.C. § 1983, injunctive relief, and declaratory relief under 28 U.S.C. § 2201 as to this cause of action. *Id*. at 19, 20.

In its motion, BLM argues that Wild Horse's fails to state a First Amendment claim for the following reasons: (1) Wild Horse cannot bring legal claims against BLM under 42 U.S.C. § 1983 because BLM is a federal agency; (2) to the extent that Wild Horse's First Amendment cause of action is based on prior viewing access restrictions and the completed 2023 Antelope Complex Gather, it is moot; (3) Wild Horse fails to allege sufficient facts to state a claim regarding on-going viewing access restriction; and (4) Wild Horse does not have a First Amendment right to view "humane" gathers and any implied "humane" gather claim under the Wild Horses and Burros Act is nonjusticiable. ECF No. 40 at 25–30. The Court addresses these arguments in turn.

1. Wild Horse's First Amendment cause of action and its related request for compensatory damage relief cannot anchor in 42 U.S.C. § 1983.

In its motion, BLM argues that Wild Horse's First Amendment cause of action should be dismissed to the extent the claim is brought and seeks compensatory damages under 42 U.S.C. § 1983 because such relief is unavailable against the federal government. ECF No. 40 at 25, 26. Specifically, BLM alleges that Wild Horse's § 1983 First Amendment claim must fail because liability in federal government actors is precluded under that Section. *Id*. BLM also argues that the claim fails even if brought under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) for similar reasons. *Id*. Wild Horse concedes these arguments and admits that damages under § 1983 are not available in this matter before requesting leave to amend to remove reference to § 1983 damages. ECF No. 43 at 16.

In the Ninth Circuit, 42 U.S.C. § 1983 precludes liability in federal government actors. *Morse v. N. Coast Opportunities*, *Inc.*, 118 F.3d 1338, 1343 (9th Cir. 1997). Furthermore, *Bivens* remedies are not available against a federal agency. *W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1119 (9th Cir. 2009). Thus, to the extent that Wild Horse alleges any First Amendment

violation or claims for compensatory damages through § 1983, such claims are barred. However, because amendment would cure this deficiency and not be futile, the Court grants Wild Horse's request for leave to amend this cause of action accordingly. *See DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir.1992) ("leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency") (internal quotation marks and citation omitted). Should Wild Horse choose to amend, it should ensure all references to § 1983 compensatory damages are removed from its proposed second amended complaint. *See* ECF No. 43-1 at 26 (Wild Horse requesting "compensatory damages for past mental or emotional injury pursuant to 28 U.S.C. § 1983" in its proposed second amended complaint).

2.   Wild Horse's First Amendment cause of action is not moot as it seeks relief to future gathers on the Antelope Complex and states a claim for relief that is plausible on its face.

In its motion, BLM argues that Wild Horse's First Amendment cause of action is moot to the extent that it is based on prior viewing access restrictions and the completed 2023 Antelope Complex gather. ECF No. 40 at 26–29. In opposition, Wild Horse argues that the issue is not moot because this is the hallmark of the type of case capable of repetition for which relief is warranted. ECF No. 43 at 17. Specifically, Wild Horse argues that BLM intends to rely on the 2017 EA to conduct gathers through 2027 before requesting leave to amend this cause of action to include additional facts showing the alleged First Amendment violations regularly occur. *Id*. at 17, 18.

After careful review of the FAC and opposition, the Court finds that Wild Horse's First Amendment cause of action is not moot because Wild Horse seeks injunctive relief as to future gathers at the Antelope Complex, not just relief specific to the now complete 2023 Antelope Complex Gather and Checkerboard Pattern Trap. The Ninth Circuit's decision in *Leigh I* is instructive on the issue of mootness. 677 F.3d 892. In *Leigh I*, the Ninth Circuit found that a plaintiff's claim for preliminary injunctive relief related to her allegation that BLM violated her First Amendment right to observe government activities was not moot partly because the relief sought applied to future gathers, not just a completed one in the past, and because there was a real possibility of another gather on the complex at issue. *Leigh II*, 677 F.3d at 896–97. The Ninth

1   Circuit concluded that completion of a gather does not render a preliminary injunction moot when

2   the relief requested could still apply to future gathers. *Id*. at 897.

3       Here, the FAC states that Wild Horse is "entitled to injunctive relief to prevent [BLM]

4   from continuing to interfere with their rights under the First Amendment … This Court is

5   authorized to enjoin [BLM] from further violations of [Wild Horse's] First Amendment rights,

6   including by compelling [BLM] to provide [Wild Horse] meaningful access to all locations where

7   horses are being gathered and to locations where removed horses are currently housed to accurately

8   document BLM's activities and handling of these horses." ECF No. 38 at 19, 20. In its prayer for

9   relief, Wild Horse requests that the Court:

10      Issue an order compelling [BLM] to provide [Wild Horse] with meaningful viewing
        access of the gather operation, off-range holding corrals where gathered horses and

11      burros from the 2023 Antelope Complex operations are currently held, and to each
        phase of *future gather and removal efforts* of horses and burros living in the

12      Antelope Complex, including trap sites, temporary holding corrals, and off range
        holding corrals.

13

14  *Id*. at 21 (*emphasis* added). The relief Wild Horse requests applies equally to the completed 2023

15  Antelope Complex Gather and "future gather and removal efforts of horses and burros living in

16  the Antelope Complex," just as the relief requested in *Leigh II* applied to future and past gathers.

