BRENT M. RESH
(Nev. Bar No. 14940)
BRENT RESH LAW, PLLC
2401 La Solana Way
Las Vegas, NV 89102
(702) 781-6903
brent@brentreshlaw.com

JESSICA L. BLOME
(Cal. Bar No. 314898, pro hac vice)
JENNIFER RAE LOVKO
(Cal. Bar No. 208855, pro hac vice)
GREENFIRE LAW, PC
2478 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| WILD HORSE EDUCATION, a non-profit corporation, and LAURA LEIGH, individually, | CASE NO. 3:23-cv-372-LRH-CLB |
| Plaintiffs, | **PLAINTIFFS' [PROPOSED] THIRD AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| v. | |
| UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management, | |
| Defendants. | |

1.     Plaintiffs respectfully bring this case to challenge the United States Department of Interior, Bureau of Land Management (BLM)'s removal of wild, free-roaming horses and burros from the Antelope and Triple B Complexes in violation of the Wild Free-Roaming Horses and Burros Act (Wild Horse Act), 16 U.S.C. § 1331, et seq., the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., the Administrative Procedures Act (APA), the Mandamus and Venue Act, 28 U.S.C. § 1361, and the First Amendment of the U.S. Constitution.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the subject matter of this action pursuant to 5 U.S.C. § 706, 28 U.S.C § 1331, and 28 U.S.C. § 1361.

3.     Venue is proper in this district pursuant to 28. U.S.C. § 1391. The BLM has sufficient contacts to subject it to personal jurisdiction in this district.

## THE PARTIES

4.     Plaintiff WILD HORSE EDUCATION is a national non-profit corporation dedicated to research, journalism, and public education concerning the activities and operations of federal and state management of the free-roaming wild horse and burro populations. Wild Horse Education's principal place of business is 216 Lemmon Drive, # 316, Reno, N.V., 89506. Wild Horse Education has more than 150,000 members and educates and informs the public about wild horses and burros through articles, photographs, videos, and sharing data and other information. Wild Horse Education also frequently submits comments on Herd Management Area Plans, Environmental Assessments, and other wild horse management documents and hearings made available for public comment. Advocating for the wild horses and burros in the Antelope and Triple B Complexes is an important issue for WILD HORSE EDUCATION and will be always in the future.

5.     Plaintiff WILD HORSE EDUCATION and its members, supporters, and staff have a long-standing interest in wild, free-roaming horses and burros and routinely advocate for wild horses and burros in Nevada. If they had been given the opportunity, Plaintiff WILD HORSE

EDUCATION would have submitted comments to BLM regarding the need for an updated EA for the Antelope and Triple B Complexes.

6.      Plaintiff WILD HORSE EDUCATION'S members, supporters, and staff visit the Antelope and Triple B Complexes for photography, observing wildlife, and other recreational and professional pursuits. Plaintiff's members, supporters, and staff gain aesthetic enjoyment from observing, attempting to observe, hearing, seeing evidence of, and studying wild horses and burros. The opportunity to possibly view wild horses and burros, or signs of them, in these areas is of significant interest and value to Plaintiff's members, supporters, and staff, and increases their use and enjoyment of Nevada's public lands. Plaintiff's members, supporters, and staff have engaged in these activities in the past and have specific plans to do so again in the future.

7.      Plaintiff WILD HORSE EDUCATION'S members and supporters are adversely impacted by the gathering and removal of wild horses and burros from the Antelope and Triple B Complexes. Plaintiff's members also have an interest in the health and humane treatment of animals, and work to rehabilitate sick and injured wildlife, including horses and burros. Plaintiff's members, staff, volunteers, and supporters have engaged in these activities in the past and intend to do so again soon.

8.      Plaintiff WILD HORSE EDUCATION, as well as its members, supporters, and staff, is dedicated to ensuring the long-term survival of the wild, free-roaming horses and burros throughout the contiguous United States, and specifically in Nevada, and to ensuring that Defendants comply with all applicable state and federal laws related to the survival and humane treatment of wild horses and burros in Nevada. In furtherance of these interests, Plaintiff's members, supporters, and staff have worked, and continue to work, to protect and advocate for wild horses and burros in Nevada and throughout the contiguous United States.

9.      The interests of Plaintiff WILD HORSE EDUCATION's members, supporters, and staff have been, and will continue to be, injured by Defendants' improper and inhumane gather and removal of wild horses and burros in the Antelope and Triple B Complexes. The interests of Plaintiffs' members, supporters, and staff have been, and will continue to be, injured by

Defendants' failure to comply with their obligations under the Wild Horse Act, NEPA, APA, and First Amendment in gathering, removing, and processing wild, free-roaming horses and burros in gruesome, inhumane, and completely hidden ways in the Antelope and Triple B Complexes pursuant to an outdated seven-year-old EA.

10.     The injunctive relief requested provides the only remedy that can redress the injuries of Plaintiff WILD HORSE EDUCATION, including of its members, supporters, volunteers, and staff. The relief requested by Plaintiffs, if granted, would require Defendants to comply with the requirements of the Wild Horse Act, NEPA, APA, and the First Amendment before further gathering and removing wild, free-roaming horses and burros from the Antelope Complex. The relief requested by Plaintiffs, if granted, would reduce the number of wild, free-roaming horses and burros needlessly injured, killed, or removed by Defendants.

11.     Plaintiff LAURA LEIGH is the Founder and President of Plaintiff WILD HORSE EDUCATION. In addition, Ms. Leigh works with multiple non-profit organizations engaged in public land issues and provides in-field documentation and commentary on public land issues such as wild horse and burro gathers and removals. Ms. Leigh is also a free-lance photojournalist, whose work has appeared internationally in media broadcast outlets, such as CNN, BBC/ITV, ABC, Common Dreams, and CounterPunch. Ms. Leigh has visited, observed, and photographed the wild horses and burros at the Antelope Complex at least once a year since 2009. Ms. Leigh experiences great enjoyment from watching and monitoring individual horses and burros in the Antelope and Triple B Complexes. Of particular interest, Ms. Leigh commonly seeks out and photographs unique stallions in the Antelope and Triple B Complexes; she has developed a personal knowledge of these stallions and their bands. Ms. Leigh has also attended, for nearly fifteen years, several wild horse and burro roundups throughout the United States, and frequently reviews photographs and videos from any roundups she is not able to attend in person on a daily basis. When Ms. Leigh recognizes individual horses and burros that she has previously observed as wild, free-roaming horses and burros, she experiences great sadness, but feels it is her responsibility to the animals to observe their treatment and capture and share it with others to educate them on the plight of wild

horses and burros. The further gathering and removal of wild horses and burros in the Antelope and Triple B Complexes in cruel and inhumane ways will adversely affect the substantial recreational, aesthetic, and conservational interests of Ms. Leigh.

12.     Defendant JON RABY is Nevada State Director of the BLM, and is charged by federal statute with managing, administering, and protecting the wild horses and burros in the State of Nevada, including the Antelope and Triple B Complexes, pursuant to the Wild Horse Act.

13.     Defendant DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGE-MENT is charged by federal statute to manage administer and protect the wild horses and burros in the State of Nevada, including the Antelope Complex, pursuant to the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331–1340.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

14.     Plaintiffs WILD HORSE EDUCATION and LAURA LEIGH submitted comments on the relevant Antelope and Triple B Complexes Gather Environmental Assessment, identified as DOI-BLM-NV-E030-2017-0010-EA in 2017.

15.     Among other matters, WILD HORSE EDUCATION commented on issues involving handling wild horses during capture. WILD HORSE EDUCATION noted an actual foaling season for the Antelope Complex herds had not been identified by the agency. The lack of clear identification of foaling/breeding season in wild horses creates a real danger to the health and safety of mares and foals, because the BLM will roundup horses in this area during actual peak foaling season, which begins in February and continues through the end of July. WILD HORSE EDUCATION requested that the BLM extend its prohibition on capture by helicopter drive trapping for the Antelope Complex from February 1 to August 15, and not follow the arbitrary March 1 to July 1 prohibition the agency uses now for all HMAs, regardless of the true foaling season for each HMA.

16.     In its public comment, WILD HORSE EDUCATION also noted that the BLM had not identified a data-based foaling season in any underlying Herd Management Area Plan (HMAP) and had not identified it in its 2017 Environmental Assessment either.

17.     Plaintiff LEIGH brought litigation involving abusive actions into the court (and other matters) and the court warned BLM in numerous instances (Triple B-2011, Jackson Mountain-2012, Owyhee Complex-2013) concerning inappropriate conduct during capture.

18.     Plaintiffs have exhausted all administrative remedies.

## GENERAL ALLEGATIONS OF FACTS

**A.  Wild Free-Roaming Horses and Burros Act**

19.     Finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West," and that "they contribute to the diversity of life forms within the Nation and enrich the lives of the American people," Congress enacted the Wild Horses and Burros Act, or "Wild Horse Act" to ensure that "wild-free roaming horses and burros shall be protected from capture, branding, harassment, [and] death," and will "be considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331.

20.     "Wild free-roaming horses and burros" are defined under the Wild Horse Act as "all unbranded and unclaimed horses and burros on public lands of the United States," which include lands "administered by the Secretary of the Interior through the Bureau of Land Management or by the Secretary of Agriculture through the Forest Service." *Id*. §§ 1332(b), (e); *see also* 36 C.F.R. § 222.60(b)(13).

21.     The Wild Horse Act directs the Secretary of the Interior to "manage wild free-roaming horses and burros as components of the public lands ... in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1331. To further ensure this objective, the statute provides that "[a]ll management activities shall be at the minimal feasible level." 16 U.S.C. § 1333(a).

22.     The Wild Horse Act also gives the Secretary the ability to remove "excess" wild free-roaming horses and burros from the public range. "[E]xcess animals" are defined in the statute as wild free-roaming horses and burros "which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16 U.S.C. § 1332(f).

23.     The BLM's regulations require that the Secretary establish Herd Management Areas (HMAs) for the maintenance of wild horse and burro herds. 43 C.F.R. § 4710.3-1. In delineating each herd management area, the BLM must consider the appropriate management level for the herd, the habitat requirements of the animals, the relationships with other uses of the public and adjacent private lands, and the constraints contained in § 4710.4, which limits management of wild horses and burros to "the minimum level necessary to attain the objective identified in approved land use plans and herd management area plans." 43 C.F.R. § 4710.4.

24.     Before removing excess horses or burros from an HMA, the Secretary must first determine that 1) an overpopulation of animals exists and 2) that action is necessary to remove excess animals, before *immediately* removing the excess animals. 16 U.S.C. § 1333(b)(2) (emphasis added). The Secretary must determine both of those requirements based on the current inventory of lands, information contained in any land use planning documents, information contained in court ordered environmental impact statements, and any additional information currently available to him/her. *Id.*

25.     A Gather Plan violates the immediacy mandate of the Wild Horse Act if it permits the removal of excess animals for a ten-year period from its adoption. *See* 16 U.S.C. § 1333(b)(2); *Friends of Animals v. Culver*, 610 F. Supp. 3d 157 (D.D.C. 2022) (invalidating an EA authorizing the phased removal of horses over a ten-year-period).

26.     The statutory provisions of the Wild Horse Act itself, as enacted by Congress, prohibits any person from (1) maliciously or negligently injuring or harassing a wild horse or (2) treating a wild horse inhumanely. *See* 43 C.F.R. § 4770.1.

27.     As regards gather operations, the Wild Horse Act provides that excess horses must be "humanely captured and removed." 16 U.S.C § 1333(b)(2)(B) & (C). "The Secretary shall cause such number of additional excess wild free-roaming horses and burros to be humanely captured and removed for private maintenance and care for which he determines an adoption demand exists by qualified individuals, and for which he determines he can assure humane treatment and care (including proper transportation, feeding, and handling) . . . The Secretary shall cause additional

excess wild free-roaming horses and burros for which an adoption demand by qualified individuals does not exist to be destroyed in the most humane and cost efficient manner possible." *Id.*

28.     The Wild Horse Act also provides that helicopter use must be conducted in a humane manner. *See* 16 U.S.C. § 1338a; 43 C.F.R. § 4740.1.

29.     "[H]umane treatment" is defined as "handling compatible with animal husbandry practices accepted in the veterinary community, without causing unnecessary stress or suffering to a wild horse or burro." 43 C.F.R. § 4700.0-5(e). "Accepted animal husbandry practices are those outlined in textbooks on the subject." 51 F.R. 7410.

30.     "Inhumane treatment" is defined as "any intentional or negligent action or failure to act that causes stress, injury, or undue suffering to a wild horse or burro and is not compatible with animal husbandry practices accepted in the veterinary community." 43 C.F.R. § 4700.0-5(f).

31.     Malicious treatment occurs through intentional acts that demonstrates a deliberate disregard for the well-being of wild horses. *See Mountain States Legal Found. v. Hodel*, 799 F.2d 1423, 1425 (10th Cir. 1986). "Such acts include, but are not limited to, unauthorized chasing, pursuing, herding, roping, or attempting to gather or catch wild free-roaming horses and burros." *Id.*; *see also* 1984 43 C.F.R. § 4700.0-5(k); 51 F.R. 7410.

32.     The Secretary delegated responsibility to administer the Wild Horse Act to the BLM. 43 C.F.R. § 4700.0-3.

33.     The BLM developed its Comprehensive Animal Welfare Program (CAWP) as "a proactive program for protecting the welfare of wild horses and burros under the agency's management and protection." The CAWP Standards for Wild Horse and Burro Gathers were prepared on June 30, 2015, and the CAWP Standards for Off-Range Corral Facilities, Transportation, and Adoption/Sale Events were prepared on January 29, 2016. These standards address the BLM's plan for humane handling, including requirements for trap and temporary holding facility design, capture and handling, transportation, and care after capture.

34.     The CAWP Standards were developed by BLM with the assistance of the University of California, Davis School of Veterinary Medicine.

35.     In December of 2020, the BLM issued a Permanent Instruction Memorandum (PIM) to "codif[y]" the use of these standards for all horse gathers and mandate training of the BLM staff, contractors, and partners associated with gather operations. *See* BLM PIM 2021-002 (Dec. 18, 2020), available at https://www.blm.gov/policy/pim-2021-002. The purpose of the PIM is to "consolidate[] current humane practices, … ensure humane care and handling of [wild horses and burros], and increase[] transparency concerning the humane treatment of wild horses and burros." The PIM "establishes a framework to ensure there are standards in place regarding the humane care and handling of animals, as well as a process to verify compliance with those standards." *Id.*

36.     In approximately 2020, as addressed in the 2020 PIM, all helicopter gather contracts and off-range corral contracts became required to incorporate the CAWP standards as specifications for performance.

37.     The CAWP Standards for Wild Horse and Burro Gathers contain over 90 different standards related to transportation, feeding, handling, and more. *See* CAWP Standards for Wild Horse and Burro Gathers. CAWP Standards for Off-Range Corral Facilities, Transportation, and Adoption/Sale Events contain over 100 different standards related to transportation, feeding, handling, and more. *See* CAWP Standards for Off-Range Corral Facilities, Transportation, and Adoption/Sale Events.

38.     CAWP Standards are not binding on BLM.

39.     As such, BLM does not regulate or require adherence to CAWP Standards; there is no consequence to their violation.

40.     An agency may only rely on an EA to support its decision to conduct gathers for a limited period, due to the immediacy requirement of the Wild Horse Act. *See* 16 U.S.C. § 1333(b)(2); *Western Rangeland Conservation Ass'n v. Zinke*, 265 F.Supp.3d 1267, 1286-88 (D. Utah 2017) (finding a six-to-ten-year phased-in gather plan violated the Wild Horse Act's immediacy requirement); *Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 170 (D.D.C. 2022) (finding a ten year gather plan exceeded BLM's statutory authority pursuant to the Wild Horse

Act's immediacy requirement.

41.     The immediacy requirement of the Wild Horse Act was adopted by amendment in 1978. *See Am. Horse Prot. Asso. v. Watt*, 694 F.2d 1310, 1315-19 (D.C.C. 1982). In stating that excess horses "shall" be removed "immediately," the word "immediately" is synonymous with "expeditiously." *Id.* at 1316.

42.     The Wild Horse Act's immediacy requirement means that "BLM may only delay necessary removal actions insofar as delay is necessary to plan and execute the actions safely and effectively." *Western Rangeland Conservation Ass'n*, 265 F.Supp.3d at 1288. The "pace and timing" of gather operations is not left entirely to BLM's discretion. *Id.* at 1284. A phased-in approach "eschews immediate removal to within AML in favor of longer-term management techniques…that will eventually result in a population size within AML." *Id.* at 1286. As such, it violates the immediacy requirement of the Wild Horse Act. *See id.*

43.     In making determinations regarding removal, the Secretary must also establish appropriate management levels (AMLs). See 16 U.S.C. § 1332(b)(1). AMLs must reflect appropriate population levels necessary to achieve and maintain a thriving, ecological balance on the public lands. *See id.* at § 1332(b)(2). The District Court of Nevada has specifically ruled that AMLS must reflect the "optimum number of horses to be maintained" for purposes of achieving a "thriving, ecological balance." *Dahl v. Clark*, 600 F. Supp. 585, 592-95 (D. Nev. 1984).

**B.  National Environmental Policy Act**

44.     A second statute, NEPA, 42 U.S.C. § 4321 et seq., governs decisions by the BLM to gather horses and burros. NEPA requires federal agencies to take a "hard look" at the environmental consequences before carrying out federal actions. *Marsh v. Or. Nat. Res. Council,* 490 U.S. 360, 373–74 (1989).

45.     NEPA serves the dual purpose of, first, informing agency decisionmakers of the significant environmental effects of proposed major federal actions and, second, ensuring that relevant information is made available to the public so that it "may also play a role in both the decision-making process and the implementation of that decision." *See Robertson v. Methow*

*Valley Citizens Council*, 490 U.S. 332, 349 (1989).

46.     To meet these goals, NEPA requires a comprehensive Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3.

47.     To determine whether a proposed action will have significant effects, an agency may prepare an Environmental Assessment ("EA"). 40 C.F.R. § 1501.54. An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (quoting 40 C.F.R. § 1508.9(a)).

48.     If in its EA the agency finds that the proposed action will not significantly affect the human environment, it may issue a finding of no significant impact ("FONSI") in lieu of an EIS. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) (citing 40 C.F.R. § 1508.9(a)(1)); *see also* 40 C.F.R. § 1501.6(e).

49.     A FONSI "briefly present[s] the reasons why an action … will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared." 40 C.F.R. § 1508.1(1).

50.     "NEPA imposes on federal agencies a continuing duty to supplement existing EAs and EISs in response to 'significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.'" *Idaho Sporting Cong., Inc. v. Alexander,* 222 F.3d 562, 566 n.2 (9th Cir. 2000) (quoting 40 C.F.R. § 1509(c)(1)(ii)).

51.     An agency "must be alert to new information that may alter the results of its original environmental analysis, and continue to take a 'hard look at the environmental effects of its planned action, even after a proposal has received initial approval.'" *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (2000).

## C.  First Amendment to the U.S. Constitution

52.     The First Amendment prohibits any law "abridging the freedom of speech, or of

the press." U.S. Const. Amend. I.

53.     Finding that "many governmental processes operate best under public scrutiny," the Supreme Court has held that there is a qualified right of access for the press and public to observe government activities. *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8–9 (1986).

54.     This Court has found that BLM's removal of wild horses and burros and other gather activities on public land meet the first part of the right of access claim—i.e., that a qualified right of access applies to gather activities. *Leigh v. Salazar*, 954 F. Supp. 2d 1090, 1101 (D. Nev. 2013).

55.     On multiple occasions, BLM has denied access, or impermissibly obstructed access, to Plaintiffs for gather operations in the Antelope and Triple B Complexes of Herd Management Areas. Absent judicial intervention, BLM is likely to continue its violations of Plaintiffs' First Amendment rights at future gathers.

**D.  The Antelope and Triple B Complexes of Herd Management Areas**

56.     The Antelope and Triple B Complexes are in northeastern Nevada. The Antelope Complex encompasses several herd management areas where wild horses live. The Antelope Complex contains the Antelope Valley HMA, Antelope HMA, Spruce-Pequop HMA, and Goshute HMA. The Triple B Complex contains the Triple B HMA, Maverick-Medicine HMA, Antelope Valley HMA (West of U.S. Highway 93), and Cherry Spring Wild Horse Territory (WHT).

57.     Discrepancies exist in BLM documents regarding the exact number of acres associated with the HMA in the Antelope and Triple B Complexes. The 2017 Antelope and Triple B Complexes Gather Plan Environmental Assessment states that the total area for the Antelope Complex consists of 1,183,340 acres of a mix of private and public lands, and the Triple B Complex consists of 1,632,324 acres of a mix of private and public lands.

58.     The topography is varied and contrasting with valley floors, alluvial fans, canyons, mountains, steep ridges, and basins. Elevations within the Antelope Complex range from 5,000 feet to over 10,200 feet. The climate is typical of middle latitude, semi-arid lands. Precipitation normally ranges from approximately five to seven inches on the valley bottoms to 16 to 18 inches on

the mountain peaks. Most of this precipitation comes during the winter months in the form of snow occurring primarily in the winter and spring with the summers being quite dry. Temperatures range from greater than 90 degrees Fahrenheit in the summer months to minus 15 degrees or colder in the mountains in the winter.

59.     There are hundreds of different species of wildlife in the Complexes including mule deer, sage grouse, blue grouse, eagles, and hawks. The Complexes are also grazed by domestic livestock.

60.     In the 2017 EA/FONSI, BLM identifies the following HMA AMLs and removal estimates:

Antelope Complex

| HMA | AML | Population Estimate | Removal Estimate to Low AML |
|---|---|---|---|
| Antelope | 150-324 | 855 | 876 |
| Antelope Valley | 155-259 | 1,517 | 1,550 |
| Goshute | 73-124 | 1,191 | 1,356 |
| Spruce-Pequop | 49-82 | 1,269 | 1,474 |
| Total | 427-789 | 4,832 | 5,256 |

Triple B Complex

| HMA | AML | Population Estimate | Removal Estimate to Low AML |
|---|---|---|---|
| Triple B | 250-518 | 2,124 | 1,874 |
| Maverick-Medicine | 166-276 | 1,571 | 1,405 |
| Antelope Valley West of US Highway 93 | 16-27 | 71 | 55 |
| Cherry Springs WHT | 40-68 | 76 | 36 |
| Total | 472-889 | 3,842 | 3,370 |

61.     The AML is defined as the number of wild horses that can be sustained within a designated Herd Management Area (HMA) which achieves and maintains a thriving natural

1   ecological balance.

2        62.      BLM estimated 7,852 wild horses needed to be removed to reach high AML and

3   8,626 need to be removed to reach low AML.

4        63.      In 2017, the BLM conducted an emergency operation in part of the Antelope

5   Complex. To support its emergency removal action, the BLM adopted an Environmental

6   Assessment/Finding of No Significant Impact on December 21, 2017 (the "2017 EA/FONSI").

7        64.      The action adopted through the 2017 EA/FONSI provides for the removal of

8   approximately 9,053 excess wild horses within the Antelope and Triple B complexes "to achieve

9   and maintain AML and administer or booster population control measures to gather and released

10  horses over a period of ten years from the initial gather." DOI-BLM-NV-E030-2017-0010-EA,
    pp.11-12.[1]

11       65.      The adoption of a ten year, phased gather is not based on a necessity to plan and

12  execute the action safely and effectively.

13       66.      Under the 2017 EA/FONSI, the BLM analyzed the environmental impacts of

14  removing thousands of wild horses and burros from the Antelope and Triple B Complexes over a

15  period of ten years. *See* DOI-BLM-NV-E030-2017-0010-EA.

16       67.      The Gather EA did not identify or analyze the herd-specific foaling season, the

17  habitat-specific ground conditions during different seasons, or the increased wildfire risk

18  associated with removing over 9,000 horses.

19       68.      Although BLM has not conducted "an extensive inventory of the project area,"

20  the agency is aware of various invasive species in the Antelope and Triple B complexes. *See*

21  DOI-BLM-NV-E030-2017-0010-EA, p.47. These species have been introduced and spread as a

22  result of past impacts from road maintenance, grazing, recreation (including OHV use), mining

    and processing, wildfires, and other ground disturbing activities. *Id.,* pp.49, 69.

23       69.      In the 2017 EA/FONSI, BLM notes: "Invasive species, particularly cheatgrass,

24

25  _____
    [1]

26

are present in various densities but are particularly abundant in disturbed sites at lower elevations (e.g., recent fires, road edges, and livestock/wild horse concentration sites)." *Id.*, p.31. These invasive species contribute "to high levels of fine fuel loading, resulting in more frequent fires." *Id.*, p.49.

70.     Livestock trampling, grazing, and surface disturbance are the key ecological switches that transition healthy ecosystems to cheatgrass-invaded systems, by eliminating the native bunchgrasses and biological soil crusts that are the natural defense against weeds. A livestock-cheatgrass-fire cycle now prevails across much of the public lands of the western United States, rendering lands susceptible to larger and more frequent fires. *See* Molvar, E.M. et al., *Cheatgrass Invasions: History, Causes, Consequences, and Solutions* (Western Watersheds Project, January 2024).

71.     There is no question that livestock grazing is associated with negative impacts to the environment, and even moderate levels of livestock grazing are advantageous to the growth of cheatgrass. *See* Testimony of Erik Molvar, Federal Lands Subcommittee Hearing, July 9, 2018.

72.     Both livestock and horses eat cheatgrass, which is an annual grass that is prone to wildfire. BLM's 2017 EA/FONSI does not distinguish between livestock and wild horse impacts as regards invasive species and associated wildfire risks. *See* DOI-BLM-NV-E030-2017-0010-EA.

73.     BLM's 2017 EA/FONSI did not evaluate the impact of removing over 9,000 horses to the quantity of invasive species in the Antelope and Triple B complexes. BLM did not analyze how the removal of over 9,000 horses has the potential to increase the number of wildfires in the complexes and adjacent lands. *See* DOI-BLM-NV-E030-2017-0010-EA.

74.     The 2017 EA/FONSI stated that "[o]pportunities for public observation of the gather activities on public lands would be provided when and where feasible, and would be consistent with WO IM No. 2013-058 and the Visitation Protocol and Ground Rules for Helicopter WH&B Gathers within Nevada." DOI-BLM-NV-E030-2017-0010-EA, p.24.

75.     WO IM No. 2013-058 is a BLM Instruction Memorandum that states "[e]very gather day is considered a public observation day … Gather operations involve some level of inherent risk due to both the nature of working with wild animals, and risks associated with normal helicopter operations. Risks are highest near the trap-site area. The BLM generally allows members of the public an opportunity to safely view gather operations from designated observation areas near the trap-site and at temporary holding facilities, but they must be escorted to those areas by BLM personnel. If a trap-site space will not safely accommodate public/media observation, then alternative viewing opportunities will be discussed and resolved <u>prior to gather operations</u> beginning in a given area."

76.     The Visitation Protocol and Ground Rules for Helicopter WH&B Gathers within Nevada recognizes that observation areas may be located close to helicopters and other heavy machinery. When these are in operation, the risk to observers and others can be limited by having members of the public stay in their vehicles and/or by having members of the public sit down, without any movement or talking. Where the number of public observers is small (e.g., 2-4 persons), BLM may provide even closer viewing opportunities of the trap-site.

77.     The BLM has purported to rely on the 2017 EA/FONSI to support gathers in the Antelope and Triple B Complexes that occurred in 2018, 2019, 2020, 2021, 2022, and 2023.

**E.  Removal of Horses from the Antelope and Triple B Complexes**

78.     The following removals have occurred thus far in the Antelope and Triple B Complexes:

- On September 1, 2024, 106 Wild Horses (48 Stallions, 39 Mares, and 19 Foals) were gathered and shipped from the Maverick-Medicine HMA;

- From July 9, 2023 – August 20, 2023, 1,936 Wild Horses (749 Stallions, 883 Mares, and 304 Foals) were gathered and shipped from the Antelope Complex-North;

- From July 9, 2023 – July 26, 2023, 1,095 Wild Horses (365 Stallions, 502 Mares, 228 Foals) were gathered and shipped from the

Antelope Complex-South;

- From July 15, 2022 – August 25, 2022, 1,849 Wild Horses (623 Stallions, 897 Mares, and 329 Foals) were gathered and shipped from the Triple B Complex;

- From August 2, 2021 – August 30, 2021, 2192 Wild Horses (770 Stallions, 1057 Mares, and 365 Foals) were gathered and shipped from the Antelope Complex;

- From July 27, 2020 – July 28, 2020, more than 50 Wild Horses, including 10 foals, were gathered and shipped from the Antelope Complex;

- From July 28 – August 22, 2020 more than 350 Wild Horses, including 100 foals, were gathered and shipped from the Triple B Complex;

- From July 9, 2019 – July 17, 2019, 787 (315 Stallions, 346 Mares, 126 Foals) were gathered and shipped from the Triple B Complex;

- From January 31, 2018 – February 23, 2018, 1,300 Wild Horses were gathered and removed from the Triple B Complex.

- From September 19, 2018 – October 2, 2018, 887 Wild Horses (Studs 359, Mares 337, Foals 191) were gathered and removed from the Antelope Valley and Goshute HMAs;

- From July 26, 2018 – July 31, 2018, 259 Wild Horses (101 Studs, 86 Mares, 72 Foals) were gathered and removed from the Antelope Complex;

- From July 2, 2018 – July 12, 2018, 133 Wild Horses, including foals, were gathered and removed from the Goshute HMA;

- From May 8, 2018 – May 31, 2018, 94 Wild Horses (45 studs, 34 mares, 15 foals) were gathered and shipped from the Antelope Complex.

79. Since 2017, 12,270 wild horses have been captured under the 2017 EA/FONSI, despite the fact that the 2017 EA/FONSI approved removal of 9,053 excess horses.

80. BLM has removed 61,940 wild horses since 2017 on a program-wide basis. The 12,270 wild horses removed under the 2017 EA/FONSI accounts for over 19% of the total number of wild horses removed on a program-wide basis.

81.     At various times during these gathers, temperatures exceeded 95 degrees Fahrenheit. During the 2023 gathers, temperatures often exceeded 100 degrees Fahrenheit.

82.     Despite having already removed wild horses from the Antelope and Triple B Complexes than envisioned by the 2017 Gather EA/FONSIS, BLM has announced another gather in the Triple B Complex will begin on November 1, 2024, to remove 2,355 wild horses.

83.     Based upon current information, BLM's gathers have not focused on AMLs in individual HMAs. Instead, BLM is removing based upon aggregated population estimates of animals in each Complex as a whole, without focusing on individual HMA AMLs.

84.     Wild horses, including foals, suffered and died cruel and inhumane deaths because of the BLM's removal actions in the Antelope and Triple B complexes, including deaths resulting from fractured skulls, broken necks, leg fractures, lacerations, and more.

85.     During gather activities, Plaintiffs unsuccessfully attempted to convince the BLM to suspend gather operations during excessive Heat Index warnings, when catastrophic injury rates rise. The BLM proceeded with its removal of horses from the Antelope and Triple B Complexes despite extreme heat and in direct contradiction of CAWP standards.

86.     Plaintiffs watched in horror, as the BLM's helicopters chased stallions, mares, and foals, causing such panic that many animals were injured or broke their legs and had to be euthanized. At least one stallion was forced to stumble around on a broken leg, in obvious pain and agony, until a BLM official finally intervened after more than thirty minutes.

87.     The BLM uses helicopters to roundup horses only if foals are not present, yet it proceeded with its roundup of horses within the Antelope and Triple B Complexes aided by helicopters even though it observed foals and was informed of the presence of foals.

88.     Due to the extreme heat, inhumane and prohibited use of helicopters, and general disregard for CAWP standards, the BLM admits that its removal actions in the Antelope and Triple B Complexes have injured and killed at least 149 horses, including approximately 30 foals, as of August 20, 2023.  These include deaths resulting from fractured skulls, broken necks, leg fractures, lacerations, and more.

89.     During gather operations in the Antelope and Triple B complexes, BLM's handling of wild horses has not been compatible with animal husbandry practices accepted in the veterinary community, and such handling has caused unnecessary stress and suffering to wild horses.

90.     BLM's treatment of wild horses during gathers in the Antelope and Triple B complexes has included intentional or negligent actions or failures to act that have caused stress injury, or undue suffering to wild horses.

91.     BLM's treatment of wild horses during gathers in the Antelope and Triple B complexes did not adhere to its own interpretation of humane handling, as codified in its CAWP Standards. For example, stock trailers at loading areas were too high from the ground to safely load at many trap sites; surfaces and floors of trailers were not properly maintained, resulting in wild horses slipping, falling, and injuring themselves; willful acts of abuse occurred in the handling of animals because BLM caused and/or allowed excessive noise and sudden activity, resulting in wild horses becoming disturbed, stressed, and agitated; electric prods were used excessively as driving or handling tools; overhead gate bars were left unpadded; insufficient dust abatement was conducted; barbed wire fencing was used as part of the wing of traps, resulting in stress and physical injury to wild horses; foals were repeatedly mistreated and separated from their herd; wild horses were pursued by helicopter at rates and distances exceeding BLM's limitations; weak, injured, and debilitated horses were handled inhumanely; wild horses have been gathered without consideration of weather conditions.

92.     The violations of CAWP Standards is evidence that BLM handling of wild horses has not been compatible with animal husbandry practices accepted in the veterinary community. Not only was the Davis School of Veterinary Medicine involved in the development of the Standards, but also, violation of the Standards goes against humane treatment policies of the American Veterinary Medical Association.

93.     BLM's treatment of wild horses during gathers in the Antelope and Triple B complexes goes against practices accepted by the Humane Society of the United States, the American Association of Equine Practitioners, and the American Society for the Prevention of

Cruelty to Animals.

94.     In addition to inhumanely treating wild horses during gathers, Defendants have failed to provide Plaintiffs consistent, meaningful viewing access of gather operations. During the 2023 removal action in the Antelope Complex, Plaintiffs were denied access because BLM purposely placed trap areas on lands only accessible through private roads, even though the BLM knew it did not have permission for the public to utilize those roads to observe the roundup.

**FIRST CAUSE OF ACTION**
**Writ of Mandamus, 28 U.S.C. § 1361**

95.     Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

96.     Defendant's 2017 EA/FONSI has been and will continue to be implemented in a manner that violates the Wild Horse Act's mandate that wild horses be handled humanely.

97.     Defendant has failed to regulate the humane treatment and handling of wild horses in violation of the Wild Horse Act and APA.

98.     Defendant has been and will continue to gather horses based upon the 2017 EA/FONSI despite have already removed a number of wild horses in excess of that envisioned and analyzed by the 2017 EA/FONSI.

99.     Defendants' actions have injured Plaintiffs in the manner described in this Complaint.

100.    The Mandamus and Venue Act, 28 U.S.C. § 1361, vests district courts with original jurisdiction over any action in the nature of mandamus to compel a federal officer or agency to perform a duty owed to plaintiffs.

101.    Plaintiffs seek a writ of prohibition preventing Defendants from gathering wild horses under the 2017 EA/FONSI unless Defendants can assure that BLM's CAWP Standards, at a minimum, are regulated and adhered to in their entirety.

**SECOND CAUSE OF ACTION**
**Administrative Procedures Act, 5 U.S.C. § 706**

102.    Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

103.    The BLM may rely on an EA to support its decision to conduct gathers for a limited period, due to the immediacy requirement of the Wild Horse Act. 16 U.S.C. § 1333(b)(2); *Friends of Animals v. Culver*, 610 F. Supp. 3d 157 (D.D.C. 2022).

104.    The BLM abused its discretion and violated the Wild Horses Act by relying on a phased Environmental Assessment—the 2017 EA/FONSI—for multiple gathers in violation of the Wild Horse Act's immediacy requirement. *See Friends of Animals v. Culver*, 610 F. Supp. 3d 157 (D.D.C. 2022).

105.    The adoption of a ten-year, phased gather is not based on a necessity to plan and execute the action safely and effectively.

106.    The action adopted through the 2017 EA/FONSI provides for the removal of approximately 9,053 excess wild horses within the Antelope and Triple B complexes over a ten year period. To date, BLM already has removed over 12,000 wild horses from these complexes.

107.    Defendants' actions have injured Plaintiffs in the manner described in this Complaint.

108.    The BLM's decision to rely on the 2017 EA/FONSI was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law or was in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. 5 U.S.C. § 706(2)(A) & (C).

**THIRD CAUSE OF ACTION**
**National Environmental Policy Act and Administrative Procedure Act, 5 U.S.C. § 706**

109.    Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

110.    BLM violated NEPA when it failed to include in its EA identification or analysis of herd-specific foaling seasons, the habitat-specific ground conditions during different seasons,

or the increased wildfire risk associated with removing over 9,000 horses.

111.     The action adopted through the 2017 EA/FONSI provides for the removal of approximately 9,053 excess wild horses within the Antelope and Triple B complexes over a ten year period. To date, BLM already has removed over 12,000 wild horses from these complexes. BLM has acted in an arbitrary and capricious manner by relying on an EA/FONSI, without further review, by removing horses in numbers that exceed 9,053 excess wild horses.

112.     Since 2017, new circumstances or information relevant to environment concerns have arisen. BLM violated NEPA when it failed to consider these new circumstances or information in a supplemental EA, EIS, or DNA. These new circumstances and information include the occurrence of wildfires not addressed by the 2017 EA/FONSI, the removal of horses in numbers exceeding that envisioned by the 2017 EA/FONSI, and changes in foaling season.

113.     The BLM violated NEPA when it failed to analyze the significant environmental impacts of removing wild horses from the Antelope and Triple B complexes as alleged herein, including by proceeding with the removal action, even though the BLM observed foals in the wild horse population.

114.     Defendants' decision to proceed with the gather and removal of over 9,000 wild horses identified as "excess" from the Antelope and Triple B Complexes without analyzing significant environmental impacts was arbitrary and capricious, an abuse of discretion, and contrary to the law.

115.     Defendants' actions have injured Plaintiffs in the manner described in this Complaint.

116.     The BLM unlawfully withheld any supplemental evaluation of the 2017 EA/FONSI as required by NEPA in violation of the APA, 5 U.S.C. § 706(1).

117.     The BLM's decision to rely on the 2017 EA/FONSI was arbitrary and capricious, and not in accordance with law in violation of the APA, 5 U.S.C. § 706(2).

**FOURTH CAUSE OF ACTION**
**First Amendment Violation, U.S. Constitution, 42 U.S.C. § 1983, 28 U.S.C. § 2201**

118.    Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

119.    Plaintiffs have a right, under the First Amendment to the United States Constitution, to observe and document the BLM's gather of the wild horses in the Antelope Complex, including during gather operations, in capture pens, sorting pens, temporary holding corrals, and off-range holding corrals where horses and burros are held for veterinary treatment and prepared for potential adoption or sale or to live at long-term holding facilities.

120.    These rights under the First Amendment to the United States Constitution have been made enforceable against the states through the Fourteenth Amendment.

121.    Defendants have interfered with Plaintiffs' protected right under the First Amendment by preventing them from observing and documenting the BLM's gather of wild horses in the Antelope Complex at multiple gathers over the last seven years.

122.    Defendants' actions have injured Plaintiffs in the manner described in this Complaint.

123.    Plaintiffs are entitled to injunctive relief to prevent Defendants from continuing to interfere with their rights under the First Amendment.

124.    This Court is authorized to enjoin Defendants from further violations of Plaintiffs' First Amendment rights, including by compelling Defendants to provide Plaintiffs meaningful access to all locations where horses are being gathered and to locations where removed horses are currently housed to accurately document the BLM's activities and handling of these horses.

125.    This Court is further authorized to compel Defendants to comply with the Wild Horse Act's humane handling requirements, including the temperature and foaling prohibitions of the BLM's CAWP standards, to protect Plaintiffs' First Amendment right to view wild horses being treated humanely.

126.    Plaintiffs are also entitled to a declaration under 28 U.S.C. § 2201(a) that

Defendants' above-described actions violated Plaintiffs' First Amendment rights.

**PRAYER FOR RELIEF**

THEREFORE, Plaintiffs respectfully requests that this Court:

A.  Issue a writ of prohibition preventing Defendants from gathering wild horses under the 2017 EA/FONSI unless Defendants can assure that BLM's CAWP Standards, at a minimum, are regulated and adhered to in their entirety;

B.  Issue a writ of prohibition preventing Defendants from gathering any additional wild horses under the 2017 EA/FONSI because Defendants have removed wild horses in number not analyzed by the 2017 EA/FONSI;

C.  Issue an order and injunction compelling Defendants to cease implementation of the 2017 EA/FONSI for the Antelope Complex until Defendants have fully complied with the Wild Free-Roaming Horses and Burros Act, National Environmental Policy Act, Administrative Procedure Act, and First Amendment;

D.  Vacate and set aside the 2017 EA/FONSI because it allows successive gathers in violation of the immediacy requirement of the Wild Free-Roaming Horses and Burros Act;

E.  Issue an order providing declaratory relief that Defendants have violated the Wild Horse Act by handling wild horses inhumanely;

F.  Issue an order providing declaratory relief that Defendants have violated Plaintiffs' First Amendment rights by not allowing Plaintiffs with meaningful viewing access of gather operations;

G.  Issue an order compelling Defendants to provide Plaintiffs with meaningful viewing access of the gather operation, off-range holding corrals where gathered horses and burros from the 2023 Antelope Complex operations are currently held, and to each phase of future gather and removal efforts of horses and burros living in the Antelope Complex, including trap sites, temporary holding corrals, and off-range holding corrals;

H.   Issue an order compelling Defendants to handle wild horses humanely, including a requirement that Defendants, at a minimum, adhere to BLM's CAWP Standards;

I.   Maintain jurisdiction over this action until Defendants are in compliance with the Wild Free-Roaming Horses and Burros Act, National Environmental Policy Act, Administrative Procedure Act, First Amendment, and every order of this Court;

J.   Award Plaintiffs compensatory damages for past mental or emotional injury pursuant to 28 U.S.C. § 1983;

K.   Award Plaintiffs attorney fees and costs pursuant to and 28 U.S.C. § 2412; and

L.   Grant such additional and further relief to which Plaintiffs may be entitled.

DATED: September 16, 2024              Respectfully Submitted,

*/s/ Brent M. Resh*
Brent M. Resh
(Nevada Bar No. 14940)
BRENT RESH LAW, PLLC
2401 La Solana Way
Las Vegas, NV 89102
(702) 781-6903
brent@brentreshlaw.com

*/s/ Jessica L. Blome*
Jessica L. Blome
(Cal. Bar No. 314898, pro hac vice)
GREENFIRE LAW, PC
P.O. Box 8055
Berkeley, CA 94707
(510) 900-9502
jblome@greenfirelaw.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 16, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically notify via email all counsel of record.

<u>   /s/ Jessica L. Blome         </u>
Filing Attorney