BRENT M. RESH
(Nev. Bar No. 14940)
BRENT RESH LAW, PLLC
2401 La Solana Way
Las Vegas, NV 89102
(702) 781-6903
brent@brentreshlaw.com

JESSICA L. BLOME
(Cal. Bar No. 314898, pro hac vice)
JENNIFER RAE LOVKO
(Cal. Bar No. 208855, pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| WILD HORSE EDUCATION, a non-profit corporation; and LAURA LEIGH, individually, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management, <br><br> Defendants. | CASE NO. 3:23-cv-00372-LRH-CB <br><br> **PLAINTIFFS' SECOND MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

1       Plaintiffs LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit
2  corporation, by and through their counsel, move this court for a temporary restraining order and
3  preliminary injunction against Defendants UNITED STATES DEPARTMENT OF INTERIOR,
4  BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau
5  of Land Management ("Defendants"). This request is submitted pursuant to Rules 65(a) and (b)
6  of the Federal Rules of Civil Procedure (FRCP).
7       The BLM adopted its Environmental Assessment (EA) for the Antelope and Triple B
8  Complexes on December 21, 2017, which provides for a ten-year, phased gather plan. Plaintiffs
9  are requesting a temporary restraining order and preliminary injunction to stop the Bureau of
10 Land Management's gather of wild horses and burros at the Triple B Complex, which is
11 scheduled to begin on November 1, 2024, and last for six weeks, due to the BLM's violation of
12 Section 1333 of the Wild Free-Roaming Horses and Burros Act, which provides that excess
13 horses must be removed *immediately* after BLM determines that (a) an overpopulation exists *and*
14 (2) gather operations are necessary to deal with the overpopulation. 16 U.S.C. § 1333(b)(2).
15 BLM also has violated NEPA by not conducting any environmental review for gathers in
16 numbers exceeding that envisioned by the 2017 EA/FONSI.
17      Plaintiffs' motion is based upon the Declaration of Jessica Blome, Declaration of Jennifer
18 Rae Lovko, Plaintiffs' Memorandum of Points and Authorities, the Declaration of Laura Leigh,
19 as well as any oral argument the court may entertain and any other papers and pleadings in this
20 action.

**Declaration of Jessica L. Blome in support of Plaintiffs' Second Motion for Temporary Restraining Order and Preliminary Injunction**

I, Jessica Blome, being duly sworn, declare as follows:

1. I represent Plaintiffs Laura Leigh and Wild Horse Education in this matter and have been admitted pro hac vice before this court.

2. The BLM adopted its Environmental Assessment (EA) for the Antelope and Triple B Complexes on December 21, 2017. The Antelope Complex and Triple B Complex are separate complexes, but the EA addresses them together for purposes of environmental review. Gathers, however, are scheduled and conducted for individual complexes or herd management areas (HMAs) within these complexes. Here, Plaintiffs are seeking an order for a Temporary Restraining Order and Preliminary Injunction preventing Defendants from gathering and removing any additional wild horses and burros from the Triple B Complex or its HMAs.

3. On October 4, I reached out to counsel for Defendants to determine whether the Bureau of Land Management (BLM) would consider cancelling the gather of horses from the Triple B Complex set to begin on November 1 to make room for a mediation in another case and to avoid this motion. Defendants declined to cancel the gather.

4. Because BLM is continuing to gather horses in the Triple B Complex even though it has already removed nearly one thousand more horses than the number of "excess" horses identified and authorized for removal in its seven-year-old Environmental Assessment, Plaintiffs are hereby requesting a temporary restraining order and preliminary injunction to stop the ongoing gather of wild horses in the Triple B Complex at least until the merits of Plaintiffs' claims challenging that 2017 Environmental Assessment can be heard.

5. As more fully described below, Plaintiffs are suffering irreparable harm because of BLM's continuous and repeated violation of the Wild & Free-Roaming Horses and Burros Act (Wild Horse Act). Plaintiffs' every attempt at administrative and judicial remedies to force BLM

to adhere to the Wild Horse Act's requirements have been ignored by Defendants.

6. Accordingly, temporary injunctive relief is necessary to stop further gathers and removals of horses from the Triple B Complex immediately.

7. This is Plaintiffs' second Motion for a Temporary Restraining Order and Preliminary Injunction. Plaintiffs requested temporary injunctive relief in August 2023, based on Defendants violations of the First Amendment and humane handling rules at the 2023 gather of wild horses from the Antelope Herd Management Area, which is part of the Antelope and Triple B Complexes. Dkt. 10. After a full-day hearing on the merits of Plaintiffs' motion, the Court denied Plaintiffs' request for relief as moot because gather operations concluded as the hearing proceeded. Dkt. 29.

8. This Second Motion for a Temporary Restraining Order and Preliminary Injunction is brought in good faith, for good cause, and not for purposes of undue delay or harassment.

I declare under penalty of perjury the foregoing to be true to the best of my knowledge and recollection.

Further this Declarant Sayeth Naught.

DATED this 10th day of October 2024 in Berkeley, Alameda County, California.

                                                       */s/ Jessica Blome*
                                                       Jessica Blome

**Plaintiffs' Memorandum of Points and Authorities**

On October 7, 2024, Defendant Bureau of Land Management (BLM) confirmed its intention to gather 2,255 horses from the Triple B Complex beginning on November 1, 2024, and continuing through December 21, 2024. If this gather goes forward, BLM will have gathered 3,042 more horses than authorized by its seven-year-old Environmental Assessment, which called for the removal of 3,370 horses in total. The scope and intensity of BLM's gather and removal actions in the Triple B Complex is unprecedented, and its announced plan to now remove twice as many horses as it was authorized to remove is nothing less than obscene.

The BLM has abused its discretion and violated the Wild & Free-Roaming Horses and Burros Act (Wild Horse Act) by relying on a seven-year old environmental review and removal determination to conduct multiple, phased gathers of "excess horses" in the Triple B Complex of Herd Management Areas over a ten-year period in violation of the Wild Horse Act and National Environmental Policy Act (NEPA). Dkt. 58 at ¶¶24-25, 40-43, 104. The BLM's decision to adopt a phased gather plan was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law or was in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), (C).

Accordingly, Plaintiffs Laura Leigh and Wild Horse Education respectfully request a Temporary Restraining Order and Preliminary Injunction preventing Defendants from gathering and removing any additional wild horses and burros from the Triple B Complex until Defendants comply with the mandates of the APA, 5 U.S.C. § 551 *et seq*. (APA) and the Wild Horse Act, 16 U.S.C. § 1331, *et seq*.

## I. Relevant Law

### A. Wild Horse Act

Plaintiffs allege that BLM abused its discretion and violated the Wild Horse Act by relying on a phased EA – the 2017 EA/FONSI – for multiple gathers in violation of the Wild Horse Act's immediacy requirement. Dkt. 058, p. 58. The adoption of a ten-year, phased gather is not based on a necessity to plan and execute the action safely and effectively. *Id.*

Under the Wild Horse Act, before removing excess horses from public lands, BLM must first determine that 1) an overpopulation of animals exists *and* 2) that action is necessary to remove excess animals, before *immediately* removing the excess animals. 16 U.S.C. § 1333(b)(2); *Friends of Animals v. United States BLM*, Civil Action No. 18-2029 (RDM), 2024 U.S. Dist. LEXIS 58642, *53 (D.D.C. Mar. 30, 2024) (hereinafter *United States BLM*); *Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 168 (D.D.C. 2022) (hereinafter *Culver*).

To demonstrate the existence of an overpopulation, BLM must show that the current inventory is in excess of the appropriate management level (AML) for a herd management area (HMA). *See* 16 USCS § 1333(b)(1). BLM defines AML as the number of "adult horses or burros (expressed as a range with an upper and lower limit) to be managed within an HMA." BLM Handbook H-4700-1, p.56. The upper limit is the maximum number of wild horses "that results in a thriving natural ecological balance (TNEB) and avoids a deterioration of the range." *Id.* The lower limit is the number that allows the population to grow for a number of years without the need for gathers. *See id.*

If an overpopulation exists, BLM must then show that currently available information demonstrates "action is necessary to remove excess animals." 16 USCS § 1333(b)(2); *Friends of Animals v. Pendley*, 523 F. Supp. 3d 39, 48 (D.D.C. 2021). And, excess animals must then be removed *immediately* so "as to achieve appropriate management levels . . . [and] restore a thriving natural ecological balance." *Id.*

B.     NEPA

Plaintiffs allege that BLM violated NEPA when it failed to conduct any environmental review after the number of horses removed from the Complex exceeded that approved by the 2017 EA/FONSI. Dkt. 058, p.22. The National Environmental Policy Act (NEPA) requires agency decisionmakers to make informed decisions whenever its proposed action will have significant environmental impacts. *See Earth Island Inst. v. United States Forest Serv.*, 697 F.3d 1010, 1019 (9th Cir. 2012); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). The removal of wild horses and burros from federal lands designated as HMAs requires some level of NEPA review before BLM can remove those animals. *See W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1275 (D. Utah 2017); *Friends of Animals v. Haugrud* (hereafter *Haugrud*), 236 F. Supp. 3d 131, 132 (D.D.C. 2017).

For "major Federal actions significantly affecting the quality of the human environment," NEPA requires a comprehensive Environmental Impact Statement (EIS). 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3. To determine whether a proposed action will have significant effects, an agency may prepare an EA, and if in its EA, the agency finds that the proposed action will not significantly affect the human environment, it may issue a finding of no significant impact (FONSI) in lieu of an EIS. See 40 C.F.R. § 1501.54; *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) (citing 40 C.F.R. § 1508.9(a)(1)); *see also* 40 C.F.R. § 1501.6(e).

In assessing the impacts of a proposed action, the agency may rely, in part, on existing NEPA analysis. 43 C.F.R. § 46.120. However, if this is done, the agency's "supporting record must include an evaluation of whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental

effects." *Id.* For a proposed action, agency review also must include an analysis of cumulative effects, which includes consideration of past actions. 43 C.F.R. § 46.115.

The supporting record used by BLM when relying on existing NEPA analysis is sometimes referred to as a Determination of NEPA Adequacy (DNA). *See Friends of Animals v. BLM* (hereafter *BLM*), No. 2:16-cv-1670-SI, 2018 U.S. Dist. LEXIS 56104, at *39 (D. Or. Apr. 2, 2018); *Haugrud*, 236 F.Supp.3d at 133 (citing BLM NEPA Handbook H-1790-1). The name of the supporting record is immaterial so long as the agency demonstrates that it took a "hard look" at the proposed project's environmental effects and addresses new circumstances, information, or effects not previously analyzed since earlier NEPA documents. *See BLM*, 2018 U.S. Dist. LEXIS at *40 (citing *Friends of Animals v. U.S. Bureau of Land Mgmt.*, 232 F.Supp. 3d 53, 60-61 (D.D.C. 2017)).

Where a gather operation has been adopted without BLM taking a "hard look" at its environmental effects, BLM's gather decision will be found to be in violation of NEPA. *See id.* at *41-42. Where BLM relies upon an earlier EA to approve a new gather operation, but BLM fails to address new circumstances, information, or effects, BLM's gather decision will be found to be in violation of NEPA. *See id.*

## II.     Statement of Material Facts

The Triple B Complex contains 1,632,324 acres, and the cumulative AML for the Complex is 472-889. Declaration of Laura Leigh, ¶ 7 (hereinafter Leigh Decl.) (citing Lovko Decl. at Exh. A, pp.3-4). In 2017, BLM estimated that the population of wild horses in the Triple B Complex was 3,842 horses and foals. *Id.* The BLM stated that 3,370 "excess" horses must be removed to achieve low AML. *Id.*

The BLM adopted its Environmental Assessment (EA) for the Antelope and Triple B Complexes on December 21, 2017. Declaration of Jennifer Rae Lovko, Exh. A (hereinafter

Lovko Decl.). According to the 2017 EA, BLM planned to conduct "an initial gather and follow-up maintenance gathers to be conducted over the next 10 years from the date of the initial gather operation to achieve and maintain appropriate management levels." Lovko Decl. at Exh. A, p.1. In other words, BLM planned to remove 3,370 horses over a ten-year period from the Triple B Complex, beginning in 2018. Over the next seven years, BLM met its goal and even exceeded it as follows:

- The first gather in the Triple B Complex took place from January 31, 2018, to February 23, 2018. Leigh Decl. ¶ 8 (citing Lovko Decl., Exh. B). Thirty horses died during the gather, and BLM removed 1,357 additional horses from the Complex. *Id.*

- The second gather in the Triple B Complex took place from July 9, 2019, to July 17, 2024. Leigh Decl. ¶ 9 (citing Lovko Decl., Exh. C). Sixteen horses died during the gather, and BLM removed 787 additional horses from the Complex. *Id.*

- The third gather in the Triple B Complex took place from July 28, 2020, to August 22, 2020. Leigh Decl. ¶ 10 (citing Lovko Decl., Exh. D). Nine horses died during the gather, and BLM removed 382 additional from the Complex. *Id.*

- The fourth gather in the Triple B Complex took place from July 15, 2022, to August 25, 2022. Leigh Decl. ¶ 11 (citing Lovko Decl., Exh. E). Twenty-three horses died during the gather, and BLM removed 1,849 additional horses from the Complex. *Id.*

- From August 29, 2024, to September 1, 2024, BLM removed additional horses from the Maverick-Medicine Herd Management Area, which is part of the Triple B Complex. Leigh Decl. ¶ 13 (citing Lovko Decl. Exh. F). During this gather, three horses died, and BLM removed an additional 106 horses from the Complex. *Id.*

In total, BLM removed or killed 4,562 horses over a six-year period during these gathers in the Triple B Complex. Leigh Decl. ¶ 12. This number exceeds the 2017 EA's authorization to remove 3,370 by 1,192 horses. *Id.*

Even though BLM has met its mandate to remove excess horses from the Triple B Complex, on October 7, 2024, BLM announced a plan to conduct yet another gather of wild horses form the Triple B Complex beginning on November 1, 2024, and lasting through December 21, 2024. Leigh Decl. ¶14 (citing Lovko Decl. Exh. G). With this gather, BLM intends to remove an additional 2,255 wild horses from the Complex. *Id.* If BLM moves forward

with its second 2024 gather in the Complex, it will have removed **3,447 more horses than authorized by the 2017 EA**.

III.     **Standard of Review**

The standard a moving party must meet to obtain injunctive relief in the form of a temporary restraining order or a preliminary injunction is the same: "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natl Res. Def. Council, Inc.,* 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008); *Shell Offshore, Inc. v. Greenpeace, Inc.,* 709 F.3d 1281, 1289 (9th Cir. 2013); *Quiroga v. Chen,* 735 F.Supp.2d 1226, 1228 (D. Nev. 2010).

IV.     **Argument**

   A.     **Plaintiffs are likely to succeed on the merits of their claims, as the 2017 EA simply does not authorize the gather of any more horses from the Triple B Complex.**

Plaintiffs are entitled to temporary injunctive relief if they demonstrate a "fair chance of success on the merits" of their claim. *Sports Form, Inc. v. United Press International, Inc.*, 686 F.2d 750, 754 (9th Cir. 1982) (internal citation omitted). There can be no doubt that the ten-year phased gather plan adopted by the 2017 EA is unlawful, and future gathers in the Triple B Complex cannot move forward until BLM complies with the Wild Horses Act. 16 U.S.C. § 1333(b)(2); *United States BLM*, 2024 U.S. Dist. LEXIS at *57-62; *Culver*, 610 F. Supp. 3d at 165-70; W. *Rangeland Consv. Ass'n*, 265 F. Supp. 3d at 1285-86.

   1.     **BLM's proposed November 1 gather violates the Wild Horse Act's immediacy requirement.**

Before the year 2000, BLM adopted an EA in connection with each of its planned gathers. But in the 2000s, BLM changed its approach. It began testing the concept of phased gather plans, which would never every excess animal at the time it determined excess but

instead, allowed the removal of excess horses through a series of successive gather actions conducted over a period of at least ten years. *See W. Rangeland Conservation Ass'n*, 265 F. Supp. 3d at 1285-86. In 2017, the District Court for the District of Utah struck down a phased gather because it violated the Wild Horse Act's immediacy requirement. *Id.* at 1286-87. The District of Utah explained that BLM does not have discretion to gradually remove excess horses or prioritize other management techniques over prompt removal, under the Wild Horse Act. *Id.*

Likewise, in *Friends of Animals v. Culver,* the District Court for the District of Columbia struck down a ten-year phased gather plan. *Culver*, 610 F. Supp. 3d at 165-66. In reviewing the immediacy requirement of the Wild Horse Act, the Court stated: "There is no indication in the statute that 'immediately' does not require BLM to remove excess horses or burros 'without delay,' and, on the Court's review, there is no statutory definition otherwise altering the plain meaning of 'immediately.'" *Id.* at 169 (discussing 16 U.S.C. § 1333(b)(2). Further, even though this requirement may be "impracticable, or even impossible, an agency's failure to comply with [it] is necessarily unlawful." *Id.*  Accordingly, the Court found that BLM violated Section 706(2) of the APA because adopting the ten-year phased gather plan was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* at 170.

In *United States BLM*, the District Court for the District of Columbia also ruled that the immediacy requirement of the Wild Horses Act "does not permit the Bureau to authorize gathers over a ten-year period without regard to whether it has already achieved AML, without regard to the statutory mandate of expedition, and without regard to new or evolving information and scientific input." *United States BLM*, 2024 U.S. Dist. LEXIS at *57-58. More specifically, once excess animals are removed to within AML, BLM cannot continue to rely upon a phased gather plan, but instead, BLM must once again make a new determination that overpopulation exists and that removal is necessary. *See id.* at *61-62. In other words, successive gathers violate the

1  immediacy requirement of the Wild Horse Act unless BLM makes a new determination based
2  upon current inventory and current information that excess horses exist before every gather. *Id.*
3  Despite courts repeatedly finding such plans unlawful, BLM continues to use them, and
4  here, the agency continues to act on the 2017 EA even though the agency has removed more
5  horses from the Triple B Complex than was determined to be necessary in the 2017 EA. Indeed,
6  the next gather will remove more wild horses from the Triple B Complex than any of the
7  previous four gathers under the 2017 EA. The BLM could have avoided these outcomes by
8  following the Wild Horses Act. Under this factor, Plaintiffs have demonstrated a "fair chance of
9  success on the merits" of their claim. *See Sports Form, Inc.*, 686 F.2d at 754.

**2.    BLM's proposed November 1 gather violates NEPA because the EA does not allow further removal of wild horses from the Triple B Complex.**

Before conducting gathers or removals of wild horses from public lands, BLM must conduct an environmental review pursuant to NEPA. *See W. Rangeland Conservation Ass'n*, 265 F. Supp. 3d at 1275*; Haugrud*, 236 F. Supp. 3d at 132. BLM has not conducted such a review for the November 1 gather.

The 2017 EA/FONSI only addressed the removal of 3,370 horses from the Triple B Complex, and as BLM has already removed 4,562 horses, the scope of the approved project has been reached. To remove additional horses, BLM now must engage in NEPA analysis either through a new EIS, new EA, or supplemental EA. *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.3, 1501.54, 1501.6(e), 1508.9(a)(1). In the alternative, BLM may be able to rely on part of the 2017 EA/FONSI, but to do so, the agency must take a "hard look" at environmental impacts and address new circumstances, new information or changes in the action or its impacts not previously analyzed. 40 C.F.R. § 46.120. For a proposed action, agency review also must include an analysis of cumulative effects, which includes consideration of past actions. 43 C.F.R. §

46.115.

Here, Defendant is relying upon the 2017 EA/FONSI without having conducted any NEPA analysis for the removal of horses in excess of that envisioned by the 2017 EA/FONSI. No new analysis has been conducted on rangeland health, wildlife, or other factors.

B.      **Absent temporary injunctive relief, Plaintiffs will suffer irreparable injury.**

"[P]laintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). "Turning first to the significance of environmental injury, the Supreme Court has instructed us that '[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.'" *The Lands Council v. McNair*, 537 F.3d 981, 1004 (9th Cir. 2008) (quoting *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545 (1987)). Reducing a species' population through government action has often been recognized by courts to cause irreparable harm justifying injunctive relief. *See Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 219-22 (D.D.C. 2003) (enjoining a state plan to kill 525 mute swans from a state population of 3,600); *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) (enjoining a bison hunt); *Fund for Animals v. Espy*, 814 F. Supp. 142, 151 (D.D.C. 1993) (same).

For Plaintiffs, specifically, the opportunity to possibly view wild horses and burros, or signs of them, in the Triple B Complex is of significant interest and value to Ms. Leigh and increases her use and enjoyment of Nevada's public lands. Leigh Decl. ¶16. She has visited the Triple B Complex after each removal operation, and she has seen that horse bands and individuals she once tracked for over a decade have completely vanished. *Id.* at ¶17. Ms. Leigh used to be able to find competing bands, which was an indication of genetic exchange; now, she sees only fragmented single bands in fenced grazing allotments. *Id.* Compounding Ms. Leigh's

distress, the horses removed from the Triple B Complex have been taken off-limits to public facilities. Leigh Decl. at ¶17. Ms. Leigh can no longer see them in the wild or captive. *Id.* The resulting void she feels has largely replaced the enjoyment she once felt. *Id.*

Plaintiffs fear that BLM will continue to remove wild horses from the Triple B Complex without adhering to the Wild Horse Act's provisions unless this Court restrains future gathers. Leigh Decl. ¶19. The November 1, 2024, gather will occur without overpopulation being determined and without necessity being shown. *Id.* Ms. Leigh fears that BLM's extreme action will destroy the herd's viability. Leigh Decl. ¶20. If BLM moves forward with the next planned gather and removes an additional 2,255 wild horses, Ms. Leigh will have experienced the total loss of more than 6,000 wild horses from the Triple B Complex since 2018. *Id.*

Watching the horses in the Complex be decimated to numbers below AML has caused Ms. Leigh to feel hopelessness, anger, frustration, and pain. *Id.* at ¶21. In all her years documenting and attending roundups, Laura Leigh has never witnessed such a massive hit to a single area's population, and the loss she has seen on the range is unprecedented. *Id.* at ¶22.

In 2017, BLM stated that 3,370 horses would need to be removed from the Triple B Complex to achieve low AML. Leigh Decl. ¶ 7 (citing Lovko Decl. Exh. A, pp.3-4). To date, BLM has removed (or killed) 4,562 wild horses and plans to remove an additional 2,255 in November of 2024. Leigh Decl. ¶¶ 12, 14 (citing Lovko Decl. Exh. G). This far exceeds what was authorized in the 2017 EA. The case law is clear that phased gathers are generally in violation of the immediacy requirement in Section 1333(b)(2) of the Wild Horse Act. *See United States BLM*, 2024 U.S. Dist. LEXIS at *57-62; *Culver*, 610 F. Supp. 3d at 165-70; *W. Rangeland Conservation Ass'n*, 265 F. Supp. 3d at 1285-86. And, in every case, once the determined excess animals are removed, BLM cannot continue to rely upon a phased gather plan. *United States BLM*, 2024 U.S. Dist. LEXIS at *61-62.

Plaintiffs have already suffered great irreparable injury and continue to suffer irreparable harm because BLM keeps relying upon an unlawful phased gather plan. Leigh Decl. ¶¶ 1-2, 15-22. Plaintiffs suffer irreparable harm in continuing to view BLM violate federal law, including the requirements of the Wild Horse Act. These are not only injuries, but irreparable injuries as required for a temporary restraining order and permanent injunction. *See, e.g.*, *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2010) (affirming district court's grant of a permanent injunction enjoining BLM's unlawful regulations).

### C. The balance of equities tips in favor of preserving the status quo until the Court can determine the merits of Plaintiffs' meritorious claims.

The balance of equities in this case strongly favors the entry of temporary injunctive relief because Plaintiffs' interest in observing horses in the Triple B Complex, which necessarily involves keeping the herd viable, far outweighs the government's interest in unlawfully rounding up these horses. Without injunctive relief, Plaintiffs will continue to be permanently and irrevocably harmed in witnessing BLM decimate the wild horses to numbers below AML without BLM ever determining that overpopulation exists and removal is necessary.

With the requested injunctive relief, BLM may continue gather operations after conducting an additional environmental assessment that demonstrates overpopulation (based on current inventory) and the necessity for future gathers (based on current information). *See* 16 U.S.C. § 1333(b)(2); *United States BLM*, 2024 U.S. Dist. LEXIS at \*; *Culver*, 610 F. Supp. 3d at 168 (D.D.C. 2022). The BLM has no legal justification for doing an end-run around the Wild Horse Act's provisions or Plaintiffs' rights to participate in BLM's analysis and determination. Accordingly, the balance of the equities and hardships tips in Plaintiffs' favor.

### D. The public interest in compliance with federal law outweighs BLM's interest in its planned unlawful removal action.

The Wild Horse Act recognizes that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West," and that "they contribute to the diversity

of life forms within the Nation and enrich the lives of the American people." 16 U.S.C. § 1331. Witnessing BLM remove more wild horses from the Triple B Complex than BLM has officially determined to be necessary is not only tragic for Plaintiffs but for everyone who cherishes these iconic and symbolic creatures. The public interest is in favor of managing these wild horses in a manner that ensures BLM abides by the law, maintains current inventory, and makes necessity determination based on current information. The public interest is in favor of ensuring that herds are not decimated to below AML and that BLM make transparent removal determinations based on current inventory and information.

## V.     Leave to Testify

Plaintiffs respectfully request that Plaintiff Laura Leigh, individually and on behalf of Wild Horse Education, be permitted to testify during the hearing on this matter to inform the court of the impact of this unprecedented scale of removals, which is decimating the herds in the Triple B Complex by removing so many thousands of horses without any disclosure of data, any determination regarding the necessity for removal, and any public involvement. Plaintiff has first-hand knowledge of the conditions in the field, and it is respectfully requested that she be allowed to inform the court of the BLM's refusal to ensure that the horses are protected.

## VI.    Conclusion

Plaintiffs respectfully request that this Court grant Plaintiffs' Second Motion for Temporary Restraining Order and Preliminary Injunction by enjoining Defendants from further gathering activities in the Triple B Complex until Defendants comply with the mandates of the Wild Horse Act and NEPA.

DATED: October 10, 2024,                             Respectfully Submitted,

                                                     */s/ Jessica L. Blome*
                                                     JESSICA L. BLOME
                                                     (Cal. Bar No. 314898, pro hac vice)

1  JENNIFER RAE LOVKO
   (Cal. Bar No. 208855, pro hac vice)
2  GREENFIRE LAW, PC
   2748 Adeline Street, Suite A
3  Berkeley, CA 94703
   (510) 900-9502
4  jblome@greenfirelaw.com
   rlovko@greenfirelaw.com
5

6  */s/ Brent Resh*
   BRENT M. RESH
7  (Nev. Bar No. 14940)
   BRENT RESH LAW, PLLC
8  2401 La Solana Way
   Las Vegas, NV 89102
9  (702) 781-6903
   brent@brentreshlaw.com
10
   *Attorneys for Plaintiffs*