TODD KIM, Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

JOSEPH W. CRUSHAM, Trial Attorney (CA Bar No. 324764)
Wildlife & Marine Resources Section
PETER BROCKER, Trial Attorney (NYS Bar No. 5385448)
Natural Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Phone: (202) 307-1145 (Crusham)
Email: joseph.crusham@usdoj.gov
Phone: (202) 305-8636 (Brocker)
Email: peter.brocker@usdoj.gov

*Attorneys for Federal Defendants*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| WILD HORSE EDUCATION, and LAURA LEIGH, individually, | Case No. 3:23-cv-00372-MMD-CLB |
| *Plaintiffs,* | **FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION [ECF NO. 60]** |
| v. | |
| U.S. DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JOHN RABY, in his official capacity as Nevada State Director of the Bureau of Land Management, | |
| *Federal Defendants.* | |

Federal Defendants, the U.S. Department of Interior, Bureau of Land Management ("BLM") and Jon Raby, oppose Plaintiffs' Second Request for Temporary Restraining Order and Preliminary Injunction, ECF No. 60.

# **TABLE OF CONTENTS**

                                                                                   Page

INTRODUCTION ................................................................................................... 1

LEGAL BACKGROUND ........................................................................................ 3

   I. The Wild Free-Roaming Horses and Burros Act ............................................ 3

   II. National Environmental Policy Act .............................................................. 4

FACTUAL BACKGROUND .................................................................................... 4

   I. Antelope and Triple B Complexes Gather Plan and Environmental Assessment .......... 4

   II. BLM's Humane Handling of Wild Horses and Burros .................................. 7

   III. Triple B Complex Since Adoption of the 2017 EA and Decision Record ......... 7

      A. Past Gathers on the Complex under the 2017 EA and Decision Record. ....... 7

      B. Current Conditions and Planned November 1 Gather ................................. 8

   IV. Procedural History ....................................................................................... 10

LEGAL STANDARD ............................................................................................... 11

ARGUMENT ............................................................................................................ 12

   I. Plaintiffs Are Not Likely to Succeed on the Merits. ...................................... 12

      A. Plaintiffs Are Not Likely to Succeed on their Wild Horse Act Claim. ......... 12

      B. Plaintiffs Are Not Likely to Succeed on their NEPA Claim. ...................... 17

   II. Plaintiffs Have Failed to Establish Irreparable Harm. .................................. 19

   III. The Balance of Harms and Public Interest Do Not Support Plaintiffs' Request
      for Emergency Relief. ................................................................................ 22

   CONCLUSION .................................................................................................. 24

i

## <u>TABLE OF AUTHORITIES</u>

**CASE**                                                                                              **PAGE(S)**

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ......................................................................... 12

*Am. Horse Prot. Ass'n, v. Watt,*
    694 F.2d 1310 (D.C. Cir. 1982) ........................................................................ 3

*Amoco Prod. Co. v. Vill. of Gambell,*
    480 U.S. 531 (1987) ................................................................................. 22, 23

*California v. Block,*
    690 F.2d 753 (9th Cir. 1982) ............................................................................ 4

*Caribbean Marine Servs. Co. v. Baldrige,*
    844 F.2d 668 (9th Cir. 1988) .......................................................................... 20

*Cloud Found. v. BLM,*
    802 F. Supp. 2d 1192 (D. Nev. 2011) .............................................................. 20

*Ctr. for Competitive Politics v. Harris,*
    784 F.3d 1307 (9th Cir. 2015) ........................................................................ 11

*Daniels-Hall v. Nat'l Educ. Ass'n,*
    629 F.3d 992 (9th Cir. 2010) ............................................................................ 5

*Friends of Animals v. BLM,*
    No. CV 18-2029 (RDM), 2024 WL 1344424 (D.D.C. Mar. 30, 2024) ...................... 12, 14, 16

*Friends of Animals v. BLM,*
    548 F. Supp. 3d 39 (D.D.C. 2021) .............................................................. 17, 21

*Friends of Animals v. Culver,*
    610 F. Supp. 3d 157 (D.D.C. 2022) ............................................................ 15, 16

*Friends of Animals v. Pendley,*
    523 F. Supp. 3d 39 (D.D.C. 2021) .................................................................. 13

*Friends of Animals v. Silvey,*
    353 F. Supp. 3d 991 (D. Nev. 2018) .......................................................... Passim

*Fund for Animals, Inc. v. BLM,*
    460 F.3d 13 (D.C. Cir. 2006) ........................................................................... 3

*In Def. of Animals v. U.S. Dep't of Interior,*
    737 F. Supp. 2d 1125 (E.D. Cal. 2010) ............................................................ 21

*In Def. of Animals v. U.S. Dep't of Interior*,
    751 F.3d 1054 (9th Cir. 2014) ................................................................... 21

*Leigh v. Jewell*,
    No. 3:11-CV-00608-HDM-WGC, 2014 WL 31675 (D. Nev. Jan. 3, 2014) ............................ 3

*Leigh v. Raby*,
    No. 3:22-CV-00034-MMD-CLB, 2022 WL 267353 (D. Nev. Jan. 28, 2022) ............ 17, 18, 24

*Leigh v. U.S. Dep't of Interior*,
    No. 2:22-CV-01200-MMD-BNW, 2024 WL 4279156 (D. Nev. Sept. 23, 2024)............ 13, 14

*Lydo Enters., Inc. v. City of Las Vegas*,
    745 F.2d 1211 (9th Cir. 1984) ................................................................... 20

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ................................................................................ 4

*Munaf v. Geren*,
    553 U.S. 674 (2008) ............................................................................... 11

*N. Alaska Env't Ctr. v. U.S. Dep't of Interior*,
    983 F.3d 1077 (9th Cir. 2020) ................................................................... 18

*Neighbors of Cuddy Mountain v. Alexander*,
    303 F.3d 1059 (9th Cir. 2002) .................................................................... 4

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................... 12

*Reno-Sparks Indian Colony v. Haaland*,
    663 F. Supp. 3d 1188 (D. Nev. 2023) ..................................................... 11, 20

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ................................................................................ 4

*W. Rangeland Conservation Ass'n v. Zinke*,
    265 F. Supp. 3d 1267 (D. Utah 2017) ........................................................... 15

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ............................................................................... 23

*Winter v. Natural Res. Def. Council*,
    555 U.S. 7 (2008) ........................................................................ 12, 19, 22

**STATUTES**

16 U.S.C. § 1331 ................................................................................................ 3

16 U.S.C. § 1332(c) ........................................................................................... 3

16 U.S.C. § 1333(a) ...................................................................................... 3, 24

16 U.S.C. § 1333(b)(1) ...................................................................................... 3

16 U.S.C. § 1333(b)(2) ............................................................................ 3, 12, 14

16 U.S.C. § 1333(b)(2)(B) ................................................................................ 3

**REGULATIONS**

43 C.F.R. § 4700.0-5(e) ................................................................................... 3

43 C.F.R. § 4710.3-1 ........................................................................................ 3

**INTRODUCTION**

The Triple B Complex in northeastern Nevada contains an unsustainable overpopulation of wild horses. Pursuant to BLM's 2017 Antelope and Triple B Complexes Gather Plan Environmental Assessment ("2017 EA") and Decision Record, BLM has conducted five gathers and removed more than 4,000 wild horses from the Triple B Complex. Despite these efforts, a significant overpopulation of wild horses remains. BLM currently estimates that there are 3,335 wild horses within the Complex, which is 700% over the target low appropriate management level ("AML") of 472 horses, and 375% over the high-AML of 889 horses. This extreme overpopulation of wild horses damages the ecosystem by reducing forage available for wildlife and permitted livestock. It also poses a risk to public safety. Moreover, as shown by the many dead and severely unhealthy horses recently observed by BLM, the overpopulation harms the horses themselves because the herd sizes have surpassed the ability of the land to support them. The Wild Free-Roaming Horses and Burros Act ("Wild Horse Act") requires BLM to conduct gathers of excess wild horses to achieve a thriving, natural ecological balance and prevent further degradation of rangeland resources.

Removing more than 2,000 horses from within the Triple B Complex is a high priority for BLM. BLM originally scheduled a gather for September 2024, and publicly shared this date in December 2023. Because of the systemic nature of wild horse overpopulations throughout the West—and the resulting shortage of holding space for gathered animals—BLM had to postpone the gather until November 1. It publicly shared this revised start date on September 12, 2024. In late August, BLM conducted an emergency gather on the Triple B Complex seeking to prevent more horses from dying because of limited forage and water before the November 1 gather. The emergency gather removed only about 100 horses from the Complex, and the upcoming gather is still desperately needed.

About ten months after the 2024 Triple B Complex gather was first scheduled, and four weeks after the adjusted November 1 date was publicly announced, Plaintiffs filed a motion for a temporary restraining order and preliminary injunction to prevent BLM from conducting the

gather. *See* ECF No. 60 ("TRO Motion"). This is Plaintiffs' second emergency motion seeking to enjoin BLM from gathering horses under the 2017 EA and Decision Record. Last August, the Court denied their first motion. ECF No. 29. It should deny this one, too.

Plaintiffs do not meet their heavy burden to show an injunction is warranted. First, they do not demonstrate a likelihood of success on the two claims on which they move. They argue that the ten-year gather plan adopted by BLM violates the Wild Horse Act's requirement that BLM "immediately" gather excess animals. But—in rejecting another challenge to the 2017 EA and Decision Record—the Ninth Circuit found no issue with long-term gather plans. And—just a few weeks ago—this Court entered judgment for BLM on similar claims brought by Plaintiffs. Put simply, it would be illogical to prevent BLM from conducting an urgently needed gather based on the "immediately" language, which requires BLM to gather animals as promptly as reasonably possible. Likewise, Plaintiffs' National Environmental Policy Act ("NEPA") claim fails because it presumes that the 2017 EA analyzed the effects of gathering a specific number of horses. The 2017 EA analyzed the impacts of ten years of gathers to achieve and maintain AML. The 2017 EA remains in effect because it has not been ten years since its issuance and BLM has not been able to gather enough horses over the life of the 2017 EA to bring the Triple B Complex down to AML.

Plaintiffs also fail to demonstrate irreparable harm and that the public interest/balance of the harms favors an injunction. Their primary argument for harm is that the gather will deprive them of the ability to view and photograph horses within the Triple B Complex, but hundreds of animals will remain even after the gather. Moreover, as established below and in the declarations from BLM personnel attached to this brief, the November 1 gather on the Triple B Complex is critical for public safety, the health of the rangeland, and for the horses themselves.

Thus, for these reasons and as explained below, the Court should deny Plaintiffs' TRO Motion.

## LEGAL BACKGROUND

### I.     The Wild Free-Roaming Horses and Burros Act

In 1971, Congress passed the Wild Horse Act, 16 U.S.C. § 1331 *et seq.*, which directs the Secretary of the Interior to provide for the protection and management of wild horses "in the area where presently found, as an integral part of the natural system of the public lands." *Id.* § 1331. But after only a few years, the wild horse population had grown dramatically, "and action [was] needed to prevent a successful program from exceeding its goals and causing animal habitat destruction." *Am. Horse Prot. Ass'n, v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982) (citation omitted). Thus, in 1978, Congress passed amendments to the Wild Horse Act, which gave the Secretary greater authority and discretion to manage and remove excess horses. *Id.* at 1316–18.

Section 3 of the Wild Horse Act directs the Secretary to manage wild horses and burros "to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). "The [BLM] (as the Secretary's delegate) carries out this function in localized 'herd management areas' ("HMAs")[.]" *Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 15 (D.C. Cir. 2006); *see* 16 U.S.C. § 1332(c); 43 C.F.R. § 4710.3-1. In each HMA, BLM typically establishes an AML range. *See Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1008 (D. Nev. 2018), ("BLM is given great deference [] in establishing AMLs…"), *aff'd*, 820 F. App'x 513 (9th Cir. 2020). If BLM determines there is an overpopulation of wild horses and burros and that action is necessary to remove them, BLM must immediately act to remove the excess animals to achieve AML. 16 U.S.C. § 1333(b)(2).

The Wild Horse Act specifies that excess wild horses shall be "humanely captured and removed." *Id.* § 1333(b)(2)(B). BLM regulations define "humane treatment" as "handling compatible with animal husbandry practices accepted in the veterinary community, without causing unnecessary stress or suffering to a wild horse or burro." 43 C.F.R. § 4700.0-5(e). BLM has broad discretion in managing and removing wild horses from public lands. *See* 16 U.S.C. § 1333(b)(1); *Leigh v. Jewell*, No. 3:11-CV-00608-HDM-WGC, 2014 WL 31675, at *5 (D. Nev.

Jan. 3, 2014) (finding the Wild Horse Act's definition of humane "affords BLM discretion in conducting [] wild horse roundups").

## II.    National Environmental Policy Act

NEPA serves the dual purpose of informing agency decision-makers of the environmental effects of proposed federal actions and ensuring that relevant information is made available to the public so it "may also play a role in both the decisionmaking process and the implementation of that decision." *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA requires the agency to take a "hard look" at the potential environmental consequences of its decision-making. *Id.* at 350.

But NEPA does not mandate particular results or impose substantive environmental obligations. *Id.* at 350-511; *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989). Instead, "NEPA ensures that [an] agency will not act on incomplete information." *Marsh*, 490 U.S. at 371. To this end, judicial review of NEPA decisions examines whether the analysis includes a "reasonably thorough discussion of the significant aspects of the probable environmental consequences" to inform the exercise of agency discretion. *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (citation omitted). "Once the court is satisfied that an agency's exercise of discretion is truly informed, the court must defer to that informed discretion." *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002) (cleaned up).

## FACTUAL BACKGROUND

## I.    Antelope and Triple B Complexes Gather Plan and Environmental Assessment

This case centers around a ten-year gather plan for several BLM-managed HMAs in Nevada. In 2017, BLM estimated that the population of wild horses within the Antelope, Antelope Valley, Goshute, Maverick-Medicine, Spruce-Pequop, and Triple B HMAs (collectively, "the Antelope and Triple B Complexes") was 9,525 wild horses—"almost 11 times above the low [AML] of 899 wild horses." **Exhibit 2** [Decision Record] at 1; 2017 EA at 3–4 (table reflecting

4

AMLs for each of the eight HMAs).[1] BLM completed the 2017 EA to assess the possible environmental effects of the proposed ten-year gather plan.

The Triple B Complex includes the Triple B and Maverick-Medicine HMAs, as well as the portion of the Antelope Valley HMA that lies West of U.S. Highway 93, and the Cherry Springs Wild Horse Territory. 2017 EA at 3–4; *see* **Exhibit 1** [Map of Triple B Complex]. BLM gathers horses in these areas together as a Complex because horses "interchange" between them. *Id.* at 123. The AML range for the Triple B Complex is 472–889 horses. *Id.* at 3–4. At the time the 2017 EA was issued, BLM estimated that there were about 3,842 horses in the Triple B Complex. *Id.* The 2017 EA notes that surveying wild horses is not an exact science—as much as 20-30% of horses may go undetected. *Id.* at 5–6. Thus, any estimates are likely underestimates. Moreover, BLM estimates that the population increases between 20–25% per year. *Id.* at 12.

Based on BLM's best estimates of the populations at the time, Alternative A in the 2017 EA calls for gathering and removing "approximately 9,053 excess wild horses within the [Antelope and Triple B] Complexes to achieve and maintain AML and to implement population control measures to gathered and released horses over a period of ten years from the initial gather." 2017 EA at 13. BLM's goal in adopting the gather plan was to get wild horse populations in the Complexes to low AML—472 horses for the Triple B Complex. *Id.* (finding Alternative A "would allow BLM to achieve management goals and objectives of attaining low range AML for a core breeding population, reducing population growth rates, and obtaining a thriving natural ecological balance on the range . . ."). Based on the estimated population within the Triple B Complex at that time—3,842—BLM estimated that 3,370 wild horses needed to be gathered and removed to achieve low AML. *Id.* at 3-4.

---

[1] Federal Defendants have not attached the 2017 EA as an exhibit because of its length. It is available at: BLM National NEPA Register, DOI-BLM-NV-E030-2017-0010-EA, https://eplanning.blm.gov/eplanning-ui/project/84367/570. The Court may take judicial notice of the 2017 EA and other items on BLM's website because they are "publicly available" on an official government website, and their accuracy and authenticity are not subject to reasonable dispute. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

The 2017 EA notes that BLM "expected that gather efficiencies and holding space during the initial gather would not allow for the attainment of the Proposed Action during the initial gather (i.e. not enough horses are successfully captured and removed to reach low AML)." *Id.* Thus, "[f]ollow-up gathers over a 10 year period to remove any additional wild horses [will be] necessary in order to achieve and maintain the low range of AML, and to gather a sufficient number of wild horses as to implement the population control component of the Proposed Action . . . for wild horses remaining in the complexes." *Id.*

The 2017 EA analyzes the environmental effects of Alternative A's ten-year gather plan. *See id.* at 30–177. As for the wild horse population, BLM determined that the plan would "improve herd health," including by decreasing "competition for forage and water resources" which would "reduce stress and promote healthier animals." *Id.* at 137–138. On the other hand, BLM found that taking no action would subject horses to "increased stress and possible death as a result of increased competition for water and/or forage as the population continues to grow even further in excess of the land's capacity to meet the wild horses' habitat needs." *Id.* at 136.

On December 21, 2017, BLM issued a Decision Record adopting Alternative A in the 2017 EA, as well as Finding of No Significant Impact ("FONSI"). BLM concluded that gathers were necessary to "prevent continued degradation of rangeland resources, and the unnecessary death or suffering of individual wild horses that are currently impacted by a lack of water and forage." Decision Record at 3. BLM found that a ten-year gather plan to achieve and maintain low AML would "ease pressure on short-term and off-range facilities that may have insufficient capacity to handle all of the excess wild horses if removed in a single gather, and will also provide a greater likelihood that a sufficient gather efficiency can be achieved to apply fertility controls to a larger segment of the wild horse population that remains post-gather." *Id.* at 4. Additionally, BLM noted that "[f]unding limitations and competing National priorities may affect the timing of gather operations and implementation of the population control components of the proposed action." *Id.* at 1.

## II.     BLM's Humane Handling of Wild Horses and Burros

Plaintiffs do not move based on the humane handling provisions of the Wild Horse Act, but they make misleading statements about BLM's prior gathers on the Triple B Complex. *See* TRO Mot. at 9 (claiming BLM "removed or killed" thousands of horses from the Triple B Complex). BLM makes every effort to ensure that its gather operations are conducted humanely. Second Declaration of Benjamin Noyes ("Noyes Decl.") ¶ 7. This includes following BLM's Comprehensive Animal Welfare Program standards ("CAWP") for gathering, handling, and caring for wild horses and burros; developing a CAWP Team to assess certain gather operations; and ensuring that there is an on-site veterinarian for gather operations. *Id.* ¶¶ 11–13; *see also id.* ¶ 18 & **Exhibit 11** [CAWP Team Assessment Report]; ECF Nos. 40-2 & 40-3 [CAWP Gather and Off-Range Standards].

Gathers are designed, in large part, to rescue horses from dire conditions associated with overpopulation. *See* Noyes Decl. ¶ 23; Second Declaration of Bruce Thompson ("Bruce Decl.") ¶ 26. However, gathers can have adverse impacts on individual animals. The loss of even one animal is tragic, but the risks associated with gathering wild animals cannot entirely be eliminated. Noyes Decl. ¶ 7. BLM categorizes wild horse deaths during gathers as "acute" or "chronic." *Id.* ¶ 8. Acute deaths are those caused by "recent or sudden injuries or medical conditions, including those that occurred or developed during capture or captivity, such as recent fractures, injuries, respiratory infections, [or] other illnesses." *Id.* Chronic deaths occur when BLM humanely euthanizes horses because of "conditions existing prior to capture, such as poor body condition, lameness, [or] physical defects." *Id.*; *see also* **Exhibit 10** [BLM Permanent Instruction Memorandum 2021-007 (Euthanasia of Wild Horses and Burros Related to Acts of Mercy, Health or Safety)]. From 2010 to 2019, BLM helicopter gather operations were estimated to have around a 1–1.2% mortality rate, with that rate including both acute and chronic deaths. *Id.* ¶¶ 9–10.

## III.     Triple B Complex Since Adoption of the 2017 EA and Decision Record

A.     Past Gathers on the Complex under the 2017 EA and Decision Record.

BLM has conducted five gathers on the Triple B Complex under the 2017 EA and

Decision Record. Noyes Decl. ¶¶ 14–19. First, from January 31 through February 23, 2018, BLM gathered 1,389 horses on the Triple B Complex, and removed 1,327. *Id.* ¶ 14. Of this total, BLM recorded two acute deaths (0.1%)[2] and 28 chronic deaths (2%). *Id.* Second, from July 8 through July 16, 2019, BLM gathered 804 horses on the Triple B Complex, and removed 803. *Id.* ¶ 15. There were six acute deaths (0.8%) and ten chronic deaths (1.1%). *Id.* Third, from July 28 through August 22, 2020, BLM gathered and removed 391 horses from the Triple B Complex. *Id.* ¶ 16. There was one acute death (0.2%) and eight chronic deaths (2%). *Id.* Fourth, from July 15 through August 25, 2022, BLM gathered 1,897 horses on the Triple B Complex, and removed 1,872. *Id.* ¶ 17. There were six acute deaths (0.3%) and 17 chronic deaths (0.9%). *Id.* The CAWP Team attending this gather found it complied with the CAWP Standards. *Id.* ¶ 18; **Exhibit 11**. Finally, from August 29 to September 2, 2024, because of the lack of forage and water in the Triple B Complex, BLM conducted an emergency gather and removed 109 horses from the Complex. *Id.*; Bruce Decl. ¶ 24. The emergency gather has not alleviated the dire conditions on the Triple B Complex which are still causing horses "to deteriorate in body conditions" and weaker horses to die. Second Declaration of Ruth Thompson ("Ruth Decl.") ¶ 10. During the emergency gather, there was one acute death (.9%) and two chronic deaths (1.8%). Noyes Decl. ¶ 19.

Thus, under the 2017 EA and Decision Record, BLM has gathered 4,590 horses on the Triple B Complex, and it has removed 4,502 horses from the Complex. Of the animals gathered, only 16, or 0.35%, died of acute causes.

B.    Current Conditions and Planned November 1 Gather

As reflected by the need to conduct an emergency gather just weeks ago, conditions on the Triple B Complex are dire. The Complex has seen extreme drought over the last few years. Bruce Decl. ¶¶ 15, 17. Making matters worse, this past summer was very dry, which has left many sources of water for wild horses on the Complex dry or with little water. *Id.*; Noyes Decl. ¶ 20. The drought conditions have also reduced the amount of forage available for wild horses. Bruce

---

[2] The percentages in this paragraph are number of each death category divided by the number of horses gathered.

Decl. ¶¶ 14–15. Even though the Maverick-Medicine HMA has seen "very limited livestock grazing over the winter of 2023 to the present," horses have begun moving outside the Complex, which reflects that there is a lack of sufficient water and forage for the horses within the Complex. *Id.* ¶ 16. Consistent with these conditions, through 2023 and 2024, BLM has observed many dead horses on the Complex, as well as very thin horses. *See id.* ¶ 13; *id.* at Figures 2–3, 7, 13, 18–21 [photographs of dead horses]; **Exhibit 6** [Body Condition Scoring Chart].

Compounding the lack of forage and water on the Triple B Complex is the extreme overpopulation of wild horses. Based on inventory flights and accounting for the 2023 and 2024 foal crops, which each increase the size of the herd by about 20-25%, BLM's current estimate is that there are 3,335 animals within the Complex. *Id.* ¶¶ 8–9, 12–13; **Exhibit 7** [2023 Flight Inventory Memo]; *see also* Ruth Decl. ¶ 9; **Exhibit 3** [BLM Nevada Wild Horse and Burro Population Statistics]. This is more than 700% over low-AML (472 horses) for the Complex, and 375% over high-AML (889 horses). Ruth Decl. ¶ 9. Despite BLM's best efforts—including conducting five gathers in less than seven years—the population of wild horses on the Triple B Complex has remained well over AML since the 2017 Decision Record. *See* Bruce Decl. ¶ 17.

As a result of this persistent extreme overpopulation and the degraded rangeland, the upcoming gather on the Triple B Complex is a high priority for BLM. *See* Ruth Decl. ¶ 10. Indeed, the counties within which the Complex is located—Elko and White Pine—each declared states of emergency in 2023 because of the overpopulation of wild horses, including within HMAs in the Triple B Complex. *Id.* ¶ 11; **Exhibit 4** [Emergency Declarations].

BLM originally announced the upcoming Triple B Complex gather to the public in December 2023. Ruth Decl. ¶ 12. At that time, the gather was scheduled for September 16, 2024, which is in BLM Fiscal Year 2024. *Id.* BLM had to postpone the gather about six weeks—to November 1, 2024—because of the "overall wild horse overpopulation throughout Nevada and the west" and the associated "limited off range holding capacity." *Id.* This postponement meant that the gather would take place in Fiscal Year 2025, instead of Fiscal Year 2024. *Id.* Thus, BLM publicly updated the Fiscal Year 2024 schedule in late July-early August 2024 to reflect that the

Triple B Complex gather would no longer take place in Fiscal Year 2024. *Id.* On September 12, 2024, BLM publicly posted the Fiscal Year 2025 schedule listing the November 1, 2024 start date for the gather. *Id.* On October 11, BLM shared an updated Fiscal Year 2025 schedule with the public, keeping the November 1 start date for the Triple B Complex gather. *Id.*

Gather operations are not scheduled to begin until November 1, 2024. *Id.* ¶ 16. BLM's contractor may begin to travel to the gather site and begin preparation activities on October 30 and October 31. *Id.* BLM has provided public notice of the gather on its website, including information about opportunities to observe trap sites at some locations, an observation protocol, and a way to sign up for observation. *Id.*; **Exhibit 5** [Public Notice and Website for Upcoming Triple B Complex Gather]. BLM may also be able to provide the public with an opportunity to observe at the temporary corrals, depending on location and conditions. *Id.* While the 2024 Triple B Complex gather sites have not yet been selected by the contractor, BLM will make efforts to provide public observation for gather operations. Ruth Decl. ¶ 18. At the same time, when arranging for public observation, BLM must account for safety of the public, BLM staff, and the contractor's employees. *Id.* ¶¶ 18–19. As is the agency's practice, BLM also update its website daily with reports on the previous day's gather operations. *Id.* ¶ 16.

During the gather that is planned to begin on November 1, BLM is seeking to gather 2,255 wild horses, and remove 2,155 of those animals from the Triple B Complex. *Id.* ¶ 14. For the approximately 100 horses returned to the Complex, BLM plans to maintain a 50:50 sex ratio and will apply fertility treatments to the mares consistent with the 2017 EA in an effort to slow the population growth rate in the Triple B Complex. *Id.*

## IV.   Procedural History

Plaintiffs originally filed suit on July 26, 2023. ECF No. 1. A few days later, they filed their first Motion for Temporary Restraining Order and Preliminary Injunction seeking to stop BLM's ongoing gathers on the Antelope Complex. ECF No. 10 at 2. On August 9, 2023, the Court held an all-day evidentiary hearing. ECF No. 29. The Court ruled from the bench and denied

Plaintiffs' motion. *Id.*; ECF No. 36 at 126:21–142:19.[3]

Plaintiffs then filed a First Amended Complaint ("FAC"). ECF No. 38. The Court granted Federal Defendants' motion to dismiss the FAC, dismissing Plaintiffs' first claim with prejudice and the others with leave to amend. ECF No. 48. Plaintiffs moved for reconsideration, which the Court denied. ECF No. 55. Plaintiffs then filed their Third Amended Complaint ("TAC"). ECF No. 58. Federal Defendants have filed a Partial Motion to Dismiss and Motion to Strike ("MTD/MTS") regarding the TAC, which is pending. ECF No. 59. Plaintiffs have also moved for leave to amend, ECF No. 63, which Federal Defendants have opposed, ECF No. 65.

On October 10, 2024, Plaintiffs filed their TRO Motion. The next day, partly based on Plaintiffs' failure to meet and confer, the Court found that an expedited briefing schedule was unwarranted and ordered Federal Defendants to respond by October 24, 2024. ECF No. 62.

## LEGAL STANDARD

A preliminary injunction is an extraordinary remedy never awarded as of right.[4] *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). The plaintiff "bears the heavy burden of making a 'clear showing' that it [i]s entitled to a preliminary injunction." *Ctr. for Competitive Politics v. Harris*, 784 F.3d 1307, 1312 (9th Cir. 2015), *abrogated on other grounds, Am. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021). When considering whether to grant an application for a temporary restraining order or preliminary injunction, the Court must examine four factors: (1) whether

---

[3] Plaintiffs' counsel asserts that the Court denied their first attempt at emergency relief "as moot because gather operations concluded as the hearing proceeded." TRO Mot. at 4, ¶ 7. This is inaccurate. The Court found that Plaintiffs' First Amendment claim was moot because it was based on the particular circumstances of one trap site and BLM had "no further intent to conduct a gather at that site or on other private property" during the challenged gathers last summer. ECF No. 36 at 128:21–129–4. But the gathers in the Antelope Complex were "still ongoing" at the time of the Court's decision—indeed, they "had another more than ten days to go." *Id.* at 127:1–3. Thus, other than one specific First Amendment issue, the Court denied Plaintiffs' first emergency motion on the merits. *See, e.g., id.* at 139:22–24 ("I don't have evidence in front of me to show that there's a violation of any law that's being involved here.").

[4] "The standard for issuing a TRO is 'substantially identical' to the standard for issuing a preliminary injunction." *Reno-Sparks Indian Colony v. Haaland*, 663 F. Supp. 3d 1188, 1195 (D. Nev. 2023) (citation omitted).

Plaintiffs are likely to succeed on the merits; (2) whether Plaintiffs are likely to suffer irreparable harm without preliminary relief; (3) whether the balance of equities tips in Plaintiffs' favor; and (4) whether the public interest would be served by issuance of the temporary restraining order. *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). The final two factors merge when the United States opposes. *Nken v. Holder*, 556 U.S. 418, 435–36 (2009).

Courts within the Ninth Circuit evaluate these four elements on a "sliding scale," where a "stronger showing of one element may offset a weaker showing of another," but a plaintiff must still make a showing on all four prongs. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1134-35 (9th Cir. 2011). For example, a court may issue an injunction if there are "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id*. at 1135.

## ARGUMENT

### I.    Plaintiffs Are Not Likely to Succeed on the Merits.

A.    Plaintiffs Are Not Likely to Succeed on their Wild Horse Act Claim.

The Wild Horse Act provides that once BLM determines that there is an overpopulation of wild horses and that action is necessary to remove excess animals, BLM "shall immediately remove excess animals from the range so as to achieve [AMLs]." 16 U.S.C. § 1333(b)(2). Courts have found that the "immediately" provision necessarily affords BLM some discretionary space to plan safe, efficient, and effective removals of excess animals. *See, e.g.*, *Friends of Animals v. BLM*, No. CV 18-2029 (RDM), 2024 WL 1344424, at *21 (D.D.C. Mar. 30, 2024)*.

Plaintiffs paradoxically argue that the Court should prevent BLM's upcoming gather on the Triple B Complex because BLM is violating the Wild Horse Act's "immediacy" requirement by relying on a "phased" ten-year gather plan. TRO Mot. at 10–12. Plaintiffs are unlikely to succeed on this claim for several reasons.

First, this Wild Horse Act claim is aimed at the wrong agency action. Plaintiffs' "immediacy" claim—both in the TAC and TRO Motion—challenges and seeks to vacate BLM's 2017 EA/FONSI, not the Decision Record. ECF No. 58 ¶¶ 102–108; *id*. at 14 ¶ D (requesting an

order to "vacate and set aside the 2017 EA/FONSI because it allows successive gathers in violation of the immediacy requirement"); TRO Mot. at 12 (challenging BLM's reliance on the "2017 EA"). Just a few weeks ago, this Court entered judgment for BLM on essentially identical claims brought by two of the same Plaintiffs in this case. *Leigh v. U.S. Dep't of Interior*, No. 2:22-CV-01200-MMD-BNW, 2024 WL 4279156, at *13 (D. Nev. Sept. 23, 2024) (*Leigh II*) (noting Plaintiffs argued that "BLM's phased approach to achieving AML" violated the immediacy requirement). The Court observed that "[t]he only agency action they have asked the Court to set aside . . . is the Final EA, rather than the actual decision to implement a phased gather." *Id.* Because the "EA simply analyzes the potential environmental effects of different proposed alternatives, it does not violate the [Wild Horse Act's] immediacy requirement." *Id.* For the same reasons, Plaintiffs' claim here is unlikely to succeed, as Plaintiffs again do not challenge or seek to vacate the Decision Record. But even if the Court generously construes Plaintiffs to be challenging the Decision Record, the claim is still unlikely to succeed.

Plaintiffs argue that courts have "repeatedly" found long-term gather plans "unlawful." TRO Mot. at 12. But in *Leigh II*, this Court rejected Plaintiffs' claim that BLM's adoption of a *20-year* phased gather plan for the Blue Wing Complex was arbitrary and capricious under the Administrative Procedure Act ("APA"). The Court found BLM's explanation for its decision reasonable: "multiple round ups may be a practical necessity where a single gather decision implicates hundreds or even thousands of wild horses and burros, which cannot realistically be removed all at once." *Leigh II*, 2024 WL 4279156, at *12 (quoting *Friends of Animals v. Pendley*, 523 F. Supp. 3d 39, 57 (D.D.C. 2021)). The Court also credited BLM's statements that the 20-year plan was necessary because the timing and pace of gathers would be influenced by holding space and funding constraints. *Id.* And the Court observed that "BLM's use of a single gather plan and a single EA to cover a period of years and a series of individual gather operations is not a departure from the agency's past practice." *Id.* (quoting *Silvey*, 820 F. App'x at 516).

Plaintiffs similarly seek to set aside the 2017 EA/FONSI as arbitrary and capricious because it violates the "immediacy" provision of the Wild Horse Act. *See* ECF No. 58 ¶ 108;

TRO Mot. at 5. And, just like in *Leigh II*, BLM explains that the basis for adopting the ten-year plan includes the practical realities of gathering thousands of horses, and that the timing and pace of gathers could be impacted by holding space and funding. *See* 2017 EA at 13; Decision Record at 1; Ruth Decl. ¶ 13 (explaining it is likely infeasible to reach AML in one gather—which would require gathering nearly 3,000 horses from the Complex—because of logistics, gather efficiencies, and limitations on holding space). In fact, *Silvey*—in which the Ninth Circuit approved of BLM's use of a "single gather plan and single [EA]" to cover a series of gathers—rejected a challenge to the *same* Decision Record and EA at issue here. *See* 820 F. App'x at 515–16. Thus, under the Court's recent order and the Ninth Circuit's guidance, Plaintiffs are unlikely to succeed on this claim.

Moreover, Plaintiffs' cases are distinguishable.[5] Most glaringly, even where courts found issues with the pacing of BLM's gathers, not one of Plaintiffs' cases entered an order *enjoining* BLM from conducting gathers. This makes sense. Plaintiffs do not meaningly challenge BLM's determination that there is an (extreme) overpopulation of horses on the Triple B Complex and that action is necessary to remove them.[6] Thus, BLM must remove horses "immediately," 16 U.S.C. § 1333(b)(2), which means that BLM must "conduct the required gathers as promptly as reasonably possible." *See Friends of Animals*, 2024 WL 1344424, at *23. Plaintiffs' requested relief—enjoining BLM from conducting the gather—would prevent BLM from carrying out this duty. *See id.* at *22 (noting illogic of argument that BLM's alleged "failure to plan to act with sufficient dispatch requires setting aside the gather plan—thereby *delaying* any such removal").

*Western Rangeland* is inapt. There, the plaintiffs sued under APA Section 706(1) to compel BLM to gather horses in various HMAs, alleging that BLM had unreasonably delayed in

---

[5] Plaintiffs raised two of their three cases—*Western Rangeland* and *Culver*—in unsuccessfully briefing their similar "immediately" claims in *Leigh II*. *See* Case No. 2:22-CV-01200-MMD-BNW, ECF No. 50 at 34–36 & ECF No. 63 at 22–24.

[6] Plaintiffs assert that the "November 1, 2024 gather will occur without overpopulation being determined and without necessity being shown," TRO Motion at 14, but set forth no facts casting doubt on BLM's estimate there are more than 3,000 horses currently within the Complex, such that the population is well-above AML and excess horses must be removed.

carrying out its duty to "immediately" remove excess animals. *W. Rangeland Conservation Ass'n v. Zinke,* 265 F. Supp. 3d 1267, 1282–1297 (D. Utah 2017). For the relevant HMAs, BLM had proposed a six-to-ten year phased removal plan intended to gradually reach AML. *Id.* at 1285–86. The court found that this phased plan conflicted with the Wild Horse Act's immediacy language. *See id.* at 1287. But the court did not, as Plaintiffs claim, "str[i]k[e] down" BLM's plans because they "violated the Wild Horse Act's immediacy requirement." TRO Mot. at 10–11. After a full analysis of the relevant factors, including the extent and consequences of the delay and the administrative difficulties of implementing the action, the court concluded that BLM had not unreasonably delayed its duty to immediately remove excess horses by adopting the phased plans. *See* 265 F. Supp. 3d at 1291 ("BLM's efforts to both successfully and sustainably manage wild horse populations pursuant to the [Wild Horse Act] are hindered by nigh-insurmountable administrative obstacles.").

Because it was an action under APA Section 706(1) to compel gathers, and Plaintiffs here are seeking to *prevent* gathers, *Western Rangeland* is not on point and does not show Plaintiffs are likely to succeed on their APA Section 706(2) claim. Even if the Court agrees with *Western Rangeland*'s reasoning on the lawfulness of phased gathers—which seemingly conflicts with *Leigh II* and the Ninth Circuit's reasoning in *Silvey*—an order preventing BLM from conducting the upcoming gather would directly conflict with that reasoning. *See, e.g.*, *W. Rangeland*, 265 F. Supp. 3d at 1284 (the immediacy provision "requires action, even when that action is based on incomplete knowledge of conditions on the ground, because the endangered and rapidly deteriorating range cannot wait" (cleaned up)).

Nor does *Culver* show that Plaintiffs are likely to succeed on this claim. The Court there found that BLM's ten-year gather plan violated the Wild Horse Act. *Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 168–171 (D.D.C. 2022). *Culver* is distinguishable because BLM had not conducted a gather in the relevant HMA in that case since 2010, and so failed to act "immediately" to remove excess horses. *See id.* at 165; *see also id.* at 170 (interpreting gather plan as BLM directing "employees to wait ten years to 'immediately' remove excess horses"). Here, BLM has

conducted five gathers on the Triple B Complex alone since the 2017 Decision Record. Noyes Decl. ¶¶ 14–19. Indeed, Plaintiffs argue here that BLM has conducted *too many* gathers. *See* TRO Mot. at 12. And Plaintiffs are mistaken that *Culver* "struck down" the relevant gather plan based on the immediacy provision. *Id.* at 11. The Court found that "BLM's legal error [was] relatively minor" and that BLM had "otherwise appropriately substantiated its Decision under both the [Wild Horse Act] and NEPA." *Culver*, 610 F. Supp. 3d at 172–73. Thus, the Court ruled that "vacatur of the Decision would harm the ecological interests that the Decision is necessary to protect," and that "BLM can both accomplish its statutory duties while reducing the time period for the completion of those duties." *See id.* at 172–73. In other words, despite finding the ten-year plan violated the immediacy provision, the Court did not vacate the decision precisely because it wanted BLM to *more quickly* conduct gathers. *Culver* therefore expressly rejected the relief that Plaintiffs seek—vacating BLM's decision documents and preventing gathers from occurring— because "the endangered and rapidly deteriorating range cannot wait." *Id.* (citation omitted).

Plaintiffs' final case—*Friends of Animals*—is even less helpful to them. Plaintiffs there also challenged BLM's ability to adopt long-term gather plans. *See* 2024 WL 1344424, at *19. The Court disagreed with them, finding that while the "immediately" language in the Wild Horse Act "requires that the agency promptly begin the process of removing excess animals," it "does not require that it complete that process 'without interval of time[.]'" *Id.* at *20 ("[T]he statute requires [BLM] to 'immediately remove excess animals,' but does not require that it 'immediately remove [*all*] excess animals.'"). Thus, the court held that the Wild Horse Act permits BLM to adopt gather plans that contemplate "staged" gathers over several years to achieve AML in the first instance, so long as BLM plans to begin removing excess animals "as promptly as reasonably possible." *See id.* at *20–23. As noted, BLM has already conducted five gathers under the Decision Record. The case also found that, if BLM reaches the sought after AML level identified as the goal of a long-term gather decision, BLM must "return to the processes required by section 1333(b)(2) before authorizing future gathers." *Id.* But—despite conducting five gathers—BLM has not come close to reaching AML on the Triple B Complex since issuance of the 2017

Decision. Bruce Decl. ¶ 17. Thus, the ongoing validity of the 2017 EA and Decision Record is consistent with the district court's decision in *Friends of Animals*.

Accordingly, Plaintiffs have not met their heavy burden to show that they are likely to succeed on their claim that BLM has violated the Wild Horse Act's command to "immediately" gather excess horses by adopting a ten-year gather plan.

B. Plaintiffs Are Not Likely to Succeed on their NEPA Claim.

Plaintiffs also argue that they are likely to succeed on the merits of their NEPA claim because a new environmental assessment was required before BLM could conduct any further gathers in the Triple B Complex. *See* ECF No. 60, 12–13. Specifically, Plaintiffs assert that a new NEPA analysis is needed because BLM has removed more excess wild horses since the 2017 EA than were identified as excess at the time of the 2017 EA. *Id*. This argument is meritless, and Plaintiffs have failed to demonstrate a likelihood of success on their NEPA claim.

As an initial matter, there is nothing improper about BLM's reliance on an EA from 2017 that analyzed ten years of gathers. This Circuit has regularly upheld NEPA analyses that considered the impacts of phased actions. *See Silvey*, 820 F. App'x at 516 (affirming a decision upholding the 2017 EA because "BLM's use of a single gather plan and a single [EA] to cover a period of years and a series of individual gather operations is not a departure from the agency's past practice"). Therefore, Plaintiffs cannot demonstrate a likelihood of success on the merits merely by pointing out that the EA is ten years old, and that BLM has conducted multiple gathers pursuant to it. *See Friends of Animals v. BLM*, 548 F. Supp. 3d 39, 64 (D.D.C. 2021) (upholding ten-year gather plan EA and rejecting argument that "NEPA requires consideration of every possible implementation action or the particulars of each gather . . .").

Plaintiffs unsuccessfully attempt to anchor this claim to the impacts of prior removals and an argument that the number of horses removed is greater than the initial estimate of the number of excess horses. They cite no case law in support of this theory. Indeed, this case is highly analogous to the argument that this Court rejected in *Leigh v. Raby* (*Leigh I*), in which this Court held that Plaintiffs had not established a likelihood of success on the merits of their NEPA claim.

17

1  *See* No. 3:22-CV-00034-MMD-CLB, 2022 WL 267353, at *8 (D. Nev. Jan. 28, 2022). There,

2  Plaintiffs argued—as they do here—that BLM's reliance on a phased ten-year gather plan EA to

3  support a follow-up gather was improper because it did not consider the impacts, if any, of the

4  horses previously removed before authorizing the next gather. *Id*. The Court held that, despite

5  some ambiguity in the language of the EA as to its scope, reliance on the EA was proper because:

> BLM's purpose is to "achieve and maintain AML" [and because the EA explained]
> that "[i]t is expected that gather efficiencies and holding space during the initial
> gather would not allow for the removal of sufficient excess animals during the
> initial gather to reach or maintain low AML[,]" . . . the EA expressly contemplated
> that multiple gathers may be necessary to achieve an AML within the established
> range—which is required by the BLM's regulation—the Court is persuaded by the
> government's interpretation . . . [and] Plaintiffs have not shown they are likely to
> succeed on their NEPA claim.

11  *Id.* at *8–9. The Court, following this reasoning, held that "[b]ecause the EA expressly

12  contemplated that multiple gathers may be necessary to achieve an AML within the established

13  range . . . the EA did consider removing [wild horses in the earlier] gather." *Id*. at *8. Thus,

14  because the EA already considered the impacts of the earlier gather, there was no need for any

15  additional NEPA analysis.

16       The same logic applies with equal force here.  Indeed, identical language is found in the

17  2017 EA as in the *Leigh I* EA, and Plaintiffs have not distinguished this case from *Leigh I* in any

18  way. The introduction to the 2017 EA states the goal of the project is "to achieve and maintain

19  appropriate management levels." 2017 EA at 1; *see id.* at 13 (stating goal is to achieve "low range

20  AML"); *see also N. Alaska Env't Ctr. v. U.S. Dep't of Interior*, 983 F.3d 1077, 1092–93 (9th Cir.

21  2020) (courts look to NEPA document for "an accurate description of the agency's proposed

22  action") (citations omitted). The 2017 EA also explains that the AML for the Triple B Complex

23  is 472 to 889 wild horses. *Id.* at 4. At the time of the EA, in 2017, BLM estimated that the Triple

24  B Complex held 3,842 wild horses, over eight times low AML. *Id.* at 4. The 2017 EA further

25  explains, just as in *Leigh I*, that "[i]t is expected that gather efficiencies and holding space during

26  the initial gather would not allow for the attainment of the Proposed Action during the initial

27  gather (*i.e.* not enough horses are successfully captured and removed to reach low AML)." 2017

28

EA at 13. And the 2017 EA notes that, as a result of likely being unable to gather enough horses to reach low AML in a single operation, "[f]ollow-up gathers over a 10 year period to remove any additional wild horses necessary in order to achieve and maintain the low range of AML" were planned. *Id*. Put simply, the 2017 EA did not analyze the effects of gathering a certain specific number of horses, as Plaintiffs suggest. It analyzed the effects of gathers over the course of a ten-year period "to reach and maintain AML." *Id.* at 12–13.

In total, under the 2017 EA and Decision Record, BLM has conducted five gathers on the Triple B Complex and has gathered 4,590 horses and removed 4,502 horses from the Complex. Noyes Decl. ¶¶ 14–19. And despite these gathers in 2018, 2019, 2020, 2022, and 2024, the population of wild horses within the Triple B Complex has never reached AML and is still estimated to be over 3,300, essentially the same as in 2017. Bruce Decl. ¶¶ 8–9, 17. As the 2017 EA explained, the expected population growth rate for the wild horse populations in the Triple B Complex is approximately 20–25% per year. 2017 EA at 12. As a result, given the continued excessive horse population and dire range conditions, *see id.* ¶ 16, *et seq.*, and consistent with the scope of the 2017 EA, BLM is once again planning to gather wild horses to work towards the goal of achieving and maintaining AML, *see* Ruth Decl. ¶ 13.

Thus, because the 2017 EA properly considered the impacts of a ten-year phased gather plan on the Triple B Complex, Plaintiffs have failed to meet their burden to show that they are likely to succeed on their NEPA claim.

## II.   Plaintiffs Have Failed to Establish Irreparable Harm.

Because Plaintiffs' claims are unlikely to succeed, the Court may end its inquiry here. *See, e.g.*, *Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.") (citation omitted). But even if the Court considers the remaining *Winter* factors, Plaintiffs cannot meet their heavy burden of proving irreparable harm. "A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate*

immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citation omitted).

As an initial matter, Plaintiffs' delay in filing weighs against a finding of irreparable harm. *See Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) ("A delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief.") (citation omitted). The challenged gather has been scheduled since December 2023 and Plaintiffs did not seek any injunctive relief in the subsequent months. Ruth Decl. ¶ 12. Even assuming Plaintiffs mistakenly believed that the gather was canceled when it did not appear on the updated Fiscal Year 2024 posted in early August,[7] the Fiscal Year 2025 schedule was publicly posted on September 12, 2024. *Id.* Thus, Plaintiffs waited at least four weeks, and up to ten months, to seek emergency relief. Courts have found similar delays to make it even harder for plaintiffs to meet their heavy burden of proving irreparable harm. *See, e.g.*, *Cloud Found. v. BLM*, 802 F. Supp. 2d 1192, 1207 (D. Nev. 2011) (finding 43-day delay in filing after gather was announced "very troublesome" but not "dispositive" on irreparable harm); *Reno-Sparks Indian Colony*, 663 F. Supp. 3d at 1202 (finding delay in filing of "some years" by some parties and "few months" by others to "cut[] determinatively against a finding of irreparable harm").

Even if delay did not weigh against a finding of irreparable harm, Plaintiffs fail to support their claims of harm. Plaintiffs primarily claim irreparable harm based on losing the "opportunity to possibly view wild horses and burros" if BLM removes horses from within the Triple B Complex. TRO Mot. at 13–14. As explained above and below, horses in the Triple B Complex are suffering and perishing based on limited water and forage caused by drought conditions and the extreme overpopulation of animals. The November 1 gather is being undertaken largely to protect horses within the Triple B Complex from falling victim to these dire conditions. *See, e.g.*, Bruce Decl. ¶ 26. Thus, even accepting that Plaintiffs have an interest in viewing horses within the Triple B Complex, this does not meet their heavy burden to show that they will suffer

---

[7] To the extent that Plaintiffs were confused about the timing of the gather, this case has been pending the entire time it has been scheduled, and Plaintiffs' counsel could have contacted counsel for Federal Defendants to resolve any confusion. They did not do so.

irreparable harm such that an injunction is warranted. *See, e.g.*, *Friends of Animals*, 548 F. Supp. 3d at 69 (finding no irreparable harm where "the horses in the HMA are at risk, and whether removed by the BLM as part of the gather or euthanized due to poor health resulting from overpopulation and the drought, those who enjoy viewing and photographing the horses may have fewer opportunities to pursue their avocations and professional studies").

Moreover, even if BLM meets its goal for this November 2024 gather and removes 2,155 horses, the Triple B Complex will still be 125% of high-AML. Bruce Decl. ¶ 26. Thus, there will still be hundreds of horses for Plaintiffs to view and photograph on the Triple B Complex absent an injunction. *See In Def. of Animals v. U.S. Dep't of Interior,* 737 F. Supp. 2d 1125, 1138 (E.D. Cal. 2010) (finding no irreparable harm where plaintiffs claimed interest in observing horses and burros because "animals will still be present after the gather," and "[t]he Court is unaware of any enforceable right to observe a particular number of animals, and it is sheer speculation that any particular individual or family unit will be affected").[8]

Plaintiffs' unsupported claims that the upcoming gather will "destroy the herd's viability" also fail to demonstrate irreparable harm. TRO Mot. at 14. BLM is afforded "great deference" in setting AMLs. *Silvey*, 353 F. Supp. 3d at 1008. Again, the upcoming gather will leave hundreds of horses in the Triple B Complex such that it will still be above high-AML. Plaintiffs' unsubstantiated opinion about how many horses are required to keep the herd "viable" cannot trump BLM's expert determination that excess horses must be removed. *See id.*; *see also In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1066 (9th Cir. 2014) (finding that agency expertise deserves deference when an overpopulation exists and action is warranted).

Likewise, Plaintiffs' vague assertions about horses that have been removed from the Triple B Complex do not prove irreparable harm. *See* TRO Mot. at 13–14. Again, even if the gather at issue goes forward, many horses will remain in the wild for Plaintiffs to view. Moreover, during the gather set to the begin on November 1, BLM may be able to provide opportunities for

---

[8] Plaintiffs claim that "horses in the Complex [have been] decimated to numbers below AML." TRO Mot. at 14. As discussed throughout this brief and the attached declarations, this is incorrect—the Complex remains far above AML.

viewing the temporary corrals holding gathered horses. Ruth Decl. ¶ 19 (explaining BLM's process for allowing viewing of horses in temporary corrals). The gathered horses will then be transferred to two off-range corrals, *id.* ¶ 16, which are either open to the public or which provide public viewing opportunities, *id.* ¶ 20.

And even assuming that Plaintiffs' interest in viewing previously removed horses could support irreparable harm to stop the *upcoming* gather, Plaintiffs' generalized claim that the removed horses "have been taken off-limits" is misleading. TRO Mot. at 13. The horses that BLM removed from the Triple B Complex since the 2017 Decision were sent for preparation to off-range corral facilities that were open to the public or provided public viewing opportunities. Ruth Decl. ¶ 20. Thousands of the horses that were removed were sent to BLM-managed off-range corrals that are open to the public daily. *Id.* Other removed horses were sent to privately-owned off-range corrals at which BLM offers tours, and Plaintiffs have attended such tours at least twice. *Id.* Indeed, BLM is offering a tour of one of these private facilities—at which the horses removed during the 2024 emergency gather are being held—tomorrow, October 25. *Id.*[9]

Plaintiffs otherwise rely on the merits of their claims to show irreparable harm. *See* TRO Mot. at 14–15. As explained above, Plaintiffs have not met their burden to show that they are likely to succeed on these claims. Thus, Plaintiffs' merits arguments do not support a finding of irreparable harm.

Accordingly, Plaintiffs have failed to meet their burden to show that they will suffer irreparable harm absent an injunction preventing BLM from conducting the November 1 gather.

**III.   The Balance of Harms and Public Interest Do Not Support Plaintiffs' Request for Emergency Relief.**

In considering the balance of the equities between the parties, traditionally a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill.*

---

[9] After preparation at these off-range corrals, some horses removed from the Triple B Complex were moved to different facilities around the country, some are still in training or awaiting adoption or sale, some have been adopted or sold, and others have been transferred to off-range pastures for long-term care. *See* Ruth Decl. ¶ 21.

*of Gambell*, 480 U.S. 531, 542 (1987)). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (citation omitted). "[W]here an injunction is asked [for] which will adversely affect a public interest . . . the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Id.* at 312-13 (citation omitted). Thus, if an injunction would go against the public interest, a court may deny injunctive relief even when a plaintiff has demonstrated a likelihood of success on the merits and that it would suffer immediate irreparable harm (neither of which is true here, as discussed above). The balance of harms and the public interest strongly favors denying Plaintiffs' TRO Motion.

First, preventing the November 1 gather would place the horses on the Triple B Complex at catastrophic risk because of extreme overpopulation, lack of water, and lack of forage. The grave conditions within the Complex are detailed above and in the declarations from BLM personnel attached to this brief. *See, e.g.*, Noyes Decl. ¶¶ 20–23; Ruth Decl. ¶¶ 9–14; Bruce Decl. ¶¶ 12-28. Horses within the Complex are dying and suffering because of these conditions. *See, e.g.*, Bruce Decl. ¶¶ 13–25; *id.* at Figures 2–3, 7, 13, 18–21. If the scheduled gather is enjoined, the rangeland will continue to deteriorate, "critical forage resources such as bunch grasses will be permanently lost" which will increase wildfire risk, and the horses on the Triple B Complex "will continue to face limited forage and water sufficient for their numbers, leading to increased risk of suffering and death[.]" Ruth Decl. ¶¶ 13–14. Public safety and the safety of the horses would also be threatened by an injunction because, absent a gather, "wild horses will move farther outside the HMA boundaries" to find forage and water. Bruce Decl. ¶ 28 (noting that gather would "help reduce the likelihood of wild horses crossing the road to Bald Mountain Mine where they can collide with motorists"). Moreover, because enjoining the November 1 gather would exacerbate the already dire conditions, it would likely require BLM to conduct more emergency gathers like the one conducted several weeks ago. Ruth Decl. ¶ 15; *see also* Noyes Decl. ¶ 23 ("Without a gather, the BLM will likely be forced to conduct emergency gathers or horses may suffer and

die."). Additionally, with winter quickly approaching, any delay of the November 1 gather would not only put more horses at risk of death and serious injury—it would impact the health and well-being of next year's foal crop as well. *See* Noyes Decl. ¶ 23.

More broadly, enjoining the November 1 gather will undercut BLM's ability to carry out its legal mandate of "manag[ing] wild free-roaming horses" to "achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). This Court has recognized this statutory obligation weighs against enjoining a gather. *See Leigh I*, 2022 WL 267353, at *11 (citing to the Wild Horse Act's mandate and concluding that "enjoining the [gather] is not in the public interest and the balance of equities weighs against granting Plaintiffs' Motion").

Thus, the balance of the equities and the public interest strongly support allowing BLM to conduct the November 1 gather, and weigh against granting Plaintiffs' TRO Motion.

## CONCLUSION

As explained, Plaintiffs have failed to meet their heavy burden to show that it is appropriate for the Court to enjoin BLM from conducting the gather on the Triple B Complex scheduled to begin on November 1. Thus, the Court should deny Plaintiffs' Second Motion for a Temporary Restraining Order and Preliminary Injunction, ECF No. 60, in its entirety.[10]

Dated: October 24, 2024     Respectfully submitted,
             TODD KIM, Assistant Attorney General
             U.S. Department of Justice
             Environment & Natural Resources Division

             */s/ Joseph W. Crusham*
             JOSEPH W. CRUSHAM, Trial Attorney
             (CA Bar No. 324764)
             Wildlife & Marine Resources Section
             Phone: (202) 307-1145
             Email: joseph.crusham@usdoj.gov

---

[10] Federal Defendants do not believe a hearing on Plaintiffs' TRO Motion is necessary, or that testimony from Plaintiff Leigh would aid the Court's decisionmaking. *See* TRO Mot. at 16. But if the Court is inclined to hold a hearing and hear from Ms. Leigh, Federal Defendants request the opportunity to cross-examine Ms. Leigh, and to call witnesses from BLM as appropriate.

PETER BROCKER, Trial Attorney
(NYS Bar No. 5385448)
Natural Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Phone: (202) 305-8636
Email: peter.brocker@usdoj.gov


*Attorneys for Federal Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 24, 2024, I electronically filed and served the foregoing with the Clerk of the Court for the United States District Court for the District of Nevada using the CM/ECF system, which will send notification of this filing to the attorneys of record.


<u>*/s/ Joseph W. Crusham*</u>
Joseph W. Crusham
Attorney for Federal Defendants