BRENT M. RESH
(Nev. Bar No. 14940)
BRENT RESH LAW, PLLC
2401 La Solana Way
Las Vegas, NV 89102
(702) 781-6903
brent@brentreshlaw.com

JESSICA L. BLOME
(Cal. Bar No. 314898, pro hac vice)
JENNIFER RAE LOVKO
(Cal. Bar No. 208855, pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| WILD HORSE EDUCATION, a non-profit corporation and LAURA LEIGH, individually,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management,<br><br>Defendants. | CASE NO. 3:23-cv-00372<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF SECOND MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION [ECF NO. 60]** |

i

**TABLE OF CONTENTS**

I.    PROCEDURAL FRAMEWORK AND APPLICABLE FACTS ................................... 2

II.    ARGUMENT ................................................................................................. 4

   A.  Plaintiffs Object to BLM's Irrelevant, Extra-Record Evidence ................................ 4

   B.  Plaintiffs' Object to Certain Evidence as Misleading Evidence ................................ 6

   C.  Plaintiffs Are Likely to Succeed on the Merits ................................................ 7

   D.  Plaintiffs Will Be Irreparably Harmed Absent the Requested Relief ........................ 9

   E.  The Balance of Harms and Public Interest ................................................ 12

III.    CONCLUSION ................................................................................. 12

1

**TABLE OF AUTHORITIES**

2

<u>**CASES**</u>

3

*Cent. United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321 (D.D.C. 2015)...................................... 16

4

*Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir. 1985) ........................................................ 14

5

*Cloud Found. v. United States BLM*, 802 F. Supp. 2d 1192 (D. Nev. 2011) .............................. 14

6

*Friends of Animals v. BLM*, No. 2:16-cv-1670-SI, 2018 U.S. Dist. LEXIS 56104 (D. Or. Apr. 2, 2018) ................................................................................................................................. 8

7

*Friends of Animals v. Haugrud*, 236 F. Supp. 3d 131 (D.D.C. 2017) ................................. passim

8

*Friends of Animals v. Pendley*, 523 F. Supp. 3d 39 (D.D.C. 2021)...................................... passim

9

*Friends of the Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000)........................................ 7

10

*Fund for Animals v. Clark*, 27 F. Supp. 2d 8 (D.D.C. 1998) ........................................................ 13

11

*Fund for Animals v. Espy*, 814 F. Supp. 142 (D.D.C. 1993) ...................................................... 13

12

*Fund for Animals v. Norton*, 281 F. Supp. 2d 209 (D.D.C. 2003)................................................ 13

13

*Idaho Sporting Cong., Inc. v. Alexander*, 222 F.3d 562 (9th Cir. 2000) ................................... 7

14

*In Def. of Animals v. U.S. Dep't of Interior*, 737 F. Supp. 2d 1125 (E.D. Cal. 2010)........... 14, 15

15

*Kadant, Inc. v. Seeley Machine, Inc.*, 244 F. Supp. 2d 19 (N.D.N.Y. 2003) ............................... 14

16

*Kunaknana v. Clark*, 742 F.2d 1145 (9th Cir. 1984) ................................................................ 9

17

*Leigh v. Raby*, No. 3:22-cv-00034-MMD-CLB, 2024 U.S. Dist. LEXIS 57734 (D. Nev. Mar. 28, 2024) ................................................................................................................................. 11

18

19

*Leigh v. United States DOI*, No. 2:22-cv-01200-MMD-BNW, 2024 U.S. Dist. LEXIS 171947 (D. Nev. Sep. 23, 2024) ..................................................................................................... 12

20

*Marcy Playground, Inc. v. Capitol Records, Inc.*, 6 F. Supp.2d 277 (S.D.N.Y. 1998) ............... 14

21

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (2000)................................................................ 7

22

*Minney v. United States OPM*, 130 F. Supp. 3d 225 (D.D.C. 2015) ........................................... 16

23

*Nev. Ass'n of Ctys. v. United States DOI*, No. 3:13-cv-00712-MMD-WGC, 2014 U.S. Dist. LEXIS 46225 (D. Nev. Apr. 2, 2014)................................................................................. 13

24

25

*Ohio Valley Envtl. Coal., Inc. v. Hobet Mining, LLC*, 702 F. Supp. 2d 644 (S.D. W. Va. 2010) 13

26

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ............................................. 9

*Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002) ....................................................................... 11

*Tough Traveler, Ltd. v. Outbound Prods.,* 60 F.3d 964 (2d Cir. 1995) ........................................ 14

*Updike v. Multnomah Cnty.*, 870 F.3d 939 (9th Cir. 2017) ............................................................ 11

*W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267 (D. Utah 2017) ............. passim

*W. Watersheds Project v. Rosenkrance*, 736 F. Supp. 2d 1276 (D. Idaho 2010) .......................... 9

*W. Watersheds Project v. Rosenkrance*, No. 4:09-CV-298-EJL, 2011 U.S. Dist. LEXIS 1288 (D. Idaho Jan. 5, 2011) ................................................................................................................... 10

*Washington v. Reno*, 35 F.3d 1093 (6th Cir. 1994) ...................................................................... 16

*Wyoming U.S. Dep't of the Interior,* 839 F.3d 938 (10th Cir. 2016) ....................................... 6, 12

### STATUTES

16 U.S.C. § 1331 ................................................................................................................................ 5

16 U.S.C. § 1333 ................................................................................................................... 6, 8, 12, 16

42 U.S.C. § 4332 ................................................................................................................................ 7

5 U.S.C. § 706 ............................................................................................................................... 5, 11

Fed. R Evid. 401 ................................................................................................................................ 9

Fed. R Evid. 403 .............................................................................................................................. 10

Fed. R. Civ. P. 8(a) .......................................................................................................................... 11

### REGULATIONS

40 C.F.R. § 150 ................................................................................................................................. 7

40 C.F.R. § 1509 .............................................................................................................................. 7

43 C.F.R. § 46.150 ........................................................................................................................... 7

Plaintiffs seek injunctive relief because the Bureau of Land Management (BLM) has violated the Wild & Free-Roaming Horses and Burros Act (Wild Horse Act) and National Environmental Policy Act (NEPA) by relying on the 2017 Antelope and Triple B Complexes Gather Plan Environmental Assessment (2017 EA) to conduct multiple, phased gathers of "excess horses" in the Triple B Complex of Herd Management Areas over a ten-year period. Not only has BLM not adhered to the Wild Horse Act's immediacy requirement, but the agency also has removed more horses than analyzed by the 2017 EA without conducting any additional environmental review. BLM's decision to adopt a phased gather plan and ignore NEPA's requirements is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law or was in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), (C).

The BLM attempts to cloud these issues by referring to conditions in the Triple B Complex over the past year or two. Dkt. 66, pp.13-14. Essentially, BLM is arguing that it can rely upon the 2017 EA because the agency *could have shown* that an overpopulation exists, and action is necessary to protect the rangeland. There can be no doubt that BLM's approach illegally sidesteps the Wild Horse Act's immediacy requirement under Section 1333(b)(2) of the Wild Horse Act as well as BLM's separate obligation to comply with NEPA when making such determinations. *See W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1275 (D. Utah 2017); *Friends of Animals v. Haugrud* (hereafter *Haugrud*), 236 F. Supp. 3d 131, 132 (D.D.C. 2017). In addition, BLM's reliance on "evidence" of current conditions improperly relies on irrelevant, extra-record evidence. And, even if this "evidence" were considered, Plaintiffs demonstrate that it does not accurately portray conditions in the Triple B Complex.

Plaintiffs are likely to win on the merits of their claims, so they are entitled to temporary injunctive relief to maintain the status quo until the Court can fully vet their claims and BLM's defenses. The wildlife subject to BLM's unlawful removal action are more than physical

1

1    property; they are living, breathing beings with responsibilities to their herds and important

2    family relationships. Removing wild horses and burros from the range is a permanent action that

3    BLM has never been forced to reverse, even as Plaintiffs ultimately succeed on the merits of

4    their claims. Absent preliminary injunctive relief, the Court leaves Plaintiffs with the prospect of

5    a Pyrrhic victory. Accordingly, Plaintiffs respectfully request that the Court enjoin BLM from

6    conducting further gather operations in the Antelope and Triple B Complexes pursuant to the

7    2017 EA until the Court can make a merits determination on the questions presented in

8    Plaintiffs' Complaint.

9    **I.    PROCEDURAL FRAMEWORK AND APPLICABLE FACTS**

10         The BLM has numerous mandatory duties that it must fulfill prior to removing wild

11   horses from public lands. Specifically, to remove excess wild horses from public lands, BLM

12   must (1) determine that an overpopulation exists, (2) demonstrate that removal is necessary, *and*

13   (3) engage in NEPA review. *See* 16 U.S.C. § 1333(b)(2); *Friends of Animals v. Pendley*

14   (hereafter *Pendley*), 523 F. Supp. 3d 39, 48 (D.D.C. 2021); *W. Rangeland Conservation Ass'n*,

15   265 F. Supp. 3d at 1275; *Haugrud*, 236 F. Supp. 3d at 132; *Wyoming*, 839 F.3d at 945. Each step

16   is required – Defendant does not have the discretion to skip any of the steps. *See id.*

17         To demonstrate the existence of an overpopulation, BLM must show that the current

18   inventory is in excess of the appropriate management level (AML) for a herd management area

19   (HMA). *See* 16 USCS § 1333(b)(1).[1] To demonstrate necessity, BLM must address rangeland

20   conditions based on currently available information. *See* 16 USCS § 1333(b)(2). As interpreted

21

22   _____

[1] AMLs are tailored for individual HMAs and not for a complex in its entirety. *See* Second Leigh Decl.,
23   Exh. A (BLM Handbook H-4700-1, p.56) (AML is the "number of adult horses or burros … to be
     managed within an HMA"). Here, the Triple B Complex contains 1,632,324 acres and consists of the
24   Triple B HMA, Maverick Medicine HMA, and Antelope Valley West HMA. The Complex also contains
     the Cherry Springs Wild Horse Territory (WHT), which is managed in accordance with an agreement
25   between BLM and USFS. Dkt. 60-1, pp.8-9. The low AMLs for each are 250 for the Triple B HMA, 166
     for the Maverick Medicine HMA, 16 for the Antelope West HMA, and 40 for the Cherry Springs WHT.
26   *Id.*

2

1    by BLM:

2                  In making the determination that excess WH&B [wild horses and
                   burros] are present and require immediate removal, the authorized
3                  officer will analyze current information including grazing
                   utilization and distribution, trend in range ecological condition,
4                  actual use, climate (weather) data, current population inventory,
                   WH&B located outside the HMA in areas not designated for their
5                  long-term maintenance and other factors which demonstrate
                   removal is needed to restore or maintain the range.  Justifying a
6                  removal based on nothing more than the established AML is not
                   acceptable.
7

8    Second Leigh Decl., Exh. A, p.47.

9            Before removing excess horses, BLM also must engage in NEPA review. *See Pendley*,

10   523 F. Supp. 3d at 48 (D.D.C. 2021); *W. Rangeland Conservation Ass'n*, 265 F. Supp. 3d at

11   1275; *Haugrud*, 236 F. Supp. 3d at 132. Such review may entail preparation of an environmental

12   assessment or an environmental impact statement. *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. §

13   1501.3; 40 C.F.R. § 1501.54.

14           "NEPA imposes on federal agencies a continuing duty to supplement existing EAs and

15   EISs in response to 'significant new circumstances or information relevant to environmental

16   concerns and bearing on the proposed action or its impacts.'" *Idaho Sporting Cong., Inc. v.*

17   *Alexander*, 222 F.3d 562, 566 n.2 (9th Cir. 2000) (quoting 40 C.F.R. § 1509(c)(1)(ii)). An

18   agency "must be alert to new information that may alter the results of its original environmental

19   analysis, and continue to take a 'hard look at the environmental effects of its planned action,

20   even after a proposal has received initial approval.'" *Friends of the Clearwater v. Dombeck*, 222

21   F.3d 552, 557 (9th Cir. 2000) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374

22   (2000)). NEPA also identifies procedures for conducting emergency gathers. *See* 43 C.F.R. §

23   46.150. (BLM contends that granting Plaintiffs' motion may force BLM to conduct emergency

24   gathers in the future; however, BLM is _not_ contending that the upcoming November gather is an

25   emergency gather.) To allow for emergency gathers, BLM must still document and consider

26

                                                    3

environmental consequences. *See* id. at (a)-(c). This may result, for example, in an EA and a finding of no significant impact (FONSI). *See id.* at (c). Where action is required prior to completion of an environmental review, BLM "shall consult with the Office of Environmental Policy and Compliance about alternative arrangements for NEPA compliance." *Id.* The required action can go no further than what is necessary to control the emergency's immediate impacts. *See id*.; *Friends of Animals v. BLM*, No. 2:16-cv-1670-SI, 2018 U.S. Dist. LEXIS 56104, at *22 (D. Or. Apr. 2, 2018).

Once a determination has been made that removal of excess horses is necessary and NEPA review has been completed, BLM must then act to *immediately* remove the excess horses. 16 U.S.C. § 1333(b)(2).

As to the Antelope and Triple B Complexes of Herd Management Areas, BLM adopted the 2017 EA seven years ago to authorize the removal of approximately 3,370 horses from the Triple B Complex, with 1,874 to be removed from the Triple B Complex, 1,405 to be removed from the Maverick Medicine HMA, 55 to be removed from the Antelope Valley West HMA, and 36 to be removed from the Cherry Springs WHT. Dkt. 60-1, p.4. To date, BLM has captured and permanelty removed approximately 4,500 horses from the Complex. Dkt. 60-2 at ¶¶8-14. With its most recent removal announcement, BLM still contends it has a right to rely on the gather plan adopted in 2017 to remove another 2,255 from the Complex, but neither the Wild Horse Act nor NEPA allow such reliance. Instead, BLM must adopt a proper gather plan that addresses the Wild Horse Act's immediacy requirement and NEPA's environmental review requirements in a document subject to NEPA and BLM's regulatory public participation procedures. *See* 16 USC § 1333(b); *Pendley*, 523 F. Supp. 3d at 48 (D.D.C. 2021); *W. Rangeland Conservation Ass'n*, 265 F. Supp. 3d at 1275; *Haugrud*, 236 F. Supp. 3d at 132.

## II.    ARGUMENT

### A.    Plaintiffs Object to BLM's Irrelevant, Extra-Record Evidence

4

1      Plaintiffs object to the declarations of Benjamin F. Noyes, Bruce Thompson, Ruth

2   Thompson, and Joseph Crusham in their entirety (including all associated exhibits and

3   photographs) as being irrelevant extra-record evidence. *See* Fed. R Evid. 401; *Kunaknana v.*

4   *Clark*, 742 F.2d 1145, 1149 (9th Cir. 1984). To the extent these declarations address whether

5   gather operations are being conducted humanely, they are irrelevant because this is not an issue

6   upon which Plaintiffs are basing their motion. The remainder of the declarations' content focuses

7   on current range conditions and horse populations in the Triple B Complex. Dkt. 66-1, 66-2, 66-

8   3, 66-4, 66-5, 66-6. However, this content also is irrelevant because the upcoming November

9   gather is *not* an emergency gather, and to the extent BLM contends the evidence is pertinent to

10  the 2017 EA and the Wild Horse Act's immediacy requirement, the content is improper extra-

11  record evidence. "While the Court can consider extra-record material to explain the agency's

12  decision, the material cannot be used to form 'a new rationalization of the agency's decision.'"

13  *W. Watersheds Project v. Rosenkrance*, 736 F. Supp. 2d 1276, 1283 (D. Idaho 2010) (quoting

14  *Kunaknana*, 742 F.2d at 1149). Once the administrative record is completed, it will not contain

15  documents created *after* issuance of the 2017 EA and produced in response to litigation. *See*

16  *Kunaknana*, 742 F.2d at 1149. And there can be absolutely no doubt that BLM will fight any

17  effort Plaintiffs make to add post-decision evidence to the record to support its claims. What's

18  good for the goose is good for the gander.

19      Moreover, if anything, BLM's ability to quickly compile extra-record evidence in

20  opposition to Plaintiffs' motion demonstrates that they have evidence in their possession that

21  could have been used to fulfill NEPA's requirements for a supplemental or new environmental

22  review. Had the agency chosen to follow the law, such an environmental review would have

23  provided the public and decisionmakers with information necessary to determine the impacts of

24  removing thousands of horses from the Complex—a key purpose served by NEPA review. *See*

25  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). The BLM cannot

26

5

1    bypass NEPA through new documents and information submitted in opposition papers. *See W.*

2    *Watersheds Project v. Rosenkrance*, No. 4:09-CV-298-EJL, 2011 U.S. Dist. LEXIS 1288, at

3    *18-19 (D. Idaho Jan. 5, 2011) (excluding post-hoc extra-record evidence submitted by BLM

4    because such evidence "cannot save a deficient NEPA analysis and circumvent the public's right

5    to comment on the data upon which the agency uses to reach its decision").

6                    **B.        Plaintiffs' Object to Certain Evidence as Misleading Evidence**

7             Should the Court nonetheless consider BLM's declarations and supporting documents,

8    Plaintiffs object that the evidence is misleading. *See* Fed. R Evid. 403. As established by the

9    Second Declaration of Laura Leigh, the declarations and supporting documents (including

10   photographs) only depict a small portion of the Complex's 1,632,324 acres. Second Leigh Decl.

11   at ¶¶19, 21-23, 25. Photographs taken by Ms. Leigh demonstrate that Defendants' photographs

12   are not indicative of the Triple B Complex in its entirety. *Id.* at ¶26. In addition, most of BLM's

13   photographs were taken at the Mavericks Medicine HMA, and BLM conducted an emergency

14   gather at this location in August of 2024 to deal with the issues. *Id.* at ¶19. Some photographs

15   also depict the Cherry Springs WHT, but those photographs erroneously conclude water sources

16   are barren due to drought when, in truth, these water sources are nonfunctioning as a result of

17   disrepair and BLM mismanagement. *Id.* at ¶¶21-22.

18            The BLM acknowledges significant snowpack exists in the Complex, but the agency

19   ignores that this implies any existing drought conditions are near an end. *Id.* at ¶18. And, BLM

20   points to photographs of roughly a dozen horses as evidence that further roundup is called for,

21   but the agency ignores that more than a dozen horses are likely to die as a result of the gather! *Id.*

22   at ¶20. Indeed, Benjamin Noyes admits in his declaration that 1.2 to 2. 7% of horses previously

23   gathered in the Triple B Complex from 2017 to the present have died onsite during gather

24   activities and do not include post-capture numbers. Dkt. 66-1 at ¶¶14-19. Not only is this extra-

25   record evidence regarding *current* conditions irrelevant to whether or not BLM's 2017 EA

26

                                                     6

1   legally authorizes the capture and removal of 2,000+ more horses, it is also misleading, as it does

2   not support BLM's argument that more than 2,000 horses must be removed in November.

3       **C.    Plaintiffs Are Likely to Succeed on the Merits**

4           Plaintiffs' complaint alleges that BLM has abused its discretion and violated the Wild

5   Horse Act by adopting the 2017 EA, a ten-year, phased gather plan. Dkt. 58, p.21. Defendants

6   argue that Plaintiffs' claim must fail because the complaint challenges the 2017 EA and not the

7   Decision Record. This argument is absurd. Plaintiffs gave fair notice[2] that they challenge the

8   adoption of the 2017 EA, which necessarily occurred through a Decision Record—a Decision

9   Record that Plaintiffs attached to their original motion. Dkt. 60-1, pp.17-25. The BLM is not at a

10  loss to understand the basis for Plaintiffs' claim. As this Court has previously noted, "[t]he

11  Federal Rules of Civil Procedure require only that a complaint include 'a short and plain

12  statement of the claim showing that the pleader is entitled to relief.'" *Leigh v. Raby*, No. 3:22-cv-

13  00034-MMD-CLB, 2024 U.S. Dist. LEXIS 57734, at *9 (D. Nev. Mar. 28, 2024) (quoting Fed.

14  R. Civil Proc. 8(a)(2)). "This simplified notice pleading standard relies on liberal discovery rules

15  and summary judgment motions to define disputed facts and issues," rather than requiring

16  plaintiffs to define all their claims perfectly before further proceedings are conducted. *Id.* at *9-

17  10 (quoting *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002)). Where a complaint

18  provides defendants with "fair notice" of a plaintiff's claims, the complaint satisfies federal

19  notice pleading requirements. *Id.* at *10 (citing *Swierkiewicz*, 534 U.S. at 514; *Updike v.

20  Multnomah Cnty.*, 870 F.3d 939, 952 (9th Cir. 2017)).

21          As regards the merits of Plaintiffs' claims, BLM argues that the caselaw does not support

22

23  [2] As stated in Plaintiffs' original motion for injunctive relief: "The BLM's decision to adopt a phased
    gather plan was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law
24  or was in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under the
    Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), (C)." Dkt. 60, p.5. "The action adopted
25  through the 2017 EA provides for the removal of approximately 9,053 excess wild horses within the
    Antelope and Triple B complexes over a ten year period. To date, BLM already has removed over 12,000
    wild horses from these complexes." Dkt. 58, p.21.

26

7

1    invalidating phased gather plans pursuant to the Wild Horse Act's immediacy requirement. Dkt.

2    66, pp.18-22. While BLM correctly notes that phased gather plans have been found valid by

3    other courts, this finding is based upon plans that demonstrate multiple roundups are a practical

4    necessity. *See Leigh v. United States DOI*, No. 2:22-cv-01200-MMD-BNW, 2024 U.S. Dist.

5    LEXIS 171947, at *31 (D. Nev. Sep. 23, 2024); *Pendley*, 523 F. Supp. 3d at 57-58. The BLM

6    must "begin and complete removal as soon as logistically possible." *W. Rangeland Conservation*

7    *Ass'n*, 265 F. Supp. 3d at 1285. The BLM does not have discretion to casually remove excess

8    horses at its leisure or prioritize other management techniques over prompt removal, under the

9    Wild Horse Act. *See id.* at 1286-87.

10            In this case, BLM has not demonstrated that the November gather is based upon practical

11    necessity. Defendants do not even address this issue, instead improperly focusing on current

12    population estimates and rangeland conditions more appropriately addressed through

13    supplemental or new NEPA allowing standard administrative practices to transpire. Furthermore,

14    the November gather seeks to remove horses *not considered* by the 2017 EA at its adoption (and

15    apparently also based on current range conditions, which were not considered by the 2017 EA at

16    its adoption). The 2017 EA authorized removal of approximately 3,370 horses to achieve low

17    AML. Dkt. 060-2 at ¶7; Dkt. 060-1, p.17. The BLM has successfully removed these horses (and

18    more) since 2017. *Id.* at ¶¶12-14. (To be clear, BLM had removed over 3,370 horses from the

19    Triple B Complex as of August 25, 2022. Dkt. 060-2 at ¶12.) No further action is allowed now

20    absent BLM determining that overpopulation exists, rangeland conditions necessitate removal,

21    *and* NEPA review is conducted. *See* 16 U.S.C. § 1333(b)(2); *Pendley*, 523 F. Supp. 3d at 48; *W.*

22    *Rangeland Conservation Ass'n*, 265 F. Supp. 3d at 1275; *Haugrud*, 236 F. Supp. 3d at 132;

23    *Wyoming*, 839 F.3d at 945.

24            The BLM asks this Court to ignore the scope of the 2017 EA, but no legal basis exists for

25    doing so. Nor can the 2017 EA (or the Decision Record) be viewed as allowing removal of *any*

26

8

number of wild horses so long as low AML has not been reached. This is because AML is only one component of a removal decision; the decision also is based on the health of the range as addressed in an environmental review. *See id.* At best (and assuming practical necessity dictated multiple gathers), the evidence before the Court shows that BLM's initial gather operations may not have violated the immediacy requirement, but the November 1, 2024, gather definitely violates the immediacy requirement, necessitating a new removal determination with additional NEPA review.

### D.    Plaintiffs Will Be Irreparably Harmed Absent the Requested Relief

Plaintiffs have demonstrated that the November 1, 2024, will result in irreparable harm. As noted in Plaintiffs' original motion, reducing a species' population through government action has often been recognized by courts to cause irreparable harm justifying injunctive relief. Dkt. 60, p.13 (citing *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 219-22 (D.D.C. 2003) [enjoining a state plan to kill 525 mute swans from a state population of 3,600]; *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) [enjoining a bison hunt]; *Fund for Animals v. Espy*, 814 F. Supp. 142, 151 (D.D.C. 1993) [same]). The removal of over 2,000 additional horses also will result in aesthetic injury to the Plaintiffs. *Id.*, p.13-15; *see also Nev. Ass'n of Ctys. v. United States DOI*, No. 3:13-cv-00712-MMD-WGC, 2014 U.S. Dist. LEXIS 46225, at *14 (D. Nev. Apr. 2, 2014) (recognizing aesthetic interests in addressing injunctive relief); *Ohio Valley Envtl. Coal., Inc. v. Hobet Mining, LLC*, 702 F. Supp. 2d 644, 653 (S.D. W. Va. 2010) (recognizing aesthetic enjoyment as a valid basis for establishing harm even when injunctive relief does not alleviate all of a plaintiff's injury); *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 220 (D.D.C. 2003) (recognizing aesthetic harm as the basis of irreparable harm even when such harm is merely contemplated).

The BLM asserts that the November gather is being undertaken largely to protect horses within the Triple B Complex from suffering; therefore, Plaintiffs' irreparable harm is without

9

merit. The history of removals in the Triple B Complex weighs against this statement being viewed as entirely true, however. Second Leigh Decl. at ¶¶10-16. The BLM's main goal is to remove horses that might compromise other multiple uses; BLM is less focused on herd health and overall rangeland conditions. *Id.* In fact, more horses are likely to die because of the November gather than are evidenced by the photographs submitted by BLM in its opposition. *Id.* at ¶20.

The BLM also asserts that Plaintiffs' delay in seeking injunctive relief weighs against a finding of irreparable harm. This is incorrect. As addressed in Laura Leigh's second declaration, Plaintiffs had no reason to seek injunctive relief until October of 2024. Second Leigh Decl. at ¶¶32-34. Plaintiffs are aware of no case finding a month or less delay is sufficient to negate irreparable harm. *See, e.g., Cloud Found. v. United States BLM*, 802 F. Supp. 1192, 1207 (D. Nev. 2011) (delay of 45 days is not dispositive on the issue of irreparable harm); *Kadant, Inc. v. Seeley Machine, Inc*., 244 F. Supp. 2d 19, 34 (N.D.N.Y. 2003) (delay of four months does not negate a finding of irreparable harm); *Marcy Playground, Inc. v. Capitol Records, Inc*., 6 F. Supp.2d 277, 281-82 (S.D.N.Y. 1998) (delay of fifteen months negates presumption of irreparable harm); *Tough Traveler, Ltd. v. Outbound Prods.,* 60 F.3d 964, 968 (2d Cir. 1995) (delay of nine months negates presumption of irreparable harm); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (delay of nine months after receiving notice in the press negates presumption of irreparable harm).

Finally, BLM asserts that Plaintiffs will suffer no irreparable harm because some horses will still be available for viewing in the Triple B Complex or at off-range corrals. First, BLM will relocate captured animals to the Broken Arrow holding facility at Indian Lakes, which is closed to the public. Moreover, in support of this argument, Defendants cite *In Def. of Animals v. U.S. Dep't of Interior*, 737 F. Supp. 2d 1125 (E.D. Cal. 2010). In that case, BLM reported in an EA that the Twin Peaks HMA had 2,303 horses and 282 burros. *See In Def. of Animals*, 737 F.

Supp. 2d at 1130. Within months of adopting the gather plan, BLM scheduled a gather for the removal 1,855 horses and 210 wild burros. *See id.* Plaintiffs argued that the removal would decrease their opportunities to view and appreciate the animals. *See id.* at 1138. This injury was "premised on the fact that some horses died recently" in another recent gather. *Id.* The Court found that this injury was not sufficient because some horses would remain on the range, which the plaintiffs could view. *See id.* The *In Def. of Animals* case is not dispositive, as its facts differ greatly from the at-issue case. Here, BLM seeks to remove thousands of horses seven years after adopting a phased gather plan—a plan that never contemplated more than 3,370 horses being removed. If allowed to proceed, BLM will have removed almost 7,000 wild horses from the Triple B Complex. Dkt. 60-2 at ¶¶12-14. This despite the fact that BLM has never analyzed the environmental impacts of such a widescale removal action; BLM has failed to demonstrate that removal will not decimate the population of horses in each of the HMAs and the WHT contained within the Triple B Complex. Second Leigh Decl. at ¶13.

Plaintiffs acknowledge that removals in the Triple B Complex will need to occur in the future, but such removal must comport with the requirements of the Wild Horse Act and NEPA. Second Leigh Decl. at ¶24. The BLM is free to take its evidence of current population and rangeland health to further removals in the future, once NEPA review has occurred. This evidence, which includes data from 2022, 2023, and 2024, has been available to BLM for a sufficient period to allow BLM the ability to conduct NEPA review. Indeed, to the extent that BLM's population estimates are based upon assumed growth of 20-25% per year, BLM could have addressed the need for removal of more than 3,370 horses over a ten-year period. The agency chose not to do so, and as a result, the scope of the EA is limited. Not only did BLM not contemplate the removal of 7,000 wild horses, but the public was never afforded an opportunity to challenge this number through the 2017 EA.

BLM may not legally remove horses not authorized by the 2017 EA nor made the subject

1    of public comment through NEPA.

2         **E.    The Balance of Harms and Public Interest**

3         The BLM asserts that the November gather, which is not an emergency gather, is

4    necessary to protect horses and the rangeland. Dkt. 66, pp.28-29. Again, even if this were true,

5    BLM still must first determine that 1) an overpopulation of animals exists and 2) action is

6    necessary to remove excess animals. *See* 16 U.S.C. § 1333(b)(2). Removal cannot be approved

7    until an environmental review occurs pursuant to NEPA. *See Pendley*, 523 F. Supp. 3d at 48

8    (D.D.C. 2021); *W. Rangeland Conservation Ass'n*, 265 F. Supp. 3d at 1275; *Haugrud*, 236 F.

9    Supp. 3d at 132.

10        Witnessing BLM remove more wild horses from the Triple B Complex than BLM has

11   officially determined to be necessary is not only tragic for Plaintiffs but for everyone who

12   cherishes these iconic and symbolic creatures. The public interest is in favor of 1) ensuring that

13   herds are not decimated to below HMA AMLs and 2) that BLM make transparent removal

14   determinations. The public interest is in favor of managing these wild horses in a manner that

15   ensures BLM abides by the law. *See Minney v. United States OPM*, 130 F. Supp. 3d 225, 236

16   (D.D.C. 2015) ("The public interest is, of course, best served when government agencies act

17   lawfully"); *Cent. United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015) ("Forcing

18   federal agencies to comply with the law is undoubtedly in the public interest"); *Washington v.*

19   *Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994) (the public has an interest "in having governmental

20   agencies abide by the federal laws that govern their existence and operations").

21   **III.    Conclusion**

22        THEREFORE, Plaintiffs respectfully request that the Court enjoin BLM from conducting

23   gathers under the phased gather plan adopted in 2017 EA until the Court makes a merits

24   determination on Plaintiffs' claims.

25

26

                                              12

1  DATED:  October 28, 2024                    Respectfully Submitted,

2                                              */s/ Jennifer Rae Lovko*
                                               Jessica L. Blome
3                                              (Cal. Bar No. 314898, pro hac vice)
                                               Jennifer Rae Lovko
4                                              (Cal. Bar No. 208855, pro hac vice
5                                              GREENFIRE LAW, PC
                                               P.O. Box 8055
6                                              Berkeley, CA 94707
                                               (510) 900-9502
7                                              jblome@greenfirelaw.com
                                               rlovko@greenfirelaw.com
8
                                               */s/ Brent M. Resh*
9                                              Brent M. Resh
                                               (Nevada Bar No. 14940)
10                                             BRENT RESH LAW, PLLC
                                               2401 La Solana Way
11                                             Las Vegas, NV 89102
                                               (702) 781-6903
12                                             brent@brentreshlaw.com
13                                             *Attorneys for Plaintiffs*
14
15
16
17
18
19
20
21
22
23
24
25
26