ADAM R.F. Gustafson, Acting Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

BONNIE BALLARD, Trial Attorney
Wildlife & Marine Resources Section
KYLE LYONS-BURKE, Trial Attorney
Natural Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Phone: (202) 532-5567 (Ballard)
Email: bonnie.m.ballard@usdoj.gov
Phone: (202) 598-3377 (Lyons-Burke)
Email: kyle.lyons-burke@usdoj.gov

*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| WILD HORSE EDUCATION, and LAURA LEIGH, individually, | Case No. 3:23-cv-00372-MMD-CLB |
| *Plaintiffs,* | **FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| U.S. DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, in his official capacity as Nevada State Director of the Bureau of Land Management, | |
| *Federal Defendants.* | |

Federal Defendants, the U.S. Department of Interior, the Bureau of Land Management and Jon Raby, in his official capacity, hereby oppose Plaintiffs' Motion for Summary Judgment, ECF No. 82, and cross-move for summary judgment.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

LEGAL BACKGROUND ..................................................................................................... 2

   I. The Wild Free-Roaming Horses and Burros Act ........................................................ 2

   II. First Amendment and Gathers Under the Act ........................................................... 3

   III. National Environmental Policy Act ......................................................................... 4

FACTUAL BACKGROUND ............................................................................................... 4

   I. Antelope and Triple B Complexes Gather Plan and Environmental Assessment ................. 4

   II. Gathers Since Adoption of the 2017 EA and Decision Record ............................................. 6

   III. BLM Releases a New Herd Management Area Plan/Gather Plan/EA, Expects to Sign New Decision Record for Complex This Year, And Will Conduct No More Gathers Under the 2017 Decision. ........................................................................................ 7

LEGAL STANDARD ........................................................................................................... 8

ARGUMENT ......................................................................................................................... 9

   I. Plaintiffs' Claims Are Prudentially Moot, and Almost Certainly Will Be Constitutionally Moot Before Briefing Completes. .................................................. 9

   II. Plaintiffs' Wild Horse Act Claim Fails. ................................................................ 12

   III. Plaintiffs' NEPA Claim Fails. ............................................................................. 16

   IV. Plaintiffs' First Amendment Claim Fails. ............................................................ 19

   A. There is No Qualified Right of Access to Bait and Water Trap Operations. ....................... 19

   B. Any perceived constraints on public access to any gather operations were narrowly tailored to serve compelling governmental interests in the safety and effectiveness of gather operations. ..................................................................................... 20

   C. Plaintiffs' allegations of restrictions on public access to holding facilities for the 2024 gather in the Triple B Complex are not supported by the record. ............................. 24

CONCLUSION .................................................................................................................... 26

i

## <u>TABLE OF AUTHORITIES</u>

**Case**                                                                            **Page(s)**

*Alaska Ctr. For Env't v. U.S. Forest Serv.*,
   189 F.3d 851 (9th Cir. 1999) ................................................................. 10

*All. for the Wild Rockies, Inc. v. U.S. Army Corps of Eng'rs*,
   237 F. Supp. 3d 1079 (D. Or. 2017) ....................................................... 9

*Am. Horse Prot. Ass'n, v. Watt*,
   694 F.2d 1310 (D.C. Cir. 1982) .............................................................. 2

*Balt.Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
   as & Elec. Co. v. Nat. ............................................................................. 9

*Biodiversity Legal Found. v. Badgley*,
   309 F.3d 1166 (9th Cir. 2002) ........................................................ 11, 12

*California v. Block*,
   690 F.2d 753 (9th Cir. 1982) .................................................................. 4

*Citizens to Pres. Overton Park v. Volpe*,
   401 U.S. 402 (1971) ................................................................................ 8

*Colvin & Son, LLC v. Haaland*,
   763 F. Supp. 3d 1176 (D. Nev. 2025) ........................................ 13, 14, 16

*Daniels-Hall v. Nat'l Educ. Ass'n*,
   629 F.3d 992 (9th Cir. 2010) .................................................................. 8

*Deutsche Bank Nat'l. Tr. Co. v. FDIC*,
   744 F.3d 1124 (9th Cir. 2014) ................................................................ 9

*Friends of Animals v. BLM*,
   548 F. Supp. 3d 39 (D.D.C. 2021) ......................................................... 17

*Friends of Animals v. BLM*,
   728 F. Supp. 3d 45 (D.D.C. 2024) .............................................. 13, 14, 15, 16

*Friends of Animals v. Culver*,
   610 F. Supp. 3d 157 (D.D.C. 2022) ............................................... 15, 16

*Friends of Animals v. Silvey*,
   353 F. Supp. 3d 991 (D. Nev. 2018) ....................................................... 2

*Friends of Animals v. Silvey*,
   820 F. App'x 513 (9th Cir. 2020) .................................... 2, 11, 13, 17

*Fund for Animals, Inc. v. BLM*,
    460 F.3d 13 (D.C. Cir. 2006) ................................................................................. 2

*In Def. of Animals v. U.S. Dep't of Interior*,
    751 F.3d 1054 (9th Cir. 2014) ............................................................................... 8

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
    681 F.3d 1006 (9th Cir. 2012) ............................................................................. 12

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976) ............................................................................................... 8

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) ................................................................................. 9

*Leigh v. Jewell*,
    No. 3:11-CV-00608-HDM-WGC, 2014 WL 31675 (D. Nev. Jan. 3, 2014) ............... 3

*Leigh v. Raby*,
    No. 3:22-CV-00034-MMD-CLB, 2022 WL 267353 (D. Nev. Jan. 28, 2022) ............ 17, 18, 26

*Leigh v. Salazar*,
    677 F.3d 892 (9th Cir. 2012) ............................................................................. 3, 19, 20

*Leigh v. Salazar*,
    954 F. Supp. 2d 1090 (D. Nev. 2013) ................................................................. 3, 20

*Leigh v. U.S. Dep't of the Interior*,
    No. 2:22-cv-01200-MMD-BNW, 2024 WL 4279156 (D. Nev. Sept. 23, 2024) ...................... 13

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ............................................................................................. 4, 9

*Mickelsen Farms, LLC v. Animal & Plant Health Inspection Servs.*,
    No. 1:15-cv-00143-EJL-CWD, 2018 WL 1413183 (D. Idaho Mar. 20, 2018) ....................... 10

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983) ............................................................................................... 9

*N. Alaska Env't Ctr. v. U.S. Dep't of Interior*,
    983 F.3d 1077 (9th Cir. 2020) ............................................................................. 18

*Nat. Res. Def. Council v. Norton*,
    No. 1:05-cv-01207-OWW-LJO, 2007 WL 14283 (E.D. Cal. Jan. 3, 2007) ............................ 9

*Native Vill. of Nuiqsut v. BLM.*,
    9 F.4th 1201 (9th Cir. 2021) ............................................................................. 10

*Neighbors of Cuddy Mountain v. Alexander,*
   303 F.3d 1059 (9th Cir. 2002) ............................................................. 4

*Press-Enter. Co. v. Superior Ct. of Cal.,*
   478 U.S. 1 (1986) ................................................................................. 3

*Pub. Emps. for Env't Resp. v. Nat'l Park Serv.,*
   No. CV 19-3629 (RC), 2021 WL 1198047 (D.D.C. Mar. 30, 2021) ....... 10

*Pub. Util. Comm'n of State of Cal. v. FERC,*
   100 F.3d 1451 (9th Cir. 1996) ............................................................. 11

*Robertson v. Methow Valley Citizens Council,*
   490 U.S. 332 (1989) ............................................................................. 4

*Scott v. Harris,*
   550 U.S. 372 (2007) ........................................................................... 25

*Seven County Infrastructure Coalition v. Eagle County, Colorado,*
   145 S. Ct. 1497 (2025) ....................................................................... 17

*W. Rangeland Conservation Ass'n v. Zinke,*
   265 F. Supp. 3d 1267 (D. Utah 2017) ................................................. 15

**Statutes**

5 U.S.C. § 706(2) .................................................................................... 8

16 U.S.C. § 1331 ..................................................................................... 2

16 U.S.C. § 1332(c) ................................................................................ 2

16 U.S.C. § 1333(a) ................................................................................ 2

16 U.S.C. § 1333(b)(1) ............................................................................ 3

16 U.S.C. § 1333(b)(2) ....................................................................... 2, 12

16 U.S.C. § 1333(b)(2)(B) ....................................................................... 3

**Regulations**

43 C.F.R. § 4700.0-5(e) ........................................................................... 3

43 C.F.R. § 4710.3-1 ............................................................................... 2

**INTRODUCTION**

The Wild Free-Roaming Horses and Burros Act of 1971 ("Wild Horse Act") requires the Bureau of Land Management ("BLM") to take management actions to address the unsustainable overpopulation of wild horses and burros in the Antelope and Triple B Complexes located in northeastern Nevada. Despite past management actions for these Complexes, BLM determined that there were over ten times as many wild horses and burros as the low end of the appropriate management level ("AML") range BLM established in 2017. To address this extreme overpopulation, BLM issued a ten-year gather plan that outlined management goals and activities that would allow BLM to effectively reduce the population and restore a thriving natural ecological balance on the range. BLM also issued a 2017 Antelope and Triple B Complexes Gather Plan Environmental Assessment ("2017 EA") to assess the possible environmental effects of the proposed ten-year gather plan in compliance with the National Environmental Policy Act ("NEPA").

The Court should reject Plaintiffs' challenge to BLM's decisions for multiple reasons. First, the Court should dismiss Plaintiffs' claims in this case as prudentially moot because they are based on the 2017 EA and Decision Record, but BLM anticipates signing a new decision record based on a new NEPA assessment in only a few months. Second, even if the Court reaches the merits of Plaintiffs' claims, they each fail. As outlined below, Ninth Circuit caselaw confirms that BLM's issuance of the 2017 gather plan sufficiently complies with the Wild Horse Act's "immediacy" provision. Moreover, BLM has fully complied with NEPA because the 2017 EA properly considered the impacts of a ten-year phased gather plan. Finally, Plaintiffs' First Amendment claim fails because even in the instances where Plaintiffs had a qualified right to public access, BLM's reasonable restrictions were narrowly tailored to ensure the safety of wild

horses and burros, members of the public, and BLM as well as to ensure effective and efficient gather operations.

For these reasons, as demonstrated below, Federal Defendants respectfully request that the Court deny Plaintiffs' Motion for Summary Judgment and grant Federal Defendants' Cross-Motion for Summary Judgment.

## LEGAL BACKGROUND

### I.    The Wild Free-Roaming Horses and Burros Act

In 1971, Congress passed the Wild Horse Act, 16 U.S.C. § 1331 *et seq.*, which directs the Secretary of the Interior to provide for the protection and management of wild horses "in the area where presently found, as an integral part of the natural system of the public lands." *Id.* § 1331. But after only a few years, the wild horse population had grown dramatically, "and action [was] needed to prevent a successful program from exceeding its goals and causing animal habitat destruction." *Am. Horse Prot. Ass'n, v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982) (citation omitted). Thus, in 1978, Congress passed amendments to the Wild Horse Act, which gave the Secretary greater authority and discretion to manage and remove excess horses. *Id.* at 1316–18.

Section 3 of the Wild Horse Act directs the Secretary to manage wild horses and burros "to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). "The [BLM] (as the Secretary's delegate) carries out this function in localized 'herd management areas' ("HMAs")[.]" *Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 15 (D.C. Cir. 2006); *see* 16 U.S.C. § 1332(c); 43 C.F.R. § 4710.3-1. In each HMA, BLM typically establishes an AML range. *See Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1008 (D. Nev. 2018), ("BLM is given great deference [] in establishing AMLs…"), *aff'd*, 820 F. App'x 513 (9th Cir. 2020). If BLM determines there is an overpopulation of wild horses and burros and that action is necessary to remove them, BLM must immediately act to remove the excess animals to achieve AML. 16 U.S.C. § 1333(b)(2).

The Wild Horse Act specifies that excess wild horses shall be "humanely captured and removed." *Id.* § 1333(b)(2)(B). BLM regulations define "humane treatment" as "handling compatible with animal husbandry practices accepted in the veterinary community, without causing unnecessary stress or suffering to a wild horse or burro." 43 C.F.R. § 4700.0-5(e). BLM has broad discretion in managing and removing wild horses from public lands. *See* 16 U.S.C. § 1333(b)(1); *Leigh v. Jewell*, No. 3:11-CV-00608-HDM-WGC, 2014 WL 31675, at *5 (D. Nev. Jan. 3, 2014) (finding the Wild Horse Act's definition of humane "affords BLM discretion in conducting [] wild horse roundups").

II.    **First Amendment and Gathers Under the Act**

The First Amendment contains a "qualified right of access for the press and public to observe government activities." *Leigh v. Salazar*, 677 F.3d 892, 898 (9th Cir. 2012) ("*Leigh I*"). The Ninth Circuit has held that whether this right of access applies to wild horse and burro gathers is governed by the two-step test articulated in *Press-Enter. Co. v. Superior Ct. of Cal.*, 478 U.S. 1, 8-9 (1986). *Leigh I*, 677 F.3d at 898–900. Under that standard, a district court must determine: (1) "whether the place and process have historically been open to the press and general public"; and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." *Id.* at 898 (quoting *Press-Enter.*, 478 U.S. at 8–9).

If the answer to both questions is affirmative, a qualified right of access attaches to the government proceeding. Courts in this District have so held with respect to the public's right to view gather operations. *Leigh v. Salazar,* 954 F. Supp. 2d 1090, 1100-01 (D. Nev. 2013) ("*Leigh II*"). The government may overcome that right by demonstrating "'an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Leigh I*, 677 F.3d at 898 (quoting *Press-Enter.*, 478 U.S. at 9). "[T]he effective and efficient gather of the horses" and "the safety of all individuals including those involved in gather activities, members of the viewing public, and the horses themselves" all constitute "important overriding interests[.]" *Leigh II*, 954 F. Supp. 2d at 1101-03.

### III. National Environmental Policy Act

NEPA serves the dual purpose of informing agency decision-makers of the environmental effects of proposed federal actions and ensuring that relevant information is made available to the public so it "may also play a role in both the decisionmaking process and the implementation of that decision." *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA requires the agency to take a "hard look" at the potential environmental consequences of its decision-making. *Id.* at 350.

But NEPA does not mandate particular results or impose substantive environmental obligations. *Id.* at 350-511; *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989). Instead, "NEPA ensures that [an] agency will not act on incomplete information." *Marsh*, 490 U.S. at 371. To this end, judicial review of NEPA decisions examines whether the analysis includes a "reasonably thorough discussion of the significant aspects of the probable environmental consequences" to inform the exercise of agency discretion. *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (citation omitted). "Once the court is satisfied that an agency's exercise of discretion is truly informed, the court must defer to that informed discretion." *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002) (cleaned up).

## FACTUAL BACKGROUND

### I. Antelope and Triple B Complexes Gather Plan and Environmental Assessment

This case centers around a 2017 gather plan for the Antelope and Triple B Complexes in Nevada. The Complexes contain the Antelope, Antelope Valley, Goshute, Spruce-Pequop, Triple B, and Maverick-Medicine HMAs, as well as the Cherry Springs Wild Horse Territory, which BLM manages jointly with the U.S. Forest Service. ATB_17991–92. The combined AML-range for the Complexes is 899-1,678 wild horses. ATB_17992. As of 2017, BLM estimated the population on the Complexes to be about 9,525 wild horses. ATB_18346; ATB_17991–92 (table reflecting AMLs and population estimates for each Complex).

BLM completed the 2017 EA to assess the possible environmental effects of the proposed ten-year gather plan. ATB_17982–18345. BLM's ultimate goal in adopting the gather plan was

to get wild horse populations in the Complexes to low AML (889 horses) and maintain those levels. ATB_18001. (finding Alternative A "would allow BLM to achieve management goals and objectives of attaining low range AML for a core breeding population, reducing population growth rates, and obtaining a thriving natural ecological balance on the range . . ."). Based on the estimated population within the Complexes at that time—9,525—BLM estimated that 8,626 wild horses needed to be gathered and removed to achieve low AML. ATB_17991–92.

Alternative A in the 2017 EA calls for gathering and removing "approximately 9,053 excess wild horses within the [Antelope and Triple B] Complexes to achieve and maintain AML and administer or booster population control measures to gathered and released horses over a period of ten years from the initial gather." ATB_18001.[1] The 2017 EA notes that BLM "expected that gather efficiencies and holding space during the initial gather would not allow for the attainment of the Proposed Action during the initial gather (i.e. not enough horses are successfully captured and removed to reach low AML)." ATB_18001. Thus, "[f]ollow-up gathers over a 10 year period to remove any additional wild horses [will be] necessary in order to achieve and maintain the low range of AML, and to gather a sufficient number of wild horses as to implement the population control component of the Proposed Action . . . for wild horses remaining in the complexes." *Id.*

The 2017 EA analyzes the environmental effects of Alternative A's ten-year gather plan. *See* ATB_18018–176. As for the wild horse population, BLM determined that the plan would "improve herd health," including by decreasing "competition for forage and water resources" which would "reduce stress and promote healthier animals." ATB_18128. On the other hand,

---

[1] There is no inconsistency between the 9,053 estimate and the estimate to get to low AML—8,626—as Plaintiffs imply. *See* ECF No. 82 at 9. While approximately 8,626 horses needed to be removed to achieve AML at the time of the 2017 EA's issuance, this figure did not factor in the anticipated growth rate of the horses or limitations on the ability to gather quickly enough to outpace that growth rate, such as gather efficiencies, funding, and holding space availability. *See* ATB_17991–92. The 9,053 estimate was an effort to account for these factors, and that the plan called for gathers to *maintain* low AML once it was reached, which would necessarily entail gathering more than 8,626 horses. ATB_18001. Ultimately, given the growth rate and inherent gather limitations, despite conducting many gathers under the 2017 Decision, BLM has been unable to reach AML on the Complexes and has not conducted any gathers to "maintain" AML.

BLM found that taking no action would subject horses to "increased stress and possible death as a result of increased competition for water and/or forage as the population continues to grow even further in excess of the land's capacity to meet the wild horses' habitat needs." ATB_18126.

On December 21, 2017, BLM issued a Decision Record adopting Alternative A in the 2017 EA, as well as Finding of No Significant Impact ("FONSI"). ATB_18346; ATB_18355. BLM concluded that gathers were necessary to achieve a thriving natural ecological balance and to "prevent continued degradation of rangeland resources, and the unnecessary death or suffering of individual wild horses that are currently impacted by a lack of water and forage." ATB_18348. BLM found that a ten-year gather plan to achieve and maintain low AML would "ease pressure on short-term and off-range facilities that may have insufficient capacity to handle all of the excess wild horses if removed in a single gather, and will also provide a greater likelihood that a sufficient gather efficiency can be achieved to apply fertility controls to a larger segment of the wild horse population that remains post-gather." ATB_18349. Additionally, BLM noted that "[f]unding limitations and competing National priorities may affect the timing of gather operations and implementation of the population control components of the Proposed Action." ATB_18346.

## II.    Gathers Since Adoption of the 2017 EA and Decision Record

Plaintiffs have requested judicial notice of BLM's publicly available gather reports for gathers conducted under the 2017 Decision Record to show the total number of horses BLM has gathered on the Complexes. *See* ECF No. 83-1 ¶¶ 1–17. Federal Defendants do not oppose Plaintiffs' request. *See* ECF No. 77 at 2 (Federal Defendants' Notice of Lodging the Record stating non-opposition to judicial notice of these reports from BLM's website "for the limited purpose of showing the number of horses that BLM has gathered under the challenged decision").

However, Table 3 in Plaintiffs' brief, which ostensibly summarizes these reports, suffers from many inaccuracies. *See* ECF No. 82 at 9–11. For example, Plaintiffs incorrectly identify the January-February 2018 gather on the Triple B Complex as occurring in 2019. *Compare id.* at 10, *with* ECF No. 83-1 at 38–50. Moreover, their "Horses Permanently Removed" column, which

they claim includes horses shipped to off-range facilities and horses that perished due to pre-existing or acute conditions, is plagued with errors. *ECF No. 82 at* 9 n.2. As just one example, for the same 2018 Triple B gather just mentioned, Plaintiffs identify 1,327 horses in this column. *Id.* at 10. The 1,327 figure represents the number of horses gathered and removed, and is based on 1,389 horses gathered, and sixty-two being released, with twenty-eight of those being mares treated with fertility controls. *See* ECF No. 83-1 at 45–46, 50; *see also* ECF No. 66-1 ¶ 14 (declaration of Benjamin Noyes explaining the same). The 1,327 figure does not, as Plaintiffs claim, include the thirty horses that died during the gather—twenty-eight of which were horses humanely euthanized based on chronic/pre-existing causes, and only two of which were acute deaths caused by the gather. *Id.*

All that said, as explained in more detail below, the precise number of horses that BLM has gathered under the 2017 Decision is immaterial. While BLM estimated in 2017 the number of horses it thought would need to be gathered to achieve and maintain low AML based on the then-current population estimate, the 2017 Decision Record did not authorize—and the 2017 EA did not analyze—gathering a specific number of horses. Rather, the 2017 Decision authorized BLM to gather horses to achieve and maintain low AML over the ten-year life of the plan, and the 2017 EA analyzed the effects of this plan. *See* ATB_18347 ("My final decision is to gather and remove excess wild horses over a ten-year period . . . to achieve and maintain established AML ranges."); ATB_18001-02 (analyzing plan to "achieve and maintain AML" over 10 years). BLM has not been able to reach AML under the 2017 Decision, despite—as Plaintiffs concede—gathering and removing more than 10,000 horses over fourteen gathers. Far from evidence of unlawfulness, this history of diligence under the 2017 Decision reflects BLM's efforts to control the horse population in compliance with the Wild Horse Act.

### III. BLM Releases a New Herd Management Area Plan/Gather Plan/EA, Expects to Sign New Decision Record for Complex This Year, And Will Conduct No More Gathers Under the 2017 Decision.

On May 29, 2025, BLM released a Preliminary Environmental Assessment for a new Antelope and Triple B Complexes Gather and Herd Management Area Plan ("Preliminary EA").

*See BLM seeks input on wild horse management in Antelope, Triple B Complexes,* BLM Nevada, available at https://www.blm.gov/announcement/blm-seeks-input-wild-horse-management-antelope-triple-b-complexes (last accessed August 26, 2025).[2] The public comment period on the Preliminary EA closed on June 29, 2025. *Id.* BLM expects to sign a new decision record adopting a plan based on the analysis in the Preliminary EA by the fall of this year. Third Declaration of Benjamin Noyes ¶ 32 ("Noyes Decl."). Once a new decision is signed, it will supersede and replace the 2017 Decision. As such, BLM does not currently anticipate gathering more animals under the 2017 Decision unless there is an emergency situation, *id.*, and there are no gathers currently scheduled to occur under the 2017 Decision. FY2025 Tentative Wild Horse and Burro Gather and Fertility Control Schedule as of August 5, 2025, available at https://www.blm.gov/sites/default/files/docs/2025-08/Tentative-FY2025-Gather-Schedule-August-2025.pdf (last accessed August 26, 2025).

## LEGAL STANDARD

Wild Horse Act and NEPA claims are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06. *See In Def. of Animals v. U.S. Dep't of Interior,* 751 F.3d 1054, 1061 (9th Cir. 2014). APA Section 706(2) provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2).

Section 706's "arbitrary and capricious" standard of review is narrow—the Court cannot "substitute its judgment for that of the agency." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). The burden of proof remains on the plaintiff. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976). The "arbitrary and capricious" standard is necessarily deferential. A decision is

---

[2] The Court may take judicial notice of other items on BLM's website because they are "publicly available" on an official government website, and their accuracy and authenticity are not subject to reasonable dispute. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). Moreover, because the release of a new gather plan and decision record implicate subject-matter jurisdiction, as explained below, the Court is not confined to the administrative record in determining its jurisdiction.

arbitrary and capricious only "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983); *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008). In other words, there must be a "clear error of judgment." *Marsh*, 490 U.S. at 378. "[A] reviewing court must generally be at its most deferential" when reviewing determinations involving agencies' technical expertise and scientific judgments. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983).

## ARGUMENT

## I. Plaintiffs' Claims Are Prudentially Moot, and Almost Certainly Will Be Constitutionally Moot Before Briefing Completes.

As explained above, BLM will very soon be signing a new decision record based on a new NEPA assessment and new determination that there is an excess of wild horses on the Complexes. Noyes Decl. ¶ 32. Thus, Plaintiffs' claims—which are entirely based on the 2017 EA and Decision Record—are prudentially moot and will become constitutionally moot before summary judgment briefing is complete.

The doctrine of prudential mootness "permits a court to 'dismiss [a claim] not technically moot if circumstances have changed since the beginning of litigation that forestall any occasion for meaningful relief[.]'" *Deutsche Bank Nat'l. Tr. Co. v. FDIC.*, 744 F.3d 1124, 1135 (9th Cir. 2014) (citation omitted). Prudential mootness "has particular applicability in cases . . . where the relief sought is an injunction against the government. A court should decline to grant declaratory or injunctive relief where the government has already changed or is in the process of changing [its] policies[.]" *Nat. Res. Def. Council v. Norton*, No. 1:05-cv-01207-OWW-LJO, 2007 WL 14283, at *7 (E.D. Cal. Jan. 3, 2007) (cleaned up); *see also All. for the Wild Rockies, Inc. v. U.S. Army Corps of Eng'rs*, 237 F. Supp. 3d 1079, 1084 (D. Or. 2017) (noting that prudential mootness has been applied to Endangered Species Act claims where the action agency had begun the

consultation process that plaintiffs sought to compel). Constitutional mootness arises "when the issues presented are no longer live and therefore the parties lack a legally cognizable interest for which the courts can grant a remedy." *Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 854 (9th Cir. 1999).

Here, each of Plaintiffs' claims is based on the 2017 Decision Record and EA. For example, Plaintiffs' first claim alleges that the 2017 Decision Record is unlawful because it authorized a ten-year gather plan. *See* ECF No. 70 ¶¶ 80–86. Plaintiffs' second claim alleges that BLM's 2017 EA violates NEPA because BLM has gathered more horses than it estimated would be necessary in 2017. *Id.*  ¶¶ 87–95. And Plaintiffs' third claim is based on alleged public access issues with gathers conducted under the 2017 Decision Record. *Id.* ¶¶ 96–103. While the Court previously denied Federal Defendants' motion to dismiss the First Amendment claim as moot, it did so because the 2017 Decision Record remained operative and permitted BLM to conduct additional gathers. *See* ECF No. 48 at 24 (finding claim live "because the 2017 EA authorizes BLM to conduct gathers in the Antelope Complex through 2027").

Once BLM signs a new decision record adopting an alternative from a new NEPA analysis, those documents will supersede and replace the 2017 Decision Record and 2017 EA at issue in this case. It is well-established that actions "challenging superseded, expired, or withdrawn agency policies or decision documents are moot because they no longer present a live controversy." *See Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*, No. CV 19-3629 (RC), 2021 WL 1198047, at *11 (D.D.C. Mar. 30, 2021) (collecting cases); *see Native Vill. of Nuiqsut v. BLM.*, 9 F.4th 1201, 1210 (9th Cir. 2021) ("When the environmental report at issue has been superseded, and the federal agencies will rely on a new and different report for the near future, the case is moot." (cleaned up)); *see also Mickelsen Farms, LLC v. Animal & Plant Health Inspection Servs.*, No. 1:15-cv-00143-EJL-CWD, 2018 WL 1413183, at *9–12 (D. Idaho Mar. 20, 2018) (issuance of superseding EA mooted claims based on prior EA). As explained in the attached declaration of Benjamin Noyes, BLM expects to sign a new decision by fall of this year. Noyes Decl. ¶ 32. And it does not plan to conduct any more gathers under the 2017 EA and

Decision Record unless there is an unforeseen emergency situation. *Id.* Given that summary judgment briefing will not conclude until November 4, 2025, Plaintiffs' case will likely be constitutionally moot before the Court can issue an order on the merits.

Federal Defendants raised the issue of impending mootness with Plaintiffs in early June, in the hopes of avoiding unnecessarily burdening the Court with briefing on a soon-to-be-moot dispute. But Plaintiffs refused to dismiss their case, or to stay summary judgment briefing until a new decision record was signed, contending that mootness exceptions applied. Plaintiffs are mistaken.

First, the "voluntary cessation" exception does not apply because BLM is not issuing superseding documents for the Complexes because of this litigation. *See Pub. Util. Comm'n of State of Cal. v. FERC*, 100 F.3d 1451, 1460 (9th Cir. 1996). ("[I]n order for this exception to apply, the defendant's voluntary cessation must have arisen because of the litigation."). The 2017 Decision Record expires in about two years, and BLM is issuing a new decision based on new NEPA analysis in the normal course of its duties under the Wild Horse Act. The 2017 EA and Decision Record have withstood an entirely separate challenge and appeal. *See Friends of Animals v. Silvey*, 820 F. App'x 513 (9th Cir. 2020). And Federal Defendants have successfully defended two emergency motions to enjoin gather operations under the 2017 EA and Decision record during this case. Any claim that BLM is issuing new documents to evade review through this litigation fails.

Second, the "capable of repetition yet evading review" exception does not apply. It is doubtful that Plaintiffs can show that the issues they raise with the 2017 documentation will recur, as they essentially allege that the 2017 EA and Decision Record are stale and that BLM needs to issue updated documents, which is precisely what BLM is in the process of doing. *See Native Vill. of Nuiqsut*, 9 F.4th at 1209 (noting plaintiffs have burden or showing "there is a reasonable expectation that they will once again be subjected to the challenged activity"). But even if Plaintiffs could show BLM's alleged violations will recur, they cannot show that "the duration of the challenged action is too short to allow full litigation before it ceases." *Biodiversity Legal*

*Found. v. Badgley*, 309 F.3d 1166, 1173 (9th Cir. 2002) (citation omitted). The duration prong is met only when "the underlying action is almost certain to run its course before either this court or the Supreme Court can give the case full consideration." *Id.* (citation omitted). The Ninth Circuit has found that actions lasting only one or two years evade review. *See Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1018 (9th Cir. 2012).

Here, the 2017 Decision Record and EA have been active for nearly eight years. They have survived an entirely separate challenge and appeal. This case itself has been pending for more than two years, and the only reason it took that much time to reach summary judgment briefing was due to Plaintiffs' pleading failures and recalcitrance regarding their defective claims attacking BLM's animal welfare standards. *See* ECF No. 48 (granting Federal Defendants' first motion to dismiss); ECF No. 55 (denying Plaintiffs' motion for reconsideration); ECF No. 69 (granting Federal Defendants' second motion to dismiss). Moreover, if they choose to, Plaintiffs can challenge the new decision record and NEPA analysis when they issue and Plaintiffs cannot credibly argue that these documents will expire or be superseded before review is possible.[3]

Thus, Plaintiffs' case is prudentially moot, will imminently be constitutionally moot, and no exceptions to mootness apply. The Court therefore need not and should not reach the merits and can dismiss this case as moot. That said, as explained below, if the Court examines the merits of Plaintiffs' claims, they each fail.

## II. Plaintiffs' Wild Horse Act Claim Fails.

The Wild Horse Act provides that once BLM determines that there is an overpopulation of wild horses and that action is necessary to remove excess animals, BLM "shall immediately remove excess animals from the range so as to achieve [AMLs]." 16 U.S.C. § 1333(b)(2). Courts

---

[3] BLM's forthcoming decision will not be expressly time-bound like the 2017 documentation. Rather, BLM will be conducting initial and follow-up gathers designed to manage horses "within the AML range" for the Complexes. *See* Preliminary EA at 14, available at https://eplanning.blm.gov/public_projects/2034747/200630470/20134805/251034785/Antelope_Triple_B_Gather-HMAP_Preliminary_EA_508.pdf (last accessed August 26, 2025). Thus, it is possible the forthcoming decision record and EA will last *longer* than the ten-year documentation at issue here.

have found that the "immediately" provision necessarily affords BLM discretion to plan safe, efficient, and effective removals of excess animals. *Colvin & Son, LLC v. Haaland*, 763 F. Supp. 3d 1176, 1183 (D. Nev. 2025); *see Friends of Animals v. BLM*, 728 F. Supp. 3d 45, 77 (D.D.C. 2024).

Plaintiffs' first claim is that BLM violated the Wild Horse Act's "immediacy requirement" by relying on a "ten-year Gather Plan for at least fourteen gathers over an eight-year period." ECF No. 82 at 21. Their basic argument is that ten-year gather plans are unlawful and that BLM has done too many gathers of too many horses under the 2017 Decision. *Id.* at 22–23.

Incredibly, Plaintiffs completely ignore this Court's ruling last October that they were unlikely to succeed on this paradoxical claim. *See* ECF No. 69 at 7–9. To be sure, denial of a motion for a temporary restraining order is not a final decision on the merits. But Plaintiffs' failure to even acknowledge the Court's prior ruling—which itself largely rested on the Court's rejection at summary judgment of a similar claim in a similar case also brought by Plaintiffs—is baffling.

As this Court explained last year, in reviewing the 2017 Decision at issue in this case, the Ninth Circuit held that "BLM's use of a single gather plan and a single environmental assessment to cover a period of years and a series of individual gather operations was not arbitrary or capricious." *Id.* at 8 (quoting *Silvey*, 820 F. App'x at 516). The Court noted that Plaintiffs were not likely to succeed "on claims based on purported issues with the same key document that the Ninth Circuit already examined and found no issue with." *Id.* Additionally, the Court observed that its decision in *Leigh v. U.S. Dep't of the Interior*, No. 2:22-cv-01200-MMD-BNW, 2024 WL 4279156, at *13 (D. Nev. Sept. 23, 2024)—brought by the same Plaintiffs here—"addressed similar arguments" and "rejected them as unpersuasive on their merits" at summary judgment. ECF No. 69 at 8. Specifically, the Court in that case rejected Plaintiffs' challenge to a "20-year phased gather plan as violating the Wild Horse Act's immediacy requirement." *Id.* This ruling was based in part on the fact that "multiple round ups may be a practical necessity where a single gather decision implicates hundreds or even thousands of wild horses and burros, which cannot realistically be removed all at once[.]" *Id.* (quoting *Leigh*, 2024 WL 4279156, at *13). Here, BLM

explained its decision to adopt a ten-year gather plan for these precise reasons. ATB_18001 ("[G]ather efficiencies and holding space during the initial gather would not allow for the attainment of the Proposed Action during the initial gather[.]"). Plaintiffs' failure to address the Court's prior reasoning dooms this claim.

Plaintiffs also ignore that, earlier this year, another court in this District found that ten-year gather plans do not violate the Wild Horse Act's immediately provision. In *Colvin*, the court held that the Wild Horse Act "permits the BLM to 'adopt gather plans that contemplate conducting a staged gather over a period of time' and at the same time requires that the BLM 'conduct the required gathers as promptly as reasonably possible after making a necessary-to-remove-excess-animals determination.'" 763 F. Supp. 3d at 1182 (quoting *Friends of Animals*, 728 F. Supp. 3d at 78). Here, the 2017 Decision adopts Alternative A, which contemplates an initial gather to occur as soon as reasonably possible, followed by additional gathers as necessary over a period of ten-years. *See* ATB_18001. Moreover, *Colvin* found that because the challenge was brought under APA Section 706(2), "[a]ny delay in implementation of the plans is beyond the scope of this Court's review." 763 F. Supp. 3d at 1183. Thus, because Plaintiffs have brought this claim only under Section 706(2), and not under Section 706(1) to *compel* gathers, their argument that BLM has not acted swiftly enough is entirely misplaced. That said, there has clearly been no delay in this case. As forecasted by the 2017 EA, ATB_18008, BLM began its first gather about one month after the Decision Record was signed. ECF No. 83-1 at 36-37. And Plaintiffs concede that BLM has conducted fourteen gathers in eight years. ECF No. 82 at 16. Put simply, BLM has acted consistent with the Wild Horse Act's immediately provision in promptly conducting numerous gathers of more than 10,000 horses under the 2017 Decision.

Rather than address this Court's prior rulings or *Colvin*, Plaintiffs regurgitate the arguments and authorities from their failed motion for a temporary restraining order. Their caselaw was distinguishable last year, and it remains so.

Most glaringly, even where courts found issues with the pacing of BLM's gathers, not one of Plaintiffs' cases vacated a gather decision based on the immediately provision, as Plaintiffs

request. ECF No. 70 at 21. This makes sense—the immediately provision in the Wild Horse Act compels BLM to gather horses as soon as reasonably possible, and setting aside a gather decision would prevent BLM from carrying out this duty. *See Friends of Animals*, 728 F. Supp. 3d at 77 (noting illogic of argument that BLM's alleged "failure to plan to act with sufficient dispatch requires setting aside the gather plan—thereby *delaying* any such removal").

     *Western Rangeland Conservation Association v. Zinke* is also inapt. There, the plaintiffs sued under APA Section 706(1) to compel BLM to gather horses in various HMAs, alleging that BLM had unreasonably delayed in carrying out its duty to "immediately" remove excess animals. *W. Rangeland Conservation Ass'n v. Zinke,* 265 F. Supp. 3d 1267, 1282–97 (D. Utah 2017). For the relevant HMAs, BLM had proposed a six-to-ten-year phased removal plan intended to gradually reach AML. *Id.* at 1285–86. The court found that this phased plan conflicted with the Wild Horse Act's immediacy language. *See id.* at 1287. After a full analysis of the relevant factors, including the extent and consequences of the delay and the administrative difficulties of implementing the action, the court concluded that BLM had not unreasonably delayed its duty to immediately remove excess horses by adopting the phased plans. *See id.* at 1291 ("BLM's efforts to both successfully and sustainably manage wild horse populations pursuant to the [Wild Horse Act] are hindered by nigh-insurmountable administrative obstacles."). Because it was an action under APA Section 706(1) to compel gathers, and Plaintiffs here are seeking to *prevent* gathers, *Western Rangeland* is not on point and does not help Plaintiffs. Moreover, even if it were on point, *Western Rangeland*'s reasoning on the lawfulness of phased gathers seemingly conflicts with this Court's prior rulings and the Ninth Circuit's reasoning in *Silvey*, discussed above.

     *Culver* is likewise inapposite. The court there found that BLM's ten-year gather plan violated the Wild Horse Act. *Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 168–171 (D.D.C. 2022). *Culver* is distinguishable because BLM had not conducted a gather in the relevant HMA in that case since 2010, and so failed to act "immediately" to remove excess horses. *See id.* at 165; *see also id.* at 170 (interpreting gather plan as BLM directing "employees to wait ten years to 'immediately' remove excess horses"). Here, BLM conducted its first gather about one month

after signing the 2017 Decision Record and has conducted fourteen total gathers in eight years. Indeed, Plaintiffs' entire argument is that BLM has conducted *too many* gathers. ECF No. 82 at 21-22. Moreover, *Culver* found that "BLM's legal error [was] relatively minor" and that BLM had "otherwise appropriately substantiated its Decision under both the [Wild Horse Act] and NEPA." *Culver*, 610 F. Supp. 3d at 172–73. Thus, the Court ruled that "vacatur of the Decision would harm the ecological interests that the Decision is necessary to protect," and that "BLM can both accomplish its statutory duties while reducing the time period for the completion of those duties." *See id.* at 172–73. *Culver* therefore expressly rejected the relief that Plaintiffs seek—vacating BLM's decision documents.

Plaintiffs' final case—*Friends of Animals v. BLM*—is even less helpful to them. Plaintiffs there also challenged BLM's ability to adopt long-term gather plans. *See Friends of Animals v. BLM*, 728 F. Supp. 3d 45, 73 (D.D.C. 2024). The court disagreed with them, finding that BLM could conduct "staged" gathers over several years to achieve AML in the first instance, so long as BLM plans to begin removing excess animals "as promptly as reasonably possible." *See id.* at 78. This is the reasoning on which *Colvin* relied to uphold ten-year gather plans. *See* 763 F. Supp. 3d at 1183. *Friends of Animals* also found that if BLM reaches the sought-after AML level identified as the goal of a long-term gather decision, BLM must make a new excess determination before gathering again. 728 F. Supp 3d at 78. But even assuming the Court agrees with this reasoning, it is irrelevant here because Plaintiffs do not claim that BLM has ever reached low AML on either the Antelope or Triple B Complexes. Nor could they, as BLM's gather reports show that overpopulation has persisted on the Complexes despite BLM's best efforts.

Thus, for all these reasons, Plaintiffs' Wild Horse Act claim fails.

### III. Plaintiffs' NEPA Claim Fails.

Next, Plaintiffs assert that the 2017 EA is unlawful because BLM has removed more than the 9,053 horses it estimated it would need to remove to achieve AML. ECF No. 82 at 22. This argument is meritless.

As an initial matter, Plaintiffs once again ignore the Court's order from last year finding

16

that they were unlikely to succeed on the merits of this claim. *See* ECF No. 69 at 8–9. Moreover, Plaintiffs entirely ignore the impact on NEPA analyses of the Supreme Court's recent decision in *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 145 S. Ct. 1497 (2025), which emphasized that "court[s] should afford substantial deference to the agency" when "determining whether an agency's EIS complied with NEPA." *Id.* at 1511–12. That rationale applies equally to analysis of an EA.  For this reason alone, the Court can reject Plaintiffs' NEPA claim.

As explained above, this Circuit has regularly upheld NEPA analyses that considered the impacts of phased actions. *See Silvey*, 820 F. App'x at 516 (affirming a decision upholding the 2017 EA because "BLM's use of a single gather plan and a single [EA] to cover a period of years and a series of individual gather operations is not a departure from the agency's past practice"). Therefore, Plaintiffs cannot succeed merely by pointing out that the EA is eight-years old and that BLM has conducted multiple gathers pursuant to it. *See Friends of Animals v. BLM*, 548 F. Supp. 3d 39, 64 (D.D.C. 2021) (upholding ten-year EA and rejecting argument that "NEPA requires consideration of every possible implementation action or the particulars of each gather . . .").

Plaintiffs unsuccessfully attempt to anchor this claim to the impacts of prior removals and an argument that the number of horses removed is greater than the initial estimate of the number of excess horses. ECF No. 82 at 22 (claiming that by gathering more than 9,053 horses, BLM has exceeded "project scope"). They cite no case law in support of this theory. Indeed, as this Court observed last year, Plaintiffs' argument is very similar to one this Court previously rejected. ECF No. 69 at 8–9 (citing *See Leigh v. Raby*, No. 3:22-CV-00034-MMD-CLB, 2022 WL 267353, at *9 (D. Nev. Jan. 28, 2022)). There, Plaintiffs argued—as they do here—that BLM's reliance on a phased ten-year gather plan EA to support a follow-up gather was improper because it did not consider the impacts, if any, of the horses previously removed before authorizing the next gather. *Id*. The Court in *Raby* held that, despite some ambiguity in the language of the EA as to its scope, reliance on the EA was proper because:

> BLM's purpose is to "achieve and maintain AML" [and because the EA explained] that "[i]t is expected that gather efficiencies and holding space during the initial gather would not allow for the removal of sufficient excess animals during the

> initial gather to reach or maintain low AML[,]" . . . the EA expressly contemplated that multiple gathers may be necessary to achieve an AML within the established range—which is required by the BLM's regulation—the Court is persuaded by the government's interpretation . . . [and] Plaintiffs have not shown they are likely to succeed on their NEPA claim.

*Id.* at *8–9. The Court, following this reasoning, held that "[b]ecause the EA expressly contemplated that multiple gathers may be necessary to achieve an AML within the established range . . . the EA did consider removing [wild horses in the earlier] gather." *Id.* at *8. Thus, because the EA already considered the impacts of the earlier gather, there was no need for any additional NEPA analysis.

The same logic applies with equal force here. The introduction to the 2017 EA states the goal of the project is "to achieve and maintain appropriate management levels." ATB_17989; ATB_18001 (stating goal is to achieve "low range AML"); *see also N. Alaska Env't Ctr. v. U.S. Dep't of Interior*, 983 F.3d 1077, 1092–93 (9th Cir. 2020) (courts look to NEPA document for "an accurate description of the agency's proposed action") (citations omitted). The 2017 EA also explains that the AML for the Complexes is 899-1,678 wild horses. ATB_17992. At the time of the EA, in 2017, BLM estimated that the Complexes held about 8,674 wild horses, almost ten times the target low AML. ATB_17991–92. The 2017 EA further explained that "[i]t is expected that gather efficiencies and holding space during the initial gather would not allow for the attainment of the Proposed Action during the initial gather (*i.e.* not enough horses are successfully captured and removed to reach low AML)." ATB_18001. And the 2017 EA notes that, as a result of likely being unable to gather enough horses to reach low AML in a single operation, "[f]ollow-up gathers over a ten-year period to remove any additional wild horses necessary in order to achieve and maintain the low range of AML" were planned. *Id*.

Put simply, the 2017 EA did not analyze the effects of gathering a certain specific number of horses, as Plaintiffs suggest. It analyzed the effects of gathers over the course of a ten-year period "to reach and maintain low AML." ATB_18000–01. Again, as noted above, Plaintiffs do not argue that BLM has reached the target low-AML over the life of the 2017 Decision despite its best efforts. Thus, their argument that BLM has "exceeded the project scope" and must make

a new excess determination falls flat. ECF No. 82 at 22.[4]

Thus, because the 2017 EA properly considered the impacts of a ten-year phased gather plan on the Antelope and Triple B Complexes, Plaintiffs' NEPA claim fails.

**IV.     Plaintiffs' First Amendment Claim Fails.**

As outlined below, Plaintiffs fail to establish that their First Amendment rights were violated for each instance described because (1) there is no qualified right of access to bait and water trap operations; (2) any perceived constraints on public access to any gather operations were narrowly tailored to serve compelling governmental interests in the safety and effectiveness of gather operations; and (3) Plaintiffs' allegations of restrictions on public access to holding facilities for the 2024 gather are not supported by the record. *See* ECF No. 82 at 24–25.

A.  **There is no qualified right of access to bait and water trap operations.**

Plaintiffs have failed to establish a qualified right of access to view gathers and temporary holding facilities where bait and water trapping are used under the two-step test for this Circuit. *See Leigh I*, 677 F.3d at 898. While Plaintiffs claim that BLM has allowed access to bait and water trap operations in the past, ECF No. 82 at 25, the two instances they describe do not support their claim. As to the first instance, the Pine Nut HMA bait and water trap site that Ms. Leigh observed in 2013 was located in close proximity to a residential area just outside of Carson City, Nevada, and was thus readily accessible by the public without invitation from BLM. *See* BLM: Wild horse bait trapping in Carson City meant public safety concerns, CarsonNOW.org (Feb. 26, 2013)  https://www.carsonnow.org/02/26/2013/blm-wild-horse-bait-trapping-carson-city-meant-public-safety-concerns. The second water trap that Ms. Leigh describes appears to refer to a tour given by BLM in 2013 of a *proposed* trap site for the Triple B Complex; however, no one from

---

[4] As explained above, BLM is in fact in the process of making a new excess determination and approving a new gather plan, rendering Plaintiffs' argument moot.

the public observed a gather conducted at that bait and water trap. Third Declaration of Bruce Thompson ¶ 7 ("Thompson Decl."). Moreover, BLM has not allowed public observation of any bait and water trap operations since 2013, and this policy is memorialized in the 2017 EA for the Antelope and Triple B Complexes Gather Plan. *Id.* ¶ 8; ATB_18053. As for Plaintiffs' alleged lack of access to temporary holding facilities, BLM is not aware of any requests from the public or Wild Horse Education ("WHE") to access temporary holding facilities for wild horses gathered during bait and water trap operations since the 2017 gather plan was issued. Thompson Decl. ¶ 9. Accordingly, while the public has been allowed access to bait and water traps for a few isolated incidents more than a decade ago, it is clear that bait and water traps have not "historically been open to the press and general public," and thus Plaintiffs have not established a "qualified right of access" to bait and water trap operations. *Leigh I*, 677 F.3d at 898.

B. **Any perceived constraints on public access to any gather operations were narrowly tailored to serve compelling governmental interests in the safety and effectiveness of gather operations.**

Even if the Court finds Plaintiffs have a qualified right of access to bait and water trap operations, BLM's limits on access to those gathers (as well as helicopter gathers) are narrowly tailored to serve two "important overriding interests": (1) "the effective and efficient gather of the horses"; and (2) "the safety of all individuals including those involved in gather activities, members of the viewing public, and the horses themselves." *Leigh II*, 954 F. Supp. 2d at 1101. First, BLM does not allow access to bait and water trap gathers in part because public observation would interfere with BLM's ability to capture horses, as wild horses are reluctant to approach a bait/water trap site when there is too much activity or people can be seen. Thompson Decl. ¶ 8. BLM outlined this restriction in the 2017 EA for the Antelope and Triple B Complexes Gather Plan and explained why allowing the public at these gathers would directly render bait and trap operations ineffective. ATB_18053. In addition, BLM restricts access to these sites because

public observation could be unsafe for the horses, BLM and contractor staff, and any public observers. Thompson Decl. ¶ 8–9; ATB_18053 ("Because these horses are wild animals, there is always the potential for injury when individuals get too close or inadvertently get in the path of gather activities."). Safety concerns also prevent the public from visiting temporary holding facilities for bait and water traps. Thompson Decl. ¶ 9. Unlike helicopter gathers, which are conducted during the day and allow for designated viewing of holding facilities once the horses have been fed and settled at the end of the day, bait and water traps operate continuously throughout all hours of the day and night. *Id.* Because of the continuous nature of the operations, there is no fixed time during daylight hours after the animals are processed and settled that would allow the public to safely visit. *Id.*

Alleged viewing restrictions of helicopter gather operations in the Triple B Complex were similarly tailored to serve BLM's overriding interests of safety and effectiveness of gather operations. Plaintiffs allege that public access to viewing active helicopter gathers "has often been impaired," ECF No. 82 at 25, but Plaintiffs ignore that viewing restrictions to some extent are nearly always necessary to ensure the safety of the public and the efficiency of helicopter gather operations. Indeed, many different factors are carefully considered before selecting public observation locations for helicopter gathers to ensure the safety of the wranglers, animals, and members of the public, as well as to ensure a successful gather operation. Noyes Decl. ¶ 24. For example, specific site factors such as topography, weather, and trap setup often dictate the best location for observers *Id.* ¶ 25. In addition, viewing areas for traps must be a minimum of 1000 feet from an area where the helicopter may be herding horses or flying over to comply with FAA and contract requirements. *Id.* ¶ 24. BLM also looks for viewing locations where the public can see most of the operation but far enough that when the helicopter or wranglers are working the

21

animals, they will not be disturbed by the public. *Id.* This can prove to be a difficult task because wild horses that have not been around humans tend to react to many things around them, and thus it is critical to minimize any unnecessary movements and noise for the safety of the animals and wranglers and for the effectiveness of the gather. *Id.* Because traps require a geographical feature such as a hill, wash, or turn so the horses cannot see the trap before being herded into it, the public usually cannot be in a spot to see animals during the entire run. *Id.* And while Plaintiffs claim that these risks could be limited by "having members of the public stay in their vehicles" or "sit down, without any movement or talking," ECF No. 82 at 13, BLM already takes those measures into account when selecting each individual public viewing site. Noyes Decl. ¶ 24.

As explained in the 2017 EA, helicopter gathers can be especially dangerous to horses and members of the public if strict observation protocols are not followed. ATB_18052–53. Unknown or unexpected obstacles in the path of helicopters can impact a pilot's ability to react in time to avoid members of the public that may be in their path, and rotor wash of a helicopter working close to the ground may cause loose objects to strike anyone in close proximity to the gather operation. ATB_18053. In addition, horses or burros may flee unexpectedly through areas they would not normally travel, which can lead to injuries to members of the public if they are in the animal's path during the herding process *Id.*

Plaintiffs specifically allege that the change in location of a viewing area for a 2019 helicopter gather in the Triple B Complex did not "allow a meaningful opportunity to observe any activity in the trap or the loading of wild horses." ECF No. 82 at 25. But Plaintiffs fail to address the complex and fact-specific nature of helicopter gathers as described above. The 2019 gather in particular involved a different contractor and pilot than the gather that Plaintiffs say they observed in 2011 at the same trap site, and pilots frequently change a set up or location of a trap based on

the way the horses appear to be moving and based on each pilot's individual flying technique. Noyes Decl. ¶ 29. Thus, although a trap may be in the same general area as a trap used for a previous gather, the direction of a trap will often change from one gather to another. *Id.* When the horses are being led in a different direction or with a different technique than a previous gather at the same trap location—as was the case for the 2019 gather—this may require a change in the way the trap is positioned and how much equipment or people can be in the general area. *Id.* As a result, viewing locations may need to move before each gather or even in the middle of a gather operation to ensure an effective gather and the safety of the public and BLM personnel. *Id.*

Next, Plaintiffs claim that the denial of access to a trap for a 2023 gather on private land amounted to a First Amendment violation. ECF No. 82 at 25. Plaintiffs' description, however, leaves out key details that demonstrate this restriction was narrowly tailored to essential BLM interests. Of the forty-two days the 2023 gather was conducted, there was only a single day when members of the public were unable to view horses as they were being trapped. Thompson Decl. ¶ 11. On July 31, 2023, BLM determined that due to the geographic features of the area and the location of a group of horses outside the HMA, it was necessary to set up a trap that could only be accessed via private land. *Id.* This was in part because the area the horses were located was within checkerboard—or, an area of land where every other parcel is privately owned— and thus the only way to access public land in the area is to cross private property. *Id.* Setting the trap on private land was necessary to ensure the effective and efficient capture of the horses while minimizing stress and ensuring safety for both the animals and gather personnel. Because of the nature of the trap site, the only viable public observation area would have required members of the public to go onto private land. *Id.* As such, BLM contacted the landowner to request permission for the public to view any gather operations that may occur on their property, but the landowner declined. *Id.;*

*see also Id.* at 6 (email from private landowner stating that BLM has permission to set up a trap on their property but stating that "there will be no public allowed on [their] private property"). Although a member of WHE requested to view the gather from an area on public land, this location would have been directly in front of the trap where incoming horses would be able to see any onlookers, so BLM determined that allowing the public in this viewing location posed too much of a safety risk to the public, horses, and contractor personnel. *Id.* ¶ 11. Members of the public were, however, able to visit the temporary corral after the animals were captured, although the WHE representative declined this offer. *Id.* Thus, while members of the public were unable to view the trapping operations while they occurred on this one day, BLM ensured public access throughout the remainder of the gather and facilitated access to temporary holding corrals the same day that viewing of active gather operations was restricted. These measures were clearly narrowly tailored to effectuate BLM's goal of conducting a safe and effective gather operation.

C.  **Plaintiffs' allegations of restrictions on public access to holding facilities for the 2024 gather in the Triple B Complex are not supported by the record.**

Finally, while Plaintiffs allege that BLM refused the public access to temporary holding facilities used for a 2024 gather because the facilities were on private land, ECF No. 82 at 20, this claim is simply not supported by the facts. The 2024 gather in the Triple B Complex was active for twenty-five days with thirteen trap sites and two holding facilities, and BLM provided opportunities for public observation of the trap sites and two holding facilities for all twenty-five days of the gather. Noyes Decl. ¶ 31. While Plaintiffs are correct that the temporary holding facilities for the 2024 gather were located on private land, BLM set up a public viewing location for the holding corrals approximately half of a mile away from the first corral and a fourth of a mile away from the second. *Id.* In addition, for twenty-three days of the twenty-five-day operation, BLM offered a tour once gather operations were concluded to allow public observers to walk

around the outside of the corrals to view the horses. *Id.* Tours of the holding facilities were unavailable for the remaining two days of the gather because it got dark before the public could return from the trap sites to the holding corral, which resulted in unsafe conditions for members of the public. *Id.* On eleven of the twenty-three days when BLM offered tours of the temporary holding facilities, the tours were declined by the members of WHE who had observed gather operations that day. *Id.* This account of the viewing opportunities for the 2024 gather is further supported by WHE's own reports of the gather operations on their website, which include numerous photos and written details of horses in the temporary holding corrals. *See, e.g.,* https://wildhorseeducation.org/2024/11/20/triple-b-roundup-update-week-3/ (describing horses at "holding" and showing close-up photos taken of horses in temporary holding facilities) (last accessed Aug. 25, 2025); https://wildhorseeducation.org/2024/11/06/triple-b-roundup-update/ ("Access to the temporary corrals (located on private property) is being facilitated at the ends of the day")  (last accessed Aug. 25, 2025). Accordingly, Plaintiffs' claim that BLM refused the public access to holding facilities for the 2024 gather is contradicted by the record and thus the Court should reject it. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that a court should not accept facts that are "blatantly contradicted by the record, so that no reasonable jury could believe it" in a ruling on a motion for summary judgment).

To the extent that Plaintiffs argue their First Amendment rights were violated because they were not granted post-gather access to the holding corrals for two days of the operation or because they were not granted viewing access closer to the corrals during active operations, BLM has demonstrated that such restrictions were necessary to ensure the safety of the animals and people present at the facilities. As explained above, tours of the corrals were not available for two days of the gather because there would have been a threat to public and personnel safety if tours were

allowed to proceed in the dark. Noyes Decl. ¶ 31. Based on the behavior of wild horses after being trapped, the horses need to settle for at least thirty minutes after being fed and watered so they do not pose a danger to themselves or staff. *Id.* ¶ 27. On a long day, that means that sometimes it is too dark to conduct a tour, as the dark poses a safety hazard to the public and to BLM staff due to the potential for falling on uneven ground. *Id.* The added movement and activity of a public tour would also be more likely to spook or scare the horses in the dark as they are in a new and unfamiliar environment. *Id.* Moreover, viewing opportunities of holding corrals during active operations must be located some distance away from the facilities until the horses are secured to ensure the safety of the horses, members of the public, and BLM personnel—regardless of whether the corrals are located on private or public land. *Id.* ¶ 26. BLM clearly provided substantial public viewing opportunities for the holding facilities, and any alleged restrictions were narrowly tailored to BLM's overriding interest in ensuring that gather operations are safely executed. *See Raby*, 2022 WL 267353 at *10 (finding that BLM's practice of requiring "some distance" from holding facilities "while securing the horses after a gather" was narrowly tailored to ensure animal safety "as well as the safety of personnel and the public").

## CONCLUSION

The Court should grant summary judgment in Defendants' favor for either of two reasons. First, this case is prudentially moot because BLM intends to issue new decision documents before briefing is completed. Second, BLM's 2017 gather plan and EA for Antelope and Triple B Complexes fully comply with the Wild Horse Act and NEPA, and Plaintiffs have failed to demonstrate any violation of their First Amendment rights.

Dated: August 26, 2025                  Respectfully submitted,

                                         ADAM R.F. GUSTAFSON, Acting Assistant
                                         Attorney General

U.S. Department of Justice
Environment & Natural Resources Division

*/s/ Bonnie Ballard*
BONNIE BALLARD, Trial Attorney
(MD Bar No. 2211280027)
Wildlife & Marine Resources Section
Phone: (202) 523-5567
Email: bonnie.m.ballard@usdoj.gov

KYLE LYONS-BURKE, Trial Attorney
(VA Bar No. 92373)
Natural Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Phone: (202) 598-3377
Email: kyle.lyons-burke@usdoj.gov

*Attorneys for Federal Defendants*

1

## <u>CERTIFICATE OF SERVICE</u>

2
  I hereby certify that on August 26, 2025, I electronically filed and served the foregoing

3
with the Clerk of the Court for the United States District Court for the District of Nevada using

4
the CM/ECF system, which will send notification of this filing to the attorneys of record.

5

6
             */s/ Bonnie Ballard*

7
             Bonnie Ballard
             Attorney for Federal Defendants

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28