# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| WILD HORSE EDUCATION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. BUREAU OF LAND MANAGEMENT, *et al.*,<br><br>Federal Defendants. | Case No. 3:23-cv-00372-MMD-CLB<br><br><br>**THIRD DECLARATION OF BENJAMIN F. NOYES** |

I, Benjamin F. Noyes, make the following declaration pursuant to 28 U.S.C. § 1746:

1.     Since 2006, I have served as the Bureau of Land Management (BLM) Ely District, Bristlecone Field Office's Wild Horse and Burro Specialist.

2.     I hold a Bachelor of Inter-Disciplinary Studies with a concentration in Agriculture Science. My curricula included numerous courses directly relevant to the care, treatment, and nutrition of horses, including Horse Science, Horsemanship 1, Horsemanship 2, and Animal Feeding and Nutrition.

3.     I grew up with and have extensive knowledge of horses. My family raises quarter horses and is very involved in their animals' breeding and care and training and showing. I train horses from weanlings to finished horses. I farrier (shoe), groom, and when they are ill, treat horses. I have competed in 4-H, and high school and college rodeo, and still compete in both rodeo and roping competitions. I am a current member of the American Quarter Horse Association, World Series of Team Roping, and the American Cowboy Team Roping Association.

4.     I currently own 12 horses and over the past 35 years have owned more than 45. My passion for horses does not tolerate their inhumane treatment, personally or professionally, be they domestic or wild.

5.     My desire to work around horses motivated me to accept a position as a BLM Wild Horse and Burro Specialist, caring for and ensuring the well-being of wild horses in eastern Nevada.

6.     As a BLM Wild Horse and Burro Specialist, I am responsible for the management of wild horses within the Ely District and administer two Herd Management Areas (HMAs) (the Antelope HMA within Antelope Complex and the Triple B within the Triple B Complex). My duties include monitoring wild horse conditions in the HMAs and herd areas (HAs) and evaluating and resolving escalating issues through use of appropriate measures.  These measures can include, but are not limited to, water hauling and/or conducting an emergency gather.  I also collect data to ascertain wild horse impacts to rangeland resources and habitat components

relevant to determining whether Appropriate Management Levels (AMLs) require modification to ensure a thriving natural ecological balance.

7.      The BLM makes every effort to ensure that gather operations are conducted in a humane manner. It is always tragic to have any death loss during a gather operation.  Unfortunately, wild horses are wild animals and can behave in unpredictable ways that can lead to injury. Even though the loss of even one horse on a gather is heartbreaking, there are risks associated with the gathering or handling of wild animals that cannot be completely eliminated.  Horses may also have pre-existing chronic conditions unrelated to the gather that lead to mortality.

8.      Wild horse mortality for gathers operations are characterized as either "acute" or "chronic" deaths. Acute/sudden deaths are due to recent or sudden injuries or medical conditions, including those that occurred or developed during capture or captivity, such as recent fractures, injuries, respiratory infections, other illnesses, etc. Chronic deaths refer to animals that are humanely euthanized due to conditions existing prior to capture, such as poor body condition, lameness, physical defects, and the like. Those chronic conditions mean that the horses have a poor long-term prognosis and euthanization is the humane option.

9.      A 2008 Government Accountability Office report on the WH&B Program states that "BLM's controls for gather include standard operating procedures, inspections, and data collection." ATB_09843. "Data collected from 6 of the 10 states from fiscal years 2005 through 2007 indicate that mortality as a result of gathers is about 1.2 %." ATB_09844.

10.     A more recent study published in Journal of Equine Veterinary Science reviewed data from 2010-2019 gather operations and found that helicopter gathers had an average of 1% mortality and water/bait trapping had 1.7% mortality. Again, these rates combine both acute and chronic deaths.  For acute deaths, the rate was about 0.28% for helicopter gathers, i.e., 1 death per 300 horses for large gathers. The study also notes that "given the capture-related mortality rates from these studies, and the recommendation that >2% capture mortality is unacceptable, it seems that BLM horse and burro welfare is generally being optimized to a level acceptable across other animal handling disciplines." The study also noted other wildlife capture mortality rates, such as for white-tail deer at 2% to 20.7% and caribou calves darted from helicopter at 0.5% to 4.1%. *See* **Exhibit A**.

11.     To ensure consistent standards and humane treatment by BLM staff and contractors involved in gathering, handling, or caring for wild horses and burros, BLM developed a Comprehensive Animal Welfare Program (CAWP), which formalized standard operating procedures while providing guidance and training to re-affirm and demonstrate the agency's commitment to humane treatment of wild horses and burros. The standard operating procedures were issued in 2015 following BLM consultation with, and input by, outside experts that included researchers, academia (from University of California Davis School of Veterinary Medicine) and veterinarians, to provide internal guidance for BLM WH&B Specialists and to ensure consistent humane treatment of wild horses and burros. *See* Wild Horse and Burro Comprehensive Animal Welfare Program, Permanent Instruction Memorandum 2021-002, available at: https://www.blm.gov/policy/pim-2021-002 (last visited August 21, 2025); ECF Nos. 40-2 & 40-3 [attaching CAWP standards]. The CAWP standard operating procedures are also incorporated as enforceable standards into contracts with independent contractors for gather and

operation of off-range corrals. In addition to these written CAWP standards, BLM has identified WH&B experts throughout the Western States who can be (and are) sent in small teams to ensure compliance with the CAWP, and to identify any remedial actions that may be required. More information regarding the CAWP is publicly available on BLM's website for the *Comprehensive Animal Welfare Program*, BLM, https://www.blm.gov/programs/wild-horse-and-burro/comprehensive-animal-welfare-program#:~:text=The%20Bureau%20of%20Land%20Management's,the%20agency's%20management%20and%20protection (last accessed August 21, 2025).

12.    All helicopter gather operations have an on-site veterinarian(s) from the U.S. Department of Agriculture Animal and Plant Health Inspection Service (APHIS) assessing and monitoring animal conditions on a daily basis, as well as consulting with the BLM gather staff to ensure the health and well-being of wild horses. If the veterinarian has concerns about the gather operations and wild horse welfare (including heat concerns), those are shared with the BLM Contracting Officer's Representative (COR) so prompt action can be taken to remedy any concerns.

13.    I am one of the 16 team members of BLM's Comprehensive Animal Welfare Program (CAWP) for the Wild Horse and Burro Program. The purpose of the CAWP is to re-affirm and demonstrate BLM's longstanding commitment to ensure that humane treatment of wild horses and burros in all on and off-Range management activities. BLM is committed to protecting animal welfare and providing humane care and treatment of wild horses and burros. The purpose of the CAWP Team is to advise and assist the CAWP Coordinator and the Wild Horse and Burro Program as we develop and implement components of the CAWP. As part of the CAWP Team, I assist in developing standards, training on the standards, and assist with completing internal formal assessments of management activities including gather operations. As a member of the CAWP Team, I have led on two and assisted with three CAWP Team Assessments for wild horse and burro gather operations, and I have also been assessed by the CAWP Team for wild horse and burro gather operations. I know the CAWP Standards and have worked to ensure those people that are on any wild horse and burro gathers are familiar and knowledgeable about the standards and that we ensure the care and compassion for the wild horses and burros that we manage. I was selected to be part of the CAWP Team because I was actively implementing the standards, had taken the initiative to complete self-assessment of the wild horse and burro gathers that I had conducted as a COR and Incident Commander (IC), as well as my on-range monitoring program and firsthand experience in handling difficult animal welfare situations on the range.

14.    Contrary to Ms. Leigh's declaration at paragraph 42, the first gather under the 2017 Gather Plan was in 2018. The Triple B Complex 2018 Wild Horse Gather started 1/31/2018 and concluded 2/23/2018. I was the IC for this gather.  During this gather, 1,389 wild horses were gathered and 1,327 excess wild horses were removed. A total of 62 animals were released which included 28 mares treated with fertility control. Out of 1,389 wild horses captured, the total mortality (from acute and chronic causes) was 30 wild horses or 2.1%. Only two (2) deaths occurred due to acute/sudden injuries caused by the gather, which represents a 0.1% acute mortality rate. Another 28 horses came in with pre-existing chronic conditions (e.g., blindness, infection, deformity, and hernia) and were humanely euthanized in accordance with BLM Permanent Instruction Memorandum (PIM) 2021-007 (Euthanasia of Wild Horses and Burros Related to Acts of Mercy, Health or Safety). *See* **Exhibit B**. These equate to a 2% mortality due

to pre-existing chronic conditions. Daily gather reports for the 2018 Triple B Complex are posted online at https://www.blm.gov/programs/wild-horse-and-burro/herd-management/gathers-and-removals/nevada/2018-Triple-B-Complex-wild-horse-gather (last visited August 21, 2025).

15.     The Triple B Complex 2019 Wild Horse Gather started 7/8/2019 and concluded 7/16/2019. I was the Incident Commander (IC) for this gather.  During this gather 804 wild horses were gathered and 803 excess wild horses were removed. Out of 804 wild horses captured, the total mortality (from acute and chronic causes) was 16 wild horses or 1.9%. Only six (6) deaths occurred due to acute/sudden injuries caused by the gather, which represents a 0.8% acute mortality rate. Another ten (10) horses came in with pre-existing chronic conditions (e.g., blindness, infection, deformity, and hernia) and were humanely euthanized in accordance with PIM 2021-007. These equate to a 1.1% mortality due to pre-existing chronic conditions. Daily gather reports for the 2018 Triple B Complex are posted online at https://www.blm.gov/programs/wild-horse-and-burro/herd-management/gathers-and-removals/nevada/2019-triple-b-complex-wild-horse-gather (last visited August 21, 2025). In reviewing the information from this gather, I discovered that the BLM's public website had reported incorrect numbers for acute and chronic deaths, although the total death number was correct. The website has been corrected.

16.     The Triple B Complex 2020 Water/Bait Wild Horse Gather started 7/28/2020 and concluded 8/22/2020. I was a COR for this gather.  During this gather 391 excess wild horses were gathered and removed. Out of 391 wild horses captured, the total mortality (from acute and chronic causes) was 9 wild horses or 2.3%. Only one (1) death occurred due to acute/sudden injuries caused by the gather, which represents a 0.2% acute mortality rate. Another 8 horses came in with pre-existing chronic conditions (e.g., blindness, infection, deformity, and hernia) and were humanely euthanized in accordance with PIM 2021-007. These equate to a 2% mortality due to pre-existing chronic conditions.  Daily gather reports for the 2020 Triple B Complex Emergency Water/Bait Gather are posted online at https://www.blm.gov/site-page/wild-horse-and-burro-herd-management-gathers-and-removals-2020-triple-b-maverick-medicine (last visited August 21, 2025).

17.     The Triple B Complex 2022 Wild Horse Gather started 7/15/2022 and concluded 8/25/2022. I was the Incident Commander (IC) for this gather.  During this gather 1,897 wild horses were gathered and 1,872 excess wild horses were removed. Approximately 100 animals were released and 50 mares were treated with fertility control. Out of 1,897 wild horses captured, the total mortality (from acute and chronic causes) was 23 wild horses or 1.2%. Only six (6) deaths occurred due to acute/sudden injuries caused by the gather, which represents a .3% acute mortality rate. Another 17 horses came in with pre-existing chronic conditions (e.g., blindness, infection, deformity, and hernia) and were humanely euthanized in accordance with PIM 2021-007. These equate to a .9% mortality due to pre-existing chronic conditions. Daily gather reports for the 2022 Triple B Complex gather are posted online at https://www.blm.gov/programs/wild-horse-and-burro/herd-management/gathers-and-removals/nevada-elko-do/2022-triple-b (last visited August 21, 2025)

18.     From July 18 through 20, 2022, a CAWP Team was present to assess the 2022 gather at the Triple B Complex. The CAWP team found that the 2022 Triple B Complex Wild Horse gather was being conducted in compliance with the Standards (96%).  The CAWP Team

Assessment Report is posted online at https://www.blm.gov/sites/default/files/docs/2022-07/Triple%20B%20Complex%20Gather%20CAWP%20July%202022%20Team%20Report.pdf (last visited August 24, 2025).

19.     The 2024 Maverick Medicine Emergency Water/Bait Gather started on 8/29/2024 and ended on 9/2/2024, with a total 109 excess wild horses gathered and removed. Out of the 109 captured, the total mortality (from acute and chronic causes) was 3 wild horses or 2.7%. One (1) death occurred due to acute/sudden injuries caused by the gather, which represents a 0.9% acute mortality rate during gather operations. Another two (2) horses came in with pre-existing conditions and were humanely euthanized in accordance with PIM 2021-007. These equate to 1.8.% mortality rate due to chronic pre-existing conditions. The daily gather reports for the Maverick-Medicine Emergency Wild Horse gather are posted online at https://www.blm.gov/programs/wild-horse-and-burro/herd-management/gathers-and-removals/nevada-elko-do/2024-maverick (last visited October 23, 2024).

20.     The BLM's policy on public and media observation is set out in Instruction Memorandum 2013-058. **Exhibit C**.  It says, "Every gather day is considered a public observation day unless the Agency Representative/Authorizing Officer (AR/AO) has made a decision to temporarily close or restrict access on public lands due to availability of gather observation sites, safety concerns or other considerations relevant to individual gather observations."

21.     I have been a Contracting Officer Representative (COR) or Incident Command (I.C.) for every helicopter and bait and water trap gather within the Ely District since 2006. Since then, we have not allowed public visitation or viewing of wild horses during any active bait and water trap operations. This is because, as outlined in the Final Environmental Assessment for the Antelope and Triple B Complexes Gather Plan that was issued in 2017, wild horses are reluctant to approach a bait/water trap site when there is too much activity or people can be seen. ATB_18053. Only essential gather operation personnel are allowed at the bait and water trap site during operations. Allowing public observation of a bait and water trap would interfere with the BLM's ability to capture wild horses and could be unsafe for the horses, BLM and contractor staff, and any public observers.

22.     In 2015, the BLM Ely District offered a one-day tour to some members of the public and the Resource Advisory Council (RAC) of a water trap operation in the Water Canyon Area (Antelope Complex), which was underway to catch and treat mares with GonaCon fertility control vaccine and then release the horses. However, during that tour, the BLM was not actively trapping wild horses. The purpose of the tour was to discuss with the RAC potential effects of the imunocontraceptive.

23.     The BLM generally offers public observation of helicopter gather operations, subject to restrictions to ensure the safety of the animals, BLM and contractor staff, and the public, as well as effectiveness of the gather.

24.     Depending on the location of the horses and the gather area, trap sites can be quite remote and can take up to several hours to reach via dirt or gravel roads.  Public viewing locations for traps must be a minimum of 1000 feet from an area that the helicopter may be herding horses or

flying over to comply with FAA and contract requirements. We try to put the public in an area where they can see most of the operation but far enough that when the helicopter or wranglers are working the animals they will not be disturbed by the public. Wild horses that have not been trapped or around humans tend to be very flighty and will react to many things around them. For the safety of the animals and wranglers, it is critical to minimize any unnecessary movements and noise. Due to the nature of a trap needing a geographical feature such as a hill, wash, or a turn so the horses can't see the trap before being herded into it, the public usually cannot be in a spot to see animals during the entire run. It is critical to locate observers and vehicles in a location to avoid scaring the animals or impeding the gather operation. Public observation locations are carefully selected to ensure the safety of the wranglers, animals, and members of the public, as well as to ensure a successful gather operation.

25.    Plaintiffs assert that any risks to observers can be limited by "having members of the public stay in their vehicles or by having members of the public sit down, without any movement or talking." MSJ at page 8. While that statement may be generally correct, the BLM takes those measures into account when selecting a given public observation site. Specific site factors dictate the best location for observers, including topography, weather, and trap setup. That may mean that vehicles must be parked at a distance that approaching horses cannot see them and so observation from vehicles would not be possible. Depending on where the horses are located in relation to the trap, the public may need to be located some distance away so the pilot has the ability to safely herd horses toward the trap from any direction. The BLM considers a great number of individual factors, but must follow BLM policy outlined in IM 2013-058. "The IC should work to ensure that the public/media have opportunities to safely observe gather activities at the trap-site and temporary holding facilities when practicable. The IC should also work to ensure that gather safety is maintained at all times and that the public/media's presence at the gather is successful."

26.    Temporary holding corral locations can be on private or public land and are selected by the contractor with the following needs in mind: proximity to a paved road for semi-trucks, needing access to close water for horses as well as dust abatement, a previously disturbed area big enough to hold the corrals for horses as well as storage for hay and equipment during the gather operation. The temporary holding corral area also needs to be in a location where the animals and equipment can be secured, and public viewing areas need to be located some distance away from the facilities to ensure the safety of the horses, members of the public, and BLM personnel. During the operation, trucks are moving horses from the trap site to the holding corral where horses are sorted by sex and age and stay for approximately 12 to 48 hours until they are shipped to an off-range facility. Trucks and equipment are generally moving around the area throughout the day loading/unloading animals, feeding, watering, and spraying water for dust abatement. At times equipment may be temporarily parked while completing a task and that may inadvertently interfere with public observation. When I have noticed the view of the public may be being blocked by equipment from the viewing location, I have asked the contractor or BLM to move it as to not impede their viewing. When this happens, it is generally people just accomplishing their tasks at the corrals and they are not intending to deliberately obstruct public observation.

6

27.     During the tour at the end of the day, the public is walked around generally within 25-40 feet of the temporary holding corrals depending on the behavior of the wild horses. We generally try to accommodate offering an end of the day tour, but depending on how long it takes to get from the trap site to the holding corral, how long it takes to sort the horses and get them fed/watered, and how long it takes them to settle down in their new environment, it may be too dark to offer the public a tour. Based on the behavior of wild horses after being trapped and worked, horses need to settle for at least 30 minutes after being worked, fed, and watered so they do not pose a danger to themselves or BLM/contractor staff. On a long day, that means that sometimes it is too dark to see anything or get pictures. Also, for the safety of BLM staff and the contractor, sometimes the day has been too long to offer public viewing of the temporary holding facilities. Those working on the gather, as well as the public, leave in the morning prior to sun up. BLM and contractor staff generally work 10-14 hours and then travel home in the dark. The added time for public viewing on an especially long day can pose numerous safety risks with added fatigue and driving at night. However, we generally try to accommodate public viewing on as many days as possible.

28.     The dark poses a safety hazard to the public observers and to the BLM staff due to uneven ground and the potential for falling. Additionally, the horses are more likely to be easily spooked or scared in the dark, especially in a new and unfamiliar environment with excessive movement and activity.

29.     I have been present and involved in selecting viewing locations for the Triple B Complex helicopter gathers in 2011, 2014, 2018, 2019, 2022, and 2024. During these gather events we had three different contractors. The contractor in 2011 was not the same contractor as the one in 2018 and 2019. Contractors and their pilots select the trap location and will frequently change the set up and location of a trap almost every time due to the way they feel the animals may want to go and their individual flying techniques, in order to ensure that the gather is safe and effective. Although the general area may be the same, the direction size and exact location of the trap will often differ. For example, in some instances the pilot will take horses into the valley and let them run back into the trap, while a different pilot may want to hook them around a point or hill into the trap. Although both techniques are effective, different techniques may require a change in the way the trap is positioned and how much equipment or people can be in the general area thus the viewing location is situated differently and can even change during a single gather operation for safety reasons and not to impede the gather operation. Thus was the case in the difference of viewing locations during the 2011 and 2018/2019 helicopter gather operations.

30.     The 2023 Antelope Complex South Wild Horse Gather started on 7/9/2023 and the gather operation ended on 7/25/2023, with a total of 1,107 wild horses being gathered. One holding corral and seven trap sites were used during this operation. The holding corral was located at a gravel pit on BLM land. Observers on the gather were able to view the trap site operation as well as view and tour holding every day throughout the gather. During this gather, Wild Horse Education had a representative present to observe the gather operation and holding every day but one. However, Laura Leigh was only present for ½ of a day on the first day of the operation and chose to stay at the holding corral and left at noon before operations concluded for the day.

31.     The 2024 Triple B Complex Wild Horse Gather started on 11/2/2024 and ended capture operations on 12/2/24, with a total of 2,163 wild horses being gathered. We had two holding corral locations and 13 trap sites during this gather. The holding corrals were set up on private land, however a viewing location was set up ½ a mile away at the first location and ¼ of a mile away at the second location where observers could view from. At the conclusion of each day when gather operations had commenced and animals were fed and watered, BLM offered a tour to allow observers to walk around the outside of the corrals to view the horses. There were 31 days for this gather operation (when gathering horses occurred), but 6 of those days we did not gather due to wind or moving the holding corral location. During this time, visitors viewed the trapping operation on all 25 days. A tour of the holding facility was offered on 23 of those days. The remaining two days were unavailable for holding facility tours because of unsafe conditions, since the distance/logistics of the trap site meant that it was dark before the public could return to the holding corral. On 11 of the 23 days where tours of the holding corrals were available, the tour of holding was declined by visitors. During this gather Wild Horse Education had a representative present at the trap sites and the holding corrals every day, however, Laura Leigh was not present at the gather or holding during this gather operation.

32.     The BLM prepared a Management Evaluation Report for the Antelope and Triple B Complexes and posted it for the public to review and comment on October 15, 2024. This report has the current and historic wild horse data for the complexes. The Antelope and Triple B Complexes Wild Horse Gather and Herd Management Area Plan Preliminary Environmental Assessment was posted for public comment on May 29, 2025. The BLM is currently reviewing those public comments and the BLM expects to issue a decision by the fall of 2025. Once the new decision is issued, it will supersede and replace the 2017 Decision. BLM does not currently anticipate gathering more animals under the 2017 Decision unless there is an emergency situation.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


BENJAMIN NOYES    Digitally signed by BENJAMIN NOYES
Date: 2025.08.25 08:29:22 -07'00'

BENJAMIN F. NOYES
Wild Horse and Burro Specialist
BLM Nevada, Ely District

# Third Declaration of Benjamin F. Noyes Exhibit A

Journal of Equine Veterinary Science 86 (2020) 102893



Contents lists available at ScienceDirect

# Journal of Equine Veterinary Science

journal homepage: www.j-evs.com



## Original Research

# Mortality and Operational Attributes Relative to Feral Horse and Burro Capture Techniques Based on Publicly Available Data From 2010-2019



## John Derek Scasta*

*Department of Ecosystem Science and Management, University of Wyoming, Laramie, WY*

### ARTICLE INFO

*Article history:*
Received 11 September 2019
Received in revised form
26 November 2019
Accepted 15 December 2019
Available online 20 December 2019

*Keywords:*
Ethics
Donkey
Free-roaming
Injury
Welfare

### ABSTRACT

Management of excessive feral horse (*Equus ferus caballus*) and burro (*Equus asinus*) populations in the United States and globally has been a controversial subject for decades. I reviewed all available US federal feral horse and burro daily gather reports from 2010 to 2019 to extract equine species, technique (bait trapping or helicopter gathering), reason (emergency or other), number gathered, number of mortalities, and mortality attributes (acute or chronic/pre-existing condition, specific cause). I found 70 reports (bait trapping burros n = 10, bait trapping horses n = 24, helicopter gathering horses n = 21) from 9 states (AZ, CA, CO, ID, MT, NV, OR, UT, WY) representing 28,821 horses and 2,005 burros. For bait trapping, 100 animals died (4 burros, 96 horses) with 16 acute causes (1 burro, 15 horses) and 84 chronic/pre-existing causes (3 burros, 81 horses). For helicopter gathering, 268 horses died with 62 acute causes and 206 chronic/pre-existing causes. Mortality ratios did not differ by capture technique (*P* > .05) for broken necks, emaciation, acute causes, or chronic/pre-existing causes. The most common mortality-causing problems were structural deformations, club foot, blindness, and emaciation. The more horses gathered per day resulted in a greater proportion of chronic/pre-existing mortalities for both trapping techniques, but only an increase of acute mortalities for helicopter gathering. The slope suggests 1 acute mortality for every 300 horses gathered. The capture mortality rate across all gathers [1.1% (368 mortalities out of 30,826 horses and burros captured)] is below a general threshold of 2% suggested for wildlife studies.

© 2020 Elsevier Inc. All rights reserved.

## 1. Introduction

Management of excessive feral horses (*Equus ferus caballus*) and burros (*Equus asinus*) in the United States has been a controversial and costly subject for many decades [1]. Population growth of these two equine species has been increasing dramatically over the last ten years with the current on-range population estimates of 88,090

*Animal welfare/ethical statement:* This is a third-party assessment of federally approved horse and burro gathers which are under the purview of the Bureau of Land Management (BLM).

*Conflict of interest statement:* The author has not received any funding for this particular mortality analyses and all research, analyses, and writing were conducted independent of BLM input. However, the author has received funding from BLM for unrelated research using GPS/VHF collars on feral horses and has been an observer of bait trapping and helicopter gathering in Wyoming, USA, only for the purposes of being on-site to place collars on horses.

* Corresponding author at: John Derek Scasta, Department of Ecosystem Science and Management, University of Wyoming, 1000 E. University Ave, Laramie, WY 82071.

*E-mail address:* jscasta@uwyo.edu.

animals (71,892 horses and 16,198 burros) which is greater than the federally mandated appropriate management level of 26,690 total horses and burros by a factor of >3× [2,3]. A common approach to feral horse and burro population management is gathering and removing horses from rangelands which is guided by the 1971 Wild Free-Roaming Horse and Burro Act (WFRHBA) [4] and subsequent amendments including in the 1976 Federal Land and Policy Management Act [5] and 1978 Public Rangelands Improvement Act [6]. Many of the feral horses and burros in the United States reside on public rangelands administered by the Bureau of Land Management (BLM) within the Department of the Interior; however, >46,000 horses and burros reside in "off-range" temporary holding and >90,000 free-roaming horses and burros also occur on Native American reservations [2,3].

The associated authority for equine gathering procedures are established for BLM Wild Horse and Burro Specialists and contracting partners by the 1971 WFRHBA as amended and are used regularly [4–6]. The standard operating procedures (SOPs) for gathering equids have been refined to optimize animal safety and include the use of helicopters and bait/water trapping [7]. In

https://doi.org/10.1016/j.jevs.2019.102893
0737-0806/© 2020 Elsevier Inc. All rights reserved.

J.D. Scasta / Journal of Equine Veterinary Science 86 (2020) 102893

addition, reporting requirements for BLM Wild Horse and Burro Specialists are mandated [8]. Bait and water trapping techniques (henceforth "bait trapping") have been around for millennia and use discrete water (in the summer) and feed (both in the summer or winter if forage is limiting) placed in a corral with a gate that can be closed remotely (Fig. 1A). In other countries, bait trapping horses is a common population management technique, such as Australia's Kosciuszko National Park (Fig. 1B) [9].

Helicopter gathering ("helicopter drive trapping" in some BLM documents; mustering in other regions of the world) is commonly used in extensive landscapes for gathering livestock and for capturing wildlife species [7,10,11] (Fig. 1C). Helicopter gathers use a helicopter to locate and then herd animals toward a set of corrals. For horses specifically, a ground crew is often used along with a domestic horse that leads horses into the corrals. Corrals often have wings comprised of light-weight material that is visible to animals to help funnel them to the corrals. In other countries, helicopter gathering is regularly used, such as for New Zealand's Kaimanawa horses (Fig. 1D) [12]. For both bait trapping and helicopter gathering, traps and temporary holding sites are placed as close to animal locations as possible to reduce the likelihood of injury and stress to the animals [7].

Regardless of technique, the physical handling of any large animal, including wildlife and livestock, brings certain risks for both the animals and their handlers [13]. For animals, such risks include acute injuries incurred during the gathering process or chronic and/or pre-existing conditions that either manifest during the gathering process or that are a welfare concern to supervising veterinarians, agency staff, contractors, and the public [14]. However, stationary bait trapping techniques differ from helicopter gathering techniques in terms of relative labor demands, time constraints, weather limitations, and physical stimulation and stress imposed on ungulates [15]. There is some evidence that helicopter gathering may affect feral horse reproduction [16] although other studies have shown no effect [17]. In addition, because horses and burros may incur new injuries or exacerbate old injuries or conditions during the gathering process, veterinary oversight beyond the mandate for helicopter gathers only may be necessary to optimize animal safety and welfare [7].

Thus, there exists many complex questions attributed to (1) the increase of feral horse and burro populations over the last decade, (2) the need to optimize animal safety during gather procedures, and (3) the need for a more in-depth understanding of daily capture rates of different capture techniques. I therefore analyzed publicly available data for US BLM—authorized horse and burro gathers nationally. I specifically addressed explicit research questions about mortalities relative to gather type, equine species, and operational attributes, specifically the number of animals gathered per day. This information will be of use to other countries seeking to adopt or revise capture techniques, will enhance US BLM horse and burro gathers for BLM staff planning and conducting gathers, and will inform veterinarians overseeing horse and burro health during gathers.

## 2. Materials and Techniques

### 2.1. Source of Data

From September 1 to November 25 of 2019, I reviewed all publicly available BLM feral horse and burro gather reports for all the western US states using daily gather reports [18]. These reports are the result of a 2010 mandated reporting requirement for BLM Horse and Burro Specialists [8]. Reports were reviewed and data were systematically extracted and organized into a database that included the equine species of focus for a gather (horse or burro), type of capture technique (bait trapping or helicopter gathering), reason for the gather (emergency or other), number of animals gathered, number of daily mortalities, and mortality attributes (acute or chronic/pre-existing condition, specific cause). By assessing daily gather reports, I then calculated proportions of mortality relative to the total number of animals gathered and relative to type of capture technique and the proportion of mortality attributes. These calculations were stratified for three capture technique and equine species combinations available in the data: bait trapping burros, bait trapping horses, and helicopter gathering horses. In addition, I calculated the number of animals gathered per successful gather day relative to capture technique and species.



**Fig. 1.** Demonstration of international use of equine capture techniques. (A) Bait trapping in Wyoming, USA, during the winter, (B) bait traps in Australia's Kosciuszko National Park, (C) helicopter gather in Wyoming, USA, and (D) helicopter gather (muster) of Kaimanawa horses in New Zealand. Photo credit for all photos to J.D. Scasta.

## 2.2. Statistical Analyses

I examined three explicit research questions. First, is bait trapping or helicopter gathering safer for horses and burros in terms of acute and/or chronic–pre-existing mortality causes? To accomplish this and for the appropriate analysis, I stratified equine mortalities at the individual gather level by equine species and cause (acute or chronic/pre-existing), calculated the proportion of equine mortalities relative to the total numbers of animals gathered, and transformed the proportions using an arcsine transformation to meet assumptions of normality. I then ran analysis of variance models with either acute mortality or chronic/pre-existing mortality as a response variable and capture technique (bait trapping or helicopter gather) and then equine species as main fixed effects. I then conducted pairwise comparisons between the three capture techniques and equine species combinations.

The second research questions was, is bait trapping or helicopter gather more effective in terms of daily capture success? For the number of animals gathered per successful gather day, I analyzed the mean number of animals gathered per day as the response variable and capture technique as the main fixed effect, and then similar to the aforementioned analyses, I conducted pairwise comparisons between the three capture techniques and equine species combinations [19]. Because ~92% of mortalities (337 of 367) occurred on days when equines were gathered, as opposed to days when they were only shipped or unsuccessful trap days, I then calculated the mean daily acute and chronic/pre-existing mortalities and plotted those relative to the mean number of equines gathered per day (only for days with at least 1 equine gathered) and used linear least squares regression stratified by capture technique to determine strength and significance of relationships.

The third research question was, what are the most frequent medical conditions leading to equine mortality? I thus summarized reported medical condition and cause of mortality or need for euthanasia for horses and burros relative to capture technique (bait trapping or helicopter) and acute or chronic/pre-existing status of the condition for 32 different identified medical conditions. Given the variability in detail and medical records provided, some of the reported categories are not mutually exclusive, and thus the presentation here reflects that level of variability rather than inclusivity or exclusivity. Finally, I also calculated mortality ratios for broken necks (a specific acute cause of mortality), emaciation (a specific chronic cause of mortality), acute mortalities, and chronic/pre-existing mortalities for horses relative to capture technique and then compared relative risk and mortality ratios between techniques using an independent samples t-test, effect size (Cohen's d), and 95% confidence intervals [19,20].

## 3. Results

### 3.1. Horse and Burro Gather Report Summary

I found 70 reports (bait trapping burros n = 10, bait trapping horses n = 24, helicopter gathering horses n = 21) from 9 states (AZ, CA, CO, ID, MT, NV, OR, UT, WY) representing 28,821 horses and 2,005 burros (Tables 1 and 2). Reports represented 1,006 unique daily gather activity summaries with 760 of the daily reports being successful gather days, where at least one horse or burro was gathered. No gather reports were available for New Mexico. In a few instances, gather reports were omitted because of confounding factors making it difficult to interpret data, particularly those gathers that were explicitly for administering contraception treatments for horses. The 70 gather reports with suitable data in total represented 30,826 total equids (2,005 burros captured with bait trapping, 5,564 horses captured with bait trapping, and

**Table 1**
Details about the bait trapping studies with publicly available gather reports including state, equine species, year, and name of gather.

| State | Species | Year | Name of Gather |
|---|---|---|---|
| AZ | Burro | 2017 | Planet Ranch *Nuisance* |
| | Burro | 2019 | Big Sandy *Nuisance* |
| | Burro | 2019 | Black Mountain *Nuisance* |
| CA | Burro | 2018 | Outside Chemehuevi |
| | Burro | 2018 | Piute Mountain |
| NV | Burro | 2017 | Johnnie |
| | Burro | 2017 | Marietta |
| | Burro | 2018 | Bullfrog |
| | Burro | 2019 | Bullfrog |
| | Burro | 2019 | Seven Troughs |
| CO | Horse | 2016 | Sand Wash Basin |
| | Horse | 2018 | Little Books |
| MT | Horse | 2015 | Pryor Mountain |
| NV | Horse | 2016 | Goshute *Emergency* |
| | Horse | 2016 | Maverick-Medicine *Emergency* |
| | Horse | 2016 | Pancake *Emergency* |
| | Horse | 2016 | Stone Cabin |
| | Horse | 2016 | Wood Hills *Emergency* |
| | Horse | 2017 | Antelope Valley Private Land |
| | Horse | 2018 | Antelope Valley and Goshute *Emergency* |
| | Horse | 2018 | Antelope Valley Deer Spring *Emergency* |
| | Horse | 2018 | Outside Goshute |
| | Horse | 2018 | Pancake |
| | Horse | 2018 | Spruce-Pequop *Emergency* |
| | Horse | 2018 | Wild Horse Range *Emergency* |
| | Horse | 2019 | Antelope Valley |
| | Horse | 2019 | Caliente Complex *Nuisance* |
| | Horse | 2019 | Red Rock *Emergency* |
| OR | Horse | 2016 | South Steens |
| | Horse | 2018 | South Steens |
| UT | Horse | 2018 | Cedar Mountain *Emergency* |
| | Horse | 2018 | Range Creek |
| WY | Horse | 2013 | McCullough Peaks |
| | Horse | 2017 | Adobe Town |

23,257 horses captured with helicopter gathering) (Table 3). Of those reports, 34 used bait trapping (Table 1) and 36 used helicopter gathering (Table 2). For burros, bait trapping techniques were the only technique used (never helicopter gathers of burros), but both bait/water trapping and helicopter gathering procedures were used for horses (Tables 1 and 2).

### 3.2. Total Mortalities Reported

Across all gather reports, 368 mortalities were reported, 364 horses and 4 burros, representing 1.26% of horses and <1% of burros (Table 3). Acute causes of mortality were noted for 77 horse mortalities and 1 burro mortality. Chronic/pre-existing causes of mortality were noted for 287 horse mortalities and 3 burro mortalities (Table 3).

### 3.3. Trap Techniques and Mortalities

Relative to capture technique, there were 148 daily gather reports for bait trapping burros, 402 daily gather reports for bait trapping horses, and 456 daily gather reports for helicopter gathering horses (Table 1). This accounted for 2,005 burros and 5,564 horses gathered with bait trapping and 23,257 horses gathered with helicopters. A total of 100 animals died during bait trapping (4 burros, 96 horses) with 16 acute mortality causes (1 burro, 15 horses) and 84 chronic/pre-existing causes (3 burros, 81 horses) (Table 3). A total of 268 horses died during helicopter trapping with 62 acute mortality causes and 206 chronic/pre-existing mortality causes (Table 3). The proportion of mortalities relative to the total number of animals gathered for acute mortality causes was 0.0005

**Table 2**
Details about the horse helicopter gathers with publicly available gather reports including state, year, and name of gather.

| State | Year | Name of Gather |
|---|---|---|
| CO | 2015 | West Douglas |
| | 2017 | Cathedral Creek |
| ID | 2015 | Soda Fire *Emergency* |
| | 2019 | Challis |
| NV | 2015 | Fish Creek |
| | 2015 | Humboldt |
| | 2015 | Little Fish Lake |
| | 2016 | Eagle and Silver King |
| | 2016 | Owyhee |
| | 2017 | Fox and Lake Range *Emergency* |
| | 2017 | Reveille |
| | 2018 | Eagle *Emergency* |
| | 2018 | Owyhee Complex *Emergency* |
| | 2018 | Silver King |
| | 2018 | Triple B Complex |
| | 2019 | Fish Creek |
| | 2019 | Triple B Complex |
| OR | 2015 | Kiger and Riddle Mountain |
| | 2018 | Cold Springs |
| | 2018 | Warm Springs |
| UT | 2017 | Cedar Mountain |
| | 2017 | Frisco |
| | 2018 | Bible Springs |
| | 2018 | Muddy Creek |
| | 2019 | Onaqui |
| | 2019 | Range Creek |
| WY | 2010 | Adobe Town, Salt Wells |
| | 2011 | Antelope Hills—Great Divide Basin |
| | 2011 | Antelope Hills—Red Desert Complex |
| | 2011 | Little Colorado and White Mountain |
| | 2012 | North Lander Complex Conant Creek |
| | 2013 | Adobe Town, Salt Wells |
| | 2014 | Checkerboard |
| | 2017 | Adobe Town, Salt Wells, Great Divide Basin |
| | 2018 | Red Desert Complex |
| | 2019 | Fifteen Mile |

($\pm$0.0005, standard error) for bait trapped burros, 0.0041 ($\pm$0.0015) for bait trapped horses, and 0.0028 ($\pm$0.0005) for helicopter gathered horses and did not differ for capture technique ($F = 1.181, P = .281$) but did differ for equine species ($F = 5.437, P = .023$; Fig. 2). The proportion of mortalities relative to the total number of animals gathered for chronic mortality causes was 0.0019 ($\pm$0.0012, standard error) for bait trapped burros, 0.0127 ($\pm$0.0050) for bait trapped horses, and 0.0073 ($\pm$0.0013) for helicopter gathered horses and did not differ for capture technique ($F = 0.340, P = .562$) but did differ for equine species ($F = 4.956, P = .029$; Fig. 2).

### 3.4. Horse Medical Conditions and Need for Euthanasia

Table 4 shows all reported medical conditions and causes of mortality (both natural and euthanasia) for horses and burros



**Fig. 2.** Proportion of equine mortalities relative to equine capture technique and acute or chronic/pre-existing medical condition. Proportion data were transformed using an arcsine transformation to meet assumptions of normality and analyzed with analysis of variance (ANOVA) models with either acute mortality or chronic/pre-existing mortality as a response variable and capture technique type (bait trapping or helicopter gather) and then equine species as main fixed effects. Pairwise comparisons between the three technique and equine species combinations were assessed and are considered significantly different with different letters (a, b) at $P < .05$. Data from 70 publicly available gather reports (bait trapping burros n = 10, bait trapping horses n = 24, helicopter gathering horses n = 21) from 9 US states (AZ, CA, CO, ID, MT, NV, OR, UT, WY) representing 28,821 horses and 2,005 burros from 2010 to 2019.

relative to capture technique (bait trapping or helicopter) and acute or chronic/pre-existing status of the condition. Regardless of gathering procedure, the most common health problems and mortality cause identified was structural deformations for 58 horses which in our assessment, included developmental abnormalities and improperly healed bone breaks that resulted in deformed limbs, joints, or other features. The second-most common, which is a more specified form of structural deformation, was club foot for 42 horses. The third-most common was blindness for 44 horses. In some cases, specific details about a missing eye or eye injury were provided. The fourth-most common was emaciation and poor body condition for 33 horses and 1 burro. Horses identified as being emaciated often also had other noted problems including being old and tooth wear (although these were not always mentioned). When emaciation was assessed relative to total animals caught per capture technique, mortality ratios were 0.0033 ($\pm$0.0025) and 0.0009 ($\pm$.0004) for bait and helicopter, respectively, but did not significantly differ [$P = .254$, Cohen's d = 0.304, 95% CI ($-0.217, 0.822$)] (Table 5). The fifth-most common was broken legs for 29 horses and 2 burros. The sixth-most common was unknown for 28 horses. Broken necks were noted for 21 horses and 1 burro. Broken neck mortality ratios were 0.0026 ($\pm$0.0014) and 0.0006 ($\pm$0.0003) for bait and helicopter respectively, but did not differ significantly [$P = .112$, Cohen's d = 0.425, 95% CI ($-0.099, 0.945$)] (Table 5). Broken legs and broken backs occurred in both capture

**Table 3**
Summary data for 70 horse and burro gathers in the United States from 2010 to 2019 based on capture technique, equid species gathered, total gather days reported, total animals gathered, and total animals mortalities relative to acute or chronic/pre-existing conditions.

| Capture Technique Equine Species | Gather Days | Total Animals Gathered | Total Animal Mortalities | [a]Acute Mortalities | [b]Chronic/Pre-Existing Mortalities |
|---|---|---|---|---|---|
| **Bait trapping** | | | | | |
| Burro | 148 | 2,005 | 4 | 1 | 3 |
| Horse | 402 | 5,564 | 96 | 15 | 81 |
| **Helicopter gathering** | | | | | |
| Horse | 456 | 23,257 | 268 | 62 | 206 |
| Total | 1,006 | 30,826 | 368 | 78 | 290 |

[a] Acute mortality considered when an animal dies or is euthanized due to acute injuries or medical conditions brought about by the gather and removal process including associated activities of capturing, sorting, and holding; includes undiagnosed mortalities.

[b] Chronic/pre-existing mortality considered when an animal dies or is euthanized for reasons related to chronic or pre-existing conditions such as poor body condition, lameness, serious physical defects, etc. Includes animals euthanized for conditions not brought about by the gather activity.

**Table 4**

Reported medical condition and cause of mortality or need for euthanasia for horses and burros relative to capture technique (bait trapping or helicopter) and acute or chronic/pre-existing status of the condition.

| Diagnoses/Condition/Cause | Bait Trapping | | Helicopter | | Total |
|---|---|---|---|---|---|
| | Acute | Chronic | Acute | Chronic | |
| Aortic aneurysm | | | 1 | | 1 |
| Blind | | 15 | | 29 | 44 |
| Broken back | | 2 | | 6 | 8 |
| Broken leg | 4 | 11 | 11 | 5 | 31 |
| Broken neck | 10 | | 12 | | 22 |
| Burn injuries | | | | 2 | 2 |
| Capture myopathy | | | 2 | | 2 |
| Cardiac arrest | | | 1 | | 1 |
| Club foot | | 23 | | 19 | 42 |
| Colic | | 1 | 1 | | 2 |
| Dehydration | | 2 | | | 2 |
| Emaciated | | 15 | | 19 | 34 |
| Head injury/fractured skull | | | 4 | 1 | 5 |
| Hernia | | | | 3 | 3 |
| Hip dislocation | | | | 1 | 1 |
| infection | | | | 1 | 1 |
| Laceration | | | 3 | | 3 |
| Lameness | | 3 | | 21 | 24 |
| Neurologic disorder | 1 | | | | 1 |
| New fatal injuries | | | 11 | | 11 |
| Parasite infestation | | | | 6 | 6 |
| Pneumonia | | 1 | | 5 | 6 |
| Pre-existing condition | | 1 | | 7 | 8 |
| Pre-existing wounds | | | | 7 | 7 |
| Seizure | | | 1 | | 1 |
| Strain | | | 5 | | 5 |
| Structural deformation | | 7 | | 51 | 58 |
| Tooth loss | | 1 | | 4 | 5 |
| Toxicity | | | 1 | | 1 |
| Tumors | | | | 2 | 2 |
| Unknown | 1 | 2 | 9 | 16 | 28 |
| Weak | | | | 1 | 1 |
| **Total** | **16** | **84** | **62** | **206** | **368** |
| **Euthanasia** | **6** | **81** | **30** | **187** | **304** |
| **Natural** | **7** | **1** | **27** | **4** | **39** |
| **Unknown** | **3** | **2** | **5** | **15** | **25** |

Data derived from 70 horse and burro gathers in the United States from 2010 to 2019 using publicly available gather data as administered by the Bureau of Land Management.

technique with broken backs only noted as chronic/pre-existing. Other less-frequent health conditions included aortic aneurysm (1), burn injuries (2), capture myopathy (2), cardiac arrest (1), colic (2), dehydration (2), head injury/fractured skull (5), hernia (3), hip dislocation (1), infection (1), laceration (3), lameness (24 horses [no burros] reported and details include arthritis, fetlocks, laminitis, etc., [21]), neurologic disorder (1), new fatal injuries undefined (11), parasite infestation (6), pneumonia (6), pre-existing condition (8),

pre-existing wounds (7), seizure (1), strain (5), tooth loss and wear (5), toxicity (1), tumors (2), and weakness (1) (Table 4).

Acute mortalities occurred in 10 of 24 bait trap gathers of horses and 23 of 36 helicopter gathers of horses (Table 5). Acute mortalities occurred in 15 of 5,564 horses caught with bait trapping and 62 of 23,257 horses caught with helicopter trapping (Table 5). For horse acute mortalities, the bait mortality ratio was 0.0041 ($\pm$0.0015) and the helicopter mortality ratio was 0.0028 ($\pm$0.0013), with a relative risk of 1.5. When analyzed, horse acute mortality ratios did not differ significantly [$P = .388$, Cohen's d $= 0.229$, 95% CI ($-0.290$ to 0.746)] (Table 5).

Chronic mortalities occurred in 13 of 24 bait trap gathers of horses and 26 of 36 helicopter gathers of horses (Table 5). Acute mortalities occurred in 81 of 5,564 horses caught with bait trapping and 206 of 23,257 horses caught with helicopter trapping (Table 5). For horse chronic mortalities, the bait mortality ratio was 0.0127 ($\pm$0.0050) and the helicopter mortality ratio was 0.0073 ($\pm$0.0013), with a relative risk of 1.7. When analyzed, horse acute mortality ratios did not differ significantly [$P = .220$, Cohen's d $= 0.326$, 95% CI ($-0.195$ to 0.845)] (Table 5).

### 3.5. Number Gathered Daily Relative to Capture Technique

For capture technique, the mean number of animals gathered per successful gather day was 20 ($\pm$6) for bait trapping burros, 19 ($\pm$3) for bait trapping horses, and 58 ($\pm$5) for helicopter gathering horses; significantly higher for helicopter gathering ($P < .001$; Fig. 3). The range of mean number of animals gathered per successful gather day was 7–63 for bait trapping burros, 4 to 67 for bait trapping horses, and 15 to 131 for helicopter gathering horses.

### 3.6. Mortalities Relative to Number Gathered per Day

When the average number of equids gathered per day was used to predict the mean daily mortalities only for days equids were actually gathered, relationships differed by equine species and capture technique. For bait trapping burros, the more burros trapped in a day had no significant or correlative effect on acute ($r^2 = 0.03$, $P = .656$) or chronic mortalities ($r^2 = 0.11$, $P = .341$) (Fig. 4A). For bait trapping horses, the more horses gathered per day had no significant or correlative effect on acute mortalities ($r^2 = 0.13$, $P = .083$); however, chronic mortalities increased ($r^2 = 0.36$, $P = .002$) (Fig. 4B). For helicopter gathering horses, the more horses gathered per day resulted in increased acute ($r^2 = 0.24$, $P = .003$) and chronic mortalities ($r^2 = 0.22$, $P = .004$) (Fig. 4C). When the slope ($m = 0.0035$) for the linear equation predicting increasing acute mortalities is examined, the increase of 1 additional acute mortality

**Table 5**

Mortality ratios for both capture techniques and relative risk for horse bait trapping relative to horse helicopter trapping for broken necks, emaciated condition, acute mortalities, chronic/pre-existing mortalities, and total mortalities.

| Metric | Broken Neck | Emaciated | Acute Mortalities | Chronic Mortalities |
|---|---|---|---|---|
| Bait gather occurrence (of 24 gathers) | 7 of 24 | 4 of 24 | 10 of 24 | 13 of 24 |
| Helicopter gather occurrence (of 36 gathers) | 8 of 36 | 8 of 36 | 23 of 36 | 26 of 36 |
| Bait horse occurrence (of 5,564 horses) | 9 of 5,564 | 14 of 5,564 | 15 of 5,564 | 81 of 5,564 |
| Helicopter horse occurrence (of 23,257 horses) | 12 of 23,257 | 19 of 23,257 | 62 of 23,257 | 206 of 23,257 |
| Bait mortality ratio ($\pm$ standard error) | 0.0026 ($\pm$0.0014) | 0.0033 ($\pm$0.0025) | 0.0041 ($\pm$0.0015) | 0.0127 ($\pm$0.0050) |
| Helicopter mortality ratio ($\pm$ standard error) | 0.0006 ($\pm$0.0003) | 0.0009 ($\pm$0.0004) | 0.0028 ($\pm$0.0013) | 0.0073 ($\pm$0.0013) |
| Relative risk (bait/helicopter) | 4.2 | 3.6 | 1.5 | 1.7 |
| $P$-value ($\alpha = 0.05$) | .112 | .254 | .388 | .220 |
| Effect size (Cohen's d) | 0.425 | 0.304 | 0.229 | 0.326 |
| 95% Confidence intervals (lower, upper) | $-0.099$, 0.945 | $-0.217$, 0.822 | $-0.290$, 0.746 | $-0.195$, 0.845 |

Data from 60 publicly available gather reports (bait trapping horses n = 24, helicopter gathering horses n = 21) from 9 US states (AZ, CA, CO, ID, MT, NV, OR, UT, WY) representing 28,821 horses from 2010 to 2019



**Fig. 3.** Number of horses and burros gathered per day across 10 burro bait trap gathers, 24 horse bait trap gathers, and 36 horse helicopter gathers from 2010 to 2019 as administered by the Bureau of Land Management. Numbers are derived for days reporting at least 1 animal gathered as some daily reports were days where trapping efforts were made but no animals were caught. Pairwise comparisons between the three technique and equine species combinations were assessed and are considered significantly different with different letters (a, b) at $P < .05$. Data from 70 publicly available gather reports (bait trapping burros n = 10, bait trapping horses n = 24, helicopter gathering horses n = 21) from 9 US states (AZ, CA, CO, ID, MT, NV, OR, UT, WY) representing 28,821 horses and 2,005 burros from 2010 to 2019.

daily could be expected with gathering an additional 300 horses per day.

## 4. Discussion

### 4.1. Gathering Equids Reveals Many Chronic/Pre-existing Medical Conditions

The process of gathering equids, regardless of capture technique, reveals many chronic and pre-existing medical conditions from which feral horses and burros may be suffering. Structural deformities were the most common medical condition and included a wide range of conditions including deformities from developmental origins, improperly healed broken bones, etc. Specific structural deformities were diagnosed in some cases such as club foot which was the second-most prevalent issue. A limitation of this study is that often there were very limited details regarding the diagnoses of mortality making it difficult to understand more specific death causes. Regardless, research on feet of wild horses in New Zealand also revealed a frequent occurrence of foot abnormalities and undesirable foot morphometric traits [22]. Such feet problems can lead to subchondral bone sclerosis particularly in horses with severe articular cartilage damage with severity increasing as horses aged in the same population of New Zealand wild horses [23]. Reintroduction of Przewalski's horses (*Equus ferus przewalskii*) includes a selection criterion of captive breeding stock that addresses horse hooves [21]. Furthermore, lameness was noted in more than ten horses, and while causality for lameness was difficult to ascertain from the reports, it was often associated with feet and lower legs (i.e., fetlocks). Problems of the eyes, particularly blindness in one or both eyes, were the third-most common medical condition. Although blindness has not been studied much in wild horses, trauma can be a cause of blindness in horses generally and can be attributed to both perforation injury and blunt trauma injury leading to optic nerve atrophy [24].

### 4.2. Emergency Gathers Have Greater Frequency of Chronic/Pre-existing Medical Conditions

The greater relative occurrence for associated chronic/pre-existing mortalities may likely be skewed as a function of the greater proportion of emergency gathers. Specifically in this data set, emergency gathers of horses represented 42% of the bait trap gathers (10 of 24) but only 11% (4 of 36) of helicopter gathers. A plausible argument could be made that the prompt for emergency gathers is often inadequate forage and/or water and thus horses and burros that subsequently have lower body condition and other problems such as reduced immunity, etc. This notion is supported by relative proportion of emaciated horses for the different capture techniques (Table 5). Thus, prudence in capturing and shipping emaciated animals should be part of the welfare consideration integrated into wild horse and burro management similar to other wild herbivore management programs [25].

### 4.3. Helicopter Gathering Does Not Present Any Greater Risk of Mortalities

Helicopter gathering may be as safe, if not safer than bait trapping—a conclusion that seems counterintuitive given the perception that helicopter gathering may be perceived as a more dangerous and physically demanding technique particularly given the agitated escape behavior wild equids display in response to helicopters [12,26]. The notion of no greater risk for helicopter gathering may be supported by the proportionally lower incidence of broken necks and lack of statistical differences specifically and the similar proportion of acute mortalities generally when compared with bait trapping. Greater emphasis on SOPs for (1) gather operations generally [7], (2) daily gather reporting specifically [8], and (3) for helicopter pilots certification [27] may all have collectively enhanced gather implementation. In addition, in 2010, a private horse protection group worked with BLM to develop an Independent Designated Observer Pilot Program with independent observers (IOs), where equine specialists not affiliated with BLM observed 3 gathers in 3 states of a total of 352 horses [28]. The IOs observed four mortalities and multiple injuries and concluded that contractors and BLM staff were skilled at avoiding excessive stress on captured animals but also gave recommendations to improve facility design, handling of the horses, sorting techniques, transport practices, etc. [28]. Specifically, a focused emphasis on the design of gathers to optimize the care and welfare of horses and the precision with which pilots are handling horses and burros from the air may be outcomes of such high-level administrative direction and participatory involvement. In addition, helicopter gathering has a greater daily capture rate and may optimize animal handling times.

### 4.4. Need to Better Understand Unknown Mortality Causes and Capture Myopathy of Horses

Interestingly, capture myopathy was only noted for the death of 2 horses. The unknown causes of death in horses, coupled with the documented deaths attributed to strain/stress, seizure, and cardiac arrest (Table 4), in this study could be attributed to capture myopathy [13]. Capture myopathy is a noninfectious metabolic disease that is most commonly associated with pursuit, capture, restraint, and transportation of animals and the induced stress that can lead to death either during or after capture efforts [29]. Unfortunately, capture myopathy has been persistently difficult to diagnose and includes several different clinical syndromes including capture shock syndrome, ataxic myoglobinuric syndrome, ruptured muscle syndrome, and delayed peracute syndrome [13]. Owing to the absence of more detailed medical data

J.D. Scasta / Journal of Equine Veterinary Science 86 (2020) 102893

7



**Fig. 4.** Comparison of mean daily mortalities relative to mean number of equines gathered per day for (A) bait trapping burros, (B) bait trapping horses, and (C) helicopter gathering horses. Data from 70 publicly available gather reports (bait trapping burros n = 10, bait trapping horses n = 24, helicopter gathering horses n = 21) from 9 US states (AZ, CA, CO, ID, MT, NV, OR, UT, WY) representing 28,821 horses and 2,005 burros from 2010 to 2019. Significant trendlines graphed as solid lines for acute mortalities and dashed lines for chronic mortalities.

necessary to confirm diagnoses, more thorough investigations of unknown death causes are needed, particularly for helicopter gathers [30].

### 4.5. Comparison of Equid Mortality Rates to Other Wildlife Species and Capture Techniques

The total capture mortality rate across all gathers in this study [1.1% (368 mortalities of 30,826 horses and burros captured)], or for specific horse capture techniques (bait mean = $1.7\% \pm 0.5\%$ SE; helicopter mean = $1.0\% \pm 0.1\%$ SE), can be compared with capture-related mortality rates published for other wildlife species. For 5 wildlife species chemically immobilized in Scandinavia, the mean mortality rate was 2.3% and ranged from 0.7% to 3.9% [31]. For

white-tailed deer caught with 4 different physical trapping techniques, capture-related mortality rates ranged from 2.0% to 20.7% [32]. For caribou calves darted from a helicopter, capture-related mortality rates ranged from 0.5% to 4.1% [33]. Thus, given the capture-related mortality rates from these studies, and the recommendation that >2% capture mortality is unacceptable [31], it seems that BLM horse and burro welfare is generally being optimized to a level acceptable across other animal handling disciplines [31]. It is important to note however that for several individual gathers, mortality rates exceeded 2% mortality. Two gathers were emergency gathers that had mortality rates >3.5% and >10.5% (2018 Wild Horse Range Emergency gather and 2016 Goshute Emergency gather, both in Nevada). In addition, one helicopter gather had a mortality rate >3.5% due to a prevalence of genetically related

structural deformations and lameness (2018 Warm Springs gather in Oregon, specifically "*angular limb deformities (ALD), conditions were indicated by club feet, severely overgrown hoof walls, collapsed heals, limb deformity, arthritic joints, toes pointed out at the fetlock, and lameness*"). Thus, a distinguishing feature of the US federal horse and burro management is the intervention when forage and water is limiting and/or when horses are suffering from other health problems, which is fundamentally different than capturing healthy animals for wildlife research. This emphasizes the continued need for quality equine veterinary care and the importance of having detailed medical history and veterinarian diagnoses and/or necropsies to move beyond lay terms and general attributions of mortalities.

## 5. Conclusions

This study assesses feral equine capture techniques in the United States, which is an important tool for when horse and burro overpopulation threatens the "thriving natural ecological balance" of rangelands [32,33]. My objective analyses of publicly available BLM equine gather data over 70 gathers, 9 states, 30,826 horses and burros, and a 10-year period has allowed for quantitative analyses that suggests helicopter gathering presents no additional risk for acute mortalities than bait trapping. Moreover, helicopter trapping can capture more horses per day. I also have provided details that both veterinarians and federal horse managers can use proactively when preparing for and supervising gathers; specifically, being aware of structural deformities, feet problems, blindness, and a greater prevalence of emaciated horses or acute mortality manifestations relative to capture technique and reason for a gather. In addition, emergency gathers may have a greater risk of mortalities attributed to handling weaker and sicker horses. My results should be considered in the context of repeatedly gathering mares for other treatments and could also guide animal welfare frameworks for US horses and burros [34–37].

## References

[1] Garrott RA, Oli MK. A critical crossroad for BLM's wild horse program. Science 2013;341:847–8.
[2] Scasta JD, Hennig J, Beck JL. Framing contemporary US wild horse and burro management processes in a dynamic ecological, sociological, and political environment. Hum Wildl Interact 2018;12:31–45.
[3] BLM. Program data, Bureau of Land management. Department of Interior; 2019. https://www.blm.gov/programs/wild-horse-and-burro/about-the-program/program-data. [Accessed 3 November 2019].
[4] Public Law 92-195. The wild free-roaming horses and burros Act of 1971. Washington, DC: Authenticated U.S. Government information. United States Government Printing Office; 1971.
[5] Public Law 94-579. The Federal Land policy and management Act of 1976 as amended. Washington, DC: Authenticated U.S. Government information. United States Government Printing Office; 1976.
[6] Public Law 95-514. Public rangelands improvement Act of 1978. 43 USC 1901. Washington, DC: Authenticated U.S. Government information. United States Government Printing Office; 1978.
[7] BLM. Appendix D Standard operating procedures for wild horse gathers. Bureau of Land Management, Department of Interior; 2019. https://eplanning.blm.gov/epl-front-office/projects/nepa/100793/148759/182713/Standard_Operating_Procedures_for_Wild_Horse_Gathers.pdf. [Accessed 1 January 2020].
[8] BLM. Wild horse and burro gather daily reporting policy. Bureau of Land Management, Department of Interior; 2010. https://www.blm.gov/policy/im-2010-162. [Accessed 3 November 2019].

[9] Driscoll DA, Worboys GL, Allan H, Banks SC, Beeton NJ, Cherubin RC, et al. Impacts of feral horses in the Australian Alps and evidence-based solutions. Ecol Manag Restor 2019;20:63–72.
[10] Hawley AWL, Peden DG. Effects of ration, season, and animal handling on composition of bison and cattle blood. J Wildl Dis 1982;18:321–38.
[11] Phillips C. Welfare and cattle behavior. In: Cockcroft PD, editor. Bovine medicine. Hoboken, NJ: John Wiley & Sons, Inc; 2015.
[12] Linklater WL, Cameron EZ. Escape behavior of feral horses during a helicopter count. Wildl Res 2002;29:221–4.
[13] West G, Heard D, Caulkett N. Zoo animal and wildlife immobilization and Anesthesia. 2nd ed. Hoboken, NJ: John Wiley & Sons, Inc; 2014.
[14] Peterson MN, Lopez RR, Frank PA, Peterson MJ, Silvy NJ. Evaluating capture methods for urban white-tailed deer. Wildl Soc Bull 2003;31:1176–87.
[15] White GC, Bartmann RM. Drop nets versus helicopter net guns for capturing mule deer fawns. Wildl Soc Bull 1994;22:248–52.
[16] Ashley MC, Holcombe DW. Effect of stress induced by gathers and removals on reproductive success of feral horses. Wildl Soc Bull 2001;29:248–54.
[17] Hansen KV, Mosley JC. Effects of roundups on behavior and reproduction of feral horses. Rangel Ecol Manag 2000;53:479–82.
[18] BLM. Wild horse and burro gather and removal reports. Bureau of Land Management, Department of Interior; 2019. https://www.blm.gov/programs/wild-horse-and-burro/herd-management/gathers-and-removals. [Accessed 3 November 2019].
[19] JASP Team. JASP Version 0.11.1 software. University of Amsterdam; 2019.
[20] Loneragan GH, Dargatz DA, Morley PS, Smith MA. Trends in mortality ratios among cattle in US feedlots. J Am Vet Med A 2001;219:1122–7.
[21] Budras KD, Scheibe K, Patan B, Streich WJ, Kim K. Laminitis in Przewalski horses kept in a semireserve. J Vet Sci 2001;2:1–7.
[22] Hampson BA, Ramsey G, Macintosh AMH, Mills PC, De Laat MA, Pollitt CC. Morphometry and abnormalities of the feet of Kaimanawa feral horses in New Zealand. Aust Vet J 2010;88:124–31.
[23] Cantley CE, Firth EC, Delahunt JW, Pfeiffer DU, Thompson KG. Naturally occurring osteoarthritis in the metacarpophalangeal joints of wild horses. Equine Vet J 1999;31:73–81.
[24] Martin L, Kaswan R, Chapman W. Four cases of traumatic optic nerve blindness in the horse. Equine Vet J 1986;18:133–7.
[25] Hampton JO, Jones B, Perry AL, Miller CJ, Hart Q. Integrating animal welfare into wild herbivore management lessons from the Australian Feral Camel Management Project. Rangel J 2016;38:163–71.
[26] Walzer C, Kaczensky P, Ganbaatar O, Lengger J, Enkhsaikhan N, Lkhagvasuren D. Capture and anaesthesia of wild Mongolian Equids – the Przewalski's horse (Equus ferus przewalskii) and Khulan (E. hemionus). Mong J Biol Sci 2006;4:19–29.
[27] BLM. Wild horse and burro program aviation handbook. Bureau of Land Management, Department of Interior; 2009. https://www.blm.gov/sites/blm.gov/files/uploads/Media_Library_BLM_Policy_H-4740-1.pdf. [Accessed 1 January 2020].
[28] Greene E, Heleski C, Ralston S, Stull C. Academic assessment of equine welfare during the gather process of the Bureau of Land Management's wild horse and burro program. J Equine Vet Sci 2011;31:352–3.
[29] Breed D, Meyer LCR, Steyl JCA, Goddard A, Burroughs R, Kohn TA. Conserving wildlife in a changing world: understanding capture myopathy – a malignant outcome of stress during capture and translocation. Conserv Physiol 2019;7:1–21.
[30] Hofmeyer JM, Louw GN, Du Preez JS. Incipient capture myopathy as revealed by blood chemistry of chased zebras. Madoqua 1973;1:45–50.
[31] Arnemo JM, Ahlqvist P, Andersen R, Bernsten F, Ericsson G, Odden J, et al. Risk of capture-related mortality in large free-ranging mammals: experiences from Scandinavia. Wildl Bio 2006;12:109–14.
[32] Haulton SM, Porter WF, Rudolph BA. Evaluating 4 methods to capture white-tailed deer. Wildl Soc Bull 2001;29:255–64.
[33] Valkenburg P, Tobey RW, Kirk D. Velocity of tranquilizer darts and capture mortality of caribou calves. Wildl Soc Bull 1999;27:894–6.
[34] NRC. Using science to improve the BLM wild horse and burro program: a way forward. Washington, DC: National Research Council, National Academies Press; 2013.
[35] Smith MA. Impacts of feral horses grazing on rangelands: an overview. J Equine Vet Sci 1986;6:236–8.
[36] Hampton JO, Robertson H, Adams PJ, Hyndman TH, Collins TC. An animal welfare assessment framework for helicopter darting: a case study with a newly developed technique for feral horses. Wildl Res 2016;43:429–37.
[37] Hampton JO, Edwards GP, Cowled BD, Forsyth DM, Hyndman TH, Perry AL, et al. Assessment of animal welfare for helicopter shooting of feral horses. Wildl Res 2017;44:97–105.

# Third Declaration of Benjamin F. Noyes Exhibit B

U.S. DEPARTMENT OF THE INTERIOR
**BUREAU OF LAND MANAGEMENT**

**EUTHANASIA OF WILD HORSES AND BURROS RELATED TO ACTS OF MERCY, HEALTH OR SAFETY.**

*PIM 2021-007*
Permanent Instruction Memorandum

### United States Department of the Interior

BUREAU OF LAND MANAGEMENT

Washington, D.C. 20240

https://www.blm.gov

May 26, 2021

In Reply Refer To:

4730 (260) P

**Permanent Instruction Memorandum No. 2021-007 (Revised)**

To:         All Field Office Officials

From:       Assistant Director, Resources and Planning

Subject:    Euthanasia of Wild Horses and Burros Related to Acts of Mercy, Health or Safety.

**Program Area:** Wild Horse and Burro (WHB) Program

**Purpose:** This Permanent Instruction Memorandum (PIM) establishes policy and procedures for the euthanasia of wild horses and burros managed by the Bureau of Land Management (BLM) when the BLM determines, consistent with this policy, an appropriate end-of-life action is required for reasons related to acts of mercy, health or safety.

**Policy/Action:** Effective immediately, all BLM state, district, and field offices must comply with the policies described in this PIM. The key aspects of this policy are the authority, training, approved methods, reporting documentation, and reasons for euthanizing a wild horse or burro related to acts of mercy, health, or safety (Attachments 1 and 2).

The Authorized Officer (AO) or the Authorized Officer's Representative (AR) will euthanize or authorize the euthanasia of a wild horse or burro when any of the following conditions exist:

1. Sickness, failing health, or an infirmity, disease, injury, lameness, or serious physical condition or defect that has a poor prognosis for improvement or chance of recovery. This includes conditions that are not treatable or when treatment is impractical for a wild horse or burro in its present setting.

2. A Henneke body condition score (Attachment 2) of less than three with a poor prognosis for improvement.

3. Old age characterized by physical deterioration, the inability to fend for itself, suffering or closeness to death.

4. Direction from a state or federal animal health official ordering the euthanasia of the animal as a disease control measure.

5. The animal exhibits dangerous characteristics beyond those inherently associated with the wild characteristics of wild horses and burros.

6. The animal poses a public safety hazard (e.g., loose on a busy highway), has escaped from a facility or pasture or is otherwise roaming freely in an unauthorized area and an alternative remedy (capture, relocation or return to a herd management area (HMA), pasture or facility) is not immediately available.

**Budget Impact:** None.

**Background:** The authority for euthanizing a wild horse or burro is provided by Public Law 92-195, Wild Free-Roaming Horses and Burros Act of 1971 Section 1333 (b)(2)(A) and 43 CFR 4730.l. The policy contained in this PIM amends and/or replaces previous policies contained in BLM Handbook H-4750-1 Wild Horse and Burro Preparation and Management and in BLM Handbook H-4700-1 Wild Horses and Burros Management.

The humane care of wild horses and burros on the range, during gathers, or located on off-range corrals/pastures or other facilities require periodic evaluation of their condition by qualified BLM personnel or a veterinarian to provide for their well-being. At times, these evaluations will result in decisions that require euthanasia. These decisions are made with the intent to prevent animal suffering through acts of mercy, protecting animal and public health and safety, and the definitions of "old, sick and lame" that are provided in 43 CFR 4700.0-5 as follows:

1. Old Wild Horse or Burro - Characterized because of age by its physical deterioration and inability to fend for itself, suffering, or closeness to death.

2. Sick Wild Horse or Burro - A wild horse or burro with failing health, infirmity, or disease from which there is little chance of recovery.

3. Lame Wild Horse or Burro - A wild horse or burro with one or more malfunctioning limbs that permanently impair its freedom of movement.

**Pages of Manual/ Handbook Sections Affected:** This IM supersedes the Wild Horses and Burros Management Handbook, H-4700-1 Section 4.9.

**Instruction Memorandums Affected:** This IM replaces expired IM 2015-070, Animal Health, Maintenance, Evaluation and Response

**Coordination:** This PIM was coordinated among HQ-100, HQ-200, HQ-260, HQ-600, WHB State Leads, APHIS Veterinarian, WHB Facility Managers, and WHB Specialists.

**Contact:** Direct all questions regarding this IM to the Division Chief, Wild Horse and Burro Program (HQ-260) at 866-468-7826 or wildhorse@blm.gov.

Signed by:              Authenticated by:

David Jenkins             Ambyr Fowler

Assistant Director         Division of Regulatory Affairs and Directives, (HQ-630)

Resources and Planning

3 Attachments

1. Guidance for Euthanasia Related to Acts of Mercy, Health, and Safety (11 pp)
2. Henneke Equine Body Condition Scoring Chart (1 p)
3. Firearms training and certification

ATTACHMENTS

**PIM2021-007 ATT1 WHB EUTHANASIA POLICY (UPDATED)** (PDF / 537 KB)
**PIM2021-007 ATT2- HENNEKE BODY SCORING CHART** (PDF / 243 KB)
**PIM2021-007 ATT3- FIREARMS TRAINING AND CERTIFICATION** (PDF / 84 KB)

FISCAL YEAR

2021

## Attachment 1:  Guidance for Euthanasia

## I.    Euthanasia for Reasons Related to Acts of Mercy or Health and Safety

The Authorized Officer (AO) will authorize the euthanasia of a wild horse or burro when any of the following conditions exist:

A. Sickness, failing health, or an infirmity, disease, injury, lameness, or serious physical condition or defect that has a poor prognosis for improvement or little chance of recovery. This would include conditions that are not treatable or for which treatment is impractical for a wild horse or burro in its present setting. This includes but is not limited to the following:

   1.  Severe tooth loss or wear.
   2.  Club foot, particularly those that are beyond vertical or affect more than one foot.
   3.  Permanent blindness; particularly double eye blindness or single eye blindness that involves an injury or condition that would require treatment or single eye blindness to which the animal is not well adjusted.
   4.  Cryptorchidism that is bilateral.
   5.  Cryptorchidism that is unilateral and cannot be completely corrected with confidence by castration.
   6.  Enlarged joints or deformed limbs such as from injury or severe arthritis.
   7.  Other serious or severe acquired, developmental, or congenital abnormalities.

B. A Henneke body condition score (Attachment 2) of less than three with a poor prognosis for improvement.

C. Old age characterized by physical deterioration, the inability to fend for itself, suffering, or closeness to death.

D. Direction from a state or federal animal health official ordering the humane  destruction of the animal as a disease control measure.

E. The animal exhibits dangerous characteristics beyond those inherently associated  with the wild characteristics of wild horses and burros.

F. The animal poses a public safety hazard (e.g., loose on a busy highway), has escaped from a facility or pasture or is otherwise roaming freely in an unauthorized area and an alternative remedy (capture, relocation, or return to a herd management area (HMA), pasture or facility) is not  immediately available.

## II.    Authorized Delegations and Required Training

A.  Authority to Authorize Euthanasia

Decisions regarding the euthanasia of a wild horse or burro rest solely with the Bureau of Land Management's (BLM's) AO, defined in 43 CFR 4700.0-5 as "any employee of the Bureau of Land Management to whom has been delegated the authority to perform the duties described herein," or the Authorized Officer's Representative (AR) (persons designated by the AO as described in 43 CFR 4730.1). In some cases, the decision to euthanize an animal must be made in the field and cannot always be anticipated. To minimize suffering by providing euthanasia in a timely manner, managers should have a sufficient number of individuals trained to perform euthanasia that meet the state director's firearm standards, the requirements outlined in 43 CFR 4700, and in this Instruction Memorandum. When possible, a veterinarian should be consulted prior to euthanasia unless circumstances necessitating euthanasia are urgent or obvious (e.g., a broken leg or other severe injury) and a logistical delay in obtaining this consultation would only prolong an animal's suffering.

B.  Authorization to Perform Euthanasia

Authorized Officers may delegate the authority to perform euthanasia in writing to anyone known to the AO to have completed required training, skill, experience, and equipment to perform euthanasia described in this policy (See Guidance for Euthanasia Related to Acts of Mercy, Health, Safety Section D.). Individuals to whom the AO may consider delegating this authority include BLM employees, veterinarians, individuals under contract with the BLM, individuals performing duties under assistance agreements with the BLM, federal, or state wildlife management officers, animal control officers, and law enforcement officers.

On gathers, at preparation facilities (facilities where animals are prepared for transport or adoption), at off-range corrals (ORC) or off-range pastures (ORP) facilities, and at inmate training facilities, the AO is responsible for ensuring trained personnel are available to perform euthanasia at appropriate times. This includes anytime when wild horses or burros are being captured, sorted, worked, or loaded for transportation, regardless of location. At adoptions and public events, the AO will ensure that a veterinarian is on-site or on-call to perform timely and discreet euthanasia if necessary, as an act of mercy.

C.  Training Requirements

Only persons trained by a veterinarian on how to perform euthanasia will be authorized to perform euthanasia. All personnel authorized to perform euthanasia will be trained to use gunshot. Only those specifically trained on the techniques for injection or captive bolt are authorized to use these techniques. Any veterinarian known to the AO to have the necessary knowledge and experience with the methods described herein may provide this training. This training will not require recertification on an annual basis; however, the Washington Office (WO) may direct individuals to take refresher training if there are significant changes in the acceptable practices.

Attachment 1-2

When a firearm (includes captive bolt guns) is used to perform euthanasia by a non-BLM employee, that individual must also have formal training or certification in firearms safety. Appropriate certification for non-BLM personnel would include a hunter or firearms safety qualification recognized as satisfying a state-mandated hunter safety requirement or a firearms safety class certified by the National Rifle Association, law enforcement, or military program.

BLM employees performing euthanasia with a free-bullet or captive bolt gun must be authorized to use a firearm by the state director and meet all requirements specified in the state office firearms policy. If a state has not issued a firearms policy addressing Wild Horses and Burros (WHB) euthanasia, the BLM employees performing euthanasia must complete annual training for certification in firearms safety and shooting proficiency in accordance with current BLM policy (see attachment 3).


## III.    Euthanasia Related to Specific WHB Management Activities

### A.   Euthanasia On-The-Range

This section sets euthanasia policy for the BLM in field situations associated with on-the-range WHB management, including lands other than those administered by the BLM where WHBs are present.

The BLM WHB specialist responsible for management of an HMA will evaluate the condition of wild horses and burros throughout the year during routine resource monitoring efforts. If an animal is suffering from any of the conditions listed in A through F above, the animal should be euthanized, if possible, on the range as an act of mercy. If euthanasia is not possible, humane killing as described in Section F below may be performed as an act of mercy. On the range, the euthanasia may be performed by any BLM employee or other qualified individual that has been delegated that authority by the AO, successfully completed the required training in euthanasia and firearms safety as described above and has the appropriate equipment available.

### B.   Euthanasia During Gather Operations

During gather operations, the Contracting Officers Representative (COR), as delegated by the AO prior to the gather, will authorize the release or euthanasia of any wild horse or burro that they believe will not tolerate the handling stress associated with transportation, adoption/sales preparation, or holding. No wild horse or burro should be released or shipped to a preparation or other facility with a preexisting condition that requires immediate euthanasia as an act of mercy. The COR or Project Inspector (PI) should, as an act of mercy and after consultation with a veterinarian if present, euthanize any animal that meets any of the conditions described in A through F above.

Attachment 1-3

C. Euthanasia at Off-Range Corrals, including Inmate Training Facilities

If euthanasia is necessary at an ORC facility it will be performed by a trained and qualified individual as authorized by the AO. The BLM employees and contractors follow comprehensive animal welfare program standards to protect the health and welfare of wild horses and burros under their care.  However, acute or chronic problems can develop during the captivity and handling of wild animals that must be humanely addressed by euthanasia. Some conditions may not immediately be apparent during gathers or other points of origin, require additional assessment or evaluation over time, or may best be addressed after an animal is moved to an ORC or preparation facility. Euthanasia at all ORC and preparation facilities will be applied as follows:

1. If an animal is affected by any of the conditions described in A through F above that causes acute pain or suffering and immediate euthanasia would be an act of mercy, the AO must ensure the animal is immediately euthanized.

2. If an animal is affected by any of the conditions described in A through F above, but is not in acute pain, the AO should first consult a veterinarian.  For example, if the animal has a physical defect or deformity that would adversely affect its quality of life, if placed in the adoption program or in ORP facilities, but acute suffering is not apparent, a veterinarian should be consulted prior to euthanasia. If the consultation confirms the animal meets a condition described in A through F above, the animal will be euthanized in a timely manner.

3. If the AO or AR concludes, after consultation with a veterinarian, that an animal in an ORC facility is affected by any of the conditions described in A through F above or cannot tolerate the stress of transportation to another facility or adoption preparation, then the animal will be euthanized.

D. Euthanasia at Off-Range Pasture and Public Off-Range Pasture Facilities

The goal at ORP and PORP facilities is to maintain healthy animals in good body condition at all times. When animals are affected by chronic conditions such as failing health, cancer, limb deformities, arthritis or other causes of illness or persistent lameness and before they show signs of suffering or a loss of overall body condition, euthanasia must be considered as an act of mercy.

Periodically throughout the year, the BLM COR, Project Inspector (PI), Program Officer (PO), or Technical Advisor (TA) responsible for oversight will evaluate all horses and burros and establish their body condition, particularly if the facility is experiencing drought or some other event, which might limit forage availability. During the year, if any animal is affected by any of the conditions listed in A through F above; the authorized personnel will euthanize that animal as soon as possible or within one week of consultation with the COR, PO, PI or TA.

Attachment 1-4

A team will formally evaluate the condition of each animal on the ORPs at least annually. The evaluation team will consist of a BLM WHB personnel designated by the COR/PO and the U.S. Department of Agriculture (USDA) Animal and Plant Health Inspection Service (APHIS) or other veterinarian acceptable to the COR or PO.

The action plan for formal evaluation includes annual inspections of all animals to evaluate their apparent health, overall condition and body condition. These inspections may identify animals that must be euthanized as an act of mercy to prevent slow and painful deaths. Visual inspections and the Henneke body condition (BC) scoring system are the prescribed methods used for the evaluation. All evaluations should be conducted prior to severe winter weather to identify horses with body condition scores of three or less before the onset of bad weather.

The PI or designated person, such as the contractor, will euthanize animals in the field within 72 hours of the evaluation. Animals with a body condition score of one or two that appear to be acutely suffering or have a poor prognosis for improvement should be euthanize sooner, if possible. Animals with a body condition score of three, or less that do not appear to be acutely suffering or have a fair or better prognosis for improvement will be rechecked in 30 days. Those that remain below BC 3 will be euthanized within 72 hours of the second evaluation. Arrangements for carcass disposal for euthanized animals will be in accordance with applicable state and county laws and ordinances.

Only the COR or PO can authorize the destruction of an animal from an ORP when that animal poses a public safety hazard or has escaped or is otherwise roaming freely in an unauthorized area when alternative remedies to capture or relocate the animal(s) have failed.

E.  Euthanasia during Transportation

Problems can develop during transport of the animal(s), such as, new injuries that may occur or the exacerbation of existing conditions.  If emergency euthanasia is necessary during transportation for any of the conditions described in A through F above, the truck driver must immediately contact the AO, the COR, or other identified BLM representative. Under these circumstances, a veterinarian should be contacted immediately to evaluate the animal and perform euthanasia if indicated as soon as possible.  If necessary, the animal(s) may need to be off-loaded at the closest BLM or suitable livestock handling facility to ensure that euthanasia can be performed safely and effectively.

F.  Euthanasia at Adoptions or Public Events

The AO will ensure that a veterinarian is on-site or on-call and available to respond within two hours at any adoption or public event.  If a veterinarian is unable to respond within that timeframe, the animal should be loaded on to a trailer and taken to the closest qualified veterinarian.  The AO will consult with the veterinarian prior to making the decision to euthanize an animal; the veterinarian will perform the euthanasia in a timely and discreet manner. In the event that no qualified veterinarian is available within 2 hours, either on and/or off-site, and the need for euthanasia is obvious, the AO may load and transport the animal to a safe and discreet location and humanely euthanize it in order to prevent further

pain and suffering.

## IV.    Euthanasia of a Large Number of Animals

Euthanasia of a large number of animals for reasons related to acts of mercy, injury, disease or safety, should be identified and outlined in advance whenever possible. When field monitoring and pre-gather planning identify an increased likelihood that large numbers of animals may need to be euthanized during a gather, this should be addressed in the gather plan. In an on-range preparation, ORC or ORP facility situation, where a gather is not involved, advance planning should also be completed by the AO whenever possible. Arrangements should be made for a USDA APHIS or other veterinarian experienced with WHB to visit the site and consult with the AO on euthanasia decisions. This consultation must be based on an examination of the animals by the veterinarian.  It should include a detailed written evaluation of the conditions, circumstances or history of the situation and the number of animals involved. Where appropriate, this information should be specific for each animal affected.  During this planning stage, it is critical that the AO include the WHB state lead, appropriate state office, district office, and field office managers, and any contractors that may be involved.

## V.    Euthanasia of Animals Unusually Dangerous, Escaped, or Pose a Public Safety Hazard

Unusually aggressive wild horses and burros can pose an unacceptable risk of injury to  personnel when maintained in enclosed spaces where some level of handling is required.  In rare cases, animals on the range can also be dangerous to domestic animals and/or people. When a horse or burro is unusually dangerous, it is reasonable to conclude that an average adopter could not humanely care for the animal as required by the regulations  (e.g., provide proper transportation, feeding, medical care and handling, 43 CFR 4750.1). The BLM cannot solve the problem by removing unusually dangerous animals from the  adoption system and placing them in an ORP facility because this resolution poses significant risk of injury to animals in transport, the BLM personnel, and ORP operators. Similarly, animals that escape from facilities or pastures or are in unauthorized areas and cannot be relocated or captured can pose a public safety hazard on highways or by their interactions with people or domestic animals.

When deciding to euthanize an animal because it is unusually dangerous, the AO, in  consultation with a veterinarian or other individuals with expertise in animal care, handling and behavior (as designated by the AO), must determine that the animal poses a significant and unusual danger to people or other animals beyond that normally associated with wild horses and burros. When unable to capture an animal to protect the public the AO must consult with another individual with expertise in animal capture and handling.  The AO must determine that all reasonable efforts to relocate or capture the animal(s) have been tried and failed. The AO must document all aspects of the  animal's behavior that make it unusually dangerous and/or describe the efforts made to relocate or capture the animal.  All documentation must be included in a report, maintained in the appropriate WHB program file, and recorded in the Wild Horse and Burro Program System (WHBPS).

# VI.    How to Perform Euthanasia

When necessary, euthanasia will be performed in a dignified and discreet manner that is recognized and approved by the American Veterinary Medical Association (AVMA) in their Guidelines for the Euthanasia of Animals:  2020 Edition. Three methods are authorized for use, as follows:

1. *Injection of a lethal dose of a barbiturate or barbiturate derivative such as sodium pentobarbital solution.*

   Only commercially available pentobarbital products will be used for injectable euthanasia of conscious animals.  Products will be administered by a veterinarian or technician working under the supervision of a veterinarian as dictated by state or federal regulations. A veterinarian supervising personnel using the euthanasia by injection technique is responsible for training that individual(s) as well as compliance with all applicable state and/or federal regulations regarding the acquisition, storage and disposition of euthanasia products. Consideration must be given for timely and appropriate carcass disposal when animals are euthanized by injection of pentobarbital products. When injectable agents are used, the veterinarian supervising the euthanasia process is responsible for ensuring carcasses are properly disposed of so tissue residues do not threaten wildlife species that may be attracted to and consume blood or carrion from euthanized animals.

2. *Gunshot to  the brain of an animal that is calm and still, or humanely restrained.*

   A properly placed gunshot to the brain of an animal that is calm and still, or humanely restrained, instantly produces an unconscious state followed quickly by a  painless and humane death. This method of euthanizing wild horses and burros requires only minimal handling and restraint; and when performed on the range, drug residues that may poison wildlife are not a concern. Only qualified and experienced persons skilled in  the safe handling and use of firearms and trained by a veterinarian will perform the procedure. The optimal placement of a gunshot is from the front of the animal,  perpendicular to the skull at a point one inch above the intersection of two imaginary lines drawn like an "X" from the eyes to the base of the ears.  Typically, when euthanizing a wild horse or burro in this manner with a handgun, the animal will be approached to within five-to-six feet and the gun will be held within a few inches or up to two-to- three feet from the animal.

   The preferred firearm for routine use will be a 22-magnum caliber revolver.  A 22 long rifle caliber handgun may also be used as well as other types and calibers of firearms including those typical for law enforcement or self-defense use (9mm, .38, .357, .40, or .45 calibers), if the operator is experienced with the firearm. Carbine rifles in lieu of a handgun in these same calibers can also be effective when used at similar or moderately increased (twenty to thirty feet) distances from those described above for handguns. The 22 magnum is highly effective, easily controlled and offers a lower risk of ricochet or having the bullet exit the  carcass.  Only hollow point or other controlled expansion types of bullets should be used to maximize tissue destruction while minimizing the risk

Attachment 1-7

of ricochet or having the bullet exit the carcass. The easiest and safest way to euthanize a wild horse or burro is with the animal standing calmly on a trailer or confined in a small pen, portion of an alleyway or chute and the operator is positioned above the animal with visual and physical access to the animal. Animals that may be agitated, fractious or will not stand calmly may need to be placed in a chute or tied down for restraint; and this may be preferable for safety and reliability. Euthanasia should not be attempted when restraint is not adequate or the animal is not standing quietly. Animals moving freely in a large open pen are generally not adequately restrained and euthanasia should not be attempted in this circumstance.

3.  *Penetrating captive bolt shot to the brain of an animal that is humanely and adequately and restrained.*

When properly applied by trained and experienced personnel, the application of a penetrating captive bolt gun to a calm, well-restrained horse or burro can be a humane and an effective means of euthanasia. Penetrating captive bolts use compressed air or a gunpowder blank to rapidly drive a metal rod through the skull into the brain. This impact, similar to a gunshot, immediately renders the animal unconscious so the animal is no longer aware of its surroundings and does not feel pain.

Unless recumbent and unable to move, animals must be restrained to minimize head movement. This restraint is typically achieved by use of a padded hydraulic squeeze chute or with a halter in a manual squeeze chute. Chemical immobilization and/or anesthesia may be used for restraint prior to application of the captive bolt as long as the captive bolt is applied immediately after the animal is adequately and safely restrained. Captive bolts are applied to the same target area described above for euthanasia by gunshot. Only the more powerful captive bolt guns with a longer bolt or specifically designed for euthanasia will be used.

Only persons authorized by BLM and specifically trained by a veterinarian in the use of a captive bolt will use this technique. The procedure will only be applied under the supervision of a veterinarian. The supervising veterinarian is not required to be on site every time a captive bolt is applied, but this supervision will include monitoring by the veterinarian to ensure euthanasia is performed humanely. Captive bolt equipment will be cleaned and maintained according to manufacturer guidelines. A record of maintenance will be kept on site with the equipment and reviewed by the supervising veterinarian on a regular basis.

Following euthanasia, death must be verified prior to moving the carcass for disposal. Properly shot or stunned animals should immediately collapse with no effort to then stand or roll into a sternal position. A blank stare straight ahead with complete dilation of the pupils, no movement of the eyes and the absence of a corneal reflex are the best indicators that death has occurred. The animal should also be examined for cessation of vital signs including pulse and rhythmic breathing. Unconscious animals should be handled and moved as little as possible until death is confirmed. Carcass disposal should be in accordance with state and local requirements, where applicable.

As recognized by the AVMA, circumstances exist with free-roaming wild animals where capture and chemical or physical restraint may not be practical prior to euthanasia. These situations may only serve to prolong or exacerbate the distress of an injured or suffering animal. Under these conditions and when an animal cannot be approached within a few feet, humane killing may be necessary to end the animal's suffering as quickly and humanely as possible. In these instances, methods typically used when hunting big-game animals of North America (e.g., elk, moose) in an ethical and responsible manner will be employed.  It is not appropriate in these instances to use smaller caliber (e.g., 5.56 mm) rifles or other weapons targeted at the brain from longer distances.  High-powered rifles targeted at the heart/lung and shoulder areas of an animal standing still and at typical hunting distances will be used in this circumstance.

For familiarity among operators, the recommended firearm is a bolt-action scoped rifle in a 30-06 caliber. Other firearm types and calibers with similar killing power typical for hunting large North American big-game animals (7mm magnum, .270, .308, .338 Win Mag, etc.) may be used if they are familiar to the operator. However, a .30-06 bolt-action scoped rifle sighted in for 200 yards offers a predictable and ethical means of quickly killing a large animal in the most humane manner possible under  these circumstances.  Only hollow point or other controlled expansion types of bullets  should be used to maximize tissue destruction and minimize the risk of ricochet. It is not appropriate to substitute the use of a high-powered rifle from a distance for euthanasia using a gunshot to the brain when an animal can be restrained or in situations, such as, gathers, or temporary or ORC facilities when restraint and use of a more conventional euthanasia technique can be applied.

As noted by the AVMA Panel on Euthanasia, the psychological response experienced by people when observing euthanasia or death in any form is an emotional one dependent on the situation and the background of the observer. Grief and distress over the loss of life are the most common reactions. Expert technique and maintaining a calm and professional atmosphere during the procedure can help minimize these reactions in the persons who must perform the procedures as well as co-workers or bystanders. For safety as well as discretion, only mission-critical persons should be nearby when euthanasia is performed. The BLM employees and contractors involved in or observing the process should behave in a dignified and discreet manner that avoids public spectacle. While these considerations should not outweigh the primary responsibility of using the most rapid and painless euthanasia method possible under the circumstances, animals should be euthanized, and carcasses moved away from public view whenever possible; animals may need to be moved off-site prior to euthanasia. In some circumstances, the use of tarps or vehicles as a visual screen may also be appropriate.

As noted by the AVMA, circumstances may arise that are not clearly covered by any policy or set of guidelines for euthanasia.  Whenever such situations arise, a veterinarian experienced with wild horses and burros should be consulted for their professional judgment of acceptable techniques for euthanasia.  The animal's species-specific physiologic and behavioral characteristics, size, approachability and degree of suffering will be taken into consideration.  In all situations, a method of euthanasia that minimizes suffering and distress of the animal will be chosen.

Attachment 1-9

A.  Documentation and Reporting of Euthanized Animals

A record of an animal's death by euthanasia on the range, during a gather, during transport, at facilities or during an adoption event, will be maintained by the BLM within WHBPS.  The death  record will identify the animal by using a description and/or freeze mark if the animal is marked, the date of the death, where the animal died and the reason(s) that euthanasia was performed. If the euthanasia was performed in the field or during a gather operation, then it is recommended that a copy of  the death record also be maintained in the appropriate HMA case file.

When euthanasia is performed at a gather, the lead COR or Incident Commander (IC), in addition to the process detailed above, will report the actions taken during gather operations in the comment section of the Daily Gather Overview, and in the Final Gather Data Report. Describing these mortalities in the gather records using the terms and definitions used in WHBPS for recording the Cause and Manner of Death along with Comments as appropriate will facilitate consistent reporting.

B.  Planning and Communication

The WHB specialist or the BLM employee responsible for an HMA, gather, facility or public event is responsible for having a euthanasia plan of action in place at all times where there are federally protected wild horses and burros.  The plan will address practical considerations such as (1) who will have designated authority to make decisions  regarding euthanasia; (2) who will perform the procedure; (3) what method(s) of  euthanasia will be used; and (4) how carcass disposal will be addressed.

When euthanasia is recommended for a large number of animals, a communications plan for internal and external contacts (including early alerts to state and Headquarters offices) should be developed in advance, if possible, and implemented concurrently while addressing the situation at-hand. The communications plan should address the need for the action, as well as the appropriate messages to the public and the media, including why animals are being euthanized and how the action is consistent with the BLM's responsibilities and policy.

All operation plans for gathers, adoptions and public events where it is possible that animals may need to be euthanized will include contingency plans that address the capability for performing the function. Each state will develop and implement a training and certification plan for those employees that will be tasked with euthanizing animals. A veterinarian will be present or on-call for all gathers, adoptions, and public events.

**HENNEKE BODY CONDITION SCORE SHEET**

**DATE:** _____

**NAME:**_____

**ANIMAL ID:**_____

**DESCRIPTION:**_____

☐ **VISUAL** or ☐ **HANDS-ON   ASSESSMENT**

**COMMENTS:** _____

**OVERALL BODY CONDITION SCORE:** _____ ÷ **6** = _____
                                        **sum total**      **overall score**

(circle descriptions for each area of the body then average together)



modified from Henneke et al. EVJ 1983;15:371-372

| Condition | Neck | Withers | Shoulder | Ribs | Back | Tailhead Area |
|---|---|---|---|---|---|---|
| **1** **Poor** (*extremely emaciated*) | Bone structure easily noticeable | Bone structure easily noticeable | Bone structure easily noticeable | Ribs projecting prominently | Spinous processes projecting prominently | Tailhead, pinbones, and hook bones projecting prominently |
| | | | N o   f a t t y   t i s s u e   c a n   b e   f e l t | | | |
| **2** **Very Thin** (*emaciated*) | Bone structure faintly discernible | Bone structure faintly discernible | Bone structure faintly discernible | Ribs prominent | Slight fat covering over base of spinous processes. Transverse processes of lumbar vertebrae feel rounded. Spinous processes are prominent | Tailhead prominent  Pin bones prominent  Hook bones prominent |
| **3** **Thin** | Neck accentuated | Withers accentuated | Shoulder accentuated | Slight fat cover over ribs. Ribs easily discernible | Fat buildup halfway on spinous processes, but easily discernible. Traverse processes cannot be felt | Tailhead prominent but individual vertebrae cannot be visually identified. Hook bones appear rounded, but are still easily discernible. Pin bones not distinguishable |
| **4** **Moderately Thin** | Neck not obviously thin | Withers not obviously thin | Shoulder not obviously thin | Faint outline of ribs discernible | Negative crease (peaked appearance) along back | Prominence depends on conformation. Fat can be felt. Hook bones not discernible |
| **5** **Moderate** | Neck blends smoothly into body | Withers rounded over spinous processes | Shoulder blends smoothly into body | Ribs cannot be visually distinguished, but can be easily felt | Back is level | Fat around tailhead beginning to feel spongy |
| **6** **Moderately Fleshy** | Fat beginning to be deposited | Fat beginning to be deposited | Fat beginning to be deposited behind shoulder | Fat over ribs feels spongy | May have a slight positive crease (a groove) down back | Fat around tailhead feels soft |
| **7** **Fleshy** | Fat deposited along neck | Fat deposited along withers | Fat deposited behind shoulder | Individual ribs can be felt, but noticeable fat filling between ribs | May have a positive crease down the back | Fat around tailhead is soft |
| **8** **Fat** | Noticeable thickening of neck | Area along withers filled with fat | Area behind shoulder filled with fat | Difficult to feel ribs | Positive crease down back | Fat around tailhead very soft |
| **9** **Extremely Fat** | Bulging fat | Bulging fat | Bulging fat | Patchy fat appearing over ribs | Obvious crease down back Flank filled with fat | Bulging fat around tailhead |

(prepared by A Kane USDA APHIS 11/21/17)

1. Authorization

   a. Upon determining that there is a legitimate need for a non-law enforcement, BLM employee to possess, carry, or use a firearm, and in accordance with the process prescribed by the state firearms manager, the supervisor must submit a request to obtain authorization from the state director. This authorization allows the supervisor's employee to complete firearms training and carry and use firearms. In addition, field office manager endorsement is required as part of the request to the state director.

   b. A background check must be conducted to determine whether an employee is prohibited from possessing, carrying, or using a firearm by court order; as a condition of sentencing, probation, or parole or pretrial diversion agreement; because of conviction of a misdemeanor crime of domestic violence; because of a felony crime; or because of a history of mental illness that presents a risk of injury to the employee or others. After the initial background check, rechecks must be performed a minimum of every 4 years.

   c. After successful completion of a background check, the employee may attend firearms training.

   d. The state firearms manager must prepare a certificate of firearms authorization for the employee, verify that the employee has passed a background check and successfully completed training and live fire range qualification requirements, and request the state director's signature on the certificate of firearms authorization.

   e. The certificate of firearms authorization must not cover more than a 12-month period and must include the following information:

      1) Employee's name,

      2) Duties requiring use of firearms,

      3) Geographic area where the authorization is valid,

      4) Purpose of firearm use,

      5) Issuance and expiration date,

      6) Specific type of firearm(s) the employee is authorized to carry,

      7) Serial number(s) of personal firearm(s) the employee is authorized to carry,

      8) State director's name, and

      9) State director's signature and date.

   f. A certificate of firearms authorization expires upon the occurrence of any of the following circumstances:

      1) At the end of the calendar year in which it was issued or the completion of the project, whichever occurs first;

      2) When there is a change of duty station, status, or transfer;

      3) Upon failure to demonstrate shooting proficiency or strict adherence to firearms safety, transport, or security requirements;

       4)  A conviction for domestic violence or the subject of a domestic violence protection order; or

       5)  When rescinded for any reason by the employee's supervisor or manager.

2.    Training

   a.   Non-law enforcement employees who possess, carry, or use a firearm in the performance of their official duties must successfully complete classroom training in the following categories, at a minimum:

       1)  General and range firearms safety;

       2)  Laws, rules, regulations, and policies;

       3)  Employee and supervisory responsibilities;

       4)  Incident reporting;

       5)  Firearms care and maintenance; and

       6)  Firearms skills.

   b.   Live Fire Range Qualification. This portion of the firearms training course must take place on the firing range under the control of an authorized instructor. The target for animal protection training must be 8 ½ by 11 inches in size and must be placed a distance of 15 yards from the firing line. Proficiency is achieved when 70 percent of the shots are on the target and when all sequences of shots are fired within the allowable time of 25 seconds. Each sequence must be performed twice to demonstrate proficiency. The shooter must also exhibit proper safe handling of the firearm(s).

   c.   Pump and Semi-Automatic Shotguns. This portion of the training course includes two sequences of live range fire consisting of magazine capacity for the shotgun, plus one (i.e., Remington 870, four rounds in magazine, plus one).

       1)  The shooter must start with a full magazine and empty chamber. The weapon must have the action closed and the safety on.

       2)  On the command to fire, the shooter is required to fire the rounds in the magazine, then reload and fire one additional round.

       3)  Upon completion, the shooter must open the action and make sure the safety is on.

       4)  The time limit is 25 seconds, and this sequence is repeated.

   d.   Double-Barrel Shotguns. This portion of the training course includes two sequences of live range fire consisting of four rounds per sequence.

       1)  The shooter must start with a full magazine and empty chamber. The weapon must have the action closed and the safety on.

       2)  On the command to fire, the shooter is required to fire the rounds in the magazine, then reload and fire one additional round.

       3)  Upon completion, the shooter must open the action and make sure the safety is on.

4)  The time limit is 25 seconds, and this sequence is repeated.

e.  Rifles. This portion of the training course includes two sequences of live range fire consisting of magazine capacity for the rifle, plus one round (i.e., a bolt action rifle with magazine capacity of three rounds; the course is four rounds for each sequence).

1)  The shooter must start with the magazine fully loaded. The action must be closed on an empty chamber and the safety on.

2)  On command to fire, the shooter must fire the rounds in the magazine, then reload and fire one additional round.

3)  Upon completion, the shooter must open the action and make sure the safety is on.

4)  The time limit is 25 seconds, and this sequence is repeated.

f.  Handguns. This portion of the training course includes two sequences of live range fire, each consisting of cylinder/magazine capacity for the handgun.

1)  The shooter must start with a fully loaded handgun.

2)  On the command to fire, the shooter must fire all rounds contained in the cylinder/magazine.

3)  Upon completion, the shooter must open the cylinder/slide and make sure the handgun is unloaded.

4)  The time limit is 25 seconds, and this sequence is repeated.

g.  Refresher Training. Employees must successfully complete refresher classroom training every 2 years and successfully complete live fire range qualification on an annual basis. Certificates of firearms authorization must not be renewed for employees that cannot successfully complete their refresher training and perform their firearms qualification.

h.  Firearms instructors must refuse to qualify any student who demonstrates a lack of basic situational awareness or firearms safety awareness or a solid understanding of the mechanical operation of firearms, regardless of that employee's successful completion of the prescribed live fire range qualification.

i.  Wild Animal Behavior Training. A basic understanding of animal behavior is an essential component of effective self-defense against large predators. All firearms instruction that is conducted to prepare employees to defend themselves against wild animal attacks must include the following:

1)  A minimum of 2 hours of training in the behaviors and characteristics of the applicable dangerous animal, taught by a knowledgeable instructor.

2)  The use of nonlethal rounds and capsaicin-based deterrent spray for deterring aggressive animals.

3)  The ethical implications and legal requirements associated with killing a game animal in defense of life and property.

4) Employees choosing to supplement or replace the use of firearms with pepper- based deterrent spray for protection against dangerous wild animals must complete a training program in the use of the spray, taught by a trained and knowledgeable instructor.

j. BLM firearms instruction must be of professional caliber. States are encouraged to promote and fund advanced instructor training relevant to the type(s) of firearms and conditions to which employee(s) will be exposed. Firearms instructors and firearms training coordinators must have significant experience in the use of firearms and must meet one or more of the following requirements prior to independently instructing employees:

1) A Federal Law Enforcement Training Center graduate.

2) A National Rifle Association firearms instructor.

3) Minimum 16 hours of basic firearms instructor training.

4) One block of discipline-specific firearms instructor training, as applicable:

a) Shotgun.

b) Rifle.

c) Handgun.

# Third Declaration of Benjamin F. Noyes Exhibit C

U.S. DEPARTMENT OF THE INTERIOR
**BUREAU OF LAND MANAGEMENT**

# WILD HORSE AND BURRO GATHERS: PUBLIC AND MEDIA MANAGEMENT

*IM 2013-058*
Instruction Memorandum

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C. 20240
http://www.blm.gov

January 23, 2013

In Reply Refer To:

4710 (WO 260) P

EMS TRANSMISSION 01/30/2013

Instruction Memorandum No. 2013-058

Expires: 09/30/2014

To:        All Field Office Officials (except Alaska)

From:      Assistant Director, Renewable Resources and Planning

Subject:   Wild Horse and Burro Gathers:  Public and Media Management

**Program Area**:  Wild Horse and Burro (WH&B) Program

**Purpose:**  The purpose of this Instruction Memorandum (IM) is to establish policy and procedures for safe and transparent visitation by the public/media at WH&B gather operations, while ensuring the humane treatment of wild horses and burros.

**Policy and Action:**  Effective immediately, all State, District, and Field offices must comply with the new policy of this IM for all gathers within their jurisdiction.  This policy establishes the procedures for safe and transparent visitation by the public/media at WH&B gather operations.

This IM is part of a package of forthcoming IMs covering aspects of managing wild horse and burro gathers, including:

- IM No. 2013-060, Wild Horse and Burro Gathers: Management by Incident Command System;
- IM No. 2013-061, Wild Horse and Burro Gathers: Internal and External Communicating and Reporting;
- IM No.  2013-059, Wild Horse and Burro Gathers: Comprehensive Animal Welfare Policy

The BLM's on-site Core Gather Team (CGT) consists of four individuals: an Incident Commander (IC), Lead Contracting Officer's Representative (Lead COR), Lead Public Affairs Officer (Lead PAO), and Lead Law Enforcement Officer (Lead LEO). Specific roles and responsibilities of each of these core positions and all other personnel, including Contracting Officer (CO), are addressed in IM No. 2013-060, Wild Horse and Burro Gathers:  Management by Incident Command System.

**National Policy Regarding Access for Public and Media Observation of Gather Operations**

- Every gather day is considered a public observation day unless the Agency Representative/Authorizing Officer (AR/AO) has made a decision to temporarily close or restrict access on public lands due to availability of gather observation sites, safety concerns or other considerations relevant to individual gather observations. Gather operations involve some level of inherent risk due to both the nature of working with wild animals, and risks associated with normal helicopter operations. Risks are highest near the trap-site area. The BLM generally allows members of the public an opportunity to safely view gather operations from designated observation areas near the trap-site and at temporary holding facilities, but they must be escorted to those areas by BLM personnel. If a trap-site space will not safely accommodate public/media observation, then alternative viewing opportunities will be discussed and resolved prior to gather operations beginning in a given area.

- If the best location for gather facilities are on private lands or if access across private lands is necessary to access gather facilities on the public lands, prior to the start of the gather operations, BLM will make every effort to obtain permission from private landowners to allow for public ingress/egress through or to host the public/media visitation on the private lands. If permission cannot be obtained and public access limitations exist, this will be announced as soon as determined.  Every effort should be made in locating gather facilities to minimize such access limitations.

- The IC should work to ensure that the public/media have opportunities to safely observe gather activities at the trap-site and temporary holding facilities when practicable. The IC should also work to ensure that gather safety is maintained at all times and that the public/media's presence at the gather is successful.

- The Lead COR coordinates the selection of the public/media-designated observation area(s) with the other members of the CGT and the Contractor to select the location that provides the best viewing of activities while also providing for the safety of the public/media, gather staff, Contracting staff and the animals.  All trap-site observation areas will be selected prior to the beginning of operations and before the arrival of public/media observers.

- Decisions and changes to agreed upon start times for gather operations will be fully coordinated and communicated between the CGT and the Contractor, through the Lead COR. The Lead PAO will work closely with the CGT to make necessary coordination of planned daily public/media meeting times and locations to get public/media into designated observation areas prior to daily trapping activities, and at designated observation areas at temporary holding and shipping areas.  Opportunities for the public/media to visit temporary holding facilities and view the shipping activities should also be provided to the extent practicable.

- The IC will ensure that decisions made and actions taken regarding public/media access to the trap-site, temporary holding facilities and other sites during the gather operations are in conformance with the standards found in existing guidance and that may be identified in IM. 2013-059, Wild Horse and Burro Gathers: Comprehensive Animal Welfare Policy.

- The Lead PAO serves as the liaison between the CGT and the public/media and is responsible for conducting media interviews and managing public/media visits including facilitating the movement of public/media during all aspects of gather operations.

- The Lead PAO will endeavor to provide stock B-roll footage of gather operations to the media upon request, resources permitting.

- The Lead LEO ensures safety by addressing public actions that may pose a safety or operational threat to the gather, including the immediate removal from the gather of individuals exhibiting unsafe or disruptive behavior.  The IC is responsible for having any public/media exhibiting unsafe or disruptive behavior removed from the gather area immediately after consultation with the Lead LEO. Instances of unsafe or disruptive behavior will be immediately addressed.

- Any disruptive behavior or interference with the gather operation by any member of the public/media, such that the safety, health, and welfare of animals or people is threatened, will result in the *suspension* or *shutting down* of the gather operation until the situation is resolved and safety is restored.  The authority to *suspend* gather operations lies with the Lead COR.  The authority to fully *shut down* gather operations lies with the CO. Specific authority for the enforcement of these concerns may be addressed by LEOs with the enforcement of 43 CFR 8365.1-4 (*Public health, safety and comfort*); and, if applicable when closure order exists, 43 CFR 8364.1(d) (*Violation of Court Order or Restriction Order*).

- A LEO will be available at all times when the public/media are present within the gather operations area and at temporary holding/shipping areas. Exceptions to this will be determined by the CGT.

- The on-site veterinarian may be asked by the IC or COR to help BLM with technical questions or information regarding animal health, condition, or welfare; but at no time shall an on-site or Animal and Plant Health Inspection Service (APHIS) veterinarian be asked or allowed to address or directly answer questions from the public/media. Requests directed to APHIS about their participation in gathers should be referred to APHIS Legislative and Public Affairs Media Coordinators.

- The trap-site and temporary holding areas are designated as safety zones and only essential personnel will be allowed inside these safety zones during gather operations or while animals are in the trap or temporary holding areas.  Essential personnel will normally consist of the Lead COR, Project Inspector (PI), and on-site veterinarian. When other BLM personnel (such as the CGT, BLM videographers, and BLM photographers) have a need to be in the safety zone on a limited basis, they are authorized as temporary essential personnel for that purpose.

- Where appropriate, the AR/AO may grant access to non-BLM personnel, such as Comprehensive Animal Welfare Policy Auditors and National WH&B Advisory Board Members, to the safety zone on a limited basis, as temporary essential personnel.

- The IC, State Director, and the WH&B Division Chief will jointly decide who constitutes temporary essential personnel in cases otherwise not described.

- Unofficial passengers (public/media, etc.) are not authorized to travel in government-owned vehicles in accordance with BLM Handbook G-1520-3 Fleet Management, Chapter 1. § III (B).

- The public/media are prohibited from riding or placing equipment in the helicopters contracted for a gather. The National Gather Contract Attachment 1 §C.9.d states "under no circumstances will the public or any media or media equipment be allowed in or on the gather helicopter while the helicopter is on a gather operation." The placement of public/media cameras or recording equipment on panels, gates and loading equipment including trucks and trailers are also prohibited.

- The minimum distance between the public/media and the helicopter operations shall be established in accordance with "Guidance regarding distance of helicopter operations from persons and property during Wild Horse and Burro gather operations" issued by the BLM Fire and Aviation Directorate on June 14, 2011, as required by Federal Aviation Administration (FAA) regulations.  However, within those constraints, the locations that will provide the best unobstructed view of the gather operations should be identified for public/media observation opportunities as described below.

- The minimum distance between the public/media and non-essential personnel and the perimeter of the temporary holding facility should be established for the gather during the pre-work conference with the Contractor and prior to any public/media presence.  This viewing distance should result in minimal disturbance to the wild horses and burros held in the facility and should be flexible based on observed animal behavior and response. The CGT may consider the use of elevated viewing such as a flatbed trailer or hillside in those cases where the observation location is at a greater distance from the gather operation.

- The CGT retains the discretion to provide additional viewing opportunities at the trap-site on a case-by-case basis after the Lead COR has determined that no helicopter or loading activities will occur for a minimum of 30 minutes or gather operations have concluded for the day, so long as the animals that might be observed have settled down and such additional opportunities can be provided in a manner that

will not result in increased stress to the gathered horses or interference with the gather activities. The Lead COR will get the concurrence of the CGT and Contractor of such additional opportunities prior to offering it to the public/media.

**Timeframe:** This IM is effective immediately.

**Budget Impact:** Unit costs for conducting gathers for removals and population growth suppression efforts have increased as a result of the staffing necessary for internal and external reporting associated with increased transparency. The budget impacts of visitation that occurs during WH&B gathers include substantial unplanned overtime and per diem expense. While limiting the number of BLM staff attending the gather to essential personnel may reduce gather costs, it should not be at the expense of the safety of the animals, gather personnel, or members of the public/media.

**Background:** The BLM has a longstanding policy of allowing public/media to view WH&B gathers. Advance planning helps ensure the safety of the animals, staff, Contractor personnel, and the public/media. The number of public/media interested in viewing gathers has increased in recent years, though interest varies from one HMA to another as well as State to State. In response to this, the BLM has implemented an Incident Command System to safely and appropriately manage the larger numbers of public/media.

A high degree of interest from the public/media to observe WH&B gathers is expected to continue. Strong communications and coordination among the on-site CGT will allow for safety and flexibility regarding the selection of observation areas for viewing trap-sites and the temporary holding facilities.

**Manual/Handbook Sections Affected:** None

**Coordination:** This IM was coordinated among WO-200, WO-260, WO-600, WO-610, WO-LE, WH&B State Leads, WH&B Specialists, State External Affairs Leads, public affairs, and law enforcement staff in the field.

**Contact:** Any questions regarding this IM can be directed to Joan Guilfoyle, Division Chief, Wild Horse and Burro Program (WO-260) at 202-912-7260, or Jeff Krauss, Division Chief, Public Affairs (WO-610) at 202-912-7410.

Signed by:                              Authenticated by:

Edwin L. Roberson                       Robert M. Williams

Assistant Director                      Division of IRM Governance,WO-560

Renewable Resources and Planning

FISCAL YEAR

2013