BRENT M. RESH
(Nev. Bar No. 14940)
BRENT RESH LAW, PLLC
2401 La Solana Way
Las Vegas, NV 89102
(702) 781-6903
brent@brentreshlaw.com

JESSICA L. BLOME*
(Cal. Bar No. 314898)
JENNIFER RAE LOVKO*
(Cal. Bar No. 208855)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

*Attorneys for Plaintiffs*
*admitted pro hac vice*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| WILD HORSE EDUCATION, a non-profit corporation and LAURA LEIGH, individually, | CASE NO. 3:23-cv-00372 |
| Plaintiffs, | |
| v. | **PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management, | |
| Defendants. | |

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................. 1

II.  ARGUMENT ..................................................................................................... 2

    A.   Defendant's implementation of the 2017 Gather Plan has violated NEPA;
        therefore, summary judgment should be granted. ........................................ 2

    B.   Defendant's implementation of the 2017 Gather Plan has violated the Wild
        Horse Act; therefore, summary judgment should be granted. ......................... 3

    C.   Defendants have violated Plaintiffs' First Amendment rights; therefore,
        summary judgment is appropriate. ................................................................. 6

        1.   Bait-and Water Gather Operations ................................................... 7

        2.   Failure to Narrowly Tailor Restrictions .............................................. 9

            a)   Bait-and-Water Gather Operations ...................................... 9

            b)   Helicopter Gather Operations .............................................. 11

    D.   Plaintiffs' claims are not moot. ................................................................... 14

        1.   Defendant has not met its burden of establishing Plaintiffs' case is moot. ............. 14

        2.   The "voluntary cessation" exception and "capable of repetition, yet evading
            review" exceptions apply. ............................................................ 15

        3.   Voluntary Cessation .................................................................... 16

        4.   Capable of Repetition, Yet Evading Review ...................................... 18

III. CONCLUSION ................................................................................................. 19

# TABLE OF AUTHORITIES

## CASES

*Armster v. U.S. Dist. Court*,
  806 F.2d 1347 (9th Cir. 1986) ................................................................. 16

*Cantrell v. City of Long Beach*,
  241 F.3d 674 (9th Cir. 2001) ............................................................. 14, 15

*City of Erie v. Pap's A.M.*,
  529 U.S. 277 (2000)................................................................................ 14

*Demery v. Arpaio*,
  378 F.3d 1020 (9th Cir. 2004) ........................................................... 16, 18

*Detroit Free Press v. Ashcroft*,
  303 F.3d 681 (6th Cir. 2002) .................................................................... 8

*FBI v. Fikre*,
  601 U.S. 234 (2024)........................................................................... 16, 17

*Forest Guardians v. United States Forest Serv.*,
  329 F.3d 1089 (9th Cir. 2003) ................................................................ 16

*Friends of Animals v. Culver*,
  610 F.Supp.3d 157 (D.D.C. 2022) (*Culver*) ................................. 3, 4, 5, 19

*Friends of Animals v. Silvey*,
  820 F. App'x 513 (9th Cir. 2020) (*Silvey*)................................................ 4

*Friends of Animals v. United States BLM*,
  2015 U.S. Dist. LEXIS 17575, No. 3:15-CV0057-LRH-WGC (D. Nev. Feb. 11, 2015)
  (*FOA II*) ............................................................................................ 2, 3

*Friends of Animals v. United States BLM*,
  728 F.Supp.3d 45 (D.D.C. 2024) (*FOA I*) ...................................... passim

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)........................................................................... 16, 17

*Hall v. Beals*,
  396 U.S. 45 (1969).................................................................................. 14

*In re United Mine Workers of Am. Int'l Union*,
  190 F.3d 545 (D.C. Cir. 1999)................................................................... 4

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
  681 F.3d 1006 (9th Cir. 2012) ................................................................ 18

ii

PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

*Knox v. SEIU*,
  Local 1000, 567 U.S. 298 (2012)....................................................................... 14

*Leigh v. Salazar*,
  954 F. Supp. 2d 1090 (D. Nev. 2013) (*Salazar*)..................................... 7, 8

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989)............................................................................................ 2

*Murphy v. Hunt*,
  455 U.S. 478 (1982)..................................................................................... 16, 18

*N. Alaska Envtl. Ctr. v. United States DOI, Bureau of Land Mgmt.*,
  983 F.3d 1077 (9th Cir. 2020) ......................................................................... 2

*Nat. Desert Ass'n v. McDaniel*,
  No. 3:09-cv-00369-PK, 2012 U.S. Dist. LEXIS 205376 (D. Or. Sep. 28, 2012)..................... 2

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004)......................................................................................... 2, 3

*NRDC v. Norton*,
  No. 1:05-CV-01207 OWW LJO (E.D. Cal. Jan. 3, 2007) .......................................... 15

*Press-Enterprise Co. v. Superior Court*,
  478 U.S. 1 (1986)............................................................................................... 7

*Price Rd. Neighborhood Ass'n v. United States DOT*,
  113 F.3d 1505 (9th Cir. 1997) ......................................................................... 2

*W. Rangeland Conservation Ass'n v. Zinke*,
  265 F.Supp.3d 1267 (D. Utah 2017)........................................................... 3, 19

*West v. Sec'y of the DOT*,
  206 F.3d 920 (9th Cir. 2000) ......................................................................... 14

*Wilderness v. Allen*,
  871 F.3d 719 (9th Cir. 2017) ......................................................................... 15

**STATUTES**

16 U.S.C. § 1333(b)(2) ......................................................................................... 6

**OTHER AUTHORITIES**

13A Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 3533.3 .......... 14

PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

In implementing the 2017 Gather Plan, Defendant has violated the National Environmental Policy Act (NEPA) because (1) BLM has exceeded the scope of the plan's environmental analysis without issuing a new or supplemental Environmental Assessment (EA), and (2) BLM has violated the Wild Free-Roaming Horses and Burros Act (Wild Horse Act) because BLM has not demonstrated that the practical realities of gathering necessitated conducting more than a dozen gathers over a span of seven years. In addressing these claims, Plaintiffs have shown that the 2017 Gather Plan only authorized the removal of "approximately 9,053 excess wild horses within the Complexes to achieve and maintain AML." ATB_18346. This number was removed by July of 2023, yet BLM continued to conduct gathers that resulted in the removal of an additional 5,000 wild horses.[1] ECF 82, pp. 9-12.

Defendants' conduct also has resulted in violations of the First Amendment, with BLM's restrictions on public access to gather operations based less on addressing overriding government interests and more on arbitrary decisions made by BLM and its staff.

---

[1] Federal Defendants state Table 3 in Plaintiffs' Motion for Summary Judgment, which summarizes gather data, does not correctly identify the number of horses permanently gathered and removed since the 2017 Gather Plan was adopted. ECF 92, pp. 11-12; 92-1, pp. 3-5. Specifically, BLM identifies the following errors:

1. BLM states that the 1/31/18-2/23/19 gather identified in Table 3 actually occurred on 1/31/18-2/23/18. ECF 92, p. 11. BLM is correct; Plaintiffs' table does contain that typographical error, but this error does not affect any argument.

For this gather, Plaintiffs indicated that 1,327 number had been permanently removed, with this number including 30 horses that died during the gather. ECF 82, pp. 9-10 and n. 2. BLM states the 30 horses are *not* included in the 1,327 number. ECF 92, p. 12. Plaintiffs have no reason to dispute BLM's representation, and accordingly, the 1,327 number should be changed to 1,357. BLM also states 62 horses were released, and this number should be deducted from the total number of horses permanently removed in Table 3. ECF 92, p. 12. Plaintiffs have no reason to dispute BLM's representation, and accordingly, the 1,357 number should be changed to 1,295. Based on this re-calculation, none of Plaintiffs' arguments are affected. BLM still removed the identified excess horse population of 9,053 in 2023 and continued to remove an additional 5,000 horses thereafter.

2. For the 7/15/22-8/25/22 gather, BLM states that Plaintiffs' identification of 1,872 wild horses being permanently removed is incorrect because it does not reflect 100 horses that were released back into the Triple B Complex. *See* ECF 92-1, p. 4. Again, even if this true, none of Plaintiffs' arguments are affected. BLM still removed the identified excess horse population of 9,053 in 2023 and continued to remove an additional 5,000 horses thereafter.

1    Defendants' cross-motion and opposition fail to establish that the 2017 Gather Plan and

2  BLM's associated actions comport with the legal requirements of NEPA, the Wild Horse Act, or

3  the First Amendment. However, the Defendants argue that this Court "need not and should not

4  reach the merits" of Plaintiffs' claims because the above-captioned case is prudentially moot and

5  will soon be constitutionally moot. ECF 92, p. 17. This argument necessarily fails because

6  Defendants have not met their burden of establishing the case is moot, and the facts demonstrate

7  BLM will continue to violate NEPA, the Wild Horse Act, and the First Amendment in the future

8  in exactly the same manner unless this Court issues an order, injunction, and declaratory relief.

9  **II.    ARGUMENT**

10     **A.    Defendant's implementation of the 2017 Gather Plan has violated NEPA; therefore, summary judgment should be granted.**

11    NEPA requires an agency to take a "hard look" at potential environmental consequences

12  before taking action. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989). When a NEPA

13  reviewed project is adopted, the government cannot act upon the project in a manner that exceeds

14  the scope of what was reviewed. *Friends of Animals v. United States BLM*, 728 F.Supp.3d 45,

15  79-81 (D.D.C. 2024) (*FOA I*); *Friends of Animals v. United States BLM*, 2015 U.S. Dist. LEXIS

16  17575, No. 3:15-CV0057-LRH-WGC, at *3-4 (D. Nev. Feb. 11, 2015) (*FOA II*); *Or. Nat. Desert*

17  *Ass'n v. McDaniel*, No. 3:09-cv-00369-PK, 2012 U.S. Dist. LEXIS 205376, at *14-26 (D. Or.

18  Sep. 28, 2012); *Price Rd. Neighborhood Ass'n v. United States DOT*, 113 F.3d 1505, 1510 (9th

19  Cir. 1997).  When the scope of a project changes based on new information or conditions, a new

20  or supplemental EA is required.[2] *See Norton v. S. Utah Wilderness All.,* 542 U.S. 55, 72-73

21  (2004); *N. Alaska Envtl. Ctr. v. United States DOI, Bureau of Land Mgmt*., 983 F.3d 1077, 1093

22  (9th Cir. 2020).

23  _____

[2] In deciding whether an earlier environmental analysis adequately analyzed the impacts of a

24  subsequent action, the Court must examine the scope of the earlier analysis. *N. Alaska Envtl. Ctr. v. United States DOI, Bureau of Land Mgmt*., 983 F.3d 1077, 1093 (9th Cir. 2020). If the scope

25  includes the subsequent action, then the rules governing supplementation apply. *Id.* Under these rules, a new or supplemental environmental analysis is required when new information or

26  circumstances exist. *Norton v. S. Utah Wilderness All.,* 542 U.S. 55, 72-73 (2004). If the scope does not include the subsequent action, then a new environmental analysis is required. *Friends of*

27  *Animals v. United States BLM*, 2015 U.S. Dist. LEXIS 17575, No. 3:15-CV0057-LRH-WGC, at

28  *7-8 (D. Nev. Feb. 11, 2015).

Here, for the 2017 Gather Plan, BLM considered resource conditions (e.g., soil, water, forage, wild horses) that existed **in 2017**, with the analysis looking at the impact of removing approximately **9,053 wild horses** on these resources. ATB_17995, ATB_18315-ATB_18316, ATB_18346. Through the Decision Record for the 2017 Gather Plan, BLM was to "gather and remove approximately 9,053 excess wild horses within the Complexes to achieve and maintain AML and to implement population control measures to gathered and released horses over a period of ten years from the initial gather." ATB_18346. Since the Decision Record was adopted, more than 9,053 excess wild horses have been gathered; this number has been exceeded by approximately 5,000 wild horses.  ECF 82, pp. 9-11.

Simply, the scope of analysis addressed in the EA for the 2017 Gather Plan did not analyze the impact of removing more than 14,000 wild horses, and the fact that subsequent gathers involved the same HMA and were conducted in the same manner as past gathers did not allow BLM to evade NEPA's requirements. *FOA II*, 2015 U.S. Dist. LEXIS at *3-4. Consideration of new population inventories and new resource conditions should have been addressed through issuance of a new or supplemental EA. *Id*.; *Norton v. S. Utah Wilderness All.,* 542 U.S. 55, 72-73 (2004). Because neither was done, summary judgment should be granted.

**B.     Defendant's implementation of the 2017 Gather Plan has violated the Wild Horse Act; therefore, summary judgment should be granted.**

Contrary to BLM's framing, ECF 90, p. 18, Plaintiffs do not contend in their Motion for Summary Judgment that ten-year gather plans are inherently and always unlawful. Rather, Plaintiffs' motion argues that BLM has violated the Wild Horse Act by relying on the 2017 Gather Plan to conduct more than a dozen gathers over an eight-year period. ECF 82, pp. 20-22, citing *FOA I*, 728 F.Supp.3d 45; *Friends of Animals v. Culver*, 610 F.Supp.3d 157 (D.D.C. 2022) (*Culver*); *W. Rangeland Conservation Ass'n v. Zinke*, 265 F.Supp.3d 1267 (D. Utah 2017).

In *W. Rangeland Conservation Ass'n*, the Utah District Court ruled that the immediacy requirement of the Wild Horse Act allows for "*some* delay" in gathering excess wild horses based on "practical realities." *W. Rangeland Conservation Ass'n*, 265 F.Supp.3d at 1283-84 (emphasis in the original).

PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

1
2
3
4

> Even when timing and conditions are right, BLM must carefully plan and execute the gather and removal so as to avoid eroding the target herd's physical health, social cohesion, or genetic viability. BLM must also comply with planning and public comment requirements under FLPMA and NEPA and retain contractors with the necessary skill and resources to safely, efficiently, and humanely execute the removals.

5
6
7

> Based on these practical realities, the court cannot interpret Section Three to require removal of excess wild animals without *any* intervening delay—such an interpretation would contravene the ultimate purposes of the WHA by forcing BLM to act recklessly and without regard for the continuing viability or humane treatment of creatures it is specifically tasked with preserving.

8

*Id.* at 1284 (emphasis in the original).

9
10
11
12
13
14
15
16
17

Defendants argue *W. Rangeland Conservation Ass'n* should not be considered because it was based on Section 706(1) of the APA and "seemingly conflicts with this Court's prior rulings and the Ninth Circuit's reasoning in [*Friends of Animals v. Silvey*, 820 F. App'x 513 (9th Cir. 2020) (*Silvey*)]." ECF 90, p. 20. The rationale of the Court's language is not impacted by whether the case involves Section 706(1) or Section 706(2) of the APA – nor do Defendants explain why this distinction would matter. And, *Silvey* is not in conflict with *W. Rangeland Conservation Ass'n*. The Court in *Silvey* merely found staged gather plans are not inherently unlawful; the Court did not contradict (nor mention) the Court's language in W. *Rangeland Conservation Ass'n*. *Silvey*, 820 F. App'x at 516.

18
19
20
21
22
23
24
25
26
27

After *W. Rangeland Conservation Ass'n* was decided, the D.C. District Court examined a Section 706(2) claim alleging the Wild Horse Act's immediacy requirement was violated by BLM's adoption of a ten-year gather plan. *Culver*, 610 F.Supp.3d at 168-171. The question before the Court was "whether BLM may lawfully direct its employees to wait ten years to 'immediately' remove excess horses that BLM has determined must be removed." *Id.* at 170. The Court ruled that BLM could not do so, particularly because BLM had conceded that "nowhere does [it] propose that it will need all ten years to achieve AML in the first instance." *Id.* While financial and administrative issue may result in some delay, "there is a limit to how long [BLM] may use these justifications to excuse inaction in the face of a statutory deadline." *Id.* (quoting *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 554 (D.C. Cir. 1999).

28

PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

BLM correctly notes the D.C. District Court did not vacate the challenged plan pending remand. ECF 90, p. 21. This decision was based on the fact that no gathers had yet occurred under the challenged plan, and "given BLM's concessions, it appear[ed] likely that BLM can accomplish its statutory duties while reducing the time period for the completion of those duties." *Culver*, 610 F.Supp.3d at 166, 173. Here, the facts are quite different because over a dozen gathers have occurred, and BLM has made no concessions that it intends to ever reduce the time period upon which gathers are completed.[3] Indeed, with the new plan that BLM may be adopting in the near future, the agency asserts it will not be "time-bound" – even by ten years. ECF 90, p. 17 n. 3.

Finally, in *FOA I*, the D.C. Circuit Court's ruling in *FOA I* reviewed challenges to a number of different ten-year gather plans. *FOA I*, 728 F.Supp.3d at 55-59. The Plaintiff argued these plans violate the Wild Horse Act's immediacy requirement; BLM argued it was free to conduct gathers for the entirety of the ten-year plan's operation. *Id.* at 69, 77. The Court found both partes were incorrect and ruled:

- Staged gather plans may be lawful provided BLM explain, at the very least, why a delay of years is necessary;

- Once the target number of excess horses has been removed and AML achieved, BLM may not conduct additional gathers to maintain AML.

*Id.* at 76-78.

Here, Defendants argue that *FOA I* does not support a finding of summary judgment because "even assuming the Court agrees with [*FOA I*] reasoning, it is irrelevant here because

---

[3] Section 706(2) provides that a "reviewing court shall . . . hold unlawful and set aside agency action . . . [that is] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). That is, vacatur is the normal remedy for an APA violation. *NRDC v. United States EPA*, 38 F.4th 34, 51 (9th Cir. 2022). In considering this issue, the Court must generally weigh the seriousness of the agency's errors, the disruptive consequences of ordering vacatur, and whether the agency could fix its errors and arrive at the same action on remand. *Id.*; *Pollinator Stewardship Council v. United States EPA*, No. 13-72346,, at *32-33 (9th Cir. Sep. 10, 2015). Here, Defendants have not actually argued that vacatur would be inappropriate should the Court find BLM violated the APA. It does not contain any discussion in its brief regarding the seriousness of the errors, disruptive consequences, or the ability to fix its errors.

Plaintiffs do not claim that BLM has ever reached low AML on either the Antelope or Triple B Complexes. Nor could they, as BLM's gather reports show that overpopulation has persisted on the Complexes despite BLM's best efforts."[4]  ECF 90, p. 21. Defendants ignore the first rule established by the *FOA I* Court, requiring BLM to explain why it took six years to remove the target population of horses from the Antelope and Triple B Complexes. *FOA I*, 728 F.Supp.3d at 77. Because BLM has offered no evidence or justification in this regard, it has violated the Wild Horse Act. As regards the second rule in *FOA I*, Plaintiffs do assert the target removal numbers have been gathered. *Id.*, p. 22 (noting that after removing 9,053 wild horses, BLM must make new determinations that an overpopulation exists and action is necessary to remove excess animals). And notably, Defendants have provided no evidence showing that once 9,053 horses were gathered, an overpopulation still existed that necessitated further removal of over 5,000 horses.

### C.     Defendants have violated Plaintiffs' First Amendment rights; therefore, summary judgment is appropriate.

In their opening brief, Plaintiffs detailed how Defendants have infringed on their First Amendment right to access and observe both helicopter gather operations, bait-and-water gather operations, and temporary holding facilities for gathered horses. ECF 82, pp. 23-26. Defendants incorrectly asserts that (1) there is no qualified right of access to bait-and-water gather operations; (2) constraints on public access to any gather operations were narrowly tailored to

---

[4] The *FOA I* Court does not address whose burden it is show AML has been achieved, and the language of the ruling indicates the Court was equally focused on BLM removing more horses than originally determined to be "excess." Specifically, the Plaintiff argued BLM violated the Wild Horse Act by adopting plans that allowed for maintenance gathers as such gathers improperly authorized "the continued removal of wild horses, even after excess animal have been removed and AMLs have been achieved." *FOA I*, 728 F.Supp.3d at 77. The Court found Plaintiff was "correct on both the facts and the law." *Id.*

> It is far from evident how this "maintenance" process differs from the type of "excess animal" determination for which the Act establishes a process that is informed by the Bureau's review and consideration of the specified sources of information. *See* 16 U.S.C. § 1333(b)(2). Although the Bureau refers to these gathers as "maintenance" gathers, they are—in fact—gathers based on new determinations that "an overpopulation exits" in the HMA and that "action is necessary to remove excess animals."

*Id.* at 78.

1  serve compelling governmental interests in the safety and effectiveness of gather operations; and

2  (3) Plaintiffs' allegations of restrictions on public access to holding facilities for the 2024 gather

3  are not supported by the record. ECF 90, p. 24.

4            1.      **Bait-and Water Gather Operations**

5         In *Leigh v. Salazar*, the Plaintiff alleged First Amendment violations at the Silver King

6  Wild Horse Gather, which happened to be a gather that utilized helicopters to drive wild horses

7  to the trap location. *Leigh v. Salazar*, 954 F. Supp. 2d 1090, 1092 (D. Nev. 2013) (*Salazar*). In

8  addressing this claim, the Court applied the two-factor test enunciated by the U.S. Supreme

9  Court in *Press-Enterprise Co.*, which provides consideration should be given to (1) whether

10  access has historically been provided, and (2) whether public access plays a significant positive

11  role in the functioning of the particular process in question. *Id.* at 1100 (citing *Press-Enterprise

12  Co. v. Superior Court*, 478 U.S. 1, 8-9 (1986)).

13         For the first factor, the Court examined "whether wild horse gathers have historically

14  been open to the press and general public." *Id.* Concluding that public access to gathers on public

15  lands has been historically provided, the Court turned to the second factor. *Id.* at 1101. In this

16  regard, the Court stated:

17         [T]he evidence before the court establishes that public access to gather activities
          plays an important role in the function of the gather, namely protecting the
18         interests of the overpopulated horses and news gathering for the benefit of the
          public. … Moreover, as plaintiff Leigh testified, public access allows individuals
19         to report on the government's activities as well as the health and condition of the
          gathered horses.
20

21         Finally, the court notes that both Mr. Shepard and Mr. Noyes testified on cross-
          examination that they believed the public has a right of access to gather activities
22         and that public access plays a significant role in the function of those gathers and
          their purpose. Moreover, in a formal policy memorandum issued by the BLM
23         dated January 23, 2013, the BLM sets forth its national policy for the public and
          media to attend and observe gather operations on public land.[5]
24

25  *Id.* As the two factors were satisfied, the *Salazar* Court concluded "the public has a right of

26

27  _____
   [5] This memorandum is attached as Exhibit P to the Declaration of Jennifer Rae Lovko in Support
   of Plaintiffs' Motion for Judicial Notice, which accompanied Plaintiffs' Motion for Summary
28  Judgment. ECF 83-1, pp. 221-

access to gathers upon public lands." *Id.*  But, BLM now argues this ruling is not applicable to bait-and-water gather operations on public lands.[6] ECF 90, pp. 24-25.

First, the *Salazar* opinion was not limited to any specific type of gather, but rather, its focus was on access to gather operations on "public lands." *Salazar*, 954 F. Supp. 2d at 1100 n.5. Plaintiffs are unaware of any legal principle (nor do Defendants cite to any legal principle) which would limit the Court's ruling based upon the mode by which the horses are gathered. Second, the same significant role fostered by public access to helicopter gather operations is served by public access to gather operations involving bait-and-water traps. ECF 82-1, ¶¶ 16-18; Second Leigh Decl. at ¶¶ 14-16. Third, in the past, BLM has allowed public observation of gathers conducted through the use of bait-and-water traps, and BLM's policies regarding public access do not state that access should be denied for gathers using bait-and-water traps. ECF 82-1, ¶ 36; ECF 83-1, Exhs. P-Q; Second Leigh Decl. at at ¶¶ 10-12. Despite this, BLM states Plaintiffs' evidence is insufficient and while access may have been allowed in the past, access has been denied since 2013. ECF 90, pp. 24-25. By its own admission, access has been allowed in the past (and thus is possible). Historical access is not erased by one BLM District[7] denying access. *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 701 (6th Cir. 2002) (noting that even "a brief historical tradition might be sufficient to establish a First Amendment right of access where the beneficial effects of access to that process are overwhelming and uncontradicted").

Plaintiffs also assert their First Amendment rights are violated when, after horses are gathered by bait-and-water traps, they are not allowed access to the temporary holding facilities

---

[6] Helicopter-driven gathers involve using helicopters in a threatening manner to provoke bands of horse to "escape" in the direction of the trap. Using bait-and-water is a passive method of trapping. This mode of trapping involves setting up panels around bait and/or water sources. Bait-and-water trap sites typically consist of an area approximately 0.25 acre in size. Second Leigh Decl. at ¶ 4. With helicopter-driven gathers, typically a large number of horses are gathered in day. For example, the 2023 gather in the Antelope Complex saw as many as 177 horses gathered in one day with the use of a helicopter. Bait-and-water gathers, on the other hand, are used for capturing small numbers of wild horses. Usually, the daily number gathered with this mode is in the single or low double digits. *Id.* at ¶ 5.

[7] Defendants rely upon the declaration of Bruce Thomas to establish that access has been denied since 2013. ECF 90, p. 25. Mr. Thomas only establishes that the Elko District began denying access to 2013; he does not refer to BLM practices outside of this District. ECF 90-2, ¶ 8.

PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

for these horses. ECF 82, p. 24. In the past, BLM has regularly allowed access. ECF 82-1, ¶ 36. BLM's own policy provides that public access will be provided for temporary holding facilities, too. ECF 83-1, Exh. P, pp. 2-3. Defendants do not deny any of this, but assert summary judgment should not be granted because "BLM is not aware of any requests from the public or [Plaintiffs] to access temporary holding facilities for wild horses gathered during bait and water trap operations since the 2017 gather plan was issued." ECF 90, p. 5. This simply is not true. Laura Leigh has asked on multiple occasions to have access to these temporary holding facilities. Second Leigh Decl. at ¶ 13. And as addressed in Plaintiffs' opening brief, access to these facilities served an important interest:

> At the temporary holding facilities, the condition of the horses is accessed, and they are cared for until being loaded for removal to longer-term off-range facilities. WHE finds access to temporary holding facilities is vital to understanding how the gather operations have impacted the horses' health and how handling and sorting is being done, how handling aides are being used or misused, if there is sufficient water and if BLM has exceed[ed] the capacity of pens as outlined in CAWP.

ECF 82-1, ¶ 41.

### 2.   Failure to Narrowly Tailor Restrictions

Plaintiffs acknowledge that BLM has an interest in effectively and efficiently gathering horses, as well as ensuring the safety of all involved, but the agency cannot demonstrate its conduct is narrowly tailored. Instead, restrictions to access are arbitrary, depending more on the office and staff involved than on any government interest. *Id*., ¶ 39.

### a)   Bait-and-Water Gather Operations

Defendants assert that BLM completely forbids viewing of bait-and-water traps because wild horses are reluctant to approach the trap site when there is too much activity. ECF 90, p. 20. Additionally, allowing access "could be unsafe for the horses, BLM and contractor staff, and any public observers." *Id.*, pp. 20-21. Assuming these statements to be true, BLM's interests could be protected with less than a complete denial of access.

Whether a gather utilizes helicopters or bait-and-water traps, both modes pose relatively little risk to the public. Second Leigh Decl. at ¶ 6. The only safety concerns for helicopter-driven

PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

1   gathers involve keeping the public out of the path of active helicopters and large horse

2   populations. *Id.* Such concerns are easily addressed through placing the public at a safe distance

3   and location that does not put them directly in the path of the drive. Where helicopters are used,

4   Ms. Leigh has been allowed access as close as 15 feet to the wings of a trap site and as far as 2

5   miles. *Id.* Bait and water gathers do not pose the same concern. *Id.* at ¶ 7. The number of horses

6   seen per day is relatively small. *Id.* In fact, these trap locations can be, if anything, a bit boring as

7   significant periods of time can pass before any horses are lured to the trap. *Id.*

8          To prevent spooking horses at traps using bait and water, it is only necessary to place the

9   public a few hundred feet away depending on the site's geography. *Id.* at ¶ 8. Even if BLM

10  believes a further distance is necessary, certainly some tangible distance can be identified. For

11  example, in 2013, BLM announced observation would be allowed approximately 1 mile from

12  bait-and-water traps in the Triple B Complex. *Id.* at ¶ 12. Blinds also can be used to hide

13  observers from wild horses. *Id.* at ¶ 9. And, any risk of spooking horses can further be addressed

14  by limiting the number of observers that are present at any given time. *Id.*

15         Defendants also contend that a complete denial of access is "narrowly tailored" for

16  temporary holding facilities of horses gathered at bait-and-water traps. ECF 90, p. 26. The

17  agency's rationale is:

18         Unlike helicopter gathers, which are conducted during the day and allow for
           designated viewing of holding facilities once the horses have been fed and settled
19         at the end of the day, bait and water traps operate continuously throughout all
           hours of the day and night. Because of the continuous nature of the operations,
20         there is no fixed time during daylight hours after the animals are processed and
           settled that would allow the public to safely visit.
21

22  *Id.* But again, these facts do not warrant a complete denial of the public's right to access the

23  temporary holding facilities. Designated viewing of holding facilities is not limited to viewing

24  "once the horses and have been fed and settled at the end of the day." *Id.* Plaintiffs have spent

25  entire days at these facilities, observing horses being unloading and processed. Second Leigh

26  Decl. at ¶ 16. Ben Noyes with BLM has also testified that the public can go to these facilities

27  during the day. ECF 36 at 48:20-49:24. Additionally, BLM's own Comprehensive Animal

28  Welfare Program Standards state "[a]ll sorting, loading or unloading of [wild horses and burros]

                                                    10

1  during gathers must be performed during daylight hours except when unforeseen circumstances

2  develop and the Lead COR/CO/PI approves the use of supplemental light." CAWP Standards, p.

3  13, available at https://www.blm.gov/sites/default/files/docs/2020-12/PIM2021-002%20att1.pdf.

4      In conclusion, BLM's current practice clearly is not narrowly tailored to any government

5  interest.

6              b)      **Helicopter Gather Operations**

7      In their opening brief, Plaintiffs identified unreasonable limitations on the Plaintiffs'

8  ability to observe helicopter gather operations. ECF 82, pp. 24-25. For example, the first

9  helicopter gather operation in the Triple B Complex pursuant to the 2017 Gather Plan was

10  conducted in 2019. ECF 82-1, ¶ 42. The location of the trap was the same location that BLM

11  used to gather horses in 2011. *Id.* In 2011, the viewing area for the trap allowed Plaintiff LEIGH

12  to see the loading of gathered horses. *Id.*, ¶ 43. She also was able to witness a helicopter pilot

13  strike a wild horse with the skid of the helicopter, which provided essential insight into BLM's

14  management of wild horses and burros. *Id.*, ¶¶ 43-44. Based on this observation, Plaintiff LEIGH

15  filed a complaint before the Nevada District Court and gained a temporary restraining order. *Id.*,

16  ¶ 44. Subsequently, BLM admitted that "some instances of inappropriate handling and

17  operational decisions were noted" during the gather. *Id.* As a result, BLM recommended a

18  number of changes to gather operations, including but not limited to the development of

19  guidelines for helicopter pilots to ensure helicopters did not make contact with any wild horses

20  or burros during a gather. *Id.* Then in 2019, when using the same trap location, the public

21  viewing area was moved by BLM to a location that did not allow a meaningful opportunity to

22  observe any activity in the trap or the loading of wild horses. *Id.*, ¶ 45.

23      BLM argues that the new location was "narrowly tailored" because the 2019 gather

24  involved a different contractor and pilot than the 2011 gather at the same site. ECF 90, p. 27.

25  However, in and of itself, this should make no difference. BLM therefore adds:

26      Although the general area may be the same, the direction size and exact location
       of the trap will often differ. For example, in some instances the pilot will take

27      horses into the valley and let them run back into the trap, while a different pilot
       may want to hook them around a point or hill into the trap. Although both

28      techniques are effective, different techniques may require a change in the way the

                                            11

1
2
3

> trap is positioned and how much equipment or people can be in the general area
> thus the viewing location is situated differently and can even change during a
> single gather operation for safety reasons and not to impede the gather operation.
> Thus was the case in the difference of viewing locations during the 2011 and
> 2018/2019 helicopter gather operations.

4

ECF 92-1, ¶ 29. This statement is unclear. Is BLM contending that the in 2011 the pilot gathered

5

the horses from a different direction than in 2019 or that during one gather, the pilot herded the

6

horses into the valley, but in the other, they hooked the horses around a point or hill into the

7

trap? Either way, this simply is not true.

8

Laura Leigh was present at both the 2011 and 2019 gathers. Leigh Decl. at ¶ 18. In 2011,

9

10

the observation location required the public to climb on top of a hill from which the gather

operations could be viewed. *Id.* In 2019, the observation location was placed farther away and

11

lower on the ground, with the trap obscured by a hillside. *Id*. For both gathers, the pilots drove

12

13

the helicopters from two different directions (the same two directions); for both gathers, the

pilots drove some of the horses directly into the valley and some of the horses were hooked

14

around the hill and into the trap. *Id*. There was no difference in the helicopter paths taken or in

15

the paths that the horses were herded. *Id*.

16

17

BLM's argument that different contractors were used, which necessitated different

observation sites simply is a fabrication. The gathers in 2011 and 2019 were conducted in the

18

same manner.

19

20

In 2023, BLM also denied access to traps, including by placing a trap on private land

within a checkerboard pattern of public and private land, asserting that access was denied

21

because the location was on private land. ECF 82, p. 25. More specifically, from July 27, 2023

22

23

through July 30, 2023, BLM conducted helicopter gathers at two different traps (a "north" trap

and a "south" trap), which were located 9 miles apart from each other. ECF 10-4, ¶ 33. On July

24

27, 2023, Colette Kaluza with Wild Horse Education was told by BLM that the public would

25

only be allowed to view gather operations at one of the trap sites. *Id.* Observation at the second

26

trap site was denied from July 27, 2023 through July 30, 2023. *Id.*, ¶ 34; ECF 10-1, ¶ 61. Then

27

on July 31, 2023, Ms. Kaluza was informed a third trap site was being designated (the Spruce

28

PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

1   South Trap), and BLM said she could not view gather operations at this third site because it was

2   on private land. ECF 10-4, ¶ 41; ECF 82-1, ¶46. She noted that there are public roads by which

3   she could view the gather, but BLM denied this, insisting that only private roads existed. ECF

4   10-4, ¶ 41. Thereafter, Plaintiffs sought a temporary restraining order, which BLM opposed in

5   the same manner it opposes this motion for summary judgment, arguing that "[t]here has only

6   been one day [July 31, 2023] when members of the public were unable to view horses as they

7   were being trapped."[8] ECF 21-3, ¶ 28; ECF 90, p. 28.

8       At this site [the Spruce South Trap], Bruce Thompson with BLM said "capturing the

9   animals required setting up and using a trap that required access to private land." *Id.* But then,

10  Mr. Thompson admitted that the trap site actually was assembled on public land, with the "load

11  out from the trap and parking" located on private land. *Id.* If the trap site was on public land, why

12  did BLM deny access to it? The agency states the trap was "within checkerboard, meaning that

13  every other section is private land. There is no other way to access the public land other than

14  crossing private land." ECF 92-2, ¶ 11. This was explored during the hearing on Plaintiff's

15  motion for a temporary restraining order, with Bruce Thompson agreeing that BLM had a choice

16  of where to place the trap. ECF 36 at 88:15-17.

17      The Court denied Plaintiff's request for a temporary restraining order, but found that

18  BLM's denial of public observation at the "checkerboard pattern" site was a First Amendment

19  violation, and "if a gathering site needs to be on private property or needs to be only accessed

20  through private property, the BLM clearly has a duty to try and obtain consent and permission

21  for [public] access … and if it doesn't have that permission, then it's going to have to show some

22  very overriding interests in why the public's right of access should be denied." ECF 36 at 129:5-

23  12. Defendants' opposition to Plaintiffs' Motion for Summary Judgment adds no further

24  argument that would detract from this finding.

25      In conclusion, while BLM has an interest in effectively and efficiently gathering horses,

26  as well as ensuring the safety of all involved, the agency cannot demonstrate its conduct is

27  _____

[8] Denial of access only occurred on one day because the gather at this location only occurred on
28  one day. Second Leigh Decl., Exh. 1 at 74:4-5.

PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

narrowly tailored. Instead, restrictions to access are arbitrary, depending more on the office and staff involved than on any government interest. *Id.*, ¶ 39.

### D.     Plaintiffs' claims are not moot.

Federal Defendants assert Plaintiffs' claims are prudentially moot and soon to be constitutionally moot because BLM intends to adopt a new gather plan and Herd Management Area Plan in the Fall of 2025 (2025 Plan). ECF 92, pp. 7-8. This assertion necessarily fails because Defendants have not met their burden of demonstrating mootness, and further, exceptions to mootness apply.

#### 1.     Defendant has not met its burden of establishing Plaintiffs' case is moot.

"A case becomes moot whenever it 'loses its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law.'" *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir. 2001) (quoting *Hall v. Beals*, 396 U.S. 45, 48 (1969)). "The central question of all mootness problems is whether changes in the circumstances that prevailed at the beginning of litigation have forestalled any occasion for meaningful relief." *West v. Sec'y of the DOT*, 206 F.3d 920, 925 n. 4 (9th Cir. 2000) (quoting Wright & Miller: 13A Federal Practice and Procedure § 3533.3). The underlying concern is that once an action has been completed or ceased, "there is no reasonable expectation that the wrong will be repeated," which makes it unfeasible for a Court to grant "any effectual relief whatever." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (citations omitted). But, where a Plaintiff maintains even a small interest in the matter and any effective relief remains, a case is not moot. *Knox v. SEIU*, Local 1000, 567 U.S. 298, 307-308 (2012); *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir. 2001). On this point, "the question is not whether the precise relief sought" by a Plaintiff when filing his/her motion is "still available." *Cantrell*, 241 F.3d at 678. Instead, "[t]he question is whether there can be any effective relief." *Id.*

"The party asserting mootness bears the burden of establishing that there is no effective relief remaining that the court could provide. That burden is always 'heavy' … but 'defendants

in NEPA cases face a particularly heavy burden.'" *Wilderness v. Allen*, 871 F.3d 719, 724 (9th Cir. 2017) (citations omitted).

> When evaluating the issue of mootness in NEPA cases, we have repeatedly emphasized that if the completion of the action challenged under NEPA is sufficient to render the case nonjusticiable, entities could merely ignore the requirements of NEPA, build its structures before a case gets to court, and then hide behind the mootness doctrine. Such a result is not acceptable.

*Cantrell*, 241 F.3d at 678. Thus, for example, effective relief is still available even after a highway has been constructed because the Court could require the highway to be closed or taken down. *Id.* And, effective relief may be available for completed action where the agency could undertake measures to repair or mitigate adverse effects. *Id.* 678-79.

Here, Defendants do not meet their heavy burden of demonstrating no effective relief remains.[9] They do not address, for example, that rulings and declaratory relief can clarify BLM's duties under NEPA, the Wild Horse Act, and the First Amendment, thereby clarifying BLM's duties for gathers under the 2017 Gather Plan, as well as for gathers under the 2025 Plan. Defendants do not address that BLM could undertake measures to mitigate its unlawful gathers through returning horses to the Complexes. Defendants simply ignore whether effective relief exists or not.

### 2. The "voluntary cessation" exception and "capable of repetition, yet evading review" exceptions apply.

---

[9] Defendant only direct reference to relief is through a quotation from *Nat. Res. Def. Council*: "A court should decline to grant declaratory or injunctive relief where the government has already changed or is in the process of changing [its] policies[.]" ECF 90, p. 14. In that case, the Plaintiff challenged two Biological Opinions (BiOps) issued under the Endangered Species Act. *NRDC v. Norton*, No. 1:05-CV-01207 OWW LJO, at *3 (E.D. Cal. Jan. 3, 2007). After litigation began, Federal Defendants reinitiated consultation on the challenged BiOps, asserting they "anticipated that new BiOps will be issued within 18 months." *Id.* at *4. Based on this, the Federal Defendants argued the case was prudentially moot. *Id.* at *5. Recognizing prudential mootness was applicable to cases involving declaratory or injunctive relief against the government, the Court ruled against the Federal Defendants because Plaintiffs' concerns were not fully addressed by the Defendants' reinitiation, and the Defendants had not demonstrated an intent to change their opinions or alter their operations significantly. *Id.* at *23-24. Here, BLM similarly has not demonstrated an intent to change the agency's opinions or alter their operations significantly.

15

PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

As addressed below, BLM's intention to adopt a new plan does not moot Plaintiffs' claims as the "voluntary cessation" exception and "capable of repetition, yet evading review" exception apply. *FBI v. Fikre*, 601 U.S. 234, 243 (2024); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000); *Murphy v. Hunt*, 455 U.S. 478, 482 (1982); *Demery v. Arpaio*, 378 F.3d 1020, 1026 (9th Cir. 2004); *Forest Guardians v. United States Forest Serv.*, 329 F.3d 1089, 1095 (9th Cir. 2003). Both exceptions are guided by the principle that "[o]nce a defendant has engaged in conduct the plaintiff contends is unlawful and the courts have devoted resources to determining the dispute, there is Article III jurisdiction to decide the case as long as 'the parties [do not] plainly lack a continuing interest.'" *Demery*, 378 F.3d at 1026 (quoting *Friends of the Earth, Inc.*, 528 U.S. at 192).

### 3.    Voluntary Cessation

When a defendant, such as BLM, voluntarily stops its allegedly unlawful conduct, this cessation "ordinarily does not suffice to moot a case." *Friends of the Earth, Inc.*, 528 U.S. at 174. If voluntary cessation could deprive a court of its power to rule upon the legality of a claim, "the courts would be compelled to leave 'the defendant … free to return to [its] old ways.'" *Id.* at 189 (citation omitted). "In accordance with this principle," a case is not mooted by voluntary conduct unless the defendant demonstrates it is "absolutely clear that the alleged wrongful behavior could not reasonably be expected to recur." *Id.*; *see also Forest Guardians*, 329 F.3d at 1095 (noting that the burden of demonstrating mootness is "a heavy one" where the at-issue conduct was voluntarily stopped). The likelihood of repetition of a challenged action in the absence of a court ruling weighs strongly in favor of the court retaining jurisdiction over the case until fully adjudicated. *See Armster v. U.S. Dist. Court*, 806 F.2d 1347, 1359 (9th Cir. 1986). This is especially true where the claims address precedential issues or constitutional rights. *See id.* at 1360. And, a Defendant cannot satisfy its burden of demonstrating mootness through "sparse" declarations asserting that it will not engage in the challenged conduct in the future. *FBI*, 601 U.S. at 243.

BLM argues this exception does not apply because the intention to adopt of the 2025 Plan is not based on this litigation. ECF 90, p. 16. Instead, BLM states "[t]he 2017 Decision Record

expires in about two years, and BLM is issuing a new decision based on new NEPA analysis in the normal course of its duties under the Wild Horse Act." *Id.* Importantly, this statement is not supported by citation to any evidence nor do the declarations that accompany Defendants' motion address the 2025 Plan's motivation. And, absent from this statement is any direct assertion that the new plan was not motivated by Plaintiffs' current litigation.

Plaintiffs' original complaint was filed on July 26, 2023. ECF 1. Only after this filing did BLM begin internal scoping for a new plan (on August 1, 2024). Preliminary Environmental Assessment for Antelope and Triple B Complexes Wild Horse Gather and Herd Management Area Plan, p. 30, available at https://eplanning.blm.gov/public_projects/2034747/ 200630470/20134805/251034785/Antelope_Triple_B_Gather-HMAP_Preliminary_EA_508.pdf. At that time, the 2017 Gather Plan, which was adopted on December 7, 2017, would not expire for more than four years.

The preliminary EA for the new plan was issued almost one year after BLM's internal scoping (in May of 2025). *Id.* Conveniently, this was only after (1) this Court's order set the briefing schedule for the parties' cross-motions for summary judgment and (2) the Defendants had lodged and certified the administrative record for this case. ECF 76; ECF 77, 77-1.

Defendants further state the agency has no intention of conducting any more gathers under the 2017 Gather Plan, but BLM does not state it absolutely will not conduct any gathers – acknowledging that "unforeseen" circumstances could arise warranting another gather. ECF 90, pp. 15-16.

Defendants do not contend that the new plan makes it "absolutely clear that the alleged wrongful behavior could not reasonably be expected to recur" – nor can they make such a contention as the new plan similarly authorizes unlawful conduct. *Friends of the Earth, Inc.*, 528 U.S. at 189. Based on BLM's "sparse" (or absent) assertions, Defendants have failed to meet their burden of demonstrating this action is moot. *FBI*, 601 U.S. at 243.

Plaintiffs' First and Second Causes of Action allege BLM's implementation of the 2017 Gather Plan violates NEPA and the Wild Horse Act because (1) BLM has exceeded the scope of the plan's NEPA analysis without issuing a new or supplemental EA, and (2) not demonstrated

that the practical realities of gathering necessitated conducting more than a dozen gathers over a span of seven years. ECF 82, pp. 9-10, 20-23. Without a ruling by this Court, BLM can continue to conduct gathers that similarly violate NEPA and the Wild Horse Act. In fact, the 2025 Plan is even more egregious than the 2017 Plan as staged gathers are not confined to a ten-year period of time. Preliminary Environmental Assessment for Antelope and Triple B Complexes Wild Horse Gather and Herd Management Area Plan, p. 30, available at https://eplanning.blm.gov/ public_projects/2034747/200630470/20134805/251034785/ Antelope_Triple_B_Gather-HMAP_Preliminary_EA_508.pdf; *see also* ECF 90, p. 17 n. 3 (stating "BLM's forthcoming decision will not be expressly time-bound like the 2017 documentation. Rather, BLM will be conducting initial and follow-up gathers designed to manage horses 'within the AML range' for the Complexes.)

Similarly, nothing in BLM's opposition demonstrates that Plaintiff's Third Cause of Action, based on First Amendment violations, will not recur – nor can they make such a contention as the new plan contains language virtually identical to the 2017 Gather Plan. *Compare* 2017 Gather Plan EA at ATB_18012 and ATB_18053 with the 2025 Gather Plan EA at pp. 22, 24-25.

### 4. Capable of Repetition, Yet Evading Review

The capable of repetition, yet evading review exception applies where the challenged action's duration is too short to be fully litigated prior to its cessation, and there is a reasonable expectation that the same party would be subjected to the same offending action again. *See Murphy*, 455 U.S. at 482; *Demery*, 378 F.3d at 1026. Defendants argue this exception does not apply because the duration of the 2017 Gather Plan is not sufficiently short. ECF 90, pp. 16-17. But, as BLM admits, an action's duration of two years is sufficient to meet this factor. ECF 90, p. 17 (citing *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1018 (9th Cir. 2012).

Here, Plaintiffs' filed the original complaint on July 26, 2023. ECF 1. Plaintiffs' claim regarding the scope of NEPA analysis being exceeded did not become ripe until 2023 when BLM had removed the target population of 9,053 horses. ECF 82, pp. 9-11. Therefore, this

exception is applicable to that claim. And, as demonstrated above in Section II.D.1, there is more than a reasonable expectation that Plaintiffs will be subjected to the same offending action again.

Plaintiffs' other claims became ripe sometime in 2017 (when the 2017 Gather Plan was adopted) or thereafter.[10] For these claims, the duration factor for this exception is arguable. Plaintiffs have been unable to find any case addressing an action that began 7 years prior to a mootness claim, and no Court has identified the upper limit for what constitutes duration that is too long. However, as demonstrated above in Section II.D.1, there is more than a reasonable expectation that Plaintiffs will be subjected to the same offending action again. Should the Court find this exception does not apply to Plaintiffs' Wild Horse Act and First Amendment claims, these claims still are not moot because the voluntary exception applies.

In summary, Defendants ignored their heavy burden of demonstrating that this case is moot because they completely ignored any discussion of whether effective relief still can be ordered by this Court. Even if Defendants had done so, the case is not moot because of the voluntary cessation and capable of repetition, yet evading review exceptions.

III.    CONCLUSION

This case focuses on the Antelope and Triple B Complexes, but the challenged action and BLM conduct represent a far larger problem repeated in other gather plans (including the 2025 Plan) and gather operations. Increasingly, BLM seeks to evade judicial review with claims of mootness and through adoption of plans that BLM contends give the agency carte blanche to ignore NEPA and the Wild Horse Act thereafter. A staged gather plan is not an unconditional authorization for BLM to remove an indeterminate and unanalyzed number of horses for so long as the agency desires. And, while the public's First Amendment right of access to observe gather

---

[10] Regarding Plaintiffs' Wild Horse Act arguments, some delay in removing the targeted, excess population likely was justified, especially because over 9,000 excess horses were determined to reside in the Complexes. *FOA I*, 728 F.Supp.3d 45; *Friends of Animals v. Culver*, 610 F.Supp.3d 157 (D.D.C. 2022) (*Culver*); *W. Rangeland Conservation Ass'n v. Zinke*, 265 F.Supp.3d 1267 (D. Utah 2017). As BLM has not offered any evidence regarding the reasons for delay, the exact date upon which this claim became ripe is unclear. But certainly, by 2023 (when BLM succeeded in removing the targeted, excess population, the agency had violated the immediacy requirement and its duty to make a new excess determination.

PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

operations can be limited through narrowly tailored means that address overriding government interests, BLM's limitations are not narrowly tailored.

Accordingly, for these reasons and the arguments presented by Plaintiffs above, Plaintiffs respectfully request that their motion be granted.


DATED:  September 29, 2025,                    Respectfully Submitted,

                                               /s/ Jennifer Rae Lovko
                                               Jessica L. Blome
                                               (Cal. Bar No. 314898, pro hac vice)
                                               Jennifer Rae Lovko
                                               (Cal. Bar No. 208855, pro hac vice)
                                               GREENFIRE LAW, PC
                                               2748 Adeline Street, Suite A
                                               Berkeley, CA 94703
                                               (510) 900-9502
                                               jblome@greenfirelaw.com
                                               rlovko@greenfirelaw.com

                                               /s/ Brent M. Resh
                                               Brent M. Resh
                                               (Nevada Bar No. 14940)
                                               BRENT RESH LAW, PLLC
                                               2401 La Solana Way
                                               Las Vegas, NV 89102
                                               (702) 781-6903
                                               brent@brentreshlaw.com

                                               Attorneys for Plaintiffs

PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND REPLY TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT