ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

BONNIE BALLARD, Trial Attorney
Wildlife & Marine Resources Section
KYLE LYONS-BURKE, Trial Attorney
Natural Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Phone: (202) 532-5567 (Ballard)
Email: bonnie.m.ballard@usdoj.gov
Phone: (202) 598-3377 (Lyons-Burke)
Email: kyle.lyons-burke@usdoj.gov

*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| WILD HORSE EDUCATION, and LAURA LEIGH, individually,<br><br>*Plaintiffs,*<br><br>v.<br><br>U.S. DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, in his official capacity as Nevada State Director of the Bureau of Land Management,<br><br>*Federal Defendants.* | Case No. 3:23-cv-00372-MMD-CLB<br><br>**FEDERAL DEFENDANTS' REPLY IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

Page

INTRODUCTION .................................................................................................................. 1

ARGUMENT ......................................................................................................................... 1

I. Plaintiffs' Claims are Constitutionally Moot. ................................................... 1

II. Gathers conducted pursuant to the 2017 Record Decision and EA complied with the Wild Horse Act's "immediately" provision. ........................................ 4

III. BLM's Gathers Were Within the Scope of the 2017 Environmental Assessment. ....................................................................................................... 7

IV. Plaintiffs' First Amendment Claim Fails. ........................................................ 9

CONCLUSION ..................................................................................................................... 11

# TABLE OF AUTHORITIES

**Cases**                                                                                                     **Page(s)**

*Alaska Ctr. For Env't v. U.S. Forest Serv.*,
  189 F.3d 851 (9th Cir. 1999) .................................................................................. 2

*California v. Texas*,
  141 S. Ct. 2104 (2021) .......................................................................................... 2

*Colvin & Son, LLC v. Haaland*,
  763 F. Supp. 3d 1176 (D. Nev. 2025) ................................................................. 5, 6

*Detroit Free Press v. Ashcroft*,
  303 F.3d 681 (6th Cir. 2002) ................................................................................. 9

*Earth Island Inst. v. U.S. Forest Serv.*,
  87 F. 4th 1054 (9th Cir. 2023) ............................................................................... 9

*Friends of Animals v. Silvey*,
  820 F. App'x 513 (9th Cir. 2020) .......................................................................... 5

*Friends of Animals v. United States BLM*,
  728 F.Supp.3d 45 (D.D.C. 2024) .......................................................................... 7

*Grand Canyon Tr. v. United States Bureau of Reclamation*,
  691 F.3d 1008 (9th Cir. 2012) .............................................................................. 1

*Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Serv.*,
  56 F.3d 1071 (9th Cir. 1995) ............................................................................. 3, 4

*Leigh v. Salazar*,
  954 F. Supp. 2d 1090 (D. Nev. 2013) .................................................................. 10

*Lindquist v. Idaho State Bd. of Corr.*,
  776 F.2d 851 (9th Cir. 1985) ................................................................................. 3

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ........................................................................................... 8, 9

*Native Vill. of Noatak v. Blatchford*,
  38 F.3d 1505 (9th Cir. 1994) ................................................................................. 2

*Native Vill. of Nuiqsut v. BLM*,
  9 F.4th 1201 (9th Cir. 2021) ................................................................................... 3

*Nome Eskimo Cmty. v. Babbitt*,
    67 F.3d 813 (9th Cir. 1995) .................................................................................................. 2

*Pub. Util. Comm'n of State of Cal. v. FERC*,
    100 F.3d 1451 (9th Cir. 1996) ............................................................................................... 3

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
    605 U.S. 168 (2025) ............................................................................................................... 9

*Western Rangeland Conservation Ass'n v. Zinke*,
    265 F.Supp.3d 1267 (D. Utah 2017) ................................................................................. 6, 7

*Wildearth Guardians v. Haaland*,
    Nos. 22-15029, 22-15091, 2023 U.S. App. LEXIS 32910 (9th Cir. Dec. 13, 2023) .................. 1

*Wisconsin v. Weinberger*,
    745 F.2d 412 (7th Cir. 1984) ................................................................................................. 8

**INTRODUCTION**

The 2017 Decision Record and Environmental Assessment ("EA") at issue here have been superseded by a new Decision Record and EA that were issued in September of 2025. Plaintiffs' claims are thus Constitutionally moot and should be dismissed. But even if the Court reaches the merits, each of Plaintiffs' claims fails as Plaintiffs' Reply continues to ignore Ninth Circuit caselaw that has consistently upheld the validity of ten-year gather decisions and accompanying EAs. In addition, Plaintiffs cannot establish any violations of their First Amendment rights. To the contrary, any restrictions to public access to horse gathers were narrowly tailored to serve e the Bureau of Land Management's ("BLM") compelling interests in safety of the public and BLM personnel and effective gather operations.

For these reasons, Federal Defendants respectfully request that the Court deny Plaintiffs' Motion for Summary Judgment and grant Federal Defendants' Cross-Motion for Summary Judgment.

**ARGUMENT**

**I.    Plaintiffs' Claims are Constitutionally Moot.**

As previewed in Defendants' opening brief, on September 30, 2025, BLM issued a new Decision Record and EA for the Antelope and Triple-B Complexes. *See BLM approves wild horse management plan for Antelope, Triple B complexes*, Sep. 30, 2025, https://www.blm.gov/announcement/blm-approves-wild-horse-management-plan-antelope-triple-b-complexes. The 2025 Decision Record and EA supersede the 2017 Decision Record and EA challenged in this case; thus Plaintiffs' claims are now Constitutionally moot. *See Wildearth Guardians v. Haaland*, Nos. 22-15029, 22-15091, 2023 U.S. App. LEXIS 32910, at *3-4 (9th Cir. Dec. 13, 2023) (citing *Grand Canyon Tr. v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1017 (9th Cir. 2012), *as amended* (Sep. 17, 2012)) ("It is well established that the supersession

1

of an agency [decision] moots any challenges to the original agency [decision]."). As noted in Defendants' opening brief, each of Plaintiffs' claims here are based on the now-superseded 2017 Decision Record and 2017 EA. *See* ECF No. 90 at 15. Consequently, enjoining the implementation of and vacating the 2017 Decision Record and EA, as Plaintiffs request, would provide no effective relief. Accordingly, Plaintiffs' claims "are no longer live and therefore the parties lack a legally cognizable interest for which the courts can grant a remedy." *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 854 (9th Cir. 1999) (citation omitted).

While Plaintiff argues that other relief such as "rulings and declaratory relief" are still available, "a declaratory judgment may not be used to secure judicial determination of moot questions." *Nome Eskimo Cmty. v. Babbitt*, 67 F.3d 813, 816 (9th Cir. 1995) (quoting *Native Vill. of Noatak v. Blatchford*, 38 F.3d 1505, 1514 (9th Cir. 1994)). Moreover, declaratory relief must still correspond with a separate remedy that will redress Plaintiffs' injuries. *See California v. Texas*, 141 S. Ct. 2104, 2115-16 (2021). As there is no longer a "'case' in the Constitutional sense of the word," the Court "lacks the power to issue a declaratory judgment." *Babbitt*, 67 F.3d at 816 (citing *Native Vill. of Noatak*, 38 F.3d at 1514).

Plaintiffs' arguments that mootness exceptions apply here are also without merit. First, Plaintiffs' assertion that the voluntary cessation exception applies falls flat. ECF No. 94 at 21 (arguing that the new decision was motivated by this litigation because BLM's decision to start the process for issuing a new EA and Gather Plan came after Plaintiff filed their Complaint). Plaintiffs' logic on this point does not support their argument – Plaintiffs alleges that BLM's decision to begin internal scoping for a new plan was motivated by this litigation because it began this process "[o]nly after" Plaintiffs filed their Complaint while simultaneously alleging that BLM must have begun this process due to this litigation because the 2017 Decision and EA "would not expire for more than four years." *Id.* at 21. Using Plaintiffs' logic, it seems the only way the issuance of a new Decision Record and EA would not be motivated by this litigation is if BLM

2

began internal scoping for the new plan nearly five years before the 2017 plan expired or waited until after the conclusion of this litigation. Plaintiffs also fail to address that, as explained in Defendants' opening brief, it would make little sense for BLM's issuance of a new EA and Decision Record to be motivated by this litigation because the 2017 EA and Decision Record have withstood an entirely separate challenge and appeal as well as two emergency motions in this case. ECF No. 90 at 16; *see also Lindquist v. Idaho State Bd. of Corrs.*, 776 F.2d 851, 854 (9th Cir. 1985) (holding that a defendant's changed conduct "[did] not appear to have been motivated by a desire to cease voluntarily any illegal conduct" because defendant's actions were previously upheld by the district court).

In addition, the voluntary cessation exception only applies when "the defendant is free to return to its illegal action at any time." *Pub. Util. Comm'n of Cal. v. FERC*, 100 F.3d 1451, 1460 (9th Cir. 1996). Here, the challenged 2017 Decision Record and EA are superseded and thus BLM can no longer rely on those decisions, which is the alleged illegal conduct for Plaintiffs' first and second claims. *See Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1071, 1075 (9th Cir. 1995) (holding that the issues stemming from plaintiffs' challenge to an agency's biological opinion were not likely to recur because the challenged opinion was "superseded, and the federal agencies will rely on [the new biological opinion] for the near future").

Likewise, the "capable of repetition yet evading review" exception does not apply here. Importantly, "[u]nder the 'capable of repetition' prong of the exception to the mootness doctrine, the *plaintiffs* have the burden of showing that there is a reasonable expectation that they will once again be subjected to the challenged activity[.]" *Native Vill. of Nuiqsut v. BLM*, 9 F.4th 1201, 1209 (9th Cir. 2021) (citation omitted). Plaintiffs have not met their burden, as they have failed to show that either of the two requirements of the capable of repetition exception are met here. First, as

3

noted above, Plaintiffs cannot show that there is a reasonable expectation that they will be subjected to the challenged action again because the challenged actions revolve around BLM's reliance on the 2017 Decision Record and EA, which are now superseded. Plaintiffs also have not shown that the duration of the challenged action is too short to allow full litigation before it ceases or expires. As Plaintiffs admit, ECF No. 94 at 23, the majority of Plaintiffs' claims ripened nearly eight years ago when the 2017 Decision Record and EA were first issued. As the Ninth Circuit has previously held that even three years is "more than enough time for litigants to obtain judicial review," the eight-year window that Plaintiffs had to bring these claims certainly do not meet the short duration requirement for the capable of repetition exception. *Idaho Dep't of Fish & Game*, 56 F.3d at 1075 (holding that the four-year lifespan of a biological opinion is not sufficiently short to satisfy the capable of repetition but evading review exception "even considering" that a year "has already passed"). And while Plaintiffs allege that their National Environmental Policy Act ("NEPA") claim did not ripen until 2023, Plaintiffs fail to address that Plaintiffs' pleading failures are the primary reason this case has taken so long to reach the summary judgment stage, ECF No. 90 at 22.

In sum, because the challenged 2017 Decision Record and EA have been superseded and no exceptions to mootness apply, the Court should dismiss this case as moot. However, should the Court nonetheless evaluate the merits of Plaintiffs' claims, as explained below, each of Plaintiffs' claims fail.

II. **Gathers Conducted Pursuant to the 2017 Record Decision and EA Complied With the Wild Horse Act's "Immediately" Provision.**

Plaintiffs' Reply fails to present valid arguments in support of their contention that the 2017 Record Decision and EA are not in compliance with the Wild Horse Act and continue to

ignore caselaw in this district that has squarely upheld ten-year gather decisions as compliant with the Wild Horse Act's "immediately" provision.

      First, Plaintiffs' arguments still fail to explain why BLM's reliance on the 2017 Decision Record to "conduct more than a dozen gathers over an eight-year period" allegedly violates the "immediately" provision of the Wild Horse Act. ECF No. 94 at 7. As explained in Defendants' opening brief, the Ninth Circuit has held that "BLM's use of a single gather plan and a single environmental assessment to cover a period of years and a series of individual gather operations" is not "arbitrary and capricious." *Friends of Animals v. Silvey*, 820 F. App'x 513, 516 (9th Cir. 2020). Moreover, this Court has held in that the Wild Horse Act's requirement that BLM "immediately remove" excess horses includes "some discretionary space" to "plan and execute safe, efficient, and effective removals consistent with the broader purposes of the WHA and in compliance with other statutory duties." *Colvin & Son, LLC v. Haaland*, 763 F. Supp. 3d 1176, 1183 (D. Nev. 2025) (citation omitted). Consistent with this approach and feasibility considerations, in its 2017 Decision Record, BLM estimated that based on the then-current population, over 9,000 horses would need to be removed to reach AML and thus a ten-year gather plan was necessary to "ease pressure on short-term and off-range facilities that may have insufficient capacity to handle all of the excess wild horses if removed in a single gather, and will also provide a greater likelihood that a sufficient gather efficiency can be achieved to apply fertility controls to a larger segment of the wild horse population that remains post-gather." ATB_18349. Additionally, BLM noted that "[f]unding limitations and competing National priorities may affect the timing of gather operations and implementation of the population control components of the Proposed Action." ATB_18346. The 2017 EA also supports this explanation, as it noted that "gather efficiencies and holding space during the initial gather would not allow for the attainment

of the Proposed Action during the initial gather (i.e. not enough horses are successfully captured and removed to reach low AML)." ATB_18001. Based on this assessment, BLM concluded that "[f]ollow-up gathers over a 10 year period to remove any additional wild horses [will be] necessary in order to achieve and maintain the low range of AML." *Id.* Consistent with its 2017 EA and Decision Record, BLM also ensured that the initial gather under the plan occurred only one month after the Decision Record was signed. ATB_18008 (noting that gathers would occur as necessary to achieve AML "following the start date of the initial gather (no sooner than January 2018)"); ECF No. 83-1 at 36-37 (confirming that the initial gather began in January of 2018). Thus, BLM conducted gathers "as promptly as reasonably possible" in compliance with the Wild Horse Act's "immediately" provision. *See Colvin*, 763 F. Supp. 3d at 1184.

Moreover, Plaintiffs continue to misinterpret caselaw that is inapplicable to the facts in this case. First, Plaintiffs' assertion that the court's rationale in *Western Rangeland Conservation Ass'n v. Zinke*, 265 F.Supp.3d 1267 (D. Utah 2017), is "not impacted by whether the case involves Section 706(1) or Section 706(2) of the APA", ECF No. 94 at 8, is incorrect. To the contrary, Section 706(1) of the APA authorizes courts to compel agency action unlawfully withheld or "unreasonably delayed" – thus, the standard of review and requested relief in *Western Rangeland* are entirely different than those contemplated by actions brought under APA Section 706(2). *See Western Rangeland*, 265 F. Supp. at 1287-88 (evaluating whether BLM has "unreasonably delayed" gathers under 5 U.S.C. § 706(1) such that plaintiffs' request for the court to compel gathers is warranted using the *TRAC* factors articulated by the D.C. Circuit). As explained in Defendants' opening brief, the court in *Colvin* specifically addresses this distinction, noting that because the challenge in that case was brought under APA Section 706(2), "[a]ny delay in implementation of the plans is beyond the scope of this Court's review." ECF No. 90 at 19 (citing

6

*Colvin* 763 F. Supp. 3d at 1183). At any rate, BLM's reliance on the ten-year gather plan does not contradict the rationale in *Western Rangeland*, rather, BLM has sufficiently shown that the "practical realities" around gathering many thousands of excess horses support a ten-year gather plan, as reading the "immediately" provision of the Wild Horse Act literally would "contravene the ultimate purposes of the [Wild Horse Act] by forcing BLM to act recklessly and without regard for the continuing viability or humane treatment of creatures it is specifically tasked with preserving." 265 F. Supp. at 1284.

Plaintiffs' continued reliance on *Friends of Animals v. U.S. BLM*, 728 F.Supp.3d 45 (D.D.C. 2024), in their Reply similarly misinterprets the court's holding in that case. Plaintiffs first assert that *Friends of Animals* requires "BLM to explain why it took six years to remove the target population of horses from the Antelope and Triple B Complexes." ECF No. 94 at 10 (citing *Friends of Animals*, 728 F. Supp. 3d at 77). But as noted above, BLM thoroughly explained why its decision to adopt a ten-year gather plan was necessary for the Antelope and Triple-B Complexes in the 2017 Decision Record and EA. And while Plaintiffs contend that BLM should have made a new determination that an overpopulation exists after removing 9,053 horses, *id.*, such a requirement is not consistent with the court's holding in *Friends of Animals*. Rather, the court in that case held that BLM need only make a new determination decision "*after* [BLM] has already achieved AML." *See Friends of Animals*, 728 F. Supp. 3d at 78. As noted in Defendants' opening brief, ECF No. 90 at 10 n.1, BLM did not reach AML in either Complex during the life of the 2017 Decision – thus, BLM's actions here are fully consistent with the court's holding in *Friends of Animals*.

### III. BLM's Gathers Were Within the Scope of the 2017 Environmental Assessment.

7

Plaintiffs' NEPA Claim fails because the scope of the 2017 Environmental Assessment was not limited to a specific number of horses, but instead was to gather sufficient horses, over time, to achieve low AML. Plaintiffs do not make any new arguments in their Reply, but instead rehash arguments from their affirmative brief. *See* ECF No. 9 at 6-7. Specifically, Plaintiffs reiterate the baseless argument that BLM was limited to gathering 9,053 horses under the 2017 Decision and the United States violated NEPA by exceeding that number. *See id.* at 7. As explained in the United States's Cross-Motion for Summary Judgment, the purpose of the 2017 Decision was to achieve low AML for the Complexes, and the 2017 EA explicitly contemplated multiple gathers to do so. *See* ECF No. 90 at 21-24.

Plaintiffs continue to cite no case law supporting their contention that BLM's gathers were limited to 9,053 horses. In fact, as Plaintiffs concede, the analysis in the 2017 EA looked "at the impact of removing approximately 9,053 wild horses." ECF No. 93 at 7. That number was an estimate based on the then-current population; it was never intended to limit the gathers. To the contrary, the focus of the 2017 EA was removing sufficient horses to reach low AML. *See* ATB_17989; ATB_18001. And Plaintiffs, again, do not contest that BLM never achieved low AML over the life of the 2017 Decision. Therefore, the scope of the 2017 EA has not been exceeded because BLM has yet to reach low-AML.

Finally, Plaintiffs argue that BLM was required to issue a "new or supplemental EA." ECF No. 93 at 7. But the question whether to prepare a supplemental EA presents "a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373, 376 (1989); *see also Wisconsin v. Weinberger*, 745 F.2d 412, 418 (7th Cir. 1984) ("[A]n agency cannot have acted arbitrarily or capriciously in deciding not to file a [supplemental environmental impact statement] unless the new information provides

a seriously different picture of the environmental landscape such that another hard look is necessary."). For a supplemental EA to be necessary, "the new information or circumstances must show that the action will affect the quality of the human environment in a significant manner or to an extent not already considered." *Earth Island Inst. v. U.S. Forest Serv*. 87 F. 4th 1054, 1069 (9th Cir. 2023) (citing *Marsh*, 490 U.S. at 376). Here, Plaintiffs have not identified any new information beyond the raw numbers of horses gathered. *See* ECF No. 93 at 7. As explained above, BLM considered the environmental impact of removing sufficient horses to reach low-AML. There is no basis upon which a supplemental EA would be required. *See Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 182 (2025) ("when an agency . . . decides what qualifies as significant or feasible or the like, a reviewing court must be at its most deferential." (citation omitted)).

## IV. Plaintiffs' First Amendment Claim Fails.

Plaintiffs' First Amendment Claim fails because all restrictions to public viewing implemented by BLM were narrowly tailored to protect the public, BLM personnel, and the horses themselves. First, Plaintiffs summarily claim that BLM has allowed public access to bait and water traps a few times over ten years ago. Both of the BLM's declarants, however, explain that the BLM has not allowed public access to bait and water traps in either the Ely or Elko Districts. Third Decl. of Benjamin Noyes ("Noyes Decl."), ECF No ¶ 21; Third Decl. of Bruce Thompson ("Thompson Decl."), ECF No. 90-2 ¶ 8. Even if the BLM had allowed such access as asserted by Plaintiffs, those isolated incidents would not be sufficient to establish that bait and water traps have been "historically open to the press and general public" as Plaintiffs claim. Plaintiffs' cited case in support of this assertion, *Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002) (citation omitted), specifically notes that a "brief historical tradition might be sufficient . . . *where the beneficial effects of access to that process are overwhelming and uncontradicted.*" *Id*. at 701 (emphasis added) (citation omitted). Here, BLM has explicitly noted that public observation would interfere with BLM's ability to capture horses during bait and water trap

9

operations because wild horses are reluctant to approach a bait/water trap site when there is too much activity or people can be seen. Thompson Decl. ¶ 8; ATB_18053. Moreover, bait and water traps "operate continuously, 24 hours a day" and thus BLM staff cannot feasibly be present at the trap site during the entire operation to ensure the public would not interfere with the gather or ensure public safety if public access were granted. Thompson Decl. ¶ 9. Moreover, as Plaintiffs admit, ECF No. 94 at 14, the number of horses seen per day at bait and water trap sites is small and long periods of time can pass before any horses even show up to the trap site. Thus, even if a few isolated incidents over ten years ago were sufficient to establish a qualified right of access to bait and water traps (they are not), Plaintiffs have failed to show that any beneficial effects of public access to trap sites are overwhelming and uncontradicted.

Even if the Court finds that there is a qualified right of access to bait and water trap sites, restrictions to these operations are narrowly tailored to ensure the safety and effectiveness of gather operations. While Plaintiffs claim there is minimal safety risk at these sites, ECF No. 94 at 14, BLM has emphasized that "there is always the potential for injury when individuals get too close or inadvertently get in the path of gather activities." ATB_18053. And, as explained above, because bait and water traps operate "24 hours a day," even if a viewing area was set up very far back from the trap as Plaintiffs suggest, there is no way BLM staff can ensure the public remains at a designated viewing area during the entire operation. *See* Thompson Decl. ¶ 9.

Second, Plaintiffs' arguments that restrictions to helicopter gathers are not narrowly tailored are similarly unavailing. Despite Plaintiffs' claims, BLM clearly laid out its detailed process for choosing public viewing sites for helicopter gathers, noting that sites for each gather – even if two separate gathers take place in the same area – are chosen on a case-by-case basis. Noyes Decl. ¶ 25. Even assuming Plaintiffs' contention that helicopter gathers in 2011 and 2019 "were conducted in the same manner" is true, ECF No. 94 at 12, Plaintiffs fail to consider that other factors like topography, weather, changes in FAA and contract requirements, where horses are located in relation to the trap, or past gather outcomes could lead BLM to change a public viewing location from one gather to the next. *See* Noyes Decl. ¶¶ 24-25; *see also Leigh v. Salazar*,

954 F. Supp. 2d 1090, 1103 (D. Nev. 2013) ("[A]ll wild horse gather locations are different and present unique challenges to [] BLM and its contractors based on the natural topography and terrain of the location.").

Finally, BLM narrowly tailored restrictions to a 2023 trap that was partially on private land to ensure the safety and effectiveness of gather operations. Despite Plaintiffs' alleged confusion of why a trap on public land could not contain a public viewing area, ECF No. 94 at 16-17, BLM clearly explained that because this trap was on checkerboard land, there is no other way to access the public land other than crossing private land." Thompson Decl. ¶ 11. And while BLM attempted to get the private landowner's permission for the public to cross their land in order to reach the trap, such access was denied. *Id.* at ¶ 6. Despite BLM's inability to set up a viewing area for the trap site itself for one day of the entire gather operation, BLM ensured public viewing access for the remainder of the gather and temporary holding corrals. ECF No. 90 at 29. Thus, the restriction on public viewing of a trap site for one day of a gather operation was narrowly tailored to effectuate BLM's goal of conducting a safe and effective gather operation.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in Defendants' favor and deny Plaintiffs' Motion for Summary Judgment.

Dated: January 12, 2026                    Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

*/s/ Bonnie Ballard*
BONNIE BALLARD, Trial Attorney
(MD Bar No. 2211280027)
Wildlife & Marine Resources Section
Phone: (202) 523-5567
Email: bonnie.m.ballard@usdoj.gov

KYLE LYONS-BURKE, Trial Attorney
(VA Bar No. 92373)
Natural Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Phone: (202) 598-3377
Email: kyle.lyons-burke@usdoj.gov

*Attorneys for Federal Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2026, I electronically filed and served the foregoing with the Clerk of the Court for the United States District Court for the District of Nevada using the CM/ECF system, which will send notification of this filing to the attorneys of record.

*/s/ Bonnie Ballard*
Bonnie Ballard
Attorney for Federal Defendants