UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| WILD HORSE EDUCATION, a non-profit corporation, and LAURA LEIGH, individually, | Case No. 3:23-cv-00372-MMD-CLB |
| Plaintiffs, | ORDER |
| v. | |
| UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and JON RABY, Nevada State Director of the Bureau of Land Management, | |
| Defendants. | |

I.    **SUMMARY**

Plaintiffs[1] challenge Defendants' actions taken under a 2017 Environmental Assessment and Record Decision involving continued maintenance efforts of sustainable wild horse and burro populations in Nevada on the grounds that recent roundups violated the Wild Free-Roaming Horses and Burros Act ("WHA" or "Wild Horses Act"), the National Environmental Policy Act of 1969 ("NEPA"), and the First Amendment. (ECF No. 70 ("Complaint").)[2] Before the Court are the cross-motions (collectively "the Motions") for summary judgment by Plaintiffs (ECF No. 82 ("Plaintiffs' Motion"))[3] and Defendants (ECF

---

[1]Plaintiffs are Wild Horse Education and Laura Leigh. Defendants are United States Department of Interior ("DOI"), Bureau of Land Management ("BLM"), and Jon Raby (Nevada State Director of BLM).

[2]Plaintiffs filed their Fifth Amended Complaint, which is the operative complaint. (ECF No. 70.)

[3]Defendants responded (ECF No. 90), and Plaintiffs replied (ECF No. 94).

1 No. 92 ("Defendants' Motion"))[4].[5] Because the Court agrees with Defendants that the

2 2017 Environmental Assessment and Record Decision are superseded by a new gather

3 plan and record decision, the Court dismisses Plaintiffs' claims as moot and accordingly

4 denies the parties' Motions on the merits as moot.

5 **II.    RELEVANT BACKGROUND[6]**

6        The present dispute revolves around BLM's removal of excess wild horses and

7 burros in the Antelope and Triple B Complexes located in northeastern Nevada under a

8 2017 Decision Record adopting a ten-year gather plan. (ECF No. 70 at 2.) The Complexes

9 are scattered across a northeastern portion of Nevada containing multiple herd

10 management areas ("HMAs"). (*Id.* at 11.) The Antelope Complex contains the Antelope

11 Valley, Antelope, Spruce-Pequop, and Goshute HMAs. (*Id.*) The Triple B Complex

12 contains the Triple B, Maverick-Medicine, and Antelope Valley HMAs as well as the

13 Cherry Spring Wild Horse Territory. (*Id.*; *see also* ECF No. 82-1 at 3.)

14       Wild Horse Education is a national nonprofit focused on research, journalism, and

15 public education related to federal and state management of free-roaming wild horse and

16 burro populations. (ECF No. 70 at 2.) Laura Leigh is the organization's founder and

17 President, and Jon Raby serves as the Nevada State Director of BLM. (*Id.* at 4-5.)

18       **A.    The Wild & Free-Roaming Horses and Burros Act**

19       In 1971, Congress passed the Wild Free-Roaming Horses and Burros Act, 16

20 U.S.C. § 1331, *et seq.*, which provides the statutory authority by which BLM "protect[s]

21 and manage[s] wild, free-roaming horses and burros as components of the public lands."

22 16 U.S.C. § 1333(a). When BLM identifies an overpopulation in a designated HMA and

23 concludes that some action is necessary to remove the excess, the Wild Horses Act

24

25       [4]Plaintiffs responded (ECF No. 93), and Defendants replied (ECF No. 97).

26       [5]Plaintiffs also filed a request for judicial notice (ECF No. 83) of public gather
reports for BLM gathers conducted under the 2017 Gather Plan. (*See* ECF No. 83-1.)
27 Defendants do not oppose the request (*see* ECF No. 77), but they dispute, in part,
Plaintiffs' interpretation of the information in Table 3 of their Motion. (ECF No. 92 at 11-
28 12.) The Court will take judicial notice of the BLM public gather reports.

       [6]The following facts are undisputed unless otherwise noted.

authorizes the agency to gather and remove excess horses. *See* 16 U.S.C. § 1333(b). This management authority is also delegated to the Secretary of the Interior ("Secretary"), who is awarded broad discretion to manage and remove "excess" wild horses and burros from public lands "to achieve and maintain a thriving natural ecological balance." *See* 16 U.S.C. § 1333(a); *see also Am. Horse Prot. Ass'n, Inc. v. Watt*, 694 F.2d 1310, 1316-18 (D.C. Cir. 1982).

### B.    The National Environmental Policy Act (NEPA)

The National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, imposes procedural requirements on federal agencies to help carry out a "national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989); *accord* 42 U.S.C. § 4331. To achieve these policy objectives, NEPA requires agencies to take a "hard look" at the environmental consequences of their planned action ahead of time. *See Kern v. BLM*, 284 F.3d 1062, 1066 (9th Cir. 2002); *see also Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989). This 'hard look' may require an environmental assessment ("EA") to determine whether to prepare an environmental impact statement ("EIS") or issue a finding of no significant impact ("FONSI"). *See id.* at 1067 (internal citations omitted).

### C.    First Amendment Qualified Right of Public Access

The First Amendment grants a "qualified right of access for the press and public to observe government activities." *See Leigh v. Salazar*, 677 F.3d 892, 898 (9th Cir. 2012) [hereinafter *Salazar I*]. This right is governed by a two-step test set forth in *Press-Enter. Co. v. Sup. Ct. of Cal. for Riverside Cnty.*, 478 U.S. 1 (1986). *See id.* First, the court must determine whether a right of access attaches to the government activity by assessing "whether the place and process have historically been open to the press and general public" and "whether public access plays a significant positive role in the functioning of the particular process in question." *Id.* (quoting *Press-Enter.*, 478 U.S. at 8). Second, if a qualified right exists, then the government may abridge that right only if it demonstrates "an overriding interest based on findings that closure is essential to preserve higher

1    values and is narrowly tailored to serve that interest." *Id.* (quoting *Press-Enter.*, 478 U.S.

2    at 9). In the horse-gather context, legitimate "overriding interests" may include the

3    "effective and efficient gather of horses" and the "safety of all individuals," including "those

4    involved in gather activities, members of the viewing public, and the horses themselves."

5    *Leigh v. Salazar* ("*Leigh II*"), 954 F. Supp. 2d 1090, 1101-1103 (D. Nev. Jul. 19, 2013).

6    Here, Plaintiffs' First Amendment claim challenges BLM's restrictions of access to

7    gather operations in the Antelope and Triple B Complex conducted under the 2017 EA,

8    including 2023 and 2024 gather operations. (ECF No. 70 at 10, 17.) Plaintiffs seek to

9    compel meaningful access to future gather operations. (*Id.* at 21.)

10    **D.    Implementation of the Antelope and Triple B Complexes Gather Plan**

11    **and 2017 Environmental Assessment**

12    The parties agree that, in December of 2017, after taking public comment, BLM

13    issued its Final Environmental Assessment (the "2017 EA") of its gather plan (the "Gather

14    Plan") and Decision Record in which it analyzed the potential environmental impacts

15    associated with a proposed gather of excess horses across the Antelope and Triple B

16    Complexes. (ECF No. 70 at 6; *see also* ECF No. 82-1 at 3.) BLM set the appropriate

17    management level[7] ("AML") at a range of 7,852 to 8,626 wild horses across the two

18    complexes. (ECF No. 70 at 13.) Under the Gather Plan, BLM announced its phased

19    approach to "gather and remove approximately 9,053 excess wild horses" of an estimated

20    9,525 wild horses and burros over the course of a ten-year period to "achieve and

21

22

---

23    [7]"AML" refers to "appropriate management levels" and represents the minimum
wild horse population threshold. *See* 16 U.S.C. § 1333(b)(1). In making removal
24    determinations, it is within the Secretary of the Interior's statutory purview to "maintain a
current inventory" and set AMLs for "wild free-roaming horses and burros" to ensure a
25    "thriving natural ecological balance" on public lands and to "protect [] from the
deterioration associated with overpopulation." *See* 16 U.S.C. § 1333(b)(1), (2); *see also*
26    *Dahl v. Clark*, 600 F. Supp. 585, 595 (D. Nev. 1984) ("[T]he test as to appropriate wild
horse population levels is whether such levels will achieve and maintain a thriving,
27    ecological balance on the public lands."). Wild horse and burro management should seek
to balance wild horse and burro populations, wildlife, livestock, and vegetation, and to
28    "protect the range from the deterioration associated with overpopulation of wild horses
and burros." *Animal Prot. Inst. of Am.*, 109 IBLA 112, 115 (1989).

4

1  maintain AML" and to "implement population control measures" in the Antelope and Triple

2  B Complexes. (*Id.* at 6; *see also* ECF No. 82 at 8.)

3       BLM has conducted multiple gathers under the 2017 Gather Plan. (ECF No. 82-1

4  at 6; ECF No. 92 at 12.) The parties agree that BLM conducted 14 different gather

5  operations across the two complexes. (*Id.*) However, the parties dispute the precise

6  number of horses gathered by BLM over this period. That is, Plaintiffs contend that

7  approximately 14,219 wild horses have been permanently removed. (ECF No. 82-1 at 6.)

8  Defendants, in response, question the accuracy of Plaintiffs' numbers and assert that the

9  "precise number" of gatherings under the 2017 EA is "immaterial" because the EA "did

10  not authorize gathering a specific number of horses." (ECF No. 90 at 11-12.) In this

11  matter, Plaintiffs' challenge hinges in part on the contention that BLM improperly deviated

12  from its 2017 Gather Plan when it removed an additional 5,000 wild horses. (*See* ECF

13  No. 94 at 5; *see also* ECF No. 82 at 9-12.)

14      **E.**    **Fall 2025 Gather Plan**

15       On May 29, 2025, about two years after this action was filed, BLM released a

16  Preliminary Environmental Assessment for a new Antelope and Triple B Complexes

17  Gather and HMA Plan ("Preliminary EA"). (ECF No. 92 at 12-13.) BLM held a public

18  comment period on the Preliminary EA, which closed on June 29, 2025. (*Id.* at 13.) In

19  their Motion, filed in August 2025, Defendants stated that a new Fall 2025 decision ("Fall

20  2025 Gather Plan" or "2025 Plan") was forthcoming and, once adopted, would supersede

21  the 2017 EA. (*Id.*) In their reply, filed in January 2026, Defendants assert that the

22  challenged 2017 EA has since been superseded by the 2025 Plan, which issued in

23  September 2025.[8] (ECF No. 97 at 5-6.) As a result, BLM "does not currently anticipate"

24

25

---

26       [8]The Court takes judicial notice of the Fall 2025 Gather Plan issued on September

27  30, 2025 addressing wild horse gathers in the Antelope and Triple B Complexes in northeastern Nevada. *See, e.g.*, Press Release, Bureau of Land Management, BLM Approves Wild Horse Management Plan for Antelope, Triple B Complexes (Sept. 30,

28  2025), https://www.blm.gov/announcement/blm-approves-wild-horse-management-plan-antelope-triple-b-complexes.

1   conducting more gathers under the 2017 EA, and there are no gathers currently

2   scheduled to occur under the 2017 EA. (ECF No. 92 at 12-13.)

3        **F.    This Action**

4        Plaintiffs initially brought this suit in July 2023. (ECF No. 1.) Plaintiffs filed a Fifth

5   Amended Complaint in November 2024 (ECF No. 70) in which they assert three claims.

6   Plaintiffs' first and second claims are brought under the Administrative Procedure Act

7   ("APA"), 5 U.S.C. § 706, alleging violations of the Wild Horses Act and NEPA.[9] (*Id.* at 18-

8   20.) The third claim is for a First Amendment violation based upon Defendants' failure to

9   provide meaningful public viewing of gather operations and access to temporary holding

10  facilities. (*Id.* at 20.) Plaintiffs seek injunctive relief to enjoin implementation of, and to

11  vacate, the 2017 EA and Decision Record, declaratory relief providing that Defendants

12  violated Plaintiffs' First Amendment rights by preventing meaningful public viewing access

13  of gather operations conducted under the 2017 EA, and a court order compelling

14  Defendants to provide meaningful public viewing access to future gathers along with

15  access to off-range holding corrals. (*See id.* at 21.)

16  **III.   DISCUSSION**

17       The parties' Motions seek summary judgment in their favor on all of Plaintiffs'

18  claims. Defendants raised issues of standing and mootness. Standing is a threshold

19  issue, so the Court will address these arguments first. *See Food & Drug Admin. v. All. for*

20  *Hippocratic Med.*, 602 U.S. 367, 378 (2024); *Lance v. Coffman*, 549 U.S. 437, 439 (2007)

21  ("Federal courts must determine that they have jurisdiction before proceeding to the

22  merits."). Plaintiffs assert two types of standing: (1) prudential standing; and (2) Article III

23  standing. (ECF No. 82 at 15-16.) In their Motion, Defendants dispute both forms of

24  standing under the premise that Plaintiffs' claims are or will soon be "moot" when BLM

25  adopts its forthcoming Fall 2025 EA in replacement of the 2017 EA. (ECF No. 92 at 14-

26

27       [9]Plaintiffs argue that BLM exceeded the projected scope authorized under the
2017 Gather Plan and violated NEPA when it gathered more horses than originally
28  estimated to be necessary without issuing a new or supplemental environmental
assessment. (ECF No. 70 at 18-20.)

16.) Because Plaintiffs seek to set aside an agency action (i.e., the 2017 EA) that has since been superseded by the Fall 2025 EA as their primary form of relief, the Court agrees that Plaintiffs' claims are moot.

### A.    Standing

The APA grants prudential standing to individuals "'aggrieved by agency action within the meaning of a relevant statute.'" *See Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153-54 (1970); 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review."). Stated differently, to sue and obtain standing under the APA's § 702, a plaintiff must demonstrate that the alleged harm falls within the "zone of interests" to be protected or regulated by the applicable federal statute. *See, e.g.*, *Ass'n of Data Processing*, 397 U.S. at 153 (holding that competitors to national banks fall within the "zone of interests" that Congress intended to protect under the Bank Services Corporation Act).

Plaintiffs assert prudential standing as to their first and second claims for relief under WHA and NEPA. (ECF No. 82 at 15-17.) Plaintiffs first assert that they fall within the "zone of interests" to be protected by the Wild Horses Act because they are "Americans with an interest in ensuring that wild-free roaming horses are properly managed and treated as an integral part of public lands." (*Id.* at 16; *see generally* ECF No. 82-1.) Under 16 U.S.C. § 1331, congressional findings and declaration of policy for the WHA state that wild horses and burros represent the "living symbols" of the "pioneer spirit of the West" and that they "enrich the lives of the American people" "as an integral part of the natural system of the public lands." The Court agrees that Plaintiffs Wild Horse Education, as an organization, and Leigh, as an individual, represent animal rights groups and wild horse enthusiasts that fit squarely within the "zone of interests" contemplated by the federal statute.

Plaintiffs further assert that they fall within NEPA's "zone of interests" because they allege environmental, aesthetic, and conservational injuries protected by the statute.

1    (ECF No. 82 at 16-17; ECF No. 82-1 at 4-6.) NEPA's "zone of interests" covers

2    environmental injuries, which include, but are not necessarily limited to, detrimental

3    effects upon a plaintiff's "recreational use and aesthetic enjoyment." *See Ecosystem Inv.,*

4    *Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287, 294-95 (5th Cir. 2018) (internal

5    citations omitted); *see also* 42 U.S.C. § 4321. As animal rights groups and wild horse

6    enthusiasts, Plaintiffs possess aesthetic and horse-welfare interests that have been

7    allegedly compromised by BLM's roundup and removal process. (*See* ECF No. 82-1 at

8    4-6.) The Court agrees that Plaintiffs have alleged injuries that fall within the "zone of

9    interests" under NEPA.

10        As to Article III standing, "[t]he irreducible constitutional minimum of standing

11    contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Plaintiffs

12    must show that (1) they have suffered an actual or imminent concrete and particularized

13    injury-in-fact, (2) the injury is "fairly traceable to the challenged action of the defendant,"

14    and (3) it is likely, rather than speculative, that the injury will be redressed by a favorable

15    judicial decision. *See id.* at 560-61. Plaintiffs assert Article III standing as to all three of

16    their claims for relief (ECF No. 82 at 17-20). The Court agrees that Plaintiffs have Article

17    III standing.

18        Defendants raised mootness in response to Plaintiffs' argument as to standing.

19    Defendants dispute Plaintiffs' prudential standing to bring their first and second claims.

20    (ECF No. 92 at 14-15.) In their Motion, Defendants argue Plaintiffs' claims are

21    "prudentially moot" because they concern agency activities carried out under the 2017

22    Gather Plan, which will be superseded by the 2025 Plan. (*Id.* at 15.) Defendants contend

23    that legal challenges to "superseded" or "expired" agency policies or decision documents

24    are "moot" and that BLM's planned adoption of a new gather plan in Fall 2025 will

25    therefore moot the 2017 Gather Plan and any agency actions taken under it. (*Id.* at 15-

26    16; *see also* ECF No. 92-1 at 8.). Defendants similarly dispute Plaintiffs' constitutional

27    standing argument as "soon to be constitutionally moot" in the absence of a "live"

28

8

1    controversy or "legally cognizable interest" for which the Court can fashion a remedy (ECF

2    No. 92 at 14-15, 17). The Court next addresses Defendants' argument as to mootness.

3    **B.    Mootness**

4         Article III limits federal court jurisdiction to "actual, ongoing controversies," *see,*

5    *e.g.*, *Honig v. Doe*, 484 U.S. 305, 317 (1988), and a case becomes moot if it "los[es] its

6    character as a present, live controversy." *See West v. Sec'y of Dep't of Transp.*, 206 F.3d

7    920, 925 (9th Cir. 2000) (rejecting mootness challenge where stage 1 of a highway

8    interchange project was complete, and stage 2 had not yet commenced) (quoting *Hall v.*

9    *Beals*, 396 U.S. 45, 48 (1969)); *see also Grand Canyon Tr. v. U.S. Bureau of*

10   *Reclamation*, 691 F.3d 1008, 1017 (9th Cir. 2012), *as amended* (Sept. 17, 2012)

11   ("[M]ootness requires that an actual, ongoing controversy exist at all stages of federal

12   court proceedings.") (internal citation omitted). The doctrine of mootness contemplates

13   "whether changes in the circumstances that prevailed at the beginning of litigation have

14   forestalled any occasion for meaningful relief." *Id.* at n.4 (quoting Wright & Miller: 13A

15   Federal Practice and Procedure § 3533.3). The rationale behind the doctrine is that, once

16   the challenged conduct ceases, "there is no reasonable expectation that the wrong will

17   be repeated," thereby foreclosing the possibility of "any effectual relief." *See City of Erie*

18   *v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (internal citations omitted). As the Ninth Circuit

19   has held, "[t]he burden of demonstrating mootness is a heavy one."[10] *Nw Envt'l Def. Ctr.*

20   *v. Gordon*, 849 F.2d 1241, 1244 (9th Cir.1988) (internal citations omitted); *see also*

21   *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir. 2001).

22        As mentioned, Defendants argue that, because Plaintiffs' claims are based upon

23   the "now-superseded" 2017 Gather Plan, Plaintiffs' request to vacate and enjoin the

24   implementation of the Plan would provide no effective relief. (ECF No. 90 at 15; ECF No.

25   97 at 6.) Generally, legal challenges to "superseded," "expired," or "withdrawn" agency

---

27   [10]In deciding a mootness issue, the core inquiry is "not whether the precise relief
28   sought at the time the application for an injunction was filed is still available" but, rather, "whether there can be any effective relief" at all. *See Gordon*, 849 F.2d at 1244-45. Stated differently, to meet this burden, one must demonstrate that no "effective relief" remains.

1  policies or decision documents are "moot." *See Pub. Emps. for Env't Resp. v. Nat'l Park*
2  *Serv.*, No. CV 19-3629 (RC), 2021 WL 1198047, at *11 (D.D.C. Mar. 30, 2021); *Native*
3  *Vill. of Nuiqsut v. Bureau of Land Mgmt.*, 9 F.4th 1201, 1210 (9th Cir. 2021) ("[W]hen the
4  environmental report at issue has been superseded, and the federal agencies will rely on
5  a new and different report for the near future, the case is moot.") (internal citations and
6  quotations omitted); *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 661
7  F.3d 66, 79 (D.C. Cir. 2011) (finding as moot superseded agency Record of Decision that
8  had "no current force or effect"). In reply, Plaintiffs fail to directly address Defendants'
9  mootness argument. They simply argue that Defendants have failed to meet their "heavy
10  burden" of demonstrating "no effective relief remains" for the alleged harms and neglect
11  to address the procedural impact of the forthcoming 2025 Plan. (ECF No. 94 at 19.)

12      The Court agrees that, with the Fall 2025 Plan now effectuated, Plaintiffs' claims
13  based on the 2017 EA and Record Decision are "no longer live," and the parties "lack a
14  legally cognizable interest for which the courts can grant a remedy." *See Alaska Ctr. for*
15  *Env't v. U.S. Forest Serv.*, 189 F.3d 851, 854 (9th Cir. 1999) (internal citation omitted);
16  *see also Arizonans for Official English v. Ariz.*, 520 U.S. 43, 45 (1997) ("[A]n actual
17  controversy must be extant at all stages of review, not merely at the time the complaint is
18  filed."). Defendants have thus met their burden of demonstrating mootness by showing
19  that no effective relief can be granted on Plaintiffs' claims, as those claims challenge
20  agency action under the no-longer-effective 2017 Plan.

21      Next, the Court will turn to Defendants' argument that that neither the "voluntary
22  cessation" nor the "capable of repetition, yet evading review" exceptions to the mootness
23  doctrine apply. (ECF No. 92 at 16-17.)

### 1.    Voluntary Cessation Exception

25      Under the "voluntary cessation" exception, "a defendant's voluntary cessation of a
26  challenged practice does not deprive a federal court of its power to determine the legality
27  of the practice," *see Friends of the Earth, Inc. v. Laidlaw Ev't. Servs. (TOC), Inc.*, 528 U.S.
28  167, 189 (2000) (internal citations and quotations omitted), unless "'there is no reasonable

1  expectation that the wrong will be repeated.'" *Pub. Util. Comm'n of State of Cal. v. FERC*,

2  100 F.3d 1451, 1460 (9th Cir. 1996) (internal citations and quotations omitted). The Ninth

3  Circuit has specified that, for this exception to apply, a defendant's voluntary cessation of

4  challenged conduct "must have arisen *because of* the litigation." *See id.* (citing *Nome*

5  *Eskimo Cmty. v. Babbitt,* 67 F.3d 813, 816 (9th Cir.1995)) (emphasis in original).

6         Defendants argue that the exception does not apply because BLM is "not issuing

7  superseding documents" (i.e., in reference to the forthcoming Fall 2025 Plan) in response

8  to this litigation to "evade review"; rather, the new plan is being developed "in the normal

9  course of duties" given the 2017 EA's upcoming expiration date. (ECF No. 92 at 16 (citing

10  *Pub. Util. Comm'n of State of Cal. v. FERC*, 100 F.3d 1451, 1460 (9th Cir. 1996)) ("[I]n

11  order for this exception to apply, the defendant's voluntary cessation must have arisen

12  because of the litigation.").) Plaintiffs counter that Defendants' argument is insincere, as

13  Defendants have acknowledged that "unforeseen" circumstances could arise and warrant

14  more gathers under the 2017 EA. (*See* ECF No. 94 at 21; ECF No. 90 at 15-16; ECF No.

15  92-1 at 8.) Plaintiffs further argue that the Court is provided with little guarantee that "the

16  allegedly wrongful behavior could not reasonably be expected to recur." (ECF No. 94 at

17  21); *see Friends of the Earth, Inc.*, 528 U.S. at 170 (analyzing the "stringent" standard for

18  determining whether a case has been mooted by a party's voluntary conduct).

19         Under these standards, the Court is unpersuaded by Plaintiffs' argument and finds

20  that BLM's decision to adopt the Fall 2025 Plan was not motivated by this litigation, as

21  Plaintiffs suggest. Indeed, BLM's proffered reason that the Fall 2025 Plan was adopted

22  in light of the upcoming expiration of the 2017 Plan (which covered a ten-year period)

23  seems reasonable and not motivated by this action. The voluntary cessation exception to

24  mootness is thus inapplicable.

25            **2.    Capable of Repetition, Yet Evading Review Exception**

26         Defendants contend that the "capable of repetition, yet evading review" exception

27  to the mootness doctrine does not apply either. (ECF No. 92 at 16.) Plaintiffs respond

28  that, because the present case meets the criteria for this exception, this case is not moot.

1   (ECF No. 94 at 22-23.) The Court, however, agrees with Defendants that the exception

2   does not apply.

3          A case is not moot if the action at issue is "capable of repetition, yet likely to evade

4   review." *See Wildwest Inst. v. Kurth*, 855 F.3d 995, 1002 (9th Cir. 2017) (internal citation

5   omitted). In assessing agency actions, the "capable of repetition, yet evading review"

6   ("repetition/evasion") exception to the mootness doctrine applies only where (1) the

7   "duration of a challenged action is too short" to be fully litigated prior to its cessation, and

8   (2) there is a "reasonable expectation" that plaintiffs will again be subjected to the

9   challenged action.[11] *See, e.g.*, *id.* at 1002-03 (internal quotations omitted); *see also*

10  *Wolfson v. Brammer*, 616 F.3d 1045, 1053 (9th Cir. 2010) (internal citation omitted); *S.*

11  *Pac. Terminal Co. v. Interstate Com. Comm'n*, 219 U.S. 498, 515 (1911) (establishing

12  "repetition/evasion" exception to the general principle of mootness).

13         First, the Court considers whether there is a "reasonable expectation" that Plaintiffs

14  would again be subjected to the challenged action under the second prong of the analysis.

15  In their Motion, Defendants argue that Plaintiffs cannot satisfy the second prong because

16  Plaintiffs fail to demonstrate that the "issues they raise with the 2017 documentation will

17  recur," particularly in light of BLM's forthcoming adoption of the 2025 Plan. (ECF No. 92

18  at 16.) The Court agrees. Because the challenged conduct revolves around the 2017

19  Decision Record and EA—which has since been superseded by the 2025 Plan—the

20  Court finds that there is no reasonable expectation that Plaintiffs will again be subjected

21  to the same challenged action, as BLM will rely on the 2025 Plan. Any challenge under

22  the WHA will involve what the 2025 Plan proposes; any challenge under NEPA will involve

23  the environmental impacts BLM considered or failed to consider in adopting that Plan;

24

25

26

27         [11]Under the "capable of repetition" prong of the exception, plaintiffs have the
28  burden of showing a "reasonable expectation that they will once again be subjected to
    the challenged activity." *Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*, 9 F.4th 1201,
    1209 (9th Cir. 2021) (citation omitted).

1   and any challenge to restrictions on public access in violation of the First Amendment will

2   need to be based on any restrictions contemplated in the 2025 Plan.[12]

3         Moreover, Defendants argue that, even if Plaintiffs could show a probable

4   recurrence of the challenged action, they cannot demonstrate that the "duration" of such

5   is "too short to allow full litigation before it ceases." (*Id.* at 17); *see Biodiversity Legal*

6   *Found. v. Badgley*, 309 F.3d 1166, 1173 (9th Cir. 2002) (holding that the duration prong

7   is met only when "the underlying action is almost certain to run its course" before a court

8   can give the case "full consideration") (internal citation omitted). In other words,

9   Defendants contend that Plaintiffs fail to satisfy the duration component of the

10  analysis because the present case has been pending for more than two years, the

11  challenged 2017 EA has been ripe for over eight years, and Plaintiffs can challenge the

12  2025 Plan. (*Id.*) Plaintiffs raise several ripeness concerns, in response, arguing that the

13  duration factor, does, in fact, apply. (ECF No. 94 at 22-23.)

14        As Defendants point out, the majority of Plaintiffs' claims ripened over eight years

15  ago after the 2017 Decision Record and EA first issued, which is "more than enough time

16  for litigants to obtain judicial review." (ECF No. 97 at 8); *see Idaho Dep't of Fish & Game*

17  *v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1071, 1075 (9th Cir. 1995) (holding that the four-

18  year lifespan of an agency's biological opinion ("BO") is not sufficiently short to satisfy the

19  "short duration" requirement and that challenge was rendered moot upon expiration of the

20  BO). The Court agrees that Plaintiffs fail to meet the "short duration" requirement. In sum,

21  Plaintiffs' claims do not evade review, and, as a result, the "capable of repetition, yet

22  evading review" exception to mootness does not apply.

23        Therefore, the Court agrees with Defendants that Plaintiffs' claims, grounded on

24  the 2017 EA and Record Decision, are moot by BLM's adoption of the Fall 2025 Plan.

25  The Court will dismiss Plaintiffs' claims as moot.

26  _____

27  [12]Plaintiffs respond that, because "BLM has not demonstrated an intent to change
    the agency's opinions or alter their operations significantly," Plaintiffs are likely to again

28  be subjected to the challenged conduct. (ECF No. 94 at 19, 23.) The Court is
    unpersuaded by this argument because, as mentioned, the challenged conduct revolves
    around the 2017 EA, which has since been superseded.

1

**IV.    CONCLUSION**

2        The Court notes that the parties made several arguments and cited to several

3   cases not discussed above. The Court has reviewed these arguments and cases and

4   determines that they do not warrant discussion as they do not affect the outcome of the

5   issues before the Court.

6        It is therefore ordered that Plaintiffs' motion for summary judgment (ECF No. 82)

7   is denied as moot.

8        It is further ordered that Defendants' cross-motion for summary judgment (ECF

9   No. 92) on the merits is denied as moot, and granted to the extent Defendants seek

10  dismissal based on mootness.

11       It is further ordered that Plaintiffs' claims are dismissed as moot.

12       The Clerk of Court is directed to enter judgment in accordance with this Order and

13  close this case.

14       DATED THIS 20th Day of February 2026.

15

16

17       _____

18       MIRANDA M. DU
         UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28

14