17  *See Leigh II*, 677 F.3d at 896–97.

18      The Court finds that future gather activity on the Antelope Complex, and specifically

19  another checkerboard pattern trap gather, is possible because the 2017 EA authorizes BLM to

20  conduct gathers in the Antelope Complex through 2027. Although the First Amendment issue and

21  any potential relief particular to the 2023 Antelope Complex Gather is clearly moot by virtue of

22  that gather concluding, the issue is not moot as to future gathers on the Antelope Complex. *See*

23  *Leigh v. Salazar*, Case No. 3:11-CV-00608-HDM, 2012 WL 2367823, at *2 (D. Nev. June 21,

24  2012) (concluding a similarly situated plaintiff's request for injunctive relief was not moot where

25  excess horses remained in the complex; where BLM was authorized to return for further gathers;

26  and where the objectionable conduct was capable of repetition).

27      Also in its motion, BLM argues that Wild Horse has failed to provide sufficient facts to

28  support a cause of action for on-going First Amendment violations. ECF No. 40 at 29, 30. In sum,

BLM argues that Wild Horse offers only conclusory, vague, and general allegations that are insufficient to state a claim. *Id*. In opposition, Wild Horse claims that the FAC alleges sufficient facts to survive a motion to dismiss. ECF No. 43 at 16, 17. After careful review of the FAC and proposed opposition amendments, the Court finds that Wild Horse alleges sufficient facts to state a First Amendment viewing access restriction claim as to any future gathers. Wild Horse offers more than conclusory and vague allegations to support this cause of action. First, the FAC establishes a qualified First Amendment right of access that applies to horse gathers. ECF No. 38 at 12. Next, Wild Horse provides a specific instance where it was denied viewing access to a gather trap on land only accessible through private roads during the 2023 Antelope Complex Gather. *Id*. at 16. Finally, the FAC makes clear that the 2017 EA permits BLM to remove excess horses from the Antelope and Triple B Complexes for a period of ten-years starting in 2017. *Id*. at 14. Accepting these facts as true, the Court may infer more than a mere possibility of past misconduct and more than a mere possibility that BLM will conduct future gathers on the Antelope Complex. The Court may infer plausibility here because BLM admittedly restricted access to the Checkerboard Pattern Trap during the 2023 Antelope Complex Gather and Wild Horse has alleged BLM is authorized to return for further gathers in the Antelope Complexes through 2027. It is plausible then that the alleged misconduct is capable of repetition.

        3.     <u>Wild Horse's First Amendment cause of action fails to establish a qualified First Amendment right to view "humane" gathers.</u>

In its motion, BLM argues that Wild Horse does not have a First Amendment right to view "humane" gathers and, to the extent that its First Amendment cause of action proceeds on such a theory, dismissal is appropriate. ECF No. 40 at 30, 31. After careful review of its opposition, it appears that Wild Horse does not contest nor oppose BLM's position on the issue. To the extent that Wild Horse is attempting to define a new qualified right of access to view "humane" gathers, the FAC and the proposed amendments do not attempt to define such a right through the established *Press-Enterprise II*-analysis. Thus, Wild Horse's First Amendment cause of action is dismissed should it attempt to proceed on such a theory. Of note, the Cout does not construe Wild

Horse's First Amendment cause of action to include a humane treatment claim under the Wild Horses and Burros Act and, therefore, review of such a claim is not warranted.

Accordingly, the Court grants BLM's motion to dismiss as to Wild Horse's fourth cause of action. This cause of action is dismissed without prejudice and Wild Horse is granted leave to amend the stated deficiencies.

## IV.    CONCLUSION

IT IS THEREFORE ORDERED that BLM's motion to dismiss (ECF No. 40) is **GRANTED** in accordance with this Order: Wild Horse's first cause of action is dismissed with prejudice for the reasons stated herein; Wild Horse's second cause of action is dismissed without prejudice and with leave to amend the deficiencies stated herein; Wild Horse's third cause of action is dismissed without prejudice and with leave to amend the deficiencies stated herein; Wild Horse's fourth cause of action is dismissed without prejudice and with leave to amend the deficiencies stated herein.

IT IS FURTHER ORDERED that Wild Horse file its second amended complaint within thirty (30) days from the filing of this Order. Failure to file the second amended complaint will result in dismissal of Wild Horse's remaining causes of action with prejudice.

IT IS SO ORDERED.

DATED this 8th day of May, 2024.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